**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



UNITED STATES OF AMERICA,

v.

TOM ALEXANDER WILLIAM HAYES, and
ROGER DARIN,

*Defendants.*

Case No.  12 MJ 3229

ORIGINAL

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ROGER DARIN'S MOTION TO DISMISS THE CRIMINAL COMPLAINT

Bruce A. Baird
James M. Garland
Alexander A. Berengaut

**COVINGTON & BURLING LLP**

*Attorneys for Defendant Roger Darin*

October 2, 2014

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    PROCEDURAL HISTORY .............................................................................. 3

III.   ARGUMENT ..................................................................................................... 3

     A.     Mr. Darin Lacks a Constitutionally Sufficient Nexus to the United States. ........... 3

          1.     To Establish a Sufficient Nexus, the Government Must Allege That Mr. Darin Aimed to Harm the United States. ............................................. 3

          2.     The Government Has Failed to Allege That Mr. Darin Aimed to Harm the United States. ............................................................................. 4

          3.     The Government's Allegations Fail Under the Minimum Contacts Test Applied in Analogous Civil Suits. ..................................................... 7

          4.     The Government's Complaint Also Violates International Law. ............... 9

               a)     Mr. Darin Lacks a Sufficient Nexus to the United States for Purposes of International Law. ..................................................... 10

               b)     The Prosecution of Mr. Darin Contravenes International Comity. .......................................................................................... 12

     B.     Mr. Darin Did Not Receive Sufficient Notice for Purposes of the Due Process Clause That His Alleged Conduct Was Criminal. .................................... 14

          1.     The Government Must Show That a Foreign Defendant Had Fair Notice That He Could Be Held Criminally Responsible for His Conduct. .................................................................................................. 14

          2.     The Government Cannot Establish That Roger Darin Had Fair Notice That His Alleged Conduct Could Expose Him to Criminal Liability. ................................................................................................... 15

     C.     The Complaint Must Also Be Dismissed Under the Presumption Against Extraterritoriality ................................................................................................. 17

IV.   CONCLUSION ................................................................................................ 18

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Al Kassar v. United States*,
  Nos. 13-CV-3541, 07-CR-354, 2014 WL 1378772 (S.D.N.Y. Apr. 8, 2014).......................4, 9

*Bouie v. City of Columbia*,
  378 U.S. 347 (1964)..............................................................................................................14

*Empire Blue Cross & Blue Shield v. Finkelstein*,
  111 F.3d 278 (2d Cir. 1997)................................................................................................18

*European Cmty. v. RFR Nabisco, Inc.*,
  — F.3d —, 2014 WL 4085863 (2d Cir. Aug. 20, 2014) ......................................................18

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004)..............................................................................................................12

*Fehlhaber v. Fehlhaber*,
  681 F.2d 1015 (5th Cir. 1982) ...............................................................................................9

*In re Grand Jury Subpoenas*,
  179 F. Supp. 2d 270 (S.D.N.Y. 2001)...................................................................................18

*Harris v. Mexican Specialty Foods, Inc.*,
  564 F.3d 1301 (11th Cir. 2009) ..............................................................................................9

*In re Hijazi*,
  589 F.3d 401 (7th Cir. 2009) ...........................................................................................9, 18

*J. McIntyre Machinery, Ltd. v. Nicastro*,
  131 S. Ct. 2780 (2011)............................................................................................................8

*Kiobel v. Royal Dutch Petroleum Co.*,
  133 S. Ct. 1659 (2013)..........................................................................................................17

*Leasco Data Processing Equip. Corp. v. Maxwell*,
  486 F.2d 1326 (2d Cir. 1972).............................................................................................7, 8

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co. Ltd.*,
  No. 12-CV-7465, 2013 WL 2099227 (S.D.N.Y. May 14, 2013) ...........................................11

*Minn-Chem, Inc. v. Agrium, Inc.*,
  683 F.3d 845 (7th Cir. 2012), *cert. dismissed*, 134 S. Ct. 23 (2013).........................................12

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010)..............................................................................................3, 7, 17, 18

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992)..........................................................................................................11

*Samantar v. Yousuf*,
  130 S. Ct. 2278 (2010)........................................................................................................5

*S.E.C. v. Sharef*,
  924 F. Supp. 2d 539 (S.D.N.Y. 2013).................................................................................8

*In re Terrorist Attacks on Sept. 11, 2001*,
  538 F.3d 71 (2d Cir. 2008)..................................................................................................5

*In re Terrorist Attacks on Sept. 11, 2001*,
  718 F. Supp. 2d 456 (S.D.N.Y. 2010).................................................................................6

*United States v. Ahmed*,
  No. 10-CR-131, 2011 WL 5041456 (S.D.N.Y. Oct. 21, 2011) ................................14

*United States v. Ahmed*,
  No. 10-CR-131, 2012 WL 983545 (S.D.N.Y. Mar. 22, 2012) ................................17

