

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

TOM ALEXANDER WILLIAM HAYES, and
ROGER DARIN,

*Defendants.*

Case No. 12 MJ 3229

**DOC #__ ___**

**OPPOSITION TO DEFENDANT ROGER DARIN'S MOTION
TO DISMISS THE CRIMINAL COMPLAINT**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION..................................................................................................1

II.  THE COMPLAINT AND ARREST WARRANT.............................................3

III.  LEGAL STANDARD..........................................................................................7

IV.  ARGUMENT........................................................................................................8

A. Darin Cannot Assert his Fifth Amendment Claims at This Time..........................8

B. Darin's Fifth Amendment Arguments Are Without Merit................................11

1.  There is a Sufficient Nexus Between Darin's Offense
    and the United States.................................................................................11

    a.  Applicable Legal Principles..................................................................11

    b.  Discussion.......................................................................................20

2.  Darin Received Ample Notice for the Purposes of the Due
    Process Clause That His Alleged Conduct Was Criminal.......................25

C. The Charge Against Darin Represents a Domestic Application
   of the Wire Fraud Statute.....................................................................29

D. The Court Should Decline to Hear Darin's Claims
   Because He Is A Fugitive.......................................................................32

1.  Courts Have Discretion to Decline to Hear Claims Raised by
    Fugitives from Justice.............................................................................32

2.  Darin is a Fugitive....................................................................................34

3.  The Court Should Decline to Hear Darin's Claims Under the
    Fugitive Disentitlement Doctrine or a More
    General Exercise of Discretion...............................................................36

V.  CONCLUSION...................................................................................................38

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arar v. Ashcroft,* 532 F.3d 157 (2d. Cir. 2008) ........................................................................ 9, 10

*Bahlul v. United States,* No. 11-1324, 2014 U.S. App. LEXIS 13287 (D.C. Cir. July 14, 2014).. 9

*Boumediene v. Bush,* 553 U.S. 723 (2008) .................................................................................. 10

*Do Rosario Veiga v. World Meteorological Org.,* 568 F. Supp. 2d 367 (S.D.N.Y. 2008)........... 10

*EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244 (1991) .................................................................. 11

*European Cmty. v. RJR Nabisco, Inc.,* Docket No. 11-2475-cv, 2014 U.S. App. LEXIS 7593 (2d Cir. Aug. 20, 2014) .............................................................................................................. 30, 31

*Empire Blue Cross & Blue Field v. Finkelstein,* 111 F.3d 278 (2d Cir. 1997) ........................... 35

*Goldberg v. UBS AG,* 690 F. Supp. 2d 92 (E.D.N.Y. 2010).................................................. 14, 16

*Hanson v. Phillips,* 442 F.3d 789 (2d Cir. 2006)......................................................................... 36

*In re Han Yong Kim,* 571 Fed. Appx. 556 (9th Cir. 2014) .......................................................... 34

*In re Hijazi,* 589 F.3d 401 (7th Cir. 2009) ............................................................................. 37, 38

*Johnson v. Eisentrager,* 339 U.S. 763 (1950)........................................................................ *passim*

*Johnson v  Laird,* 432 F.2d 77 (9th Cir. 1970) ............................................................................ 33

*Lewis v. United States,* 146 U.S. 370 (1892) ............................................................................... 32

*Loginovskaya v. Batratchenko,* 764 F.3d 266 (2d Cir. 2014)...................................................... 31

*Mathews v. Diaz,* 426 U.S. 67 (1976)............................................................................................ 9

*McNally v. United States,* 483 U.S. 350 (1987)........................................................................... 25

*Molinaro v. New Jersey,* 396 U.S. 365 (1970)....................................................................... 32, 33

*Morrison v. National Australia Bank Ltd.,* 561 U.S. 247 (2010) ................................................. 31

*Pasquantino v. United States,* 544 U.S. 349 (2005) .................................................................... 30

*Smith v. United States,* 94 U.S. 97 (1876) ................................................................................... 33

*United States v. Ahmed*, 10 CR. 131 (PKC), 2011 U.S. Dist. LEXIS 123182 (S.D.N.Y. Oct. 20, 2011) ........................................................................................................................................ 14

*United States v. Ahmed*, 10 Cr. 131 (PKC), 2012 U.S. Dist. LEXIS 39451 (S.D.N.Y. Mar. 21, 2012) ........................................................................................................................................ 29

*United States v. Al Kassar*, 582 F. Supp. 2d 488 (S.D.N.Y. 2008) ............................................. 26

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ....................................................... *passim*

*United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013) ......................................................... 13, 16, 18

*United States v. Altman*, 48 F.3d 96 (2d Cir. 1995) ....................................................................... 26

*United States v. Alvarez-Machain*, 504 U.S. 655 (1992) ............................................................... 18

*United States v. Awadalla*, 357 F.3d 243 (2d Cir. 2004) ............................................................... 36

*United States v. Blackmon*, 839 F.2d 900 (2d Cir. 1988) .............................................................. 29

*United States v. Blanco*, 861 F.2d 773 (2d Cir. 1988) ................................................................... 35

*United States v. Best*, 304 F.3d 308 (3d Cir. 2002) ...................................................................... 18

*United States v. Caicedo*, 47 F.3d 370 (9th Cir. 1995) .................................................................. 12

*United States v. Canady*, 126 F.3d 352 (2d Cir. 1997) ................................................................. 32

*United States v. Cardales*, 168 F.3d 548 (1st Cir. 1999) .............................................................. 12

*United States v. Catino*, 735 F.2d 718 (2d Cir. 1984) .................................................................. 34

*United States v. Davis*, 905 F.2d 245 (9th Cir. 1990) ............................................................. 11, 18

*United States v. Eagleson*, 874 F. Supp. 27 (D. Mass. 1994) .................................................. 34, 35

*United States v. Eng*, 951 F.2d 461 (2d Cir. 1991) .............................................................. 33, 34-35

*United States v. Gilboe*, 684 F.2d 235 (2d Cir. 1982) ................................................................... 29

*United States v. Goldblatt*, 813 F.2d 619 (3d Cir. 1987) ............................................................... 25

*United States v. Hernandez*, 09 CR 625 (HB), 2010 U.S. Dist. LEXIS 65400 (S.D.N.Y. June 30, 2010) ........................................................................................................................................ 35

*United States v. Hill*, 279 F.3d 731 (9th Cir. 2002) ...................................................................... 19

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) .................................................................... 22

iii

*United States v. Jimenez*, 421 F. Supp. 2d 1008 (W.D. Tex. 2006) ................................................. 7

*United States v. Kashamu*, No. 94 CR 172, 2010 U.S. Dist. LEXIS 72859 (N.D. Ill. July 15, 2010) ....................................................................................................................................................... 37

*United States v. Kim*, 246 F.3d 186 (2d Cir. 2001)................................................................... *passim*

*United States v. Klimavicius-Viloria*, 144 F.3d 1249 (9th Cir. 1998) .......................................... 17

*United States v. Levis*, 488 Fed. Appx. 481 (2d Cir. 2012) .......................................................... 23

*United States v. Llyods Banking Group plc*, 3:14-cr-00165 (AWT) .............................................. 4

*United States v. Manuel*, 371 F. Supp. 2d 404 (S.D.N.Y. 2005) ....................................... 14, 19, 24

*United States v. Martinez-Hidalgo*, 993 F.2d 1052 (3d Cir. 1993) ............................................... 12

*United States v Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ...................................... 16, 17, 24

*United States v. Oliveri*, 190 F. Supp. 2d 933 (S.D. Tex. 2001)............................................. 32, 34

*United States v. Paradies*, 98 F.3d 1266 (11th Cir. 1996)............................................................ 28

*United States v. Perez-Herrera*, 610 F.2d 289 (5th Cir. 1980)..................................................... 20

*United States v. Perez-Oviedo*, 281 F.3d 400 (3d Cir. 2002) ....................................................... 12

*United States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006)......................................................... *passim*

*United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) .............................................................. 28

*United States v. Postal*, 589 F.2d 862 (5th Cir. 1979) ................................................................. 18

*United States v Ramirez-Amaya*, 812 F.2d 813 (2d Cir. 1987)..................................................... 20

*United States v. Reed*, 639 F.2d 896 (2d Cir. 1981) ..................................................................... 27

*United States v. Reumayr*, 530 F. Supp. 2d 1210 (D.N.M. 2008) ................................................ 12

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008).............................................................. 23, 26

*United States v. Salazar*, 485 F.2d 1272 (2d Cir. 1973)................................................................. 8

*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) ............................................................... 11

*United States v Shapiro*, 391 F. Supp. 689 (S.D.N.Y. 1975)....................................................... 33

*United States v. Stanzione*, 391 F.Supp. 689 (S.D.N.Y. 1975) ............................................... 33, 37

*United States v. Suerte*, 291 F.3d 366 (5th Cir. 2002)................................................................. 12

iv

*United States v. Tejada*, 06 Mag. 770 (GWG), 2006 U.S. Dist. LEXIS 40127 (S.D.N.Y. June 19, 2006) ......................................................................................................................................... 7

*United States v. Trapilo*, 130 F.3d 547 (2d Cir. 1997) ...................................................... 20, 29, 36

*United States v Umeh*, 527 Fed. Appx. 57 (2d Cir. 2013) .................................................... 14, 21

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)................................................................. 9

*United States v. Yeh*, No. CR 10-00231 WHA, 2013 U.S. Dist. LEXIS 69284 (N.D. Cal. May 15, 2013) ....................................................................................................................................... 33

*United States v. Yousef*, 327 F. 3d 56 (2d Cir. 2003)............................................................. 11, 18

*United States v. Yousef*, No. S3 08 Cr. 1213 (JFK), 2010 U.S. Dist. LEXIS 86281 (S.D.N.Y. Aug. 23, 2010) .................................................................................................................... *passim*

*Weiss v. United States*, 122 F.2d 675 (5th Cir. 1941).................................................................... 26

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)............................................... 18

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ......................................................................................... 9

## Statutes

18 U.S.C. § 1343............................................................................................................................. 29

18 U.S.C. § 1349............................................................................................................................. 29

18 U.S.C. § 20.................................................................................................................................... 6

18 U.S.C. § 3237............................................................................................................................. 21

28 U.S.C. § 2466............................................................................................................................. 35

## Rules

Fed. R. Crim. P. 3 ............................................................................................................................. 7

Fed. R. Crim. P. 4 ............................................................................................................................. 7

Fed. R. Crim. P. 5 ............................................................................................................................. 7

Fed. R. Crim. P. 43. ........................................................................................................................ 32

## I.  INTRODUCTION

From his home country of Switzerland – after assuring the Government, through counsel, that he cannot be extradited and will never appear in a United States courtroom to answer the charge he faces – the defendant, Roger Darin, asks this court to dismiss a Criminal Complaint alleging that in the Southern District of New York and elsewhere, he participated in a conspiracy to manipulate benchmark interest rates that are used in financial markets and products around the world, including in transactions with various market participants based in the United States. Even if this Court were to consider Darin's motion on its merits, it should be denied.

First, Darin's principal claims are based on an unstated and unfounded premise: while arguing that his conduct is beyond the reach of United States criminal law, Darin – who remains at liberty in Switzerland – assumes that he can assert a right to due process under the Fifth Amendment to the U.S. Constitution. He is incorrect. Of course, if and when Darin appears in the United States to participate in the criminal process, he will be entitled of all of the applicable protections afforded under the Constitution, including the right to due process of law. Currently, however, as a foreign citizen living freely in his home country, Darin cannot assert such a claim. Indeed, the Supreme Court and the Court of Appeals for the Second Circuit have stated that federal courts lack the authority even to consider the sort of argument that Darin has advanced. This threshold bar to Darin's motion reflects the scope of the constitutional protection that he has sought to invoke; accordingly, it is entirely distinct from the separate, discretionary question of whether the Court should permit a defendant to litigate claims while evading the reach of United States authorities.

Second – even assuming *arguendo* that this Court were to possess and exercise the discretion to reach the merits of Darin's due process claims – his arguments are unavailing.

1

Darin asserts that he cannot be prosecuted in the United States because the LIBOR manipulation scheme in which he allegedly participated lacks a sufficient "nexus" to this country. Even if such a nexus had to be alleged and supported in a criminal complaint – a proposition that Darin seems to assume but that he cannot support – the charge against Darin would not represent an arbitrary or fundamentally unfair application of United States law because that conduct has a connection or "nexus" to this country. Indeed, the opening allegations of the Complaint make clear that Darin is charged with participating in a conspiracy to commit wire fraud "in the Southern District of New York and elsewhere," rather than solely in a foreign country. More specifically, the Complaint alleges that Darin and his co-conspirators used communication facilities and wire transmissions in the United States in furtherance of a scheme to manipulate Yen LIBOR rates in order to defraud counterparties based in the Southern District of New York and elsewhere. Based on all of the allegations in the Complaint, and the clear implications of those allegations, there is a sufficient nexus between Darin's alleged offense and the United States to satisfy any requirement under the Due Process Clause.

Darin further contends that his purported right to process has been violated because he was not on notice that his conduct could be considered criminal. The allegations in the complaint, however, make clear that Darin participated in a scheme to manipulate LIBOR rates that would determine the profitability of trades, and that this scheme was devised and executed through, among other means, the transmission of false and misleading LIBOR submissions that were formulated to provide UBS with a secret pecuniary advantage over its counterparties. When individuals engage in deceptive devices of this sort as part of a scheme – in essence – to cheat others out of their property, the prosecution of such conduct does not contravene, or even implicate, notions of fundamental fairness.

2

Third, contrary to Darin's assertions, application of the wire fraud statute in this case would not be extraterritorial because – as explicitly alleged in the Complaint – the conspirators, including Darin himself, used wires in the United States to execute their scheme. Moreover, in precedent that Darin has failed to cite and cannot persuasively distinguish, the Second Circuit, while acknowledging and applying the presumption that United States statutes should not be construed to apply to extraterritorial offenses, has held that so long as wire signals transmitted in furtherance of a scheme pass into or through the United States, the wire fraud statute reaches conduct that otherwise occurs outside this country. Accordingly, and contrary to Darin's apparent position, United States law does not permit individuals who reside elsewhere to defraud victims in this country through the use of electronic communications that are transmitted to and from the United States.

Finally, in the exercise of its discretion, the Court can and should decline to consider Darin's motion under the related doctrines of fugitive disentitlement and mutuality in litigation until he submits to the jurisdiction of this Court.

Accordingly, and for the reasons set forth more fully below, Darin's motion should be denied.

## II.    THE COMPLAINT AND ARREST WARRANT

On December 12, 2012, the Government filed a Complaint charging Darin, a Swiss citizen, with one count of conspiracy to commit wire fraud by engaging in a scheme to defraud counterparties – including counterparties in the United States – to interest-rate derivatives trades by secretly manipulating benchmark interest rates to which the profitability of those trades was

3

tied. (Compl. at 1.)[1] More specifically, Darin is charged with participating in a fraudulent scheme to manipulate the London Interbank Offered Rate ("LIBOR") for Yen, a key global benchmark interest rate, to the advantage of his former employer, UBS AG ("UBS"), and to the disadvantage of UBS's counterparties, including United States-based counterparties. (*Id.* at 4-6).[2]

Darin was charged along with a co-defendant, Tom Hayes, who also worked as a Tokyo-based derivatives trader at UBS during the relevant time period. (*Id.* ¶¶ 1, 15). While employed at UBS, Darin traded short-term interest rate products; in addition, he was responsible for overseeing the bank's Yen LIBOR submissions, and he supervised more junior traders who also made those submissions. (Compl. ¶ 16).