*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011).................................................................................*passim*

*United States v. Bin Laden*,
  92 F. Supp. 2d 189 (S.D.N.Y. 2000)..............................................................................14, 15

*United States v. Caicedo*,
  47 F.3d 370 (9th Cir. 1995) ..............................................................................................12

*United States v. Cardales*,
  168 F.3d 548 (1st Cir. 1999)..............................................................................................10

*United States v. Davis*,
  905 F.2d 245 (9th Cir. 1990) ..............................................................................................9

*United States v. Gatlin*,
  216 F.3d 207 (2d Cir. 2000)..............................................................................................14

*United States v. Ibarguen-Mosquera*,
  634 F.3d 1370 (11th Cir. 2011) .........................................................................................10

*United States v. Javino*,
  960 F.2d 1137 (2d Cir. 1992)............................................................................................13

*United States v. Klimavicius-Viloria,*
   144 F.3d 1249 (9th Cir. 1998) ........................................................................................3, 4, 7

*United States v. Mostafa,*
   965 F. Supp. 2d 451 (S.D.N.Y. 2013)..................................................................................4, 6

*United States v. Perlaza,*
   439 F.3d 1149 (9th Cir. 2006) ............................................................................................5, 6

*United States v. Saac,*
   632 F.3d 1203 (11th Cir. 2011) ...........................................................................................14

*United States v. Vilar,*
   729 F.3d 62 (2d Cir. 2013)...................................................................................................17

*Wilder v. News Corp.,*
   No. 11-CV-4947, 2014 WL 1315960 (S.D.N.Y. Mar. 31, 2014) .............................................8

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980)................................................................................................................4

**Statutes**

18 U.S.C. § 1343.............................................................................................................2, 15, 17

18 U.S.C. § 1349....................................................................................................................17

**Additional Authorities**

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402....................................................10, 13

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 403.............................................10, 12, 13

## I.    INTRODUCTION

Before this Court is an unprecedented attempt to expand the extraterritorial reach of the United States criminal law.  The Government has charged Roger Darin, a foreign national, with conspiring to manipulate a foreign financial benchmark, for a foreign currency, while working for a foreign bank, in a foreign country.  The *only* nexus between Mr. Darin's alleged conduct and the United States is the fact that the financial benchmark at issue, the London Interbank Offered Rate ("Libor") for Yen, was ultimately published by third parties in the United States — along with virtually every other country in the world.  If the Government's sweeping theory is accepted, then federal law could be used to prosecute any foreign national, acting outside the United States, who has affected any piece of financial information that can be accessed through the Internet.  The Constitution does not permit such prosecutorial overreach.

Libor is a benchmark interest rate that, prior to January 2014, was administered by the British Bankers' Association ("BBA"), a private trade association based in London.[1]  Libor is determined by the BBA based on information provided by a panel of member banks, each of which provided a daily submission to the BBA with its opinion as to the hypothetical estimated rates at which the bank could borrow funds in the inter-bank market in London.[2]  For Yen Libor during the relevant time period, sixteen banks submitted their opinions to the BBA and its agent, Thomson Reuters, in London.  Thomson Reuters then eliminated the four highest and the four lowest submissions and averaged the remaining opinions to derive the Yen Libor figures for that

---

[1]     Responsibility for the administration of Libor was transferred to the Intercontinental Exchange, Inc. in early 2014.

[2]     Specifically, member banks are asked to respond to the following question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"  *See* BBA LIBOR: HISTORICAL PERSPECTIVE, *available at* http://www.bbalibor.com/explained/historical-perspective; *see also* ICE BENCHMARK ADMINISTRATION, *available at* https://www.theice.com/iba/libor (same question).

day. Once the Yen Libor opinion averages (or "fixings") were calculated, they were published by Thomson Reuters in London.

Roger Darin is a citizen of Switzerland who has never resided in the United States. The Government alleges that during the relevant time period, Mr. Darin was employed by UBS, a Swiss financial services company, in its Singapore, Tokyo, and Zurich offices. His primary responsibility was trading Yen-denominated short-term interest rate derivative products. In addition, Mr. Darin was allegedly responsible for UBS's Yen Libor submissions to the BBA.

The Complaint alleges that Mr. Darin conspired with another UBS employee, Tom Hayes, to commit wire fraud in violation of 18 U.S.C. § 1343 by agreeing to submit Yen Libor opinions that would benefit Mr. Hayes' trading positions. The Complaint does *not* allege that Mr. Darin aimed this conduct at the United States, its citizens, or its interests. Nor does it allege that Mr. Darin had any basis to understand that this conduct would subject him to criminal prosecution in *any* country, let alone the United States.

The Government's failure to allege these facts is fatal to its Complaint. Where, as here, a foreign defendant is charged for conduct taking place outside the United States, the Due Process Clause of the Fifth Amendment requires that the defendant both (i) have a "sufficient nexus" to the United States; and (ii) receive "fair notice" that the alleged conduct was criminal. The Government's attempt to prosecute Mr. Darin in a country with which he has *no* connection, for conduct that has *never* before been deemed criminal, fails both of these requirements.