The London Interbank Offered Rate, or "LIBOR," is the primary global benchmark for short-term interest rates, and it is calculated by averaging submissions from leading banks around the world specifying the rates they would be charged if borrowing from other banks. (*Id.*

---

[1]    In this submission, references to "Compl." are to the Complaint; references to "D. Mem." are to the memorandum filed in support of Darin's motion to dismiss. For convenience, the Complaint is attached to this submission as Exhibit A.

[2]    Two defendants have pled guilty in the Southern District of New York to charges related to the manipulation of Yen LIBOR; four other defendants have been charged in the same case. *See United States v. Robson et al.*, Case No. 1:14 Cr. 00272 (JSR) (S.D.N.Y.). Three additional defendants have been charged in the Southern District with crimes related to Yen LIBOR manipulation in separate case. *See United States v. Read et al.*, Case No. 1:13 Mag. 02224 (UA) (S.D.N.Y.). Two affiliates of major financial institutions – UBS Securities Japan and RBS Securities Japan – have pled guilty to fraud charges based on the manipulation of Yen LIBOR and have been sentenced for those crimes in the District of Connecticut. *See United States v. UBS Securities Japan*, Case No. 3:12-cr-00268 (RNC); *United States v. RBS Securities Japan*, Case No. 3:13 Cr. 00073 (MPS). The conviction of UBS Securities Japan was based, in substantial part, on conduct in which Hayes and Darin participated while employed at UBS. *See United States v. UBS Securities Japan*, Doc. No. 4 (plea agreement, including statement of facts). Two other banks have entered deferred prosecution agreements with the Department of Justice based, in part, on their role in fraudulent schemes that included the manipulation of Yen LIBOR. *See United States v. Cooperatieve Centrale Raiffeisen-Boerenleenbank BA*, 3:13-Cr. 00200 (AWT); *United States v. Lloyds Banking Group plc*, 3:14 Cr. 00165 (AWT).

4

at 4). LIBOR is therefore designed to reflect, on average, the prevailing rates of interest being charged for unsecured loans in the interbank market. Many financial institutions, mortgage lenders, and credit card agencies set their own rates relative to LIBOR. (*Id.*). Because of the widespread use of LIBOR in financial markets and the transactions, these rates play a fundamentally important role in financial systems around the world.[3] The Japanese Yen was one of the original currencies for which LIBOR was calculated, along with the British Pound Sterling and U.S. dollar. *See* The Wheatley Review of LIBOR, https://www.gov.uk/government/uploads/ system/uploads/attachment_data/file/191763/condoc_wheatley_review.pdf, at 14. The market for Yen LIBOR-based products is significant; for example, the Wheatley Review found that Yen LIBOR is used for more interest rate swaps and floating rate notes than any currency besides the U.S. dollar. *See id.* at 36.

The Complaint alleges that Defendants Darin and Hayes caused UBS "repeatedly to provide false and misleading information in its daily Yen LIBOR submissions." (*Id.* at 8). The Complaint also alleges that Darin trained at least one UBS employee responsible for Yen LIBOR submissions and "told him that the primary consideration in determining UBS's Yen LIBOR submissions each day was the requests from [Defendant Hayes] and other UBS Yen swaps traders. Darin advised [the UBS employee] that such requests were to be accommodated." (*Id.* at 9). Darin also accommodated such requests himself. (*Id.* ¶ 21). Thus, in determining its LIBOR contributions, although UBS was asked to submit the rate at which it could borrow funds in the London interbank market in the relevant currency and at specified maturities, (D. Mem. at 1 n.2

---

[3]     The British Banker's Association, which administered LIBOR during the relevant time period, has referred to LIBOR as the "world's most important number." *See* Libor Links Deleted as U.K. Bank Group Backs Away From Rate, http://www.bloomberg.com/ news/2012-03-07/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate.html.

5

(quoting guidance from BBA)), UBS employees – at Hayes's behest and on instructions from Darin – instead chose to submit rates that would benefit Hayes's portfolio (or "book") of trades referencing Yen LIBOR, at the expense of counterparties to those trades. Evidence described in the Complaint reflects Darin's understanding that such submissions were false and improper. Thus, in response to a request from Hayes for a LIBOR submission that favored Hayes's trading position, Darin advised Hayes of the "unbiased" rate that Darin would submit and warned that he could not make a submission that was "too far away from the truth" without running the risk that UBS would be "banned" from the panel of LIBOR-submitting banks; in that instance, Darin nonetheless accommodated Hayes by submitting a rate that varied from the unbiased figure that he mentioned to Hayes – although not by a distance so far "from the truth" that was likely, in Darin's view, to be detected and therefore to result in negative consequences. (Compl. ¶ 21(d)).

The Complaint further alleges that the conspiracy involved a variety of overt acts in the Southern District of New York, including: (1) Defendant Hayes entering two trades with a counterparty based in Purchase, New York; (2) Defendants Hayes and Darin engaging in electronic chats routed through the Southern District; and (3) Defendants Hayes and Darin causing the publication of manipulated LIBOR rates in New York, New York. (*Id.* at 2). The Complaint also alleges that the scheme had an effect on one or more financial institutions within the meaning of 18 U.S.C. § 20. (*Id.* at 3).[4]

---

[4]    Darin acknowledges in his memorandum that apart from his role in the LIBOR submission process, "his primary responsibility was trading Yen-denominated short-term interest rate derivative products." (D. Mem. at 2). These are precisely the sort of products that reference Yen LIBOR. The Complaint does not, and need not, include detailed allegations regarding Darin's trading activity. At the appropriate time, however, the Government is prepared to allege and prove that the counterparties to Darin's own trades included prominent U.S.-based financial institutions, including JPMorgan Chase & Co. and Lehman Brothers Holdings Inc. As the Complaint already makes clear, Hayes also traded with U.S. counterparties.

6

This Court issued an arrest warrant for Darin on December 12, 2012. He has not appeared before this Court. Darin's counsel has indicated to counsel for the United States that he does not plan to do so at any time, and is content to remain in his native Switzerland for his entire life if necessary. (Declaration of Thomas B.W. Hall ("Hall Decl.") ¶ 2, attached hereto as Exhibit B). The United States has taken and will continue to take all appropriate steps to secure Darin's appearance before the Court.[5]

## III.  LEGAL STANDARD

Fed R. Crim. P. 3 states that a criminal complaint is a "written statement of the essential facts constituting the offense charged." A criminal complaint signed by a magistrate judge allows an arrest warrant to be issued under Fed. R. Crim P. 4. A complaint merely must establish probable cause for an arrest. If a complaint fails to do so, "it would have to be dismissed." *United States v. Tejada*, 06 Mag. 770 (GWG), 2006 U.S. Dist. LEXIS 40127, *2 (S.D.N.Y. June 19, 2006); *see also United States v. Jimenez*, 421 F. Supp. 2d 1008, 1010-11 (W.D. Tex. 2006) (motion to dismiss criminal complaint decided based on whether the facts of the complaint showed probable cause). *Cf.* Fed. R. Crim. P. 5.1(f) ("If the magistrate judge finds no probable cause to believe an offense has been committed or the defendant committed it, the magistrate judge must dismiss the complaint and discharge the defendant.").

The Government is not aware of any authority supporting the proposition that a complaint, in order to withstand scrutiny, must allege facts and describe evidence on which the Government would rely in responding to claims such as those Darin has asserted in his motion to

---

[5]     Hayes, a citizen of the United Kingdom, faces pending criminal charges in London. His trial is currently scheduled to commence in the spring of 2015.

dismiss.[6] Specifically, no court has ever dismissed any criminal charge prior to trial based on the absence of an explicit allegation describing a nexus between the offense and the United States.

## IV.   ARGUMENT

### A. Darin Cannot Assert His Fifth Amendment Claims at This Time.

In Darin's leading arguments – set forth in Sections III.A and III.B of his memorandum – he contends that the complaint against him must be dismissed on Fifth Amendment Due Process grounds. The United States looks forward to confronting Darin's constitutional claims in court at the proper time – but this is not that time. In his effort to advance these arguments now, Darin ignores altogether a threshold issue: as a foreign citizen residing abroad who is not in custody and has not appeared in this Court, Darin *currently* cannot assert claims under the Fifth Amendment.

This is a long-standing and well-established principle. In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Supreme Court considered the *habeas* petitions of German nationals arrested in China and detained in Germany after the Second World War. The petitioners claimed that their imprisonment violated the Fifth Amendment and other provisions of the Constitution. *Id.* at 767. In reviewing the Supreme Court's jurisprudence in this area, Justice Jackson noted that "the Court has been at pains to point out that it was *the alien's presence within its territorial jurisdiction* that gave the Judiciary power to act." *Id.* at 771 (emphasis added). The Court then rejected the suggestion that the aliens abroad had Fifth Amendment rights in United States courts:

---

[6]      Even if the charging document were an indictment, the United States would not need to allege a nexus to the United States or fair notice of criminality. The Second Circuit has "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973)

> Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has even hinted at it. The practice of every modern government is opposed to it.

*Id.* at 784 (citation omitted). *See also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (discussing *Eisentrager* in the context of a non-resident alien's Fourth Amendment claim and recognizing that the Supreme Court has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States"); *Bahlul v. United States*, No. 11-1324, 2014 U.S. App. LEXIS 13287, *215 (D.C. Cir. July 14, 2014) ("The Supreme Court has applied the Constitution to aliens in the United States and in U.S. territories, but has not extended constitutional rights to aliens in foreign countries."); *Arar v. Ashcroft*, 532 F.3d 157, 179 n.15 (2d Cir. 2008) (noting the "constitutional significance of geographic borders" in considering alien's constitutional claims and affirming *Eisentrager*'s "power to act" language as controlling law).

Conversely, the Supreme Court has recognized that "[t]he Fifth Amendment, as well as the Fourteenth Amendment, protects every [alien within the jurisdiction of the United States] from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (citations omitted). As this Court has held, "[t]he two available toeholds to persons who assert constitutional rights from outside the sovereign territory of the United States are American citizenship and some element of *de facto* or

9

*de jure* American sovereignty over the territory of the events in question." *Do Rosario Veiga v. World Meteorological Org.*, 568 F. Supp. 2d 367, 374 (S.D.N.Y. 2008).

Here, Darin does not have a "toehold" to claim constitutional rights by virtue of his citizenship or by his presence in the United States (or U.S.-controlled) territory. He has not been detained by the United States overseas, like the petitioners in *Eisentrager* or, more recently, the petitioners seeking to challenge their detention at United States military facilities;[7] he is, instead, at liberty in Switzerland. He is not present in this country as an alien. Indeed, he is not present in this country at all – a point he makes repeatedly in his motion – and thus cannot assert Fifth Amendment rights at this time. The cases cited by Darin where a court accepted, or even considered, a defendant's Fifth Amendment "sufficient nexus" or lack of notice arguments all involved defendants who were *physically present* in the United States. Once Darin appears in the United States, he will have all the constitutional rights afforded to non-citizen defendants, including rights under the Fifth Amendment. Until that time, however, he cannot invoke rights under the Fifth Amendment, and the Court should not consider his constitutional claims. Indeed, *Eisentrager* instructs that where an alien attempts to assert constitutional claims from outside the United States, a federal court called upon to consider such claims lacks the "power to act." *Eisentrager*, 339 U.S. at 771. The Second Circuit has recognized the same principle far more recently. *Arar*, 532 F.3d at 179 n.15.

---

[7]    Cases like *Boumediene v. Bush*, 553 U.S. 723 (2008), do not undermine the Government's position here in any way. In *Boumediene*, for instance, the Supreme Court considered whether "enemy combatants" held at a U.S. military base on U.S-controlled territory could pursue constitutional claims by seeking writs of *habeas corpus*. *Id.* at 739. The Court concluded that they could do so, because the Suspension Clause of the U.S. Constitution had effect at Guantanamo Bay and the applicable act did not suspend the writ of habeas corpus. *Id.* at 753-71. That holding has no bearing on the circumstances presented here, where Darin is not in the custody of the United States or, for that matter, in any nation's custody.

10

**B. Darin's Fifth Amendment Arguments Are Without Merit**.

Even assuming Darin had constitutional rights under the Fifth Amendment, his due process arguments fail on the merits.

### 1. There is a Sufficient Nexus Between Darin's Offense and the United States.

First, Darin advances the novel argument – unsupported by citation to a single analogous criminal case – that he lacks a constitutionally sufficient nexus to the United States, and that accordingly, his prosecution here would be arbitrary and fundamentally unfair under the Due Process Clause. His argument is legally and factually without merit and should be rejected.

#### a. Applicable Legal Principles

It is well established that, "as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" *United States v. Yousef*, 327 F. 3d 56, 86 (2d Cir. 2003) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). *See also, e.g., United States v. Siddiqui*, 699 F.3d 690, 700 (2d Cir. 2012). The Supreme Court has never suggested that the Due Process Clause limits Congress's authority to enact criminal statutes that apply to conduct committed abroad. In *Yousef*, however, the Second Circuit agreed with the Ninth Circuit's view that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *Yousef*, 327 F.3d at 111 (quoting *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990) and rejecting the defendants' due process claim). The Second Circuit articulated and

11

applied the same principle in *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) ("*Al Kassar II*") (holding, as in *Yousef*, that the required nexus had been demonstrated).[8]

As this Court has observed, dismissals under the "sufficient nexus" requirement are exceedingly rare. *United States v. Yousef*, No. S3 08 Cr. 1213 (JFK), 2010 U.S. Dist. LEXIS 86281, *8 n.2 (S.D.N.Y. Aug. 23, 2010)) (noting that the Court is "not aware of any case in which a federal court has dismissed an action on the ground that the extraterritorial application of a federal statue violates the Due Process Clause") (citing *United States v. Reumayr*, 530 F. Supp. 2d 1210, 1223 (D.N.M. 2008) (same)). Indeed, the Government is only aware of, and Darin has only cited, once such decision. *See United States v. Perlaza*, 439 F.3d at 1169 (overturning convictions under the MDLEA after trial, and dismissing charges on the alternative basis of a failure to prove the required nexus, because the district court did not find, and the Government conceded it had not proven, that drugs dumped from a stateless speedboat off the coast of South

---

8   This proposition is far from clear or well-established. Indeed, the First, Third, and Fifth Circuits have expressly rejected the "nexus" requirement, holding that due process is satisfied as long as application of a statute is not "arbitrary or fundamentally unfair." *See, e.g., United States v. Suerte*, 291 F.3d 366, 375-76 (5th Cir. 2002); *United States v. Perez-Oviedo*, 281 F.3d 400, 402-03 (3d Cir. 2002); *United States v. Cardales*, 168 F.3d 548, 552-53 (1st Cir. 1999); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056-57 (3d Cir. 1993). Moreover, even in the Ninth Circuit, the "nexus" requirement does not apply in all cases. *See, e.g., United States v. Caicedo*, 47 F.3d 370, 373 (9th Cir. 1995) (holding that a nexus is not required for prosecutions under the Maritime Drug Law Enforcement Act (the "MDLEA") involving "stateless vessels"); *accord United States v. Perlaza*, 439 F.3d 1149, 1167-68 (9th Cir. 2006). In *Yousef*, while adopting the Ninth Circuit's view, the Second Circuit did not acknowledge this division of authority or discuss the differing views that have been articulated in the cases and commentary addressing this issue. Needless to say, the Government does not question the force of Second Circuit authority in this Court. Purely for purposes of preserving the position, however, the United States reserves the right to argue at a later time that the nexus requirement is not a necessary component of due process. Moreover, there is no need to reexamine this question in considering Darin's motion, because the requisite "nexus" can readily be established in this case.