These constitutional deficiencies require dismissal of the Complaint. But they are not the only flaws in the Government's attempt to extend U.S. law to reach Mr. Darin's alleged foreign conduct. The Complaint must also be dismissed under the presumption against extraterritoriality because neither the conspiracy nor the wire fraud statutes under which Mr. Darin was charged

contain a clear indication that they were intended to apply outside the United States. *See*

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a statute gives no clear

indication of an extraterritorial application, it has none.").

## II.     PROCEDURAL HISTORY

On December 12, 2012, the Government filed a criminal complaint with this Court

seeking an arrest warrant for Mr. Darin (Dkt. 1 and attached to the Declaration of Bruce A. Baird

as Exhibit A) ("Compl."). On the same day, the Court ordered that the Complaint be filed under

seal. On December 19, 2012, the Court ordered that the Complaint be unsealed pending further

order of the Court (Dkt. 4). There have been no public filings in Mr. Darin's case since

December 19, 2012. Now, after waiting more than 18 months with his life on hold, Mr. Darin

respectfully submits this motion to dismiss the Complaint.

## III.    ARGUMENT

### A.     Mr. Darin Lacks a Constitutionally Sufficient Nexus to the United States.

#### 1.     To Establish a Sufficient Nexus, the Government Must Allege That Mr. Darin Aimed to Harm the United States.

When the Government seeks to prosecute a non-citizen for conduct occurring entirely

abroad, the Fifth Amendment requires "a sufficient nexus between the defendant and the United

States, so that such application [of the criminal law] would not be arbitrary or fundamentally

unfair." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (internal quotation marks

and citation omitted). This "sufficient nexus" test in the criminal context "serves the same

purpose as the 'minimum contacts' test in [civil] personal jurisdiction. It ensures that a United

States court will assert jurisdiction only over a defendant who 'should reasonably anticipate

being haled into court' in this country." *United States v. Klimavicius-Viloria*, 144 F.3d 1249,

3

1257 (9th Cir. 1998) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

In the Second Circuit, courts have focused this due process analysis on whether "the *aim* of [the defendant's] activity is to cause harm inside the United States or to U.S. citizens or interests." *Al Kassar*, 660 F.3d at 118 (emphasis added); *id.* at 119 ("Jurisdictional nexus is determined by the aims of the conspiracy, not by its effects."). In *Al Kassar*, the "intent to harm what [the defendant] believed to be U.S. assets was the crux of the relevant inquiry...." *Al Kassar v. United States*, Nos. 13-CV-3541, 07-CR-354, 2014 WL 1378772, at *8 (S.D.N.Y. Apr. 8, 2014) (considering Al Kassar's habeas petition). Similarly, in *United States v. Mostafa*, this Court held that when analyzing whether a "sufficient nexus" exists, "the *determinative issue* is whether defendant's actions were calculated to harm American citizens and interests." 965 F. Supp. 2d 451, 459 (S.D.N.Y. 2013) (emphasis added), *reconsideration denied* (Oct. 22, 2013).

### 2.   The Government Has Failed to Allege That Mr. Darin Aimed to Harm the United States.

The Government in this case has not alleged — and cannot establish — that Mr. Darin's actions "were calculated to harm American citizens and interests." *Id.* Mr. Darin is a Swiss citizen and resident. At all times relevant to the Government's allegations, Mr. Darin was located outside the United States. The charged conduct occurred while he was employed by a Swiss bank trading financial products denominated in Yen. Mr. Darin's alleged role in the conspiracy consisted of causing UBS's Yen Libor opinion to be submitted to the agent of a trade association in the United Kingdom. No aspect of Mr. Darin's allegedly wrongful conduct, in other words, was directed towards the United States, its currency, or any U.S. person or interest.

4

Two allegations in the Complaint appear directed at establishing a sufficient nexus between Mr. Darin and the United States: (1) that Mr. Hayes "entered into trades with a counterparty based in Purchase, New York"; and (2) that Mr. Darin, amongst others, "caused the publication of manipulated interest rate information in New York." Compl. ¶ 2. Neither of these allegations establishes a sufficient nexus between Mr. Darin and the United States for purposes of the Fifth Amendment.