America had any nexus to the United States).[9] Based on the circumstances presented here, and the allegations in the Complaint, Darin should not be the first defendant ever to secure the dismissal of criminal charges prior to trial on this ground.

In support of his motion, Darin asserts – and relies heavily upon the theory – that in order to establish a sufficient nexus to the United States under the Due Process Clause, the Government must allege and prove that his actions "were calculated to harm American citizens and interests" and that he "aimed to harm the United States." (D. Mem. at 3-6). Because the Complaint does not explicitly allege that he possessed such subjective intent, Darin claims, it must be dismissed. Putting aside Darin's unsupported position that this is a pleading requirement, he misstates the law. No court, in the Second Circuit or elsewhere, has ever adopted the legal standard on which he bases his claim.

While an intent to harm the United States plainly suffices to establish a "sufficient nexus" for due process purposes, *Al Kassar II*, 660 F.3d at 119, "a 'substantial intended effect' in or on the United States *is sufficient but not necessary* to justify the extraterritorial application of federal criminal law." *Yousef*, 2010 U.S. Dist. LEXIS 86281, \*9 (emphasis added); *id.* at \*4 (acknowledging that the defendant may not have acted with "the specific purpose of harming interests of or related to the United States," but finding nonetheless that the defendant "was

---

9     The United States is aware of no other case dismissing an indictment on "sufficient nexus" grounds, and no court has rendered such a ruling prior to trial. Moreover, even in *Perlaza*, the Ninth Circuit did not review a finding regarding this issue. Rather, it held that: (1) the district court erred by concluding that such a finding was unnecessary; and (2) the error was not harmless, based on the Government's concession that it had not proven a nexus to the United States. *Perlaza*, 439 F.3d at 1168-69. Thus, in cases where this issue has been raised and decided, on the merits, no court has found a deprivation of due process. *See also United States v. Ali*, 718 F.3d 929, 943 (D.C. Cir. 2013) ("[The defendant] has not cited – and we have not found – any case in which extraterritorial application of a federal criminal statute was actually deemed a due process violation. Although that does not mean such a result is beyond the realm of possibility, it does suggest [the defendant's] burden is a heavy one, for he traverses uncharted territory.").

13

aware that the charged conduct would have such an effect"). To determine whether a "sufficient nexus" exists, "courts also have considered factors such as the 'defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and *whether those acts could be expected to or did produce an effect in the United States.*'" *Id.* at \*9 (quoting *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 106 (E.D.N.Y. 2010) (emphasis added). Indeed, the Second Circuit and this Court have found a "sufficient nexus" for Due Process Clause purposes in circumstances where no "substantial intended effect" was alleged or proven.

For instance, in *United States v. Umeh*, the Second Circuit, applying *Al Kassar II*, found that the "nexus" requirement was satisfied where the jury found that "each defendant joined a conspiracy *knowing* that the cocaine to be trafficked would reach the United States." 527 Fed. Appx. 57, 63 (2d Cir. 2013) (emphasis added). *See also United States v Ahmed*, 10 CR. 131 (PKC), 2011 U.S. Dist. LEXIS 123182, \*1 (S.D.N.Y. Oct. 20, 2011) (denying defendant's motion to dismiss on jurisdictional grounds despite no allegation in the indictment that "the defendant engaged or intended to engage in specific acts either within the United States or directed at its citizens or property here or in other countries"); *United States v. Manuel*, 371 F. Supp. 2d 404, 408-09 (S.D.N.Y. 2005) (finding sufficient nexus where the leaders of the conspiracy knew illegal drugs transported within Europe were intended for shipment to the United States, even though defendant drug courier did not know of or intend a United States destination for the drugs). Even in *Perlaza*, on which Darin relies, the Ninth Circuit stated clearly that in order to satisfy due process, the Government "needs to establish *some detrimental effect within, or nexus to, the United States.*" *Perlaza*, 439 F.3d at 1169 (emphasis added) (citing Ninth Circuit precedent holding that "jurisdiction is appropriate if the acts performed outside the United States produce *detrimental effects* within the United States" (emphasis added)). Neither

14

the Ninth Circuit, nor any other court, has intimated that such a nexus can only be established if

the defendant subjectively intends or "aims" to harm United States interests; nor does it comport

with law or logic to suggest that absent such a showing, it would be arbitrary or fundamentally

unfair to prosecute a defendant in the United States for conduct occurring abroad.

To be sure, in *Al Kassar II,* 660 F.3d at 118-19, the Court found a sufficient nexus based

on evidence that the defendants in that case intended to harm United States interests. Nowhere in

that decision, however, did the Second Circuit suggest that absent proof of such intent, it would

offend due process to prosecute a defendant in the United States if his conduct occurred

elsewhere. Indeed, if the Court intended to adopt such a novel standard – contrary to clear

precedent both in the Ninth Circuit, which the Second Circuit cited in *Yousef* and *Al Kassar*, and

elsewhere – it presumably would have acknowledged, and even explained, its diversion from all

prior authority. Darin nonetheless attempts to manufacture support for his desired standard by

quoting isolated statements in *Al Kassar* out of the context in which they appear. His argument,

however, is not faithful to the Court's holding or reasoning.[10] Thus, as the D.C. Circuit recently

pointed out, in rejecting the same argument that Darin has advanced here: "[E]ven assuming

---

[10]     For example, Darin quotes the Second Circuit's statement that "[j]urisdictional nexus is
determined by the aims of the conspiracy, not by its effects. " (D. Mem. at 4 (quoting *Al
Kassar II*, 660 F.3d at 119). This statement, however, provides no support for Darin's
position. Rather, it appears in the context of an explanation as to why the defendants'
arguments were unavailing, notwithstanding their contention that "their conduct was so
far removed from any U.S. interest or person." *Al Kassar II*, 660 F.3d at 119. As the
Court observed: "True, the defendants' conduct [consisting of a conspiracy to engage in
arms trafficking, detected through a sting operation] never came close to harming any
U.S. interest or property, but this is irrelevant for conspiracy offenses, which often result
in no palpable harm. Jurisdictional nexus is determined by the aims of the conspiracy, not
its effects." *Id.* Thus, the line that Darin quotes merely makes clear that for a conspiracy,
an inchoate offense, the nexus inquiry will often turn on the scope and nature of the
conspiracy's objectives, rather than on any actual harm inflicted upon victims. The
quoted statement does not even refer to the subjective intent of an individual defendant,
let alone imply that due process requires proof of an aim to harm the United States.

15

[that *Al Kassar II*'s] characterization [of the nexus requirement] is right, the decision only tells us when such a nexus *exists, not when it is absent . . . ." United States v. Ali*, 718 F.3d at 944 (emphasis added). The Circuit therefore rejected the defendant's overly "expansive" reading of *Al Kassar II*. This Court should do the same.

Darin's reliance on *United States v. Mostafa*, 965 F. Supp. 2d 451, 459-60 (S.D.N.Y. 2013), is similar but even more misplaced. In *Mostafa*, the defendant was accused of conspiring to take hostages, including United States nationals, along with other offenses. *Id.* at 455-58. Darin quotes from a part of the District Court's opinion summarizing *Al Kassar II*. He does not acknowledge that immediately following that language, the opinion states:

> Defendant argues that [while two of the hostages taken in Yemen may have been American citizens], there is no allegation [in the indictment] that he intended to harm the United States or its citizens. *However, Defendant's specific intent to harm Americans is not what the law requires. Rather, courts have found sufficient nexus to exist based upon factors such as the "defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States."* It is also unnecessary that the defendant had any expectation that he would be prosecuted in the United States. The facts alleged in the indictment are therefore plainly sufficient.

*Mostafa*, 965 F. Supp. 2d at 459 (emphasis added) (citations omitted) (quoting *Goldberg v. UBS AG*, 690 F. Supp. 2d at 106). Thus, while *Al Kassar* provides no support for the legal standard on which Darin bases his nexus claim, *Mostafa* explicitly rejects that standard.[11]

---

[11]     In his brief, Darin quotes only the final sentence of the following discussion in *Mostafa*:

> *Al Kassar* leaves no doubt that defendant's arguments regarding the sufficiency of a jurisdictional nexus are without merit. There is no requirement that the indictment contain allegations of defendant's presence in the United States, actual communications into or out of the United States, or transaction of business within the United States. Rather, the determinative issue is whether defendant's actions were calculated to harm American citizens or interests.

In a creative effort to invent legal standards that are more to his liking, Darin turns his attention away from authoritative or even analogous precedent and looks to other sources. Specifically, he relies upon (1) standards that have been developed in civil cases addressing whether a party's "minimum contacts" with a forum provide a basis for personal jurisdiction and (2) principles of customary international law. These arguments are plainly untenable.

First, there is no case that applies a minimum-contacts analysis in determining whether a criminal prosecution is arbitrary and fundamentally unfair under the Due Process Clause. Darin's only source of support for this notion is a single passing and general observation in a 1998 Ninth Circuit opinion. *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (stating that "[t]he nexus requirement serves the same purpose as the 'minimum contacts' test in personal jurisdiction" and going on to discuss the requirements for establishing general personal jurisdiction in the civil context). While, in a broad sense, the nexus requirement may serve the same purpose as the civil minimum contacts test, it is not the same test, and there is no support for a wholesale importation of minimum-contacts jurisprudence into the criminal realm. The United States is aware of no court that has done so, and for good reason, as there are important differences between the two contexts. For example, one of the principal purposes of the "minimum contacts" requirement – "to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system,"

_____

*Mostafa*, 965 F. Supp. 2d at 459. The defendants' intent to harm American interests was "the determinative issue" in *Al Kassar II* merely because that was the basis for a sufficient nexus presented in that case. By isolating this statement, however, and removing it from its context, Darin apparently wants to suggest that other factors – such as defendant's presence in the United States, communications into or out of the United States, or business transactions in this country – are categorically irrelevant to the nexus analysis. Not surprisingly, there is no decision that adopts such a position, because for purposes of due process, many factors can create a sufficient nexus between a defendant and the United States.

17

*World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 292 (1980) – has no application in the context of a federal criminal case. Indeed, the United States has a strong interest in punishing those who seek to do it harm through conduct committed abroad – and it has the prerogative to pursue that objective even where, unlike here, doing so meets with objections from the country in which the criminal conduct took place. *See, e.g.*, *United States v. Alvarez-Machain*, 504 U.S. 655 (1992). Thus, in definitively rejecting the sort of argument that Darin has advanced here, the D.C. Circuit recently stated: "In support of his due process argument, [the defendant] cites a panoply of cases concerning personal jurisdiction in the context of civil suits. It is true courts have periodically borrowed the language of personal jurisdiction in discussing the due process constraints on extraterritoriality. But [the defendant's] flawed analogies do not establish actual standards for judicial inquiry; the law of personal jurisdiction is simply inapposite." *Ali*, 718 F.3d at 943.

Second, Darin's effort to rely on principles of customary international law is similarly misplaced. As a threshold matter, Darin points to no law – in the Second Circuit or elsewhere – that would justify the dismissal of a criminal case on purely international law grounds. Courts have in fact recognized the opposite proposition: that international law creates no rights for criminal defendants. *See Davis*, 905 F.2d at 248 ("International law principles, standing on their own, do not create substantive rights or affirmative defenses for litigants in United States courts."); *see also Yousef*, 327 F.3d at 91 ("United States law is not subordinate to customary international law or necessarily subordinate to treaty-based international law and, in fact, may conflict with both."); *United States v. Best*, 304 F.3d 308, 314 (3d Cir. 2002) (a defendant "cannot rely upon a mere violation of international law as a defense to the court's jurisdiction.") (quoting *United States v. Postal*, 589 F.2d 862, 884 (5th Cir. 1979)).

18

As Darin concedes, the Second Circuit has not considered international law in analyzing

purportedly extraterritorial prosecutions under the Fifth Amendment. (D. Mem. at 9). But even

assuming Darin could make a colorable claim to dismiss the Complaint solely under

international law, that claim would fail based on the provisions of the Restatement (Third) of

Foreign Relations Law ("Restatement"). First, the Complaint plainly alleges that conduct took

place within the territory of the United States. *Compare* Restatement § 403(2)(a) *with* Compl. ¶

2. Second, the Complaint plainly alleges a direct effect in the United States: U.S. counterparties

losing money in transactions with UBS. *Compare* Restatement § 403(2)(a) with Compl. ¶ 3. And

even the Ninth Circuit, the court that has looked to principles of customary international law in

assessing the adequacy of a nexus to the United States, has recognized that "[u]nder the

territorial jurisdiction theory, jurisdiction is appropriate if the acts performed outside the United

States produce detrimental effects within the United States." *United States v. Hill*, 279 F.3d 731,

739 (9th Cir. 2002). To whatever extent international law is relevant to this analysis, it supports

the Government's position – not Darin's. Judge Lynch of this Court adopted the same approach

in *Manuel*. *See* 371 F. Supp. 2d at 409 n.4. ("While international law standards of national

jurisdiction are not binding on the Congress, it should be noted that extraterritorial application of

United States law to Manuel is entirely in keeping with international law, since international law

permits a country to exercise jurisdiction over acts committed outside it that have harmful effects

within it.").[12]

---

[12]    Similarly, Darin derives no support from his effort to promote the cause of comity
        between nations. Darin cannot point to a decision by any federal court dismissing a
        criminal case based on international comity. (D. Mem. at 12-13). Comity is a concern
        typically left to those branches of government that handle international relations: the
        executive and legislative branches. Darin's lengthy argument regarding international
        comity is simply a different way of addressing in what circumstances non-citizens
        residing abroad should be subject to prosecution in the United States. As discussed *infra*,

### b. Discussion

At the outset, it bears repeating that in this case, Darin is charged with committing a territorial offense: a conspiracy to commit wire fraud in this District and elsewhere, where wire transmissions into the United States were used in furtherance of the scheme to defraud. Although Darin was located abroad during the scheme, it is well-established that the geographic location of a wire fraud is determined, at least in part, by the path of wire signals transmitted in furtherance of the scheme. *See, e.g., United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997). Moreover, a conspiracy to commit wire fraud occurs in any location in which "an overt act in furtherance of the conspiracy was committed by any of the coconspirators." *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987). "This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (applying these principles in affirming a conviction for wire fraud and securities fraud). *See also United States v. Perez-Herrera*, 610 F.2d 289, 291 (5th Cir. 1980) ("We have repeatedly held it is not a defense to a conspiracy charge that the defendant never entered the country, at least so long as an overt act in furtherance of the conspiracy occurred within the United States.").

Based on these well-established principles, Darin's alleged offense occurred, among other locations, here in the United States. The requirement of establishing a sufficient nexus for

those determinations are discerned by courts on the basis of Congressional intent. Moreover, while Darin raises the specter that "Japan, Singapore, or Switzerland *could* assert jurisdiction" over Darin (D. Mem. at 13 (emphasis added)), Darin has been charged in this country since December 2012 and none of the countries cited have moved to prosecute him. The United States Department of Justice and United States regulators have worked closely with foreign regulators and law enforcement in the LIBOR investigation in an exercise of international comity, not in contravention of international comity. International comity will not be disrupted by Darin's prosecution here.