With respect to the first allegation, the Government cannot bootstrap Tom Hayes' connections with the United States to establish a sufficient nexus for Roger Darin. Due process is a threshold standard that demands fairness to the individual defendant; it cannot be satisfied by applying vicarious bases of criminal liability such as conspiracy or aiding and abetting. As the Ninth Circuit explained in *United States v. Perlaza*:

> Relying on the theory of aiding and abetting does not vitiate the need to consider the underlying bases for jurisdiction…. Aiding and abetting is a substantive area of criminal law that allows courts to punish vicariously a defendant who, in some way, associates himself with an illegal venture, participates in it as in something he wishes to bring about, and seeks by his actions to make it succeed. *The ability of a United States court to exercise jurisdiction over that particular defendant, however, is a preliminary determination totally distinct from the crime itself and must be considered before any United States court or jury may determine whether the defendant acted as a principal or an aider and abettor.*

439 F.3d 1149, 1168–69 (9th Cir. 2006) (emphasis added) (internal citations omitted).

The Ninth Circuit's analysis in the criminal context mirrors the approach followed by the Second Circuit in the civil context. The Second Circuit expressly rejected a "concerted action theory of liability" as a basis for establishing personal jurisdiction over foreign defendants whose conduct was not "expressly aimed" at causing effects within the United States, even if they "could and did foresee" those effects. *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 94–95 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 130 S. Ct. 2278 (2010) (internal quotation marks and citation omitted). On remand, the district court in *In re Terrorist*

5

*Attacks* made clear that the Second Circuit's rejection of plaintiffs' "concerted action theory of liability," foreclosed any attempt to establish personal jurisdiction through application of conspiracy doctrine. *See* 718 F. Supp. 2d 456, 482 (S.D.N.Y. 2010) (noting that "both civil conspiracy and aiding-abetting are theories of concerted liability" and "[t]he Second Circuit explicitly found that a concerted action-based theory of jurisdiction ... would not support the exercise of jurisdiction over a foreign defendant").

As for the allegation that Mr. Darin caused manipulated interest rate information to be published in New York, this allegation fails under a straightforward application of *Al Kassar* and *Mostafa*. The Government alleges that Mr. Darin was responsible for UBS's Yen Libor submission to Thomson Reuters, the BBA's agent, in London. Compl. ¶¶ 10, 16. Thomson Reuters, in turn, calculated the Yen Libor numbers based on contributions from sixteen panel banks and published the information worldwide. *Id.* ¶ 10. Given the number of countries in which Yen Libor is published, the Government could not plausibly allege that Thomson Reuters "aim[ed]" its activity at the United States, let alone that Mr. Darin did so. *Al Kassar*, 660 F.3d at 118. Because the Government has not alleged (and cannot establish) that Mr. Darin's actions were aimed at the United States — as opposed to any of the scores of other countries in which Yen Libor is published — the Fifth Amendment bars his prosecution.

The cases in which the "sufficient nexus" test has been applied have mainly involved terrorism, arms, and drug trafficking. Unlike the financial misconduct allegedly committed by Mr. Darin, these cases all involved a manifest intent to harm the United States. In the one case in which the Government failed to allege a sufficient nexus, *Perlaza*, the court did not hesitate to dismiss the indictment. *See* 439 F.3d at 1168–69. This Court should do the same.

3.    **The Government's Allegations Fail Under the Minimum Contacts Test Applied in Analogous Civil Suits.**

While it is the due process standard for criminal cases articulated in *Al Kassar* that requires this Court to dismiss the Complaint, there is additional support for this conclusion in factually similar cases from the civil context.  The civil "minimum contacts" analysis, which is regularly applied to allegations of complex financial conduct, confirms that the Government's Complaint fails to pass constitutional muster.  *See Klimavicius-Viloria*, 144 F.3d at 1257 (noting that the "sufficient nexus" test in the criminal context "serves the same purpose as the 'minimum contacts' test in [civil] personal jurisdiction.").

In *Leasco Data Processing Equipment Corp. v. Maxwell*, for example, the Second Circuit barred a civil plaintiff from doing precisely what the Government seeks to do here — namely, establish jurisdiction over a foreign defendant who did not specifically aim his allegedly false and misleading statements towards the United States.  468 F.2d 1326, 1342 (2d Cir. 1972), *abrogated on other grounds by Morrison*, 561 U.S. 247.  In *Leasco*, the plaintiffs alleged that the defendants conspired to cause them to purchase stock in a British publisher at inflated prices.  *Id.* at 1330.  Among the defendants was a British accounting firm, which allegedly certified the false financial statements upon which the plaintiffs relied.  *Id.* at 1331–32.  The plaintiffs argued that jurisdiction existed in the United States because the accounting firm "must have known that its reports on [the publisher] would be relied on by anyone interested in buying [its] shares." *Id.* at 1342.  Chief Judge Friendly disagreed, observing that:

> On that basis accountants operating solely in London could be subjected to personal jurisdiction in any country whose citizen had purchased stock of a company they had audited; the same would be true, of course, of accountants operating solely in the United States. *Although such worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process.*

*Id.* at 1342 (emphasis added).  In other words, the defendant's general knowledge that his conduct would affect other countries is insufficient.  In order to establish "minimum contacts," the defendant's intent must be specifically aimed at a particular country — *i.e.,* "[he] must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him," rather than know generally that his conduct could have effects anywhere.  *Id.* at 1341.