20

purposes of due process has never been recognized or applied in such circumstances; rather, in the jurisdictions that have adopted such a requirement, it has only been applied to offenses that are purely extraterritorial, such as those charged in *Yousef* and *Al Kassar*. To the Government's knowledge, no court has ever suggested that such a finding would have to be made in a case where a defendant engaged in conspiracy to defraud victims in the United States and elsewhere and where that scheme was foreseeably furthered by wire transmissions into this country. The alleged commission of such a territorial offense either makes the nexus requirement entirely inapplicable or, in itself, satisfies that requirement – at least for purposes of determining the adequacy of a criminal complaint.[13]

Even assuming *arguendo* that Darin's alleged offense were extraterritorial, it would not be arbitrary or fundamentally unfair to prosecute him in the United States because "the allegations in the complaint are more than sufficient to support findings that: (1) Darin's conduct "could be expected to or did produce an effect in the United States," *Yousef*, 2010 U.S. Dist. LEXIS 86281 at *9; and (2) Darin was aware that his conduct would have such an effect. *Umeh*, 527 Fed. Appx. 57 at 63. Indeed, even if the Court's inquiry were to focus entirely, and incorrectly, on Darin's intent, the allegations in the Complaint would meet the requirement of due process, because the scheme in which he participated was aimed at promoting the financial interests of the conspirators, and of UBS, at the expense of UBS's trading partners in the international market for interest-rate derivatives tied to Yen LIBOR. Some of those parties – as

---

[13]     In effect, Darin is arguing that it is a violation of due process to prosecute him in a district where this case is properly venued under 18 U.S.C. § 3237. That is an untenable claim. *See United States v. Kim*, 246 F.3d 186, 191-92 (2d Cir. 2001) (holding that wire fraud is a continuing offense under 18 U.S.C. § 3237 and that venue for such an offense is "proper in any district in which the offense began, continued, or concluded.").

the Complaint makes clear, and as Darin necessarily understood – were based in the United

States and, specifically, in the Southern District of New York.

The Complaint alleges that "[m]any financial institutions, mortgage lenders, and credit

card agencies set their own rates relative to LIBOR and that "[m]ortgages, credit cards, student

loans, and other consumer lending products often use LIBOR as a reference rate." (Compl. ¶7).

As a sophisticated player in the financial markets who traded in Yen LIBOR products, Darin was

aware of the significant role of Yen LIBOR in global financial transactions, including in the

United States, and could reasonably expect that its manipulation would have direct and

significant effects in the United States extending well beyond any losses to UBS's trading

partners.[14] A jury, moreover, could permissibly and readily conclude that Darin fully intended to

bring about the natural and probable consequences of his efforts to manipulate Yen LIBOR in

order to favor UBS's trading positions over those of its counterparties, including market

participants in the United States. *See, e.g., United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir.

1997) (recognizing that "one is presumed to intend the natural and 'probable' consequences of

one's acts").

The Complaint also alleges that Defendants Darin and Hayes caused the publication of

manipulated interstate information (i.e., LIBOR rates) in New York, New York. (*Id.* ¶2(c)).

Darin argues that this conduct was not "aimed" at the United States. (D. Mem. at 6.) But the

reality is that Darin entered into a conspiracy with sweeping global aims: to manipulate a leading

global benchmark interest rate to make money for UBS and for the conspirators personally.

Darin is correct that LIBOR rate information is published in "scores ... of countries," (*id.*), but

that is the risk Darin took by entering into a conspiracy with global scale: the risk of being held

---

[14]    A civil suit alleging precisely such consequences is currently pending in this District. *See Laydon v. Mizuho Bank, Ltd. et al.*, Case No. 12-cv-3419 (GBD).

to account for his illegal actions where his LIBOR manipulation efforts had effects, and particularly in an international financial center like New York.[15]

The Complaint further alleges that Defendant Hayes entered into trades with counter-parties in New York, and that electronic communications with such counterparties – transmitted into the United States – furthered the scheme in which Hayes and Darin participated. (*Id.* ¶¶ 2(a), 3, 22). This conduct was entirely foreseeable to Darin, especially in light of his regular interactions with Hayes, the prominent place that Hayes occupied among Yen-derivatives traders both within UBS and globally, and Darin's own direct experience as such a trader.[16] (*Id.* ¶¶ 2, 19-33). As the Complaint makes clear, Hayes and Darin, along with others, participated in a conspiracy directed against market participants in the United States and elsewhere, and their scheme had a global impact. (*Id.* ¶¶ 19-21). As a participant in that conspiracy, Darin is accountable for the actions of his co-conspirators, and those actions play a factually significant and legally proper role in forming part of the nexus between Darin and the United States. *See, e.g., Manuel*, 371 F. Supp. 2d at 409-10 (Lynch, J.) (concluding that in keeping with basic

---

[15]     *Cf. Royer*, 549 F.3d at 895 (holding in the context of a venue challenge that "the defendants, having concocted a scheme that relied so heavily on the actions of the [web] site subscribers for its success and that defrauded investors throughout the country, can hardly complain that their very *modus operandi* subjected them to prosecution in numerous districts, including the Eastern District of New York."); *United States v Levis*, 488 Fed. Appx. 481, 485 (2d Cir. 2012) ("When the case involves publication on the internet, venue is proper in any district where it is reasonably foreseeable that the material will be accessed.") (citing *Royer*, 549 F.3d at 895).

[16]     The Complaint does not, and need not, contain specific allegations regarding Darin's trading activity. The available evidence, however, indicates that during the time of the conspiracy, Darin entered into LIBOR-based trades with United States counterparties with a notional value of some ¥967 trillion ($8.7 billion). This evidence, which the Government can provide to the Court and is prepared to introduce, is consistent with the allegation in the Compliant stating that, overall, the fraudulent scheme in which Hayes and Darin participated was intended to defraud UBS's counterparties "and also globally impacted transactions and financial products tied to Yen LIBOR." (Compl. ¶ 20).

23

principles of conspiracy law, the defendant was guilty of joining the conspiracy and was

"brought under American jurisdiction" by the acts of his conspirators, regardless of whether the

defendant was aware of the facts that established such jurisdiction); *Mostafa*, 965 F. Supp. 2d at

459 (finding sufficient nexus where counts in an indictment alleged that defendant's co-

conspirators engaged in conduct that occurred in the United States). This principle sensibly and

necessarily follows from the overall purpose of the nexus requirement. If an individual

participates in collective venture in which co-conspirators take actions that occur, or have an

impact, within the United States, that conduct links the individual to this country and defeats any

claim that his prosecution here is arbitrary or fundamentally unfair.[17]

---

17    Relying on a statement from *Perlaza*, Darin contends that the Court should not take
      Hayes's conduct into account in assessing Darin's nexus to the United States. (D. Mem.
      at 5). *Perlaza*, however, provides no support for that position and is not contrary to the
      controlling precedent from this jurisdiction cited above.

      *Perlaza* involved two groups of defendants who were traveling on boats off the coast of
      South America. One group was aboard a stateless speedboat referred to in the opinion as
      the "Go-Fast"; the other was aboard a Colombian-flagged fishing boat named the Gran
      Tauro. *Perlaza*, 439 F.3d at 1153-57. Consistent with Ninth Circuit precedent, the district
      court concluded that for the Go-Fast defendants, because their boat was stateless, no
      nexus finding was required in order to assert jurisdiction. *Id.* at 1161. It then determined
      that because the Gran Tauro defendants had aided and abetted the Go-Fast defendants,
      there was no need for the Government to demonstrate any nexus between the Gran Tauro
      and the United States. *Id.*at 1168. As the first basis for overturning the defendants'
      conviction, the Ninth Circuit held that the district court committed reversible error by
      making the finding that the Go-Fast was a stateless vessel; that question, the Circuit held,
      should have been submitted to the jury. *Id.* On that basis alone, the district court's
      conclusion that no nexus had to be demonstrated with respect to the Gran Tauro
      defendants could not survive review. *Id.* Continuing, however, and setting forth an
      alternative basis for its ruling, the Circuit explained: "Relying on the theory of aiding and
      abetting does not vitiate the need to consider the underlying bases for jurisdiction." *Id.*
      Thus, in the Ninth Circuit's view – absent an exception making the nexus requirement
      inapplicable – that requirement would have to be met for each individual defendant, and
      the inquiry could not be obviated based on an aiding-and-abetting theory. *Id.* at 1168-69.
      That rationale, however, does not suggest in any way that in determining whether the
      requisite nexus exists – rather than dispensing with the inquiry entirely, as the district
      court did in *Perlaza* – the actions of a defendant's co-conspirators (or aiders and abettors)
      should not be taken into account or properly attributed to the defendant. *Perlaza* simply

24

## 2. Darin Received Ample Notice for the Purposes of the Due Process Clause That His Alleged Conduct Was Criminal.

Darin next contends that he did not receive sufficient notice that his conduct was criminal

for purposes of the Due Process Clause. (D. Mem. at 14). Darin's argument that Yen LIBOR

submissions were "opinions in response to a hypothetical fact" (*id.* at 15) ignores the most basic

facts of the fraud alleged in the Complaint: Defendants Darin and Hayes were secretly

manipulating – to UBS's advantage and to its counterparties' detriment – an integral component

of the trades UBS was entering into with those counterparties. Even more simply, on this point,

Darin is arguing, in essence that he was deprived of fair notice that he could be prosecuted for

participating in a scheme to manipulate LIBOR, by making false and misleading LIBOR

submissions, in order to gain a secret advantage over UBS's trading partners. This argument is

contrary to the allegations in the Complaint, which demonstrate that Darin understood the

implications of his actions.

The crime of fraud is neither new nor complicated. As courts have observed, fraud can be

difficult to define with precision, and in abstract terms because the offense has been committed

in so many different ways; nonetheless, the essential nature of a fraudulent scheme is not

difficult to identify. Fraud is "measured in a particular case by determining whether the scheme

demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid

dealings in the general life of the community." *United States v. Goldblatt*, 813 F.2d 619, 624 (3d

Cir. 1987). *See also McNally v. United States*, 483 U.S. 350, 358 (1987) ("the words 'to defraud'

commonly refer to wronging one in his property rights by dishonest methods or schemes," and

_____

does not address that question. For that reason, even if the decision were authoritative here (and it is not), *Perlaza* does not contradict decisions from this jurisdiction finding that a sufficient nexus has been established based on the conduct of a defendant's co-conspirators.

"usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.")
(internal citations omitted). Indeed, as courts have observed for many years: "[T]he law does not
define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity."
*United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) (quoting *Weiss v. United States*, 122
F.2d 675, 681 (5th Cir. 1941)).

Understandably, Darin does not seem to suggest that it would violate due process, based
on a lack of fair notice, to prosecute an individual for committing fraud. He instead argues that
he would not have known that one could be prosecuted for fraud by secretly manipulating a
benchmark rate to gain a secret advantage over parties to transactions in which that rate
determine profit and loss. In support of that view, Darin contends that: (1) LIBOR manipulation
had not specifically been criminalized at the time of this conduct; and (2) because a LIBOR
submission is subjective, it cannot be false. These arguments are without merit.

Whether UBS's Yen LIBOR submissions were "opinions" as Darin argues or facts, Darin
– as a sophisticated employee of one of the world's largest banks – had ample notice that
intentionally attempting to manipulate a global benchmark interest rate like LIBOR – with an
"opinion" or with a simple lie – was the type of crime that would "subject [him] to prosecution
somewhere." *Al Kassar II*, 660 F.3d at 119. Financial fraud in a global market is plainly criminal
conduct, as this Court has recognized by accepting the guilty pleas of Paul Robson and Takayuki
Yagami for manipulating Yen LIBOR. *See United States v. Robson et al.*, Case No. 1:14-cr-
00272-JSR (S.D.N.Y.) (Doc. Nos. 16, 21). Darin surely cannot suggest that he had "suddenly
learned" that financial fraud "was illegal in the United States or anywhere else." *United States v.
Al Kassar*, 582 F. Supp. 2d 488, 495 (S.D.N.Y. 2008) ("*Al Kassar I*") (internal quotation and

citation omitted). Tellingly, none of the cases cited by Darin in his "notice" argument involve financial fraud.

Darin further argues that the European Commission "implicitly recognized" that LIBOR manipulation was not criminalized during the relevant time period, because it had subsequently proposed a measure specifically barring this practice. (D. Mem. at 16). However, simply because a specific statute has been passed to proscribe specific fraudulent conduct does not mean that an original, broader statute did not apply to the proscribed conduct. *See, e.g.*, *United States v Reed*, 639 F.2d 896, 905 (2d Cir. 1981) ("[T]he mail fraud statute remains an important tool for prosecuting frauds even in those areas where legislation has been passed more directly addressing specific fraudulent conduct.").[18]

And while Darin argues that LIBOR submissions are "statements of opinion" and therefore such submissions cannot be false (D. Mem. at 15), Darin's own statements as reflected in the Complaint reflect otherwise. Indeed, the Complaint alleges that Darin cautioned Hayes that he could not make a LIBOR submission too far from the "truth" without suffering negative consequences. (Compl. ¶ 21(d)(ii)). The Complaint also alleges Darin was able to identify LIBOR submissions that were "unbiased" and "correct." (*Id.* ¶¶ 21(d)(ii), 21(f)). The Complaint alleges Darin knew what LIBOR submission would be "correct" and "unbiased" – but submitted something different than the truth, to the advantage of UBS's trading positions. Based on those

---

[18]    Notably, Defendant Hayes has been charged by the United Kingdom's Serious Fraud Office ("SFO") with LIBOR manipulation-related crimes, and is scheduled to go to trial in May 2015. On October 7, 2014, a former senior banker at a British bank pled guilty to LIBOR manipulation in a British court. *See* http://dealbook.nytimes.com/ 2014/10/07/a-former-banker-pleads-guilty-in-british-libor-case/. And on October 28, 2014, the SFO charged a former broker with LIBOR manipulation. *See* http://www.reuters.com /article/2014/ 10/28/libor-tullett-prebon-cryanidUSL5N0SN4V520141028. Regardless of what the European Commission thought of LIBOR manipulation, the U.K. criminal authorities recognize it as a crime.

27

allegations and the evidence supporting them, Darin's contention that one cannot make a false and misleading statement in a LIBOR submission is decisively refuted.

Darin also argues that "this absence of fair notice is also reflected in the specific facts alleged against Mr. Darin. Nowhere in the Complaint is there any suggestion that Mr. Darin knew... that his alleged conduct could subject him to criminal prosecution." (D. Mem. at 16). Darin ignores the Complaint's allegation on its first page that he "*knowingly* ... agree[d] to commit certain offenses against the United States." (Compl. at ¶ 1 (emphasis added)). The United States' "knowledge" allegation could not be made more plainly. And Darin points to no law that would require the United States to allege in the complaint "specific facts" about his "training ... instructions, guidance, or warnings" regarding LIBOR manipulation. (D. Mem. at 16). Indeed, these allegations are not elements of conspiracy to commit wire fraud: the United States not only does not need to allege such facts – the United States need not prove them. "The specific intent required under the mail fraud statute is the intent to defraud ... and not the intent to violate a statute." *United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989), *cert. denied*, 493 U.S. 810 (1989). *See also United States v. Paradies*, 98 F.3d 1266, 1285 (11th Cir. 1996) ("In ... fraud cases, the government need only prove that the defendant had the intent to deceive and ignorance of the law is no defense.").

Moreover, while the Complaint alleges that Darin was aware he could expose UBS to potential regulatory penalties for making manipulative LIBOR submissions (Comp. at ¶ 21(d)(ii)), that allegation certainly does not foreclose the possibility that Darin was aware of potential criminal penalties. As the Court is well aware, criminal actors are not in the regular practice of committing to writing their contemporaneous belief that their criminal conduct is, in

28

fact, criminal. Darin can make his notice defense before a jury once he submits to the jurisdiction of this Court.