Since *Leasco*, courts have repeatedly rejected the argument that foreign defendants are subject to jurisdiction in the United States because they knew of "worldwide reliance" on financial information that they disseminated.  As this Court recently explained, even if it is "generally foreseeable" that investors will rely on statements made in other countries, jurisdiction may not be premised on such diffuse potential effects.  *See Wilder v. News Corp.*, No. 11-CV-4947, 2014 WL 1315960, at *1, *6 (S.D.N.Y. Mar. 31, 2014) (dismissing complaint against Rebekah Brooks, former editor of *News of the World*, for making false and misleading statements in the United Kingdom to conceal the now-defunct tabloid's illegal newsgathering tactics).  Even where the defendant's conduct involves complex financial activity, "defendants must have 'followed a course of conduct *directed* at … the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct.'"  *S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 545 (S.D.N.Y. 2013) (emphasis added) (quoting *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011)).

Here, the Government has alleged that Libor "is the primary global benchmark for short-term interest rates" and that "[m]any financial institutions, mortgage lenders, and credit card agencies set their own rates relative to LIBOR."  Compl. ¶ 7.  But even if the Government were correct that *Yen* Libor is used in financial transactions worldwide — and even if Mr. Darin could

8

have foreseen that the Yen Libor fixings would be published (and relied upon) in the United States among other countries — these allegations amount to nothing more than the "worldwide reliance" theory of jurisdiction rejected in *Leasco*. The Government has not alleged that Mr. Darin's actions were aimed at the United States in any way, nor that he had knowledge that his conduct would produce specific effects in this country. Were this a civil action, the Government's Complaint would fail under these well-established principles. Given that this is a *criminal* action, in which Mr. Darin's due process interests are heightened, there can be no doubt that the Complaint has failed to properly allege a sufficient nexus. *See Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1312 n.9 (11th Cir. 2009) ("[G]reater due process protection is required in the criminal context than in the civil context."); *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1027 (5th Cir. 1982) ("The due process requirements in a civil case where only property interests are at stake are, of course, much less stringent than in a criminal case involving life and liberty interests.").

### 4.    The Government's Complaint Also Violates International Law.

Finally, the Complaint against Mr. Darin violates international law, which other Circuits have found relevant in assessing whether an extraterritorial prosecution comports with the Fifth Amendment. *See, e.g.*, *In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009) (noting that Sections 402 and 403 of the Restatement (Third) of Foreign Relations Law provide guidance on whether a foreign defendant's contacts with the United States are sufficient to sustain a prosecution for purposes of due process); *United States v. Davis*, 905 F.2d 245, 249 n.2 (9th Cir. 1990). The Court need not reach this issue under the *Al Kassar* standard — which turns on the straight-forward question whether the defendant had the "*intent* to harm" U.S. citizens or interests, 2014 WL 1378772, at *8 (emphasis added) — but it provides yet another reason for concluding that the Government's prosecution of Mr. Darin is arbitrary and fundamentally unfair.

9

a)   **Mr. Darin Lacks a Sufficient Nexus to the United States for Purposes of International Law.**

International law imposes limitations on a State's power to regulate conduct taking place outside its territory. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402(1)(C) ("RESTATEMENT") ("Subject to § 403, a state has jurisdiction to prescribe law with respect to ... conduct outside its territory that has or is intended to have substantial effect within its territory."); *see also id.* § 403(1) ("[A] state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable.").[3]  In determining whether a particular exercise of extraterritorial jurisdiction is unreasonable, the Restatement urges courts to consider the "link of the activity to the territory of the regulating state" and "the extent to which the activity takes place within the territory, or has *substantial, direct, and foreseeable effect* upon or in the territory." *Id.* § 403(2)(a) (emphasis added).

The Complaint against Mr. Darin fails this standard.  First, the alleged conduct did not "take[] place within the territory" of the United States.  The Government alleges that during the

---

[3]      Section 402 also provides that a state has jurisdiction to prescribe law with respect to "certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests." RESTATEMENT § 402(3). This basis of jurisdiction, sometimes referred to as the "protective principle," applies to "a limited class of offenses . . . directed against the security of the state or other offenses threatening the integrity of governmental functions that are generally recognized as crimes by developed legal systems." RESTATEMENT § 402, comment (f).  Courts have exercised extraterritorial jurisdiction based on this principle only when the defendant's conduct caused, or aimed to cause, harm to the *state itself,* as opposed to citizens of that state. *See, e.g., United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1379 n.5 (11th Cir. 2011) ("Under the protective principle, Congress may criminalize behavior that may threaten the security of the United States."); *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999) ("In addition, under the 'protective principle' of international law, a nation is permitted 'to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security.'") (internal citation omitted).  This basis of jurisdiction is accordingly irrelevant.

relevant time period, Mr. Darin was working for UBS in Japan, Singapore, and Switzerland. Compl. ¶ 16.