## C. The Charge Against Darin Represents a Domestic Application of the Wire Fraud Statute.

Darin argues that the charged conspiracy statute (18 U.S.C. § 1349) and wire fraud statute (18 U.S.C. § 1343) lack extraterritorial application, and that the charges against him are "an unauthorized extraterritorial application" of them. (D. Mem. at 17). In considering the extraterritorial application of the conspiracy statute, the Court should look to the underlying substantive offense: wire fraud. *See Kim*, 246 F.3d at 191 n.2 ("Because there was jurisdiction over the wire fraud counts against [defendant], there was also jurisdiction over the conspiracy counts.") (quoting *United States v. Blackmon*, 839 F.2d 900, 910-11 (2d Cir. 1988)); *United States v. Ahmed*, 10 Cr. 131 (PKC), 2012 U.S. Dist. LEXIS 39451, *4-5 (S.D.N.Y. Mar. 21, 2012).

Because the United States has alleged as part of the conspiracy wires into the Southern District, this case represents a *domestic* application of the wire fraud statute. *See Kim*, 246 F.3d at 190-91 (application of wire fraud statute to scheme that was perpetrated from abroad was appropriate because "our goal is simply to vindicate the intended purpose of the statute, that is, to prevent the use of [our telecommunication systems] in furtherance of fraudulent enterprises"); *see also Trapilo*, 130 F.3d at 552 ("what is proscribed [under the wire fraud statute] is use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property. Nothing more is required. The identity and location of the victim, and the success of the scheme, are irrelevant"); *United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982) (holding district court had jurisdiction over wire fraud charges related to international shipping scam against non-resident alien).

29

Darin's conduct is factually indistinguishable from Kim's. While Kim was an American citizen and Darin is not, nothing about the Second Circuit's holding in *Kim* is predicated on the defendant's citizenship. Indeed, the Second Circuit cited with approval the *Gilboe* decision, involving a non-resident alien who perpetrated his wire fraud scheme from abroad. *Kim*, 246 F.3d at 190. Nothing about the wire fraud statute or the analysis in *Kim* suggests that the nationality of the defendant would change the extraterritoriality inquiry. Just as in *Kim*, a victim here is located in the Southern District of New York. (Compl. at ¶ 2(a)).

While Darin is correct that there is a presumption against extraterritoriality, the Second Circuit has already examined the wire fraud statute under similar factual circumstances and concluded that the prosecution was proper. *See Kim*, 246 F.3d 186. In *Kim*, the defendant claimed on appeal that the district court lacked jurisdiction over his fraudulent conduct because "none of his conduct, or that of his co-conspirators, occurred in the United States." *Id.* at 188. The Second Circuit acknowledged the general presumption against extraterritoriality but then looked carefully at Congressional intent in enacting the statute. *Id.* at 189. The Second Circuit found that the wire fraud statute applied to Kim's conduct, holding that "our goal is simply to vindicate the intended purpose of the statute, that is, to prevent the use of [our telecommunication systems] in furtherance of fraudulent enterprises. Such a goal is best met by the conclusion that the district court had jurisdiction over this case." *Id.* at 190-91. *See also Pasquantino v. United States,* 544 U.S. 349, 371-72 (2005) (observing in dicta that even if defendants' conduct in violation of the wire fraud statute could be deemed to have occurred outside the United States, the statute's prohibition of frauds executed "in interstate or foreign commerce" indicates that "this is surely not a statute in which Congress had only domestic concerns in mind") (internal quotation marks omitted)).

30

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), and *European Cmty. v.*

*RJR Nabisco, Inc.*, Docket No. 11-2475-cv, 2014 U.S. App. LEXIS 7593 (2d Cir. Aug. 20, 2014)

do not change the analysis. *Morrison* cautions that "[t]he general reference to foreign commerce

in the definition of 'interstate commerce' does not defeat the presumption against

extraterritoriality." 561 U.S. at 263. But as the Second Circuit has recognized, if Congress does

not provide a "clear statement" on extraterritoriality, the Court must then proceed to analyze the

"focus of Congressional concern." *Loginovskaya v. Batratchenko*, 764 F.3d 266, *10 (2d Cir.

2014). Although the *Kim* decision preceded *Morrison*, that is exactly what the Second Circuit did

in *Kim* by looking at the Congressional concern with closing the loophole that had previously

existed in the wire fraud statute. *Kim*, 246 F.3d at 189.

As for the *RJR Nabisco* case, the Second Circuit there made only a cursory review of the

wire fraud statute's extraterritorial application and did not consider the Second Circuit's opinion

in *Kim*. *RJR Nabisco*, 2014 U.S. App. LEXIS 759, *25-26. But this cursory review is not

surprising considering the Second Circuit's ultimate conclusion in *RJR Nabisco*:

> We need not now decide precisely how to draw the line between domestic and
> extraterritorial applications of the wire fraud statute, mail fraud statute, and Travel
> Act, because wherever that line should be drawn, the conduct alleged here clearly
> states a domestic cause of action. The complaint alleges that defendants hatched
> schemes to defraud in the United States, and that they used the U.S. mails and
> wires in furtherance of those schemes and with the intent to do so. ... In other
> words, plaintiffs have alleged conduct in the United States that satisfies every
> essential element of the mail fraud, wire fraud, and Travel Act claims.

*Id.* at 32. Here, the Complaint similarly alleges conduct in the United States that satisfies every

essential element of the wire fraud statute: all that is required within the United States is "use of

the telecommunication systems of the United States" to facilitate a scheme to defraud. *Trapilo*,

130 F.3d at 552. The scheme need not be hatched within the United States, as *Kim* and *Gilboe*

demonstrate.

**D. The Court Should Decline to Hear Darin's Claims Because He Is a Fugitive.**

## 1. Courts Have Discretion to Decline to Hear Claims Raised by Fugitives from Justice.

One of the bedrock principles of federal criminal law is the defendant's presence. As the Second Circuit has held, "[a] leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the [defendant]." *United States v. Canady*, 126 F.3d 352, 360 (2d Cir. 1997) (quoting *Lewis v. United States*, 146 U.S. 370, 372 (1892)). The Federal Rules of Criminal Procedure codify this principle through Rule 43(a), which requires that, "[u]nless this rule, Rule 5, or Rule 10 provides otherwise, the defendant must be present at: (1) the initial appearance, the initial arraignment, and the plea; (2) every trial stage, including jury impanelment and the return of the verdict; and (3) sentencing." Fed. R. Crim. P. 43(a).

This general principle has caused federal courts to establish the equitable doctrine of fugitive disentitlement, which recognizes that a fugitive from justice should not be permitted to call upon the resources of the court for determination of his case. *See, e.g.*, *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970) ("No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes the restraints placed upon him pursuant to the conviction."); *United States v. Oliveri*, 190 F. Supp. 2d 933, 935 (S.D. Tex. 2001) ("[T]he fugitive disentitlement doctrine has come to signify the unwillingness of courts to waste time and resources exercising jurisdiction over litigants who will only comply with favorable rulings of the court.").

The Second Circuit has recognized that the fugitive disentitlement doctrine "may be invoked at the discretion of the court" and "is grounded on the impropriety of permitting a fugitive to pursue a claim in federal court where he might accrue a benefit, while at the same

32

time avoiding an action of the same court that might sanction him." *United States v Eng*, 951 F.2d 461, 465 (2d Cir. 1991). The Supreme Court has long recognized this concept of mutuality in litigation. *See Smith v. United States*, 94 U.S. 97, 97 (1876) ("It is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party ... is where he can be made to respond to any judgment we render"); *Johnson v. Laird*, 432 F.2d 77, 79 (9th Cir. 1970) ("*Smith* rests upon the inherent discretion of any court to refuse to hear the claim of a litigant who indicates that he will comply with that court's decree only if it is favorable").

While the fugitive disentitlement doctrine had its origins in defendants who absconded after conviction and who sought to reverse their convictions while in flight, *see Molinaro*, 396 U.S. at 366, courts – including this one – have applied the doctrine to pre-trial proceedings. For instance, in *United States v Stanzione*, this Court rejected a fugitive defendant's motion to dismiss the indictment against him, holding that "until he is willing to submit his case for complete adjudication – win or lose – he should not be permitted to call upon the resources of the court for the determination of selective claims." 391 F. Supp. 1201, 1202 (S.D.N.Y. 1975). *See also United States v. Shapiro*, 391 F. Supp. 689, 692 (S.D.N.Y. 1975) (recognizing that courts have discretion to hear motions to dismiss filed by fugitive defendants, and choosing to exercise that discretion because defendant's counsel informed the court "that if the jurisdictional issue were decided against her client, *he would surrender promptly to permit a determination on the merits*" (emphasis added)).

Courts across the country have similarly applied the fugitive disentitlement doctrine to pre-trial motions. *See, e.g , United States v. Yeh*, No. CR 10-00231 WHA, 2013 U.S. Dist. LEXIS 69284, *8 (N.D. Cal. May 15, 2013) (declining to consider defendant's motion to dismiss the indictment and holding that it "would be a waste of resources to adjudicate advisory opinions

at [defendant's] behest"); *Oliveri*, 190 F. Supp. 2d at 935 (denying defendant's motion to dismiss indictment against him and holding that the defendant is "attempting to obtain the benefit of a favorable ruling from this court without risking the burdens that may flow from an adverse ruling"); *United States v. Eagleson*, 874 F. Supp. 27, 31 (D. Mass. 1994) (denying defendant's pre-trial motion to vacate forfeiture orders against him because defendant had "refused to submit to this Court's jurisdiction or to abide by the consequences of its ultimate judgment"). *See also In re Han Yong Kim*, 571 Fed. Appx. 556, *4 (9th Cir. 2014) ("While we decline to decide whether the fugitive disentitlement doctrine applies in a case like Kim's where a foreign national residing abroad refuses to voluntarily travel to the United States for trial in the absence of an extradition order, we must conclude that the district court did not clearly err either in holding that it does").

### 2. Darin is a Fugitive.

While Darin claims that he is not a fugitive from justice (D. Mem. at 18 n.1), he has failed to appear in this Court and has taken active steps to avoid extradition to the United States by avoiding travel outside of his native country of Switzerland. This makes Darin a fugitive. Courts define the term "fugitive" as someone who seeks to evade prosecution by either actively avoiding the authorities or remaining in a geographic location that is out of the authorities' reach.

> The intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending. This is true whether the defendant leaves the jurisdiction intending to avoid prosecution, or, having learned of the charges while legally outside the jurisdiction, constructively flees by deciding not to return.

*United States v Catino*, 735 F.2d 718, 722 (2d Cir. 1984) (citations omitted). "Fleeing from justice does not, as the words literally connote, mean a person 'on the run.' ... Fleeing from justice is not always a physical act; it may be a state of mind. When a person purposely leaves the jurisdiction or decides not to return to it, in order to avoid prosecution, he is a fugitive." *Eng*,

951 F.2d at 464. Indeed, "how the person became a 'fugitive' is not necessarily relevant because the focus is on the *intent to return and appear before the court.*" *United States v. Hernandez*, 09 CR 625 (HB), 2010 U.S. Dist. LEXIS 65400, *13-14 (S.D.N.Y. June 30, 2010) (emphasis added). *See also United States v. Blanco*, 861 F.2d 773, 779 (2d Cir. 1988) ("A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges"); *Eagleson*, 874 F. Supp. at 29 ("Because [defendant] has such notice [of the indictment] and has, nevertheless, refused to submit to the jurisdiction of this Court to answer that indictment, the Court regards him as a fugitive").[19] Because Darin has notice of the criminal charges, has retained U.S.-based counsel in connection with this matter, and now actively resists traveling to the United States -- or, indeed, outside of Switzerland -- for the express purpose of avoiding this Court's jurisdiction, the Court should regard Darin as a fugitive.[20]

---

[19]     *Cf.* 28 U.S.C. § 2466(a) (defining fugitive for the purposes of the fugitive disentitlement doctrine in civil forfeiture actions to include a person who "*declines to enter* or reenter the United States to submit to [the court's] jurisdiction" or "otherwise evades the jurisdiction of the court in which a criminal case is pending against the person" and "is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction") (emphasis added).

[20]     Defendant's reliance on the definition of "fugitive" from *Empire Blue Cross & Blue Field v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997) is misplaced. In that opinion, the Second Circuit simply quoted the definition of "fugitive" from Black's Law Dictionary -- a definition that has subsequently changed to encompass "[a] criminal suspect who flees, *evades*, or escapes arrest, *prosecution*, or imprisonment." Black's Law Dictionary, 7th ed. (1999) (emphasis added). Moreover, the Second Circuit in *Finkelstein* went on to conclude that "[w]e see no reason to entertain the cause of one who will respond to a judgment only if it is favorable." 111 F.3d at 282 (internal quotation and citation omitted). That describes Darin's motion precisely.

### 3. This Court Should Decline to Hear Darin's Claims Under the Fugitive Disentitlement Doctrine or a More General Exercise of Discretion.

The Court should exercise its discretion to decline to consider defendant's arguments at this stage. There are significant policy considerations that suggest the Court should exercise its discretion not to consider Darin's motion until he submits to the jurisdiction of this Court, either under the fugitive disentitlement doctrine or under a more general exercise of its discretion. The Second Circuit has identified at least four relevant policy considerations undergirding the fugitive disentitlement doctrine: "(1) assuring the enforceability of a decision against a fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice to promote efficient operation of the courts; and (4) avoiding prejudice to the other side engendered by a defendant's flight." *Hanson v. Phillips*, 442 F.3d 789, 795 (2d Cir. 2006). The Second Circuit has instructed district courts to consider all four grounds in deciding whether to exercise discretion is hearing a fugitive's claims. *United States v. Awadalla*, 357 F.3d 243, 245 (2d Cir. 2004).

Here, the Court should choose not to exercise its discretion for all four reasons identified in *Hanson*. First, if the Court decides against Darin, the decision will not be enforceable: Darin will not submit to the Court's jurisdiction if the Court denies his motion on the merits. Second, Darin is "flouting the judicial process" by refusing to appear in this Court, and the Court should impose a penalty for his doing so. Third, ruling on Darin's motion on the merits would encourage others in Darin's position – including potentially other defendants in LIBOR-related cases residing abroad – to take flight from justice. Fourth, Darin's continued absence from this Court prejudices the United States. The Complaint alleges conduct that occurred between September 2006 and September 2009. (Compl. at ¶ 1). With each month that Darin refuses to

36

appear before this Court, witnesses' memories fade and the criminal events become more remote in time, thereby prejudicing the prosecution of this case.

Darin is positioned similarly to the defendant in *Stanzione*. Like Stanzione, Darin is "willing to enjoy the benefits of a legal victory, but is not at all prepared to accept the consequences of an adverse holding." 391 F. Supp. at 1202. Also like Stanzione, if Darin's "motion to dismiss were to be denied on the merits, defendant would remain a fugitive from justice, making it impossible to bring his case to final resolution." *Id.*

Darin's passing reliance on *In re Hijazi*, 589 F.3d 401 (7th Cir. 2009) is misplaced for several reasons. (D. Mem. at 18 n.6). First, *Hijazi* is not controlling precedent in this Circuit, and no courts in this Circuit have adopted it or even cited it. Second, the district court's "duty" to rule on Hijazi's motion was essentially created by the Seventh Circuit out of thin air: the Seventh Circuit pointed to no statute or rule that imposed that "duty" on the district court. Third, courts in the Seventh Circuit have heeded the Seventh Circuit's warning that *Hijazi* involved "unusual circumstances," 589 F.3d at 403, because the United States is aware of only one case applying *Hijazi* to a true fugitive disentitlement case. *See United States v. Kashamu*, No. 94 CR 172, 2010 U.S. Dist. LEXIS 72859 (N.D. Ill. July 15, 2010). Fourth, *Hijazi* is factually distinguishable in several respects from the case at bar:

> - In *Hijazi*, the government of Kuwait actively opposed the prosecution of the case, going so far as to say in a letter from the Kuwaiti Ambassador that "we strongly believe that the underlying facts do not support the indictment." *Id.* at 405. In the present case, although the Swiss Government has informally indicated that it would decline to extradite Darin, the Swiss Government forced Darin's former employer, UBS AG, to disgorge profits of approximately $62 million as a result of the scheme to manipulate LIBOR. *See* http://www.finma.ch/e/aktuell/pages/mm-ubs-libor-20121219.aspx. This case therefore does not involve the "delicate foreign relations issues" identified by the Seventh Circuit in *Hijazi*. 589 F.3d at 411.