Second, Mr. Darin's alleged conduct did not have a "direct" effect on or in U.S. territory. As courts have explained in analogous contexts, to qualify as "direct," an effect must "follow[] as an immediate consequence of the defendant's activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (interpreting the term "direct" in the Foreign Sovereign Immunities Act); *accord Lotes Co., Ltd. v. Hon Hai Precision Indus. Co. Ltd.*, No. 12-CV-7465, 2013 WL 2099227, at *7 (S.D.N.Y. May 14, 2013) (same interpretation in the context of the Foreign Trade Antitrust Improvements Act). "But for" causation is insufficient, as are "secondary and indirect effects" that occur as "the by-product of numerous factors." *See Lotes Co., Ltd.*, 2013 WL 2099227, at *8–*9 (internal quotation marks and citations omitted).

The Complaint does not come close to passing this test. According to the Government, the alleged conspiracy between Mr. Hayes and Mr. Darin involved the following steps: (1) Mr. Hayes would submit requests to Mr. Darin or one of his subordinates; (2) Mr. Darin allegedly considered these requests in supervising the submission of UBS's daily Libor opinions; (3) Mr. Darin or his subordinates caused the transmission of UBS's Libor submission to Thomson Reuters, the agent for the BBA during the relevant time period, in London; (4) Thomson Reuters collected submissions from fifteen other banks and eliminated the top four and bottom four submissions, such that on any given day, an individual bank could not predict whether its contribution would be included in the final fixing; and (5) after averaging the remaining eight banks' submissions, Thomson Reuters published the final Yen Libor fixings.

As this attenuated chain of causation demonstrates, even if UBS's submission did affect the ultimate Yen Libor fixing on a particular day — and even if the publication of that particular

fixing caused an injury to a person in the United States — it did so only through "a House-that-Jack-Built situation in which action in a foreign country filters through many layers and finally causes a few ripples in the United States." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 860 (7th Cir. 2012), *cert. dismissed*, 134 S. Ct. 23 (2013).[4] This is the very opposite of a direct effect.

### b) The Prosecution of Mr. Darin Contravenes International Comity

The Complaint against Mr. Darin also contravenes the principle of international comity, which counsels courts to "avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004). International comity is embodied in the reasonableness requirement in Section 403 of the Restatement. *See* RESTATEMENT § 403, comment (a).

Comity concerns are particularly acute in the criminal context, where the cross-border application of U.S. law is most likely to offend a foreign sovereign. As the Ninth Circuit has explained:

> [P]unishing a crime committed on foreign soil … is an intrusion into the sovereign territory of another nation. As a matter of comity and fairness, such an intrusion should not be undertaken absent proof that there is a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests.

*United States v. Caicedo*, 47 F.3d 370, 372 (9th Cir. 1995); *see also* RESTATEMENT § 403 rptr. n.8 (cautioning that criminal jurisdiction may be "perceived as particularly intrusive" and therefore "should be exercised more sparingly than civil jurisdiction over the same activity, and

---

4    "This is the House That Jack Built" is a Mother Goose nursery rhyme and cumulative tale that states, in representative part, that "This is the man all tattered and torn, that kissed the maiden all forlorn, that milked the cow with the crumpled horn, that tossed the dog, that worried the cat, that killed the rat, that ate the malt, that lay in the house that Jack built." *Available at* http://www3.amherst.edu/~rjyanco94/literature/mothergoose/rhymes/thisisthehousethatjackbuilt. html.

only upon strong justification").  Accordingly, assertion of extraterritorial criminal jurisdiction "has been infrequent" and "has generally been limited to serious and universally condemned offenses, such as treason or traffic in narcotics, and to offenses by or against military forces." RESTATEMENT § 403 rptr. n.8.

In this case, there are at least three countries that — unlike the United States — have a potential international law basis for asserting jurisdiction over Mr. Darin's alleged crime.  Japan Singapore, or Switzerland could assert jurisdiction on the ground that, according to the Complaint, Mr. Darin was working within their respective territories during the relevant time period.  *See* Compl. ¶ 16; *see also* RESTATEMENT § 402(1)(a) (providing that a state has jurisdiction over "conduct that, wholly or in substantial part, takes place within its territory").  Switzerland could potentially also assert jurisdiction on the basis that Mr. Darin resides in Switzerland and is a Swiss national.  *See id.* § 402(2) (providing that a state has jurisdiction over "the activities, interests, status, or relations of its nationals outside as well as within its territory").

Here, in contrast, the United States asserts the right to reach into Swiss territory, to prosecute a Swiss national living in Switzerland, for conduct that took place in other non-U.S. countries.  The risk of undue interference with these other countries' right to independently regulate their own citizens and conduct taking place within their own territory is plain.  *See, e.g.*, *United States v. Javino*, 960 F.2d 1137, 1143 (2d Cir. 1992) (stating that even if Congress had intended the National Firearms Act to apply extraterritorially, doing so would likely be unreasonable as a matter of international law "[i]n light of the substantial interests that other countries have in regulating the manufacture of firearms within their own borders").