- Hijazi "surrendered voluntarily to Kuwaiti authorities" and posted a bond. *Id.* at 405. Darin has not similarly surrendered to Swiss authorities.

- The Seventh Circuit attached significance to the fact that because Hijazi was a Lebanese citizen living in Kuwait at the time of the charges and because the United States had issued a "red notice" for his provisional arrest, Hijazi was "unable to travel home to Lebanon to see his family." *Id.* at 407. Here, Darin is a native of Switzerland, living in Switzerland, and is not similarly prejudiced.

- The procedural posture of the present case is different from *Hijazi*. By the time Hijazi filed his petition for a writ of mandamus with the Seventh Circuit, it had been approximately three years since he had filed his initial motion to dismiss, creating an "impasse" that the Seventh Circuit apparently felt compelled to address. 589 F.3d at 403, 405-06. Here, although Darin has been charged for almost two years, his motion to dismiss was only recently filed.

- Hijazi's co-defendant pled guilty after two mistrials and received only probation, a fact which the Seventh Circuit referenced multiple times in its opinion. 589 F.3d at 405. Here, charges are pending against Defendant Hayes (both here and in the United Kingdom), and so there is no suggestion that Darin's co-defendant is not culpable or that the evidence against Darin's co-defendant is weak, as in *Hijazi*.

## V. CONCLUSION

In support of his motion, Darin describes this case as reflecting "an unprecedented attempt to expand the extraterritorial reach of the United States criminal law." (D. Mem at 1). With even greater alarm, he cautions that if "the Government's sweeping theory is accepted, then federal law could be used to prosecute any foreign national, acting outside the United States, who has affected any piece of financial information that can be accessed through the Internet." (*Id.*). Darin apparently believes that these dire warnings will serve his tactical interests. That effort should not succeed, however, because the exaggerated threat that Darin describes is a fiction that bears no resemblance to the case that has been brought.

The Complaint alleges that Roger Darin participated in conspiracy to commit wire fraud, in the Southern District of New York and elsewhere, by manipulating a benchmark rate used in a

38

global financial market. That scheme victimized parties in the United States, and it was furthered by the transmissions of electronic communications into this country. The Complaint further alleges that Darin was an experienced derivatives trader who made and oversaw UBS's Yen LIBOR submissions, and who did so in order to promote the unlawful and sweeping objectives of the fraudulent scheme in which he participated. Thus, this case does not present, and says nothing about, a circumstance in which someone has merely affected some piece of financial information that is available on the Internet. If the Government ever brings such a case, the Court may be called upon to address the concerns that Darin has invented. It has no cause to do so here.

For all the reasons discussed above, if and when Darin is in a position to assert claims under the Due Process Clause, those claims should be rejected. Moreover, the wire fraud statute applies to Darin's conduct, which is alleged as a territorial offense. The Court should not devote its resources to resolving claims asserted by a defendant who will not submit to its authority. If it does so, however, the Government respectfully submits that Darin's motion should be denied.

DATED:     November 7, 2014          WILLIAM J. STELLMACH
                                      Acting Chief, Fraud Section

                                      THOMAS B.W. HALL
                                      Trial Attorney

39

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

Case No. 12 MJ 3229

TOM ALEXANDER WILLIAM HAYES, and
ROGER DARIN,

*Defendants.*

## CERTIFICATE OF SERVICE

I certify that on this 7th day of November, 2014, I caused to be sent, via First Class U.S. Mail, a copy of the foregoing **OPPOSITION TO DEFENDANT ROGER DARIN'S MOTION TO DISMISS THE CRIMINAL COMPLAINT** to the following:

Bruce A. Baird
James M. Garland
Alexander A. Berengaut
Covington & Burling, L.L.P.
1201 Pennsylvania Avenue, NW
Washington, DC 20004

THOMAS B.W. HALL
Trial Attorney

40

# EXHIBIT A

# 12 MAG 3229

Approved:

_William Stellmach_ [signature]

William Stellmach, Deputy Chief          Elizabeth Prewitt, Asst. Chief
Daniel Braun, Deputy Chief               Richard Powers, Trial Attorney
Luke Marsh, Trial Attorney               *Antitrust Division (New York)*
*Criminal Division (Fraud Section)*

Before:      HONORABLE FRANK MAAS
             United States Magistrate Judge
             Southern District of New York

- - - - - - - - - - - - - - - - - -x
                                    :    **TO BE FILED UNDER SEAL**
UNITED STATES OF AMERICA
                                    :    **COMPLAINT**
          - v. -
                                    :    18 U.S.C. §§ 1349, 1343 &
TOM ALEXANDER WILLIAM HAYES, and         2; 15 U.S.C. § 1
ROGER DARIN,                        :
                                         COUNTY OF OFFENSE:
          Defendants.               :    New York and elsewhere
- - - - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          MICHAEL J. MCGILLICUDDY, being duly sworn, deposes and
says that he is a Special Agent with the Federal Bureau of
Investigation ("FBI") and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

          1.    From at least in or about September 2006 through
in or about September 2009, in the Southern District of New York
and elsewhere, TOM ALEXANDER WILLIAM HAYES and ROGER DARIN, the
defendants, and others known and unknown, did knowingly combine,
conspire, confederate, and agree to commit certain offenses
against the United States, that is: to devise and intend to
devise a scheme and artifice to defraud, and to obtain money and
property by means of materially false and fraudulent pretenses,
representations, and promises, knowing that they were false and
fraudulent when made, and transmitting and causing to be
transmitted certain wire communications in interstate and foreign
commerce, for the purpose of executing the scheme, to wit, the
defendants engaged in a scheme to defraud counterparties to
interest rate derivative trades taken on behalf of their employer
by secretly manipulating benchmark interest rates to which the
profitability of those trades was tied, in violation of Title 18,

profitability of those trades was tied, in violation of Title 18, United States Code, Section 1343.

## Overt Acts

2.      In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

> a.    On or about September 12, 2007 and on or about July 15, 2008, HAYES entered into trades with a counterparty based in Purchase, New York;

> b.    At various times relevant to this Complaint, including on or about March 29, 2007 and on or about April 28, 2008, DARIN engaged in electronic chats with HAYES; and

> c.    At various times relevant to this Complaint, HAYES and DARIN, and others known and unknown, caused the publication of manipulated interest rate information in New York, New York.

(Title 18, United States Code, Section 1349)

## COUNT TWO
### (Wire Fraud)

3.      At various times relevant to this Complaint, in the Southern District of New York and elsewhere, TOM ALEXANDER WILLIAM HAYES, the defendant, unlawfully, wilfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HAYES caused confirmations on or about September 12, 2007 and on or about July 15, 2008, to be transmitted from outside the United States to a counterparty based in Purchase, New York, for transactions involving interest rate derivative products tied to a benchmark interest rate which HAYES was secretly manipulating.

(Title 18, United States Code, Sections 1343 and 2)

2

## COUNT THREE
### (Antitrust)

4.      In or about May 2009, in the Southern District of
New York and elsewhere, TOM ALEXANDER WILLIAM HAYES, the
defendant, and his co-conspirators, including an employee at a
major financial institution, and others known and unknown,
engaged in a combination and conspiracy in unreasonable restraint
of interstate and foreign trade and commerce in violation of
Section 1 of the Sherman Act.  The aforesaid combination and
conspiracy consisted of an agreement, understanding, and concert
of action among HAYES and his co-conspirators, the substantial
terms of which were to fix Yen LIBOR, a key price component of
Yen LIBOR-based derivative products.

(Title 15, United States Code, Section 1)

### Affect on a Financial Institution

5.      The scheme alleged in this Complaint had an affect
on one or more financial institutions, within the meaning of
Title 18, United States Code, Sections 20 and 3293(2).

\*       \*       \*       \*       \*

The bases for my knowledge and the foregoing charges
are, in part, as follows:

6.      I am a Special Agent with the FBI of the United
States Department of Justice.  I am thoroughly familiar with the
information contained in this Complaint, either through my own
direct involvement in investigative work or through conversations
with law enforcement agents and others, and my examination of
documents, audio recordings, and other records from the various
entities identified below.  Because this Complaint is being
submitted for a limited purpose, I have not set forth each and
every fact that I know about the investigation.  To the extent
that this Complaint contains assertions concerning dates and
numbers, such assertions are often approximations based upon
information and evidence gathered to date.  Where the contents of
documents and the actions, statements, and conversations of
others are reported herein, they are reported in substance and in
part, except where otherwise indicated.
¶

3

### Relevant Background

#### A.    The London Interbank Offered Rate

7.    The London Interbank Offered Rate ("LIBOR") is the primary global benchmark for short-term interest rates, and it is calculated by averaging the estimates from leading banks around the world of the rates they would be charged if borrowing from other banks.  Many financial institutions, mortgage lenders, and credit card agencies set their own rates relative to LIBOR. Mortgages, credit cards, student loans, and other consumer lending products often use LIBOR as a reference rate.

8.    LIBOR is published under the auspices of the British Bankers' Association ("BBA"), a trade association based in London.  LIBOR is calculated for ten currencies at fifteen borrowing periods (or maturities), ranging from overnight to one year.

9.    The LIBOR for a given currency at a specific maturity is the result of a calculation based upon submissions from a panel of banks for that currency selected by the BBA. According to the BBA, the basis for a panel bank's LIBOR submission must be the rate at which members of the bank's staff primarily responsible for management of the bank's cash perceive that the bank can borrow unsecured funds from another bank in the designated currency over the specified maturity.

10.    Each bank on the panel for a particular currency submits its LIBORs every London business day through electronic means to Thomson Reuters, as an agent for the BBA, by 11:10 a.m. London Time.  Among other currencies, Thomson Reuters publishes LIBORs for the Japanese Yen.  After each Yen panel bank has submitted its rates, Thomson Reuters ranks the contributed rates from highest to lowest, then excludes the top four and bottom four submissions, and finally averages the remaining middle eight submissions to determine the official LIBOR setting (or "fix") for that particular currency at each maturity.  Thomson Reuters then publishes those fixings publicly, including to servers and counterparties based in New York, New York.

#### B.    Relevant Individuals and Entities

11.    As explained above, each panel bank made daily submissions to the BBA purporting to report the rates at which it could borrow sums of a "reasonable market size" from other banks for specified maturities.

4

12.   The Yen LIBOR panel included, among other banks:

    a.   Bank A, a global financial services company headquartered in New York, New York;

    b.   Bank B, a global financial services company headquartered in Frankfurt, Germany;

    c.   Bank C, a global financial services company headquartered in Edinburgh, Scotland;

    d.   Bank D, a global financial services company headquartered in New York, New York; and

    e.   UBS AG, a global financial services company headquartered in Basel and Zurich Switzerland, with eleven principal offices around the world, including New York, New York.   At certain times relevant to this Complaint, UBS AG operated, among other wholly-owned subsidiaries, UBS Securities Japan Ltd., an investment bank and financial services firm based in Tokyo, Japan (collectively, "UBS").[1]

13.   Brokerage Firm A and Brokerage Firm B (collectively, the "Brokerage Firms") were London-based, inter-dealer brokers that, in exchange for commissions or other fees, matched buyers and sellers in various financial products, enabling them to engage in transactions.   The Brokerage Firms provided such services to numerous clients, including Yen LIBOR panel banks, for Yen money market transactions, among other things.

14.   At certain times relevant to this Complaint, prior to making Yen LIBOR submissions to the BBA, submitters at various Yen LIBOR panel banks consulted with inter-dealer brokers employed by the Brokerage Firms to learn about transactions,

---

[1]   At all times relevant to this Complaint, UBS operated branches or agencies within the United States, which were financial institutions, within the meaning of Title 18, United States Code, Section 20.   UBS also engaged in transactions with counterparties that included financial institutions.   One or more of these financial institutions was affected by the conduct charged in this Complaint, within the meaning of Title 18, United States Code, Section 3293(2).

activity, or trends in the short-term money markets in which banks would lend and borrow Yen. Because the Brokerage Firms had knowledge regarding the interest rates paid in such money market transactions, Yen LIBOR submitters considered such information, at certain times, in determining their banks' submissions.

15. Beginning in or about July 2006 through in or about September 2009, TOM ALEXANDER WILLIAM HAYES, the defendant, worked as a senior Yen swaps trader at UBS in Tokyo. At certain times relevant to this Complaint, he was assisted by a junior trader (the "UBS Junior Trader"). From in or about December 2009 through in or about September 2010, after leaving UBS, HAYES was employed as a senior Yen swaps trader at Bank D in Tokyo.

16. At certain times relevant to this Complaint, ROGER DARIN, the defendant, worked as a short-term interest rates trader at UBS in Singapore, Tokyo, and Zurich. At certain times during his tenure at UBS, in addition to trading, DARIN was also responsible for the bank's Yen LIBOR submissions to the BBA, and supervised two junior short-term interest rate traders ("UBS Junior Submitter 1" and "UBS Junior Submitter 2"), who also submitted UBS's Yen LIBORs to the BBA.

## C. UBS's Trading in Yen LIBOR-Based Derivative Products

17. UBS and other Yen LIBOR panel banks engaged in the trading of Yen LIBOR-based derivative products such as futures, forward rate agreements, and interest rate swaps. Interest rate swaps, for example, are a type of financial product in which two parties agree to exchange interest rate cash flows based on a specified notional amount. In one common type of interest rate swap, each party agrees to pay either a fixed or floating rate denominated in a particular currency to the other party. The fixed or floating rate is multiplied by a notional principal amount to calculate the cash flows which must be exchanged at settlement. This notional amount generally does not change hands. LIBOR is a leading global benchmark used to index the floating rate in interest rate swaps.

18. HAYES and DARIN, among other UBS traders, traded in interest rate swaps and other interest rate derivative products indexed to different maturities of Yen LIBOR (such as 3-month or 6-month Yen LIBOR), effectively wagering on the direction in which Yen LIBOR would move. The bank compensated the defendants, in part, based on the profitability of their trading positions, effectively tying the defendants' bonuses to their success in predicting the movements of Yen LIBOR.

6

## The Fraudulent Scheme

19. From at least in or about September 2006 through in or about June 2010, HAYES, together with others known and unknown, orchestrated a scheme to manipulate Yen LIBOR to maximize profits for his trading positions at the expense of his counterparties. Among other fraudulent devices to manipulate Yen LIBOR in a direction favorable to his trading positions, HAYES engaged in the following means and methods to execute his fraudulent scheme:

> a. HAYES conspired with DARIN, and others known and unknown within UBS, to cause the bank to make false and misleading Yen LIBOR submissions to the BBA;

> b. HAYES caused the Brokerage Firms to disseminate to other Yen LIBOR panel banks false and misleading information about short-term interest rates for Yen which those banks could and did rely upon in formulating their own Yen LIBOR submissions to the BBA; and

> c. HAYES made efforts to coordinate with Yen swaps traders at other Yen LIBOR panel banks to likewise cause those banks to make false and misleading Yen LIBOR submissions to the BBA.