13

**B.    Mr. Darin Did Not Receive Sufficient Notice for Purposes of the Due Process Clause That His Alleged Conduct Was Criminal.**

    **1.    The Government Must Show That a Foreign Defendant Had Fair Notice That He Could Be Held Criminally Responsible for His Conduct.**

In addition to requiring a "sufficient nexus" between the defendant and the United States, the Due Process Clause also requires that foreign defendants receive fair warning that their conduct could expose them to criminal liability. "The idea of fair warning is that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Al Kassar*, 660 F.3d at 119 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). In the international context, "[f]air warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Id.*; *see also United States v. Ahmed*, No. 10-CR-131, 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011) (considering a due process challenge based on lack of fair warning in the context of a motion to dismiss); *United States v. Bin Laden*, 92 F. Supp. 2d 189, 218 (S.D.N.Y. 2000) (same), *abrogated on other grounds by United States v. Gatlin*, 216 F.3d 207, 212 n.6 (2d Cir. 2000).

In analyzing due process claims by foreign defendants based on a lack of notice, courts in the Second Circuit and elsewhere have considered whether the alleged acts are "self-evidently criminal," *Ahmed*, 2011 WL 5041456, at *3 (internal quotation marks and citation omitted), or, as the Eleventh Circuit has put it, "condemned universally by law-abiding nations." *United States v. Saac*, 632 F.3d 1203, 1210 (11th Cir. 2011) (internal quotation marks omitted). To the extent that a given crime is universally condemned, a defendant cannot reasonably complain that he did not know his conduct would render him subject to prosecution. *See Bin Laden*, 92 F.

Supp. 2d at 218 (defendant could not reasonably be surprised to learn that "mass murder was illegal in the United States or anywhere else"). By the same token, however, where an alleged crime is not self-evidently criminal and is not universally condemned, constitutionally sufficient notice is less likely to exist.

2. **The Government Cannot Establish That Roger Darin Had Fair Notice That His Alleged Conduct Could Expose Him to Criminal Liability.**

Far from being "universally condemned," the allegedly criminal conduct charged against Mr. Darin is premised on an unprecedented theory of criminal liability. To determine Yen Libor during the relevant time period, the BBA asked banks on the panel to submit their opinion as to the hypothetical estimated rate at which they might be able to borrow a reasonable amount of funds in London at a particular moment in time, assuming anyone was willing to lend it to them. UBS's Yen Libor submissions were thus opinions in response to a hypothetical question, not representations of fact or even statements of opinion *about* a concrete fact. The BBA itself has acknowledged that Libor rates are "not necessarily based on actual transactions." *See* BBA LIBOR: THE BASICS, *available at* http://www.bbalibor.com/explained/the-basics.

At the time Mr. Darin was allegedly supervising the employees that set UBS's Yen Libor submission, no defendant had ever been prosecuted — by the U.S. or any other country — for the manipulation of Libor. This is not surprising, given that Libor submissions are statements of opinion regarding a hypothetical question, not statements of fact that can be true or false. But even assuming that UBS's Yen Libor submissions *could* substantiate a charge under the wire fraud statute, 18 U.S.C. § 1343, there is no question that Mr. Darin could not have reasonably anticipated the novel theory of liability that has been asserted against him.

In fact, the European Commission — a jurisdiction with far stronger ties to Libor than the U.S. — has implicitly recognized that such behavior was *not* criminalized during the relevant

15

time period.  In July 2012, the Commission proposed legislation to criminalize Libor

manipulation, noting that the proposed amendments were necessary because benchmarks such as

Libor were not covered by proposed legislation under consideration since 2011.  *See* European

Comm'n Mem. at 1, Memo/12/595 (July 25, 2012) ("Given that benchmarks are not currently

explicitly covered by these proposals, the Commission has concluded that direct manipulation of

benchmarks does not fall within the scope of either proposal."), *available at*:

http://europa.eu/rapid/press-release_MEMO-12-595_en.htm.

  The absence of fair notice is also reflected in the specific facts alleged against Mr. Darin.

Nowhere in the Complaint is there any suggestion that Mr. Darin knew, or could have reasonably

understood, that his alleged conduct could subject him to criminal prosecution.  There is also no

allegation that Mr. Darin received training about potential criminal risks of influencing UBS's

Yen Libor submissions, or that he received instructions, guidance, or warnings from his

supervisors to this effect.

  At most, the Complaint alleges that Mr. Darin believed that Tom Hayes' conduct could

have caused the BBA to ban UBS from the Yen Libor panel.  *See* Compl. ¶ 21(d)(ii) (alleging

that Mr. Darin stated that "he could not set too far away from the 'truth' or he would risk getting

UBS 'banned' from the Yen LIBOR panel").  Rather than support the Government's position,

however, this statement is further reason to conclude that Mr. Darin did not have reasonable

notice that his conduct was proscribed by any government or regulatory body.  Had Mr. Darin

believed that assisting Mr. Hayes would expose him to criminal liability, his primary concern

would have doubtless been the risk to his own liberty — not UBS's standing with the Yen Libor

panel.  As this alleged chat demonstrates, the most serious consequence Mr. Darin could

reasonably foresee was sanction of his employer by the BBA. No existing laws or regulations alerted him to the potential for criminal prosecution.