20. In this manner, HAYES, together with others known and unknown, devised and carried out a scheme to defraud UBS's and Bank D's counterparties and also globally impacted transactions and financial products tied to Yen LIBOR. Counterparties entering into Yen LIBOR-based derivative trades with HAYES, and therefore UBS and Bank D, did not know about this manipulation and were deceived regarding its occurrence.

## A. The Conspiracy to Falsify UBS's Yen LIBOR Submissions

21. Unless otherwise specifically stated, based on my review of business records from UBS, the Brokerage Firms, and other Yen LIBOR panel banks, my participation in interviews, including those with the UBS Junior Trader and UBS Junior

7

Submitter 2,[2] my review of memoranda of interviews conducted by other agents, my review of summaries prepared by others, including summaries of UBS trading records, and my review of publicly available information, I have learned the following:

        a.    From at least in or about September 2006 through in or about August 2009, HAYES, DARIN, and others known and unknown, caused UBS repeatedly to provide false and misleading information in its daily Yen LIBOR submissions to the BBA regarding the interest rates at which UBS could borrow reasonable sums denominated in Yen from other banks. As explained above, HAYES and DARIN provided this false and misleading information to cause the final Yen LIBOR fixings published by Thomson Reuters to move in directions favorable to UBS trading positions in Yen LIBOR-based derivative products.

        b.    For example, in an electronic chat on or about November 20, 2006:[3]

            i.    HAYES explained to UBS Junior Submitter 1 that HAYES and DARIN "generally coordinate" and "skew the libors a bit." HAYES further stated: "really need high 6m fixes till thursday."

---

[2]    Both the UBS Junior Trader and UBS Junior Submitter 2 are cooperating with this investigation pursuant to non-prosecution agreements stating that, if these individuals abide by the terms of the agreements, neither the Criminal Division nor the Antitrust Division of the United States Department of Justice will prosecute them for their roles in the conduct alleged in this Complaint.

[3]    A redacted copy of this UBS internal chat is attached hereto as Exhibit 1. All exhibits to this Complaint have been redacted to protect the identities and privacy interests of individuals and entities not specifically named in this Complaint. All shorthand, misspellings, and grammatical or typographical errors in the originals have been preserved in the excerpts quoted in this Complaint. As reflected in the attached Exhibits, the ellipses included in the quoted excerpts throughout were either in the original or indicate a line break in the original.

      ii.    UBS Junior Submitter 1 then responded: "will def be on the high side."

      iii.  On the trading day preceding this chat, UBS's submission for 6-month Yen LIBOR was tied for the second lowest submission to the BBA.  However, following HAYES's request, the bank's submission became among the highest and remained so through the Thursday identified in the request.  On or about Friday, November 24, 2006, UBS's submission returned to a level that was tied for the third lowest on the Yen LIBOR panel.

    c.    In or about early 2007, DARIN trained UBS Junior Submitter 2 and told him that the primary consideration in determining UBS's Yen LIBOR submissions each day was the requests from HAYES and other UBS Yen swaps traders.  DARIN advised UBS Junior Submitter 2 that such requests were to be accommodated, and UBS Junior Submitter 2 subsequently complied with DARIN's instruction.

    d.    DARIN also personally accommodated requests from HAYES and other UBS Yen swaps traders. For example, in an electronic chat on or about March 29, 2007:[4]

      i.    HAYES requested, among other things, that UBS's 3-month Yen LIBOR submission be "low," to which DARIN responded: "ok."

      ii.   DARIN subsequently indicated that UBS's "unbiased" 3-month Yen LIBOR submission would be 0.69 percent and that he could not set too far away from the "truth" or he would risk getting UBS "banned" from the Yen LIBOR panel.

---

[4]    A redacted copy of this UBS internal chat is attached hereto as Exhibit 2.

iii. HAYES then responded, in part: "ok obviousl;y no int in that happening either...not asking for it be 7bp from reality...anyway any help appreciated."

iv. Subsequent to the chat, UBS's 3-month Yen LIBOR submission was 0.67 percent instead of the "unbiased" 0.69 percent that DARIN suggested otherwise would have been submitted. According to BBA records of Yen LIBOR panel bank submissions for that day, the resulting 3-month Yen LIBOR fix was 1/8 of a basis point[5] lower than it otherwise would have been had UBS's submission remained at the "unbiased" 0.69 percent.

e. Although the movements in Yen LIBOR submissions requested by HAYES and the UBS Junior Trader who acted at his direction could be measured in basis points, the yields to HAYES's trading positions were considerable. In fact, at certain times relevant to this Complaint, HAYES indicated in his requests to DARIN or UBS Junior Submitter 2 approximately how much his trading positions would benefit from even relatively slight movements in the resulting Yen LIBOR fix. For example, in a series of electronic chats from on or about Wednesday, March 12, 2008 through on or about Monday, March 17, 2008:[6]

i. On or about Wednesday, March 12, 2008, HAYES asked UBS Junior Submitter 2 for a "high" 3-month Yen LIBOR submission because "we have 2m usd fix in 3m on monday...per bp." UBS's trading records confirm that HAYES had a net trading position on or about Monday, March 17, 2008, that would profit by approximately

---

[5] A basis point (or "bp") is equal to 0.01 percent; 100 basis points therefore equals 1.00 percent.

[6] Redacted copies of these UBS internal chats are attached hereto as Exhibit 3.

10

$2.1 million based on a one basis point increase in the 3-month Yen LIBOR fix on that day.

ii.  UBS Junior Submitter 2 then responded that UBS's 3-month Yen LIBOR submission of 0.99 percent had been on the very high side the previous day and, as a result, UBS Junior Submitter 2 needed to go lower and "thought about 0.97." HAYES then inquired whether 0.98 percent was possible, but noted: "anyway the actual fix is monady...so thats the key day."

iii. That same day, notwithstanding UBS Junior Submitter 2's suggestion that a 0.97 percent submission was more appropriate, UBS's 3-month Yen LIBOR submission was 0.98 percent, consistent with HAYES's request.

iv.  The following two days--on or about Thursday, March 13, 2008, and on or about Friday, March 14, 2008--UBS Junior Submitter 2 increased the bank's 3-month Yen LIBOR submission to 0.99 percent.

v.   On or about Monday, March 17, 2008, the "key day" for his trading position, HAYES noted that he had spoken with DARIN regarding the 3-month Yen LIBOR submission and inquired whether "we could push it a bit more than usual." UBS Junior Submitter 2 then replied: "friday fixed 3mt at 0.99...shall i go fro 1%?" HAYES then answered "pls," to which UBS Junior Submitter 2 replied: "ok will do."

vi.  On or about Monday, March 17, 2008, UBS's 3-month Yen LIBOR submission was 1.00%. On that day, alone, the resulting 3-month Yen LIBOR fix generated approximately $793,000 in additional profits for HAYES's trading book and, ultimately, for UBS compared to that which it would have earned had

11

            the bank's submission remained at 0.97 percent.

    viii. The following day, on or about Tuesday, March 18, 2008, UBS's 3-month Yen LIBOR submission decreased to 0.95 percent.

  f.  Likewise, in an electronic chat on or about April 28, 2008:[7]

    i.  HAYES requested a low 6-month LIBOR submission from DARIN and asked: "hi roger i have a 500k usd fix in 6m today, can we try to keep it on the low side pls?"[8]

    ii.  DARIN then replied: "i'll submit something low...but if u can u should square it up."  DARIN then added: "the correct 6m is 1.08."

    iii.  HAYES subsequently responded: "appreciate the help."

    iv.  That same day, UBS's 6-month Yen LIBOR submission was 0.98 percent, compared to DARIN's "correct" rate of 1.08 percent. According to BBA records, the resulting 6-month Yen LIBOR fix was 1/4 of a basis point lower than it would have been had UBS submitted the "correct" rate of 1.08 percent.

  g.  Similarly, in an electronic chat on or about June 29, 2009:[9]

---

[7]  A redacted copy of this UBS internal chat is attached hereto as Exhibit 4.

[8]  In this context, I believe that "500k usd fix" means HAYES had a trading position which would gain or lose $500,000 for each single basis point movement in the resulting 6-month Yen LIBOR fix.

[9]  A redacted copy of this UBS internal chat is attached hereto as Exhibit 5.

      i.     In requesting a high 6-month Yen LIBOR submission from UBS Junior Submitter 2, HAYES inquired: "can we st 6m libor high pls?"

      ii.    UBS Junior Submitter 2 then responded that, based on available information, UBS's 6-month Yen LIBOR submission likely would be 0.7150 percent.

      iii. HAYES then asked: "can we go 74 or 75...we have 2m usd a bp fix."[10]

      iv.    UBS Junior Submitter 2 then responded: "yes sure will. i go with .75 for you." UBS's 6-month Yen LIBOR submission was indeed 0.75 percent that day, which was 3.5 basis points higher than the rate which UBS Junior Submitter 2 would have submitted.

      v.     According to BBA records of Yen LIBOR panel bank submissions for that day, UBS's 6-month Yen LIBOR submission of 0.75 percent placed it in the upper quartile, which meant that another bank's submission which would have been otherwise discarded was moved down into the "middle eight" and averaged to determine the final LIBOR fix. As a result of that change, the 6-month Yen LIBOR fix that day was increased by 1/16 of a basis point.

    h.    On at least approximately 335 of the 738 trading days from in or about November 2006 through in or about August 2009, HAYES or the UBS Junior Trader, at HAYES's direction, requested that DARIN, UBS Junior Submitter 1, or UBS Junior Submitter 2 accommodate HAYES's requests when setting UBS's Yen LIBOR

---

[10]    In this context, I believe that "2m usd a bp fix" means HAYES had a trading position which would gain or lose $2 million for each single basis point movement in the resulting 6-month Yen LIBOR fix.

submissions.[11] At certain times in this period, HAYES requested accommodations for continuous days.

    i.    HAYES engaged in this conduct both before and after entering into trades with various counterparties.

    j.    At certain times relevant to this Complaint, counterparties to HAYES's trading positions included entities located in New York, New York which were financial institutions, within the meaning of Title 18, United States Code, Section 20.

    22.    Based on previously identified sources, I have learned that:

    a.    At certain times relevant to this Complaint, HAYES engaged in Yen LIBOR-based derivative transactions with a counterparty (the "Counterparty") based in Purchase, New York.

    b.    For example, on or about September 12, 2007, HAYES entered into two trades with the Counterparty for derivative products tied to 6-month Yen LIBOR. The confirmations for these trades were electronically routed from

---

[11]    Based on the sources previously identified, I learned that beginning in or about 2007, managers at UBS issued instructions to submitters for various LIBOR currencies, including the Yen and U.S. dollar, to "err on the low side" in their submissions or to make submissions that would be in the "middle of the pack" of other panel bank submissions. These instructions, at least part, were prompted by concerns that if UBS submitted higher LIBORs relative to other banks, UBS could attract negative attention in the media by potentially creating the impression it was paying higher rates of interest due to difficulties in obtaining funds: higher LIBORs might suggest UBS had a credit problem. According to UBS Junior Submitter 2, these instructions from higher levels within UBS, at certain times, prevented HAYES from manipulating Yen LIBOR to benefit his trading positions, leading to multiple complaints by HAYES and at least two attempts by his supervisor to obtain an exception for HAYES. Internal electronic communications recovered during this investigation corroborate this information.

14

UBS's offices overseas to the Counterparty's primary servers, located in Rye Brook, New York.

c.   On the valuation dates prior to the settlement of those trades, HAYES requested that UBS Junior Submitter 2 move UBS's 6-month Yen LIBOR submissions in the direction that maximized HAYES's profits on those trades.  According to BBA records, compared to the previous day, the change in UBS's 6-month Yen LIBOR submission was consistent with the direction of HAYES's request on one of those dates.

d.   On or about July 15, 2008, HAYES again entered into a Yen LIBOR-based derivative transaction with the Counterparty, and the confirmation was again electronically routed through the Counterparty's servers in this District from overseas.

e.   In an interview with another agent, the principal in charge of fixed income rate trading for North America and Asia at the Counterparty stated that he never speculated or observed that a Yen LIBOR panel bank had submitted rates to the BBA that benefitted its trading positions.  Instead, the Counterparty's principal assumed that there was a segregation of duties and that the Yen swaps trader at the panel bank on the other side of the Counterparty's trading positions was not involved in the bank's Yen LIBOR submissions because otherwise the swaps trader could influence those submissions at the Counterparty's expense.

## B.   Dissemination of False and Misleading Interest Rate Information Through the Brokerage Firms

23.   Unless otherwise specifically stated, based on previously identified sources, I have learned the following:

a.   From at least in or about September 2006 through in or about September 2009, HAYES, and others known and unknown, also enlisted

15

brokers employed at the Brokerage Firms for the purpose of disseminating false and misleading interest rate information into the marketplace. As explained above, such brokers have many contacts at Yen LIBOR panel banks, including Yen swaps traders and Yen LIBOR submitters. Some brokers employed at the Brokerage Firms, because they arrange large money market transactions between major financial institutions, are in a position to obtain knowledge of interbank lending activity and money markets generally. Yen LIBOR submitters at various panel banks, at times, incorporate information furnished by the Brokerage Firms in determining their Yen LIBOR submissions. By disseminating false and misleading information through the Brokerage Firms, HAYES, and others known and unknown, furthered the scheme to manipulate Yen LIBOR to move in directions favorable to HAYES's trading positions.

b.   In exchange for this assistance from the brokers, HAYES arranged for the Brokerage Firms to be compensated in the form of increased fees or trading commissions.

24.   At certain times relevant to this Complaint, a broker employed at Brokerage Firm A ("Broker A1") assisted HAYES in brokering interest rate derivative trades, and another broker employed at Brokerage Firm A ("Broker A2") distributed suggested LIBORs via a daily email to Yen LIBOR panel bank submitters and others, purporting to disclose where Broker A2, based on his information and experience, believed that Yen LIBOR would or should be set for that day at each specified maturity. HAYES solicited Broker A1 to intercede with Broker A2 to adjust Broker A2's suggested LIBORs to benefit HAYES's trading positions.

a.   As the financial crisis unfolded in or about August 2007, interbank lending declined. Based on my participation in interviews with LIBOR submitters employed at various panel banks, I learned that this trend increased the extent to which LIBOR submitters relied on information from the Brokerage Firms in determining their submissions because the individual panel banks were engaged in less interbank lending themselves and consequently

16

relied more on other data. For example, in
an electronic chat with Broker A1 on or about
August 15, 2007:[12]

    i.    HAYES noted that he needed "to keep 6m
        up till tues then let it collapse."

    ii.   Broker A1 then responded: "doing a good
        job so far...as long as the liquidity
        remains poor we have a better chance of
        bullying the fix."

    iii. Later that day, Broker A2's forecast for
        the 6-month Yen LIBOR included in Broker
        A2's suggested LIBORs was increased by
        half of a basis point compared to the
        previous day.

  b.  The next day, in an electronic chat with
     Broker A1 on or about August 16, 2007:[13]

    i.    HAYES reiterated his need for a high 6-
        month Yen LIBOR fix and stated: "really
        really really need high 6m."

    ii.   Broker A1 then responded: "yep think i
        realise that" and "yes mate, will make
        myself useful."

    iii. Later that day, Broker A2's forecast for
        the 6-month Yen LIBOR included in Broker
        A2's suggested LIBORs was increased by
        6.5 basis points compared to the
        previous day.

  c.  At certain times relevant to this Complaint,
     multiple Yen LIBOR panel banks made
     submissions that mirrored exactly Broker A2's
     suggested LIBORs for extended periods of
     time. For example, in the period between
     January 1, 2008 and December 31, 2009, there

---

[12]   A redacted copy of this Bloomberg chat is attached
hereto as Exhibit 6.