### C.  The Complaint Must Also Be Dismissed Under the Presumption Against Extraterritoriality.

Lastly, the Complaint against Mr. Darin should be dismissed because it involves an unauthorized extraterritorial application of the conspiracy and wire fraud statutes. Under the "canon of statutory interpretation known as the presumption against extraterritorial application ... '[w]hen a statute gives no clear indication of an extraterritorial application, it has none.'" *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (quoting *Morrison*, 561 U.S. at 255). "This presumption serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id.* (internal quotation marks and citation omitted).[5]

The statutes under which Mr. Darin was charged contain no "clear indication of an extraterritorial application." The relevant conspiracy statute, 18 U.S.C. § 1349, says nothing about extraterritorial application. And even if the Court looked past the conspiracy statute to the underlying substantive offense, *see United States v. Ahmed*, No. 10-CR-131, 2012 WL 983545, at *2 (S.D.N.Y. Mar. 22, 2012), the wire fraud statute, 18 U.S.C. § 1343, *also* contains no clear indication of extraterritorial application. The only language in the wire fraud statute that even arguably supports an extraterritorial interpretation is its reference to transmissions "in interstate *or foreign commerce.*" 18 U.S.C. § 1343 (emphasis added). But as the Supreme Court observed in *Morrison*, a "general reference to foreign commerce ... does not defeat the presumption

---

[5]     "[T]he general rule is that the presumption against extraterritoriality applies to criminal statutes," except for the limited category of statutes—not relevant here—"where the law at issue is aimed at protecting the right of the government to defend itself." *United States v. Vilar*, 729 F.3d 62, 73-74 (2d Cir. 2013) (internal quotation marks omitted).

against extraterritoriality." 561 U.S. at 248 (internal citation omitted); *see also European Cmty.*

*v. RFR Nabisco, Inc.*, — F.3d —, 2014 WL 4085863, at *8 (2d Cir. Aug. 20, 2014) ("We

conclude that the reference[] to foreign commerce in [the wire fraud statute] … do[es] not

indicate a congressional intent that the statutes apply extraterritorially."). Since neither statute

thus contains a clear indication of extraterritorial application, neither statute can be used to

prosecute Mr. Darin for his wholly extraterritorial conduct.[6]

## IV.   CONCLUSION

If the U.S. Government can charge Roger Darin in this case, it can sweep up foreign

nationals anywhere in the world based on nothing more than a claim that the U.S. is among the

nations affected. Congress did not intend, and the Constitution does not permit, such an

unlimited expansion of U.S. law overseas. The Complaint against Mr. Darin must accordingly

be dismissed.

---

[6]      This Court has the power to decide Mr. Darin's motion based on an appearance by Mr. Darin's counsel. *See In re Hijazi*, 589 F.3d at 413-14. The Court would not be obliged to decide the motion if Mr. Darin were a fugitive from justice, but that is not the case here. The so-called "fugitive disentitlement doctrine" only applies to a fugitive from justice — *i.e.,* one "who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district." *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997) (alterations in original) (internal quotation marks omitted). Mr. Darin has done neither, and therefore is not a fugitive. Nor is the fact that Mr. Darin remains outside the United States sufficient to transform him into a fugitive for purposes of the disentitlement doctrine. While courts have held that "[a] person can be a fugitive even when he does not 'flee' but is simply found outside the jurisdiction," *In re Grand Jury Subpoenas*, 179 F. Supp. 2d 270, 287 (S.D.N.Y. 2001) (internal quotation marks omitted), this "constructive flight" standard requires that the defendant be present in the jurisdiction of the court at the time of the alleged crime. *See id.* ("One cannot be a fugitive in these circumstances unless (i) *he was present in the jurisdiction at the time of the alleged crime*, (ii) he learns, while he is outside the jurisdiction, that he is wanted by the authorities, and (iii) he then fails to return to the jurisdiction to face the charges.") (emphases added). Roger Darin indisputably was not present in the jurisdiction of this Court at the time of the alleged offense — or any other relevant time.

Dated:    October 2, 2014

Respectfully submitted,

COVINGTON & BURLING LLP

By:    _____

Bruce A. Baird
James M. Garland*
Alexander A. Berengaut*
1201 Pennsylvania Avenue NW
Washington, DC 20004
Tel:  (202) 662-6000
Fax:  (202) 662-6291
bbaird@cov.com
jgarland@cov.com
aberengaut@cov.com
* *Pro hac vice application pending*

*Attorneys for Defendant Roger Darin*

19