[13]   A redacted copy of this Bloomberg chat is attached
hereto as Exhibit 7.

were approximately 523 trading days, and on approximately 308 of those trading days, Bank D made submissions in all eight maturities that were identical to the forecasts from Broker A2, at times down to the fifth decimal point.

d. At certain times relevant to this Complaint, HAYES expressed appreciation to Broker A1 for Broker A2's influence. For example, in an electronic chat on or about August 22, 2008:[14]

   i. Broker A1 stated: "think [Broker A2] is your best broker in terms of value added :-)."

   ii. HAYES then replied: "yeah...i reckon i owe [Broker A2] a lot more."

   iii. Broker A1 then responded: "[Broker A2's] ok with an annual champagne shipment, a few pi ss ups with [Broker A2's supervisor] and a small bonus every now and then."

25. At certain times relevant to this Complaint, HAYES engaged in similar contacts with a broker employed at Brokerage Firm B ("Broker B").

   a. For example, in an electronic chat with Broker B on or about February 25, 2009:[15]

      i. HAYES instructed Broker B: "low 1m and 3m...we must keep 3m down." He then stated: "try for low on all of em."

      ii. Broker B then responded: "ok ill do my best for those tday."

      iii. To compensate Broker B for that

---

[14]   A redacted copy of this Bloomberg chat is attached hereto as Exhibit 8.

[15]   A redacted copy of this Bloomberg chat is attached hereto as Exhibit 9.

assistance, HAYES then asked Broker B to broker a 150 billion Yen trade. Broker B then stated that the commissions the trade would generate would "make us make3 budget for the month so massive yes."

## C.   Efforts to Coordinate with Traders Employed at Other Yen LIBOR Panel Banks

26.   Unless otherwise specifically stated, based on previously identified sources, I have learned the following:

- a.   From at least in or about January 2007 through in or about July 2009, HAYES regularly contacted Yen swaps traders employed at other Yen LIBOR panel banks, including Bank A, Bank B, and Bank C.

- b.   HAYES asked such traders either to request particular Yen LIBOR submissions from their banks' respective submitters or to move their banks' submissions in a particular direction (upward or downward).

- c.   In this way, HAYES not only directly influenced UBS's Yen LIBOR submissions, but also sought to influence the submissions of other Yen LIBOR panel banks. By taking trading positions aligned with HAYES's trading positions, the traders at Bank A, Bank B, and Bank C could likewise profit from manipulating their own respective banks' submissions to move in the same direction that HAYES was requesting for UBS's submissions.

### 1.   Efforts to Influence Bank A's Yen LIBOR Submissions

27.   At certain times relevant to this Complaint, HAYES contacted a Yen swaps trader employed at Bank A ("Trader A") in an effort to influence Bank A's Yen LIBOR submissions.   For example, in an electronic chat with Trader A on or about January 19, 2007:[16]

---

[16]   A redacted copy of this chat is attached hereto as Exhibit 10.

19

a.  HAYES asked: "bit cheeky but if you know who
    sets your libors and you aren't the other way
    I have some absolutely massive 3m fixes the
    next few days and would really appreciate a
    high 3m fix."  HAYES then noted: "Anytime i
    can return the favour let me know as the guys
    here are pretty accommodating to me."

b.  Trader A then replied: "I will try my best."

28.  In another electronic chat with HAYES on or about
January 29, 2007:[17]

a.  Trader A requested: "Anything you need on
    libors today? High 6m would help me."

b.  HAYES then responded: "high 3m i'll sort our
    6m rate for you thanks."

c.  Following this chat, HAYES contacted UBS
    Junior Submitter 1 and requested a high 6-
    month Yen LIBOR submission.

29.  HAYES subsequently referenced efforts to
coordinate with Trader A to a Yen swaps trader employed at Bank C
("Trader C") to explain why the 3-month Yen LIBOR was high.  For
example, in an electronic chat on or about February 2, 2007:[18]

a.  HAYES explained: "3m libor is too high cause
    i have kept it artificially high."

b.  After Trader C inquired how HAYES had done
    that, HAYES responded: "being mates with the
    cash desks, [Bank A] and i always help each
    other out...too."

## 2.  Efforts to Influence Bank B's Yen LIBOR Submissions

30.  At certain times relevant to this Complaint, HAYES
contacted a Yen swaps trader employed at Bank B ("Trader B") in a

---

[17]  A redacted copy of this chat is attached hereto as
Exhibit 11.

[18]  A redacted copy of this Bloomberg chat is attached
hereto as Exhibit 12.

similar effort to influence Bank B's Yen LIBOR submissions. For example, in a series of electronic chats from on or about May 21, 2009 through on or about May 22, 2009:[19]

> a. On or about May 21, 2009, HAYES asked Trader B: "cld you do me a favour would you mind moving you 6m libor up a bit today, i have a gigantic fix." UBS's trading records confirm that HAYES had a net trading position that day that would profit by approximately $459,000 based on a one basis point increase in the 6-month Yen LIBOR fix on that day.

> b. Trader B then responded: "I can do taht." Bank B's 6-month Yen LIBOR submission then increased by six basis points compared to its submission the previous day.

> c. According to BBA records of Yen LIBOR panel bank submissions for that day, the resulting 6-month Yen LIBOR fix was 3/8 of a basis point higher than it otherwise would have been had Trader B left Bank B's submission at the same rate that it had been for the previous 26 trading days. Accordingly, just from the change in Trader B's 6-month Yen LIBOR submission, HAYES generated approximately $172,000 in additional profits for his trading book and, ultimately, for UBS.

> d. The following day, on or about May 22, 2009, Trader B asked HAYES: "u happy with me yesterday?" HAYES then replied: "thx."

### 3. Efforts to Influence Bank C's Yen LIBOR Submissions

31. At certain times relevant to this Complaint, HAYES contacted Trader C in a similar effort to influence Bank C's Yen LIBOR submissions. On occasion, HAYES also agreed to reciprocate and influence UBS's submissions to accommodate requests from Trader C. For example, in a series of electronic chats on or

---

[19]   Redacted copies of these Bloomberg chats are attached hereto as Exhibit 13.

about March 6, 2007:[20]

> a. Trader C requested that HAYES take steps to ensure low UBS Yen LIBOR submissions for all maturities: "can u go fr low everything plse?"
>
> b. HAYES then replied that he would make that request, but he personally needed a high 3-month Yen LIBOR fixing.
>
> c. HAYES then made a request to UBS Junior Submitter 1 consistent with Trader C's request for low 1-month and 6-month Yen LIBOR submissions, while omitting the 3-month maturity which HAYES needed to remain high. Specifically, HAYES stated: "hi pls don't forget low 1m and 6m! :)"
>
> d. That day, compared to the previous day, UBS's 1-month and 6-month Yen LIBOR submissions dropped by 2.0 and 2.5 basis points, respectively, consistent with Trader C's request to HAYES.

32.   HAYES also made similar requests of Trader C regarding Bank C's Yen LIBOR submissions.  For example, in a series of electronic chats between on or about April 19, 2007 through on or about April 24, 2007:[21]

> a. On or about Thursday, April 19, 2007, HAYES requested assistance in lowering 3-month Yen LIBOR and stated: "have some huge huge fixes."  He then asked: "can you do me a favour and ask your cash guys for a low 3m?" (In numerous chats, HAYES referred to Yen LIBOR submitters as "cash guys," "cash boys," or the "cash desk.")  Trader C then responded: "will do my best i am pretty flat at teh moment so don't really care."  That same day, Bank C's 3-month Yen LIBOR

---

[20]   Redacted copies of these chats are attached hereto as Exhibit 14.

[21]   Redacted copies of these Bloomberg chats are attached hereto as Exhibit 15.

submission was 0.65 percent, down from 0.67
percent the previous day.

b.    On or about Friday, April 20, 2007, HAYES
stated: "hi mate thanks for keeping 3m low
y/day wd really appreciate it if u cld try
for the same over the next few days." Later
that day, HAYES again requested: "i know i
only talk to you when i need something but if
you could ask your guys to keep 3m low wd be
massive help as long as it doesn't interfere
with your stuff...tx in adavance."
Approximately 30 minutes later, HAYES further
inquired: "mate did you manage to spk to your
cash boys?" Trader C then responded: "yes u
owe me they are going 65 and 71." HAYES then
replied: "thx mate yes i do...in fact i owe
you big time." Approximately 45 minutes
later, HAYES learned that Bank C had made a
3-month Yen LIBOR submission of 0.64 percent
that day, below even the number Trader C had
previewed to him. Accordingly, HAYES
expressed his gratitude and stated: "they set
64!...thats beyond the call of duty!"

c.    On or about Tuesday, April 24, 2007, HAYES
stated: "hello mate thanks for the help on
libors, if you cld ask for a low 3m for one
last day wd be a big help, am meeting [a
bank] tonight so i'll drop your name into the
conversation!"

d.    After three consecutive trading days at 0.64
percent, Bank C's 3-month Yen LIBOR
submission increased to 0.65 percent the
following day, on or about Wednesday, April
25, 2007.

### The Agreement to Fix the
### Price of Yen LIBOR-Based Derivative Products

33.    In furtherance of the price fixing agreement
alleged in Paragraph 4, HAYES, together with Trader B and others
known and unknown, communicated and agreed with each other, as
set forth in Paragraph 30, to fix the price of interest rate
derivative products whose price was based on Yen LIBOR. As a
result of this price fixing agreement, entities located in the
United States and headquartered in New York, New York that were

23

counterparties to these affected derivative contracts incurred losses.

### HAYES's Post-UBS Conduct

34.  Unless otherwise specifically stated, based on previously identified sources, I have learned the following:

> a.  In or about September 2009, HAYES left his employment at UBS and began working as a senior Yen swaps trader at Bank D from in or about December 2009 through in or about September 2010.
>
> b.  In or about June 2010, HAYES attempted to cause a Yen LIBOR submitter at Bank D (the "Bank D Submitter") to provide false and misleading information in its daily Yen LIBOR submissions to the BBA.
>
> c.  For example, in an exchange of emails on or about June 1, 2010:[22]
>
>> i.  HAYES asked a junior Yen swaps trader at Bank D ("Trader D") to request that the Bank D Submitter make Yen LIBOR submissions favorable to HAYES's trading positions and stated: "It really suits our book can we ask if we can just leave it there for a couple of weeks?"
>>
>> ii.  Trader D then responded: "I will mention it tomorrow morning so [the Bank D Submitter] has it in [the Bank D Submitter's] mind.  But to be honest they are really nervous about it, so I don't think we can be too pushy."
>
> d.  At certain times during his tenure at Bank D, HAYES remained in contact with, among others, Broker A1, Trader B, and the UBS Junior Trader in a continued effort to solicit Yen LIBOR submissions that were favorable to HAYES's trading positions.

--------

[22]  A redacted copy of this email exchange is attached hereto as Exhibit 16.

24

e.   In an electronic chat with the UBS Junior
     Trader on or about May 12, 2010:[23]

     i.    HAYES stated: "libors are going down
           tonight."

     ii.   The UBS Junior Trader then asked: "why
           you think so?"

     iii.  HAYES then explained: "because i am
           going to put some pressure on people."

f.   While employed at Bank D, HAYES also made
     efforts to influence Bank C's Yen LIBOR
     submissions through another broker working at
     Brokerage Firm A ("Broker A3"). For example,
     in a series of electronic chats on or about
     March 3, 2010 through on or about
     March 4, 2010, HAYES and Broker A3 discussed
     whether they could cause Bank C's Yen LIBOR
     submitter (the "Bank C Submitter") to lower
     Bank C's 3-month Yen LIBOR submission:[24]

     i.    On or about March 3, 2010, HAYES told
           Broker A3: "i really need a low 3m jpy
           libor into the imm[25]...any favours you
           can get with [Bank C Submitter] would be
           much appreciated...even if [the Bank C
           Submitter] on;ly move 3m down 1bp."
           Broker A3 then agreed to contact Bank C
           Submitter on behalf of HAYES.

     ii.   Following HAYES's request, Broker A3
           asked the Bank C Submitter: "u see 3m
           jpy libor going anywhere btween now and
           imm?" Broker A3 continued: "we hve a

---

[23]   A redacted copy of this Bloomberg chat is attached
hereto as Exhibit 17.

[24]   Redacted copies of these Bloomberg chats are attached
hereto as Exhibit 18.

[25]   In this context, I believe "imm" refers to the
International Monetary Market date, which occurs quarterly on the
third Wednesday of March, June, September, and December.

25

> mutual friend who'd love to see it go
> down, no chance at all?"  The Bank C
> Submitter then speculated that the
> request came from HAYES and replied:
> "haha TH by chance."  Broker A3 then
> responded: "shhh."

iii. That next day, on or about March 4,
2010, Bank C's 3-month Yen LIBOR
submission decreased by one basis point
compared to the previous day, consistent
with HAYES's request to Broker A3.
After the resulting Yen LIBOR fixings
were posted, Bank C Submitter told
Broker A3: "Libor lower ;)."  Broker A3
then responded: "good work!!!!"

35.   Based on my participation in interviews with
the UBS Junior Trader, along with my review of audio recordings,
I also learned the following:

a.   On or about March 29, 2011, the UBS Junior
Trader informed HAYES that the United States
Department of Justice had contacted UBS in
order to schedule an interview with the UBS
Junior Trader.

b.   In response, HAYES then advised the UBS
Junior Trader to remove any belongings from
Japan and to return to the foreign country
where HAYES believed the UBS Junior Trader to
be located.  HAYES further cautioned that:

> The U.S. Department of Justice,
> mate, you know, they're like
> [unintelligible], the dudes who,
> you know, you know, absolutely
> like, you know, you know
> [unintelligible] put people in
> jail.  Why the hell would you want
> to talk to them?

26

WHEREFORE, deponent prays that arrest warrants be issued for the above-named defendants and that they be imprisoned or bailed as the case may be.

MICHAEL J. MCGILLICUDDY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
12th day of December, 2012

HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

27

Given the confidential nature of this investigation, the Government respectfully requests that the Court order that this Complaint be filed under seal.

Respectfully submitted,

DENIS J. MCINERNEY
Chief
Fraud Section
Criminal Division

DEIRDRE A. MCEVOY
Chief
New York Field Office
Antitrust Division

By:

Daniel Braun
Deputy Chief
Fraud Section
Criminal Division

Elizabeth Prewitt
Assistant Chief
New York Field Office
Antitrust Division

SO ORDERED:

HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

28

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.

TOM ALEXANDER WILLIAM HAYES, and
ROGER DARIN,

*Defendants.*

Case No. 12 MJ 3229

Declaration of Thomas B.W. Hall

---

Thomas B.W. Hall, pursuant to 28 U.S.C. § 1746, declares as follows under penalty of

perjury:

1. I am an attorney duly authorized to practice before this Court, and represent the

United States in this matter.

2. Counsel for Defendant Roger Darin has informed the United States that

Defendant Darin does not plan to appear in this Court at any time, and is content to remain in his

native Switzerland for his entire life if necessary.


Dated: November 7, 2014
Washington, D.C.

THOMAS B.W. HALL
Trial Attorney