

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.

TOM ALEXANDER WILLIAM HAYES, and
ROGER DARIN,

*Defendants.*

---

ORIGINAL   DOC # ___19___

Case No.  12 MJ 3229

---

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT ROGER DARIN'S <u>MOTION TO DISMISS THE CRIMINAL COMPLAINT</u>

Bruce A. Baird
James M. Garland
Alexander A. Berengaut

**COVINGTON & BURLING LLP**

*Attorneys for Defendant Roger Darin*

December 3, 2014

## **TABLE OF CONTENTS**

Page

I.  Introduction ........................................................................................................ 1

II.  The Court Must Rule on the Merits of Mr. Darin's Claims ................................ 3

    A.  Mr. Darin Is Entitled to the Protections of the Due Process Clause Because He Is Being Prosecuted in an Article III Court ............................................... 3

    B.  The Fugitive Disentitlement Doctrine Does Not Apply to Mr. Darin. .................. 6

III.  Mr. Darin Lacks a Constitutionally Sufficient Nexus to the United States. ....................... 9

    A.  The "Sufficient Nexus" Test Requires That the Defendant "Aim" His Conduct at the United States ................................................................. 9

    B.  The Government Has Not Alleged and Cannot Establish That Mr. Darin Aimed His Conduct at the United States. ................................................. 13

IV.  Mr. Darin Lacked Fair Notice That His Alleged Conduct Could Subject Him to Criminal Prosecution ................................................................................. 16

V.  Conclusion ........................................................................................................ 17

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arar v. Ashcroft,*
    532 F.3d 157 (2d Cir. 2008) ............................................................................4

*Boumediene v. Bush,*
    553 U.S. 723 (2008) .......................................................................................5

*Calder v. Jones,*
    465 U.S. 783 (1984) .....................................................................................15

*Empire Blue Cross & Blue Shield v. Finkelstein,*
    111 F.3d 278 (2d Cir. 1997) ..........................................................................6

*F. Hoffmann-LaRoche Ltd. v. Empagran S.A.,*
    542 U.S. 155 (2004) .....................................................................................13

*Goldberg v. UBS AG,*
    690 F. Supp. 2d 92 (E.D.N.Y. 2010) .....................................................10, 12

*In re Grand Jury Subpoenas,*
    179 F. Supp. 2d 270 (S.D.N.Y. 2001) ...........................................................7

*GSS Group Ltd. v. Nat'l Port Auth.,*
    680 F.3d 805 (D.C. Cir. 2012) ......................................................................4

*Harris v. Mexican Specialty Foods, Inc.,*
    564 F.3d 1301 (11th Cir. 2009) ...................................................................12

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984) .......................................................................................4

*In re Hijazi,*
    589 F.3d 401 (7th Cir. 2009) ...............................................................3, 8, 12

*J. McIntyre Mach. Ltd. v. Nicastro,*
    131 S. Ct. 2780 (2011) ...........................................................................11, 14

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ...................................................................................1, 5

*Leasco Data Processing Equip. Corp. v. Maxwell,*
    468 F.2d 1326 (2d Cir. 1972) .................................................2, 11, 13, 14

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)......................................................................................6

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992)....................................................................................13

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)....................................................................................15

*S.E.C. v. Sharef*,
    924 F. Supp. 2d 539 (S.D.N.Y. 2013)..........................................................4

*In re Terrorist Attacks on Sept. 11, 2001*,
    538 F.3d 71 (2d Cir. 2008)..........................................................................15

*In re Terrorist Bombings of U.S. Embassies in E. Africa*,
    552 F.3d 177 (2d Cir. 2008)..........................................................................5

*Toys "R" Us, Inc. v. Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003)........................................................................13

*United States v. Al Kassar*,
    660 F.3d 108 (2d Cir. 2011)......................................................................1, 9

*United States v. Ali*,
    718 F.3d 929 (D.C. Cir. 2013)....................................................................10

*United States v. Altman*,
    48 F.3d 96 (2d Cir. 1995)............................................................................17

*United States v. Awadalla*,
    357 F.3d 243 (2d Cir. 2004)......................................................................7, 8

*United States v. Blanco*,
    861 F.2d 773 (2d Cir. 1988)..........................................................................7

*United States v. Bodmer*,
    342 F. Supp. 2d 176 (S.D.N.Y. 2004)..........................................................9

*United States v. Catino*,
    735 F.2d 718 (2d Cir. 1984)..........................................................................7

*United States v. Covington*,
    395 U.S. 57 (1969)........................................................................................9

*United States v. Davis*,
    905 F.2d 245 (9th Cir. 1990)......................................................................12

*United States v. Eng*,
    951 F.2d 461 (2d Cir. 1991).................................................................................7

*United States v. Giffen*,
    326 F. Supp. 2d 497 (S.D.N.Y. 2004)..................................................................17

*United States v. Kim*,
    246 F.3d 186 (2d Cir. 2001)..................................................................................6

*United States v. Klimavicious-Viloria*,
    144 F.3d 1249 (9th Cir. 1998) ............................................................................11

*United States v. Manuel*,
    371 F. Supp. 2d 404 (S.D.N.Y. 2005)..........................................................10, 15

*United States v. Mostafa*,
    965 F. Supp. 2d 451 (S.D.N.Y. 2013)..........................................................10, 16

*United States v. Noriega*,
    683 F. Supp. 1373 (S.D. Fla. 1988) .....................................................................4

*United States v. Perlaza*,
    439 F.3d 1149 (9th Cir. 2006) ............................................................................15

*United States v. Saathoff*,
    708 F. Supp. 2d 1020 (S.D. Cal. 2010)...............................................................17

*United States v. Schreiber*,
    535 F. Supp. 1359 (S.D.N.Y. 1982)......................................................................7

*United States v. Skilling*,
    561 U.S. 358 (2010)............................................................................................17

*United States v. Tawahongva*,
    456 F. Supp. 2d 1120 (D. Ariz. 2006) ..................................................................9

*United States v. Umeh*,
    527 Fed. App'x. 57 (2d Cir. 2013).......................................................................10

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990).........................................................................................3, 5

*Veiga v. World Meterological Org.*,
    568 F. Supp. 2d 367 (S.D.N.Y. 2008)..................................................................4

*Wilder v. News Corp.*,
    No. 11-CV-4947, 2014 WL 1315960 (S.D.N.Y. Mar. 31 2014)..........................11

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980) ........................................................................................................11

**Other Authorities**

Fed. R. Crim. P. 12 .........................................................................................................9

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402 ......................................................13

## I.   Introduction

The Constitution does not allow the Government to prosecute every foreign person in every foreign country.  The Fifth Amendment requires a "sufficient nexus" between foreign defendants and the United States so that their prosecution here is not arbitrary or fundamentally unfair.  *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).  It also requires that a foreign defendant receive fair notice that his conduct constitutes a crime.  *Id.* at 119.  In this case, the Government has used a novel theory of fraud to charge a foreign citizen, acting entirely abroad, with conspiring to manipulate a foreign financial benchmark for a foreign currency.  The question is whether this unprecedented extraterritorial prosecution violates the Fifth Amendment.

In its opposition brief, the Government strives mightily to convince the Court not to answer that question.  In a telling reflection of the weakness of its position on the merits, the Government spends almost half its brief urging this Court not to address the substantial constitutional defenses of a man whose life is on hold because of the pending charge.  Indeed, the Government argues, this Court *cannot* rule on Mr. Darin's motion because the Fifth Amendment does not apply to foreign defendants outside the United States.  According to the Government, unless Mr. Darin physically appears in federal court, the Court lacks the power to determine whether the very complaint that this Court signed violates the Constitution.

The Fifth Amendment is not so easily evaded.  The Government bases its extraordinary position on *Johnson v. Eisentrager*, 339 U.S. 763 (1950), a *habeas* case involving foreign enemy combatants who were tried by a military commission in China.  But *Eisentrager* has nothing to do with the power of Article III courts to vindicate the constitutional rights of foreign defendants who are being prosecuted in the United States.  In fact, federal courts have repeatedly permitted foreign defendants to assert the kinds of constitutional defenses raised by Mr. Darin here.  And in the civil context, foreign individuals and corporations, appearing through counsel, routinely

assert their due process rights to contest personal jurisdiction. The label may change in the criminal context, but the underlying due process right is the same, and criminal defendants deserve it no less than civil defendants.

Nor can the Government escape a ruling on the merits by invoking the "fugitive disentitlement doctrine." That applies only to "fugitives"—*i.e.,* those who flee or refuse to return to the jurisdiction where they committed the alleged crime. The doctrine does not apply here because Mr. Darin is not a fugitive; he neither fled the United States nor failed to return here.

The Court must, accordingly, reach the questions the Government wants to avoid: whether a "sufficient nexus" connects Mr. Darin to the United States and whether he received fair notice. To the former question, the Government's answer is "worldwide reliance"—the notion that, because Yen Libor plays a "significant role" in "global financial transactions" (Response Brief ("RB") at 22), some of those transactions must necessarily take place in the United States, as Mr. Darin must have known. But this theory wholly fails to allege that Mr. Darin "*aimed*" his conduct at the United States, which is the touchstone of the Second Circuit's "sufficient nexus" test. Indeed, it is *exactly* the same theory that Judge Friendly rejected in *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1342 ("*Leasco*") (2d Cir. 1972), a leading opinion on personal jurisdiction. In its opposition, the Government strains to argue that civil personal jurisdiction is completely irrelevant to the criminal "sufficient nexus" doctrine, but it tellingly has nothing to say about *Leasco* itself.

The Government's response to Mr. Darin's notice argument is equally flawed. The Government argues that Mr. Darin was on notice because he conspired to commit fraud and "the essential nature of a fraudulent scheme is not difficult to identify." (RB at 25). But the Government points to no precedent supporting its novel theory that someone can commit fraud

2

by providing an opinion in response to a hypothetical question.  Even if the wire fraud statute could be stretched to reach such conduct, Mr. Darin could not reasonably have anticipated that he might be prosecuted in any country, let alone in the distant United States.

## II.     The Court Must Rule on the Merits of Mr. Darin's Claims.

The Government raises two threshold objections to the Court's consideration of Mr. Darin's motion.  First, the Government argues that the Fifth Amendment does not apply to non-citizens outside the United States who are not in U.S. custody.  Second, the Government argues that the Court should exercise its discretion and decline to consider Mr. Darin's motion under the fugitive disentitlement doctrine.  Both arguments are baseless.

### A.     Mr. Darin Is Entitled to the Protections of the Due Process Clause Because He Is Being Prosecuted in an Article III Court.

The Government leads with the argument that the Fifth Amendment does not apply because Mr. Darin is not physically in the United States and thus lacks a constitutional "toehold" here.  The Government ignores, however, that Mr. Darin is being prosecuted in an Article III court in the United States.  His assertion of the Fifth Amendment through counsel therefore occurs here—not in Switzerland.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (Kennedy, J., concurring) ("The United States is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution. All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant.").

The Government would have this Court believe that denying due process protections for foreign criminal defendants "is a long-standing and well-established principle."  (RB at 8).  It cites no authority for this proposition, and the truth is the opposite:  federal courts have repeatedly permitted foreign defendants to assert the rights at issue here.  *See In re Hijazi*, 589

3

F.3d 401, 412 (7th Cir. 2009) (Wood, J.) (concluding that, even though the defendant had not appeared in the United States, he was entitled to a ruling on his Fifth Amendment claim); *United States v. Noriega*, 683 F. Supp. 1373, 1375 (S.D. Fla. 1988) (allowing a foreign defendant to bring any motion "attacking the validity of the indictment and the jurisdiction of the court").

By insisting that Mr. Darin appear personally to assert his undisputed constitutional right to due process, the Government would deny individual criminal defendants the same due process rights enjoyed by corporate and individual defendants in civil cases. *See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418-19 (1984) (deciding the due process claim of a foreign company that appeared through counsel to challenge personal jurisdiction); *S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 548 (S.D.N.Y. 2013) (same for an individual defendant); *see also GSS Group Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 816 (D.C. Cir. 2012) (citations omitted) ("In opposing personal jurisdiction on due process grounds the corporation, through its attorney, makes itself present. And since it has been forced to appear in the United States, at least for that limited purpose, it is entitled to the protection of the Due Process Clause . . . .").[1] This is backwards. As discussed below, the same due process interests underlie the doctrine of civil personal jurisdiction and the criminal "sufficient nexus" test, and to the extent the standards differ, criminal defendants are entitled to *more* protection. *See infra* Section III.A.

The Government seeks to justify this perverse outcome by relying on *Eisentrager*, which it claims stands for the bright-line rule that "a foreign citizen residing abroad who is not in

---

[1] The Government cites *Veiga v. World Meterological Org.*, 568 F. Supp. 2d 367 (S.D.N.Y. 2008) and *Arar v. Ashcroft*, 532 F.3d 157 (2d Cir. 2008), but those cases involved foreign *plaintiffs*. Foreign plaintiffs are differently situated because they have not "been forced to appear in the United States" and thus are not necessarily "entitled to the protection of the Due Process Clause." *See GSS Group, Ltd.*, 680 F.3d at 816. *Arar* was also superseded by the Second Circuit's subsequent *en banc* decision, which does not address this issue. *See* 585 F.3d 559 (2d Cir. 2009).

custody and has not appeared in [U.S.] court ... cannot assert claims under the Fifth Amendment." (RB at 8). But *Eisentrager* held no such thing. The Supreme Court's decision in *Eisentrager* was carefully limited to the unique facts of that *habeas* case, in which German nationals were detained outside the United States in the aftermath of World War II. The Court held that "the Constitution does not confer a right of personal security or an immunity from military trial and punishment *upon an alien enemy engaged in hostile service of a government at war with the United States.*" *Id.* at 785 (emphasis added). Since *Eisentrager*, both the Supreme Court and the Second Circuit have cautioned against applying that decision in precisely the categorical manner that the Government now urges. *See Boumediene v. Bush*, 553 U.S. 723, 762 (2008) ("Nothing in *Eisentrager* says that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution."); *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 201 (2d Cir. 2008) ("[T]he Court's rejection of the Fifth Amendment claim in *Eisentrager* cannot be unmoored from the salient facts of the case: an overseas conviction of 'nonresident enemy aliens,' following the cessation of hostilities, by a duly-constituted military court.").

The Government's overbroad interpretation of *Eisentrager* is also at odds with the Supreme Court's observation in *Boumediene* that "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." 553 U.S. at 764. In *Eisentrager*, the Court was "concerned about judicial interference with the military's efforts to contain 'enemy elements, guerilla fighters, and 'werewolves.'"" *Id.* at 770 (quoting *Eisentrager*, 339 U.S. at 784); *cf. Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J., concurring) (noting that the "absence of local judges or magistrates available to issue warrants, the different and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to

cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country"). Here, there are no practical impediments to the resolution of Mr. Darin's motion. *Eisentrager* is accordingly inapposite.[2]

### B.      The Fugitive Disentitlement Doctrine Does Not Apply to Mr. Darin.

The Government also argues that the Court should decline to consider Mr. Darin's motion under the "fugitive disentitlement doctrine." That doctrine vests the courts with discretion to decline to consider motions of criminal defendants who qualify as "fugitives." But because Mr. Darin is not a fugitive, the doctrine has no place here.

Traditionally, a fugitive is one "who, having committed a crime, *flees* from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district." *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997) (alterations in original) (emphasis added) (internal quotation marks omitted). There is no dispute that Mr. Darin—who has lived openly in Switzerland since before he was charged—does not qualify as a fugitive under this definition.

Rather, the Government argues that Mr. Darin is a fugitive because he has "remain[ed] in a geographic location that is out of the authorities' reach." (RB at 34). As described in our opening brief, however, this "'constructive flight' standard requires that the defendant be present in the jurisdiction of the court at the time of the alleged crime." (Opening Brief ("OB") at 18 n.6

---

[2] The Government does not contend that *Eisentrager* bars the Court from considering Mr. Darin's statutory argument based on the presumption against extraterritoriality. (It does contend that the Court should not consider Mr. Darin's statutory argument because of the fugitive disentitlement doctrine.) On the merits, the Government argues that the presumption against extraterritoriality is not implicated because "[t]he charge against Darin represents a domestic application of the wire fraud statute." (RB at 29). The Government principally relies on *United States v. Kim*, 246 F.3d 186 (2d Cir. 2001) for this argument. That case, however, was decided before *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), and its extraterritoriality analysis of the wire fraud statute was based, at least in part, on precisely the ground that *Morrison* rejected, namely, a statute's use of the phrase "foreign commerce." *See Kim*, 246 F.3d at 189; *Morrison*, 561 U.S. at 248.

(quoting *In re Grand Jury Subpoenas*, 179 F. Supp. 2d 270, 287 (S.D.N.Y. 2001) (Chin, J.) (emphasis added) ("One cannot be a fugitive in these circumstances unless (i) *he was present in the jurisdiction at the time of the alleged crime*, (ii) he learns, while he is outside the jurisdiction, that he is wanted by the authorities, *and* (iii) he then fails to return to the jurisdiction to face the charges.")). This rule is well-established. *See, e.g.*, *United States v. Schreiber*, 535 F. Supp. 1359, 1363 (S.D.N.Y. 1982) ("One, of course, cannot be a fugitive unless he was present in the demanding state at the time the crime was committed."). Mr. Darin was not in the United States at the time of the alleged offense; he is accordingly not a fugitive.

The Government spends four pages discussing the fugitive disentitlement doctrine but fails to address *In re Grand Jury Subpoenas* or its holding anywhere in its brief. The cases the Government *does* cite cut against its position by making clear that the constructive flight doctrine applies only to those who fail to "*return*" to the jurisdiction where they committed the alleged offense.[3] Mr. Darin cannot be obligated to "return" to the United States to raise his claims; he was not here to begin with.

The Government also argues that the Court should decline to consider Mr. Darin's claim under a "more general exercise of discretion." (RB at 36). The Government identifies several policy considerations that, it argues, should guide this Court's discretion. *See id.* (citing *United States v. Awadalla*, 357 F.3d 243, 245 (2d Cir. 2004)). These considerations, however, are relevant *only* if the Court first concludes that the defendant is a fugitive. *See Awadalla*, 357 F.3d

---

[3] *See, e.g., RB* at 34-35 (quoting *United States v. Eng*, 951 F.2d 461, 464 (2d Cir. 1991) (emphasis added) ("When a person purposely leaves the jurisdiction or decides not to *return* to it, in order to avoid prosecution, he is a fugitive."); *United States v. Blanco*, 861 F.2d 773, 779 (2d Cir. 1988) (emphasis added) ("A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to *return* to the United States to face charges."); *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984) (emphasis added) (inferring intent to flee "whether the defendant leaves the jurisdiction intending to avoid prosecution, or having learned of the charges while legally outside the jurisdiction, constructively flees by deciding not to *return*.")).

at 245.  Because, as discussed, Mr. Darin does not qualify as a fugitive, these discretionary factors are irrelevant.

Even if the factors were weighed here, the result would favor Mr. Darin.  The purposes of the fugitive disentitlement doctrine are to impose a "penalty for flouting the judicial process," to "discourag[e] flights from justice," and to avoid prejudice "caused by the defendant's escape." *Awadalla*, 357 F.3d at 245.  Mr. Darin has done none of these things.  The Government also claims that Mr. Darin is "willing to enjoy the benefits of a legal victory, but is not at all prepared to accept the consequences of an adverse holding." (RB at 37); *see also Awadalla*, 357 F.3d at 245 (fugitive disentitlement serves to assure the enforceability of decisions rendered against the fugitive).  But this assertion—like the Government's representation that Mr. Darin is "content" with his current situation in Switzerland (RB, Ex. B)—is flatly incorrect.  As the undersigned sets out in an accompanying declaration, Mr. Darin's professional and personal life have been utterly derailed by the Government's complaint. (Declaration of Bruce A. Baird, at ¶¶ 3-6).  He cannot find a job, leave Switzerland, or afford to start a family.  (*Id.*).

To be sure, if this Court dismisses the Complaint, Mr. Darin will benefit.  But if the Court denies Mr. Darin's motion, he will suffer even more than he already is.  A decision permitting the Government's extraterritorial prosecution to proceed will compound and make permanent the professional and personal hardships under which Mr. Darin and his family are currently living. (*Id.* at ¶ 7). *See Hijazi*, 589 F.3d 401 at 413 (rejecting the Government's "mutuality" argument where, *inter alia*, the foreign defendant could not ever leave Kuwait without risking extradition).[4]  Accordingly, even if these equitable considerations were relevant (they are not), they weigh in favor of ruling on Mr. Darin's motion.

---

[4] The Government argues that *Hijazi* is factually distinguishable (RB at 37-38), but the factual differences the Government identifies were peripheral to the court's decision.  The essential facts

**III.    Mr. Darin Lacks a Constitutionally Sufficient Nexus to the United States.**

With no valid basis for deferring Mr. Darin's motion, the Government cannot prevent the

Court from reaching the merits and confronting the constitutional flaws of the complaint.  The

first such flaw is the lack of "a sufficient nexus between [Mr. Darin] and the United States."  *Al*

*Kassar*, 660 F.3d at 118.  As explained below, the "sufficient nexus" test requires that the

defendant "aim" his conduct towards the United States, as opposed to the world as a whole.

While Government claims that no court has ever dismissed a charge on "sufficient nexus"

grounds, it does not and cannot deny that it has never before reached this far.  And because the

Government has not alleged—and cannot establish—that Mr. Darin satisfies this standard, the

complaint must be dismissed.[5]

**A.    The "Sufficient Nexus" Test Requires That the Defendant "Aim" His
Conduct at the United States**

In *Al Kassar*, the Second Circuit held that "[f]or non-citizens acting entirely abroad, a

jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States

or to U.S. citizens or interests."  660 F.3d at 118.  In its brief, the Government argues that a

---

are the same.  Here, as in *Hijazi*, the defendant is effectively confined to a small country, where
his personal and professional life are adversely affected.  These restrictions constitute a profound
interference with that person's liberty, regardless of whether he is confined in his home country.

[5] Under Rule 12(b)(1) of the Federal Rules of Criminal Procedure, "[a] party may raise by
pretrial motion any defense, objection, or request that the court can determine without a trial on
the merits."  Pursuant to this rule, a "charge in a complaint may be dismissed if it is subject to a
defense that may be decided solely on issues of law."  *United States v. Tawahongva*, 456 F.
Supp. 2d 1120, 1125 (D. Ariz. 2006) (considering defendant's motion to dismiss criminal
complaint on the ground that it violated the First Amendment).  The Government denies that it
has an obligation to allege facts in its Complaint on which the Government would rely in
responding to Mr. Darin's motion.  (RB at 7).  But it has been long established that where, as
here, a charge is constitutionally deficient after accepting all pertinent allegations as true, then
dismissal is appropriate.  *See United States v. Covington*, 395 U.S. 57, 60-61 (1969) (holding that
defendant was entitled to dismissal of indictment before trial where Fifth Amendment privilege
provided complete defense to the prosecution); *United States v. Bodmer*, 342 F. Supp. 2d 176,
189 (S.D.N.Y. 2004) (dismissing indictment prior to trial on the ground that charge violated Fifth
Amendment notice requirement); *see also infra* at Section IV (discussing additional cases in
which indictments were dismissed on fair notice grounds).

specific intent to harm the United States is sufficient but not necessary to satisfy the "sufficient nexus" test, and that courts have also considered "the defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States." (RB at 14 (quoting *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 106 (E.D.N.Y. 2010)). The Government cites, for example, *United States v. Umeh*, in which the Second Circuit held that the "sufficient nexus" test was satisfied because "defendants conspired to distribute drugs with knowledge that they would be exported to the United States." 527 Fed. App'x. 57, 63 (2d Cir. 2013) (summary order).

None of the cases cited by the Government, however, rebut Mr. Darin's essential point: that to establish a "sufficient nexus," the Government must plead that the defendant "aimed" his conduct at the United States, as opposed to another country or the world as a whole. (OB at 6).[6] The Government claims that no court has ever adopted a "sufficient nexus" standard that requires "aiming," (RB at 13) but the cases it relies upon all involved defendants who aimed their conduct at the United States. When a foreign defendant conspires to export drugs to the United States, he has aimed his conduct at the United States. *See Umeh*, 527 Fed. App'x. at 63.[7] When a foreign defendant takes a U.S. citizen hostage, he has aimed his conduct at the United States. *See United States v. Mostafa*, 965 F. Supp. 2d 451, 456 (S.D.N.Y. 2013). But when a defendant is allegedly

---

[6] *United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013), relied upon by the Government, is the exception that proves this rule. That case involved piracy, one of the very few "universal jurisdiction offenses," which by definition are punishable by all civilized nations and do not therefore require a showing of a nexus of the offense with a particular state. *Id.* at 935. Needless to say, Mr. Darin's alleged offense is not in this category.

[7] The Government also cites *United States v. Manuel*, 371 F. Supp. 2d 404 (S.D.N.Y. 2005), which involved a conspiracy to distribute narcotics in the United States. *Manuel* is completely inapposite because it did not address the constitutional "sufficient nexus" test at all. Instead, *Manuel* turned on whether Congress intended the relevant criminal statute to apply extraterritorially. *Id.* at 409. It is misleading for the Government to suggest that this decision about the reach of a statute (*i.e.*, jurisdiction over the *offense*) is relevant to whether there is a "sufficient nexus" here (*i.e.*, jurisdiction over the *person*).

responsible for the submission of an opinion to a trade association in the United Kingdom, and that opinion indirectly affects a piece of financial information that is relied upon in the global financial markets as a whole, he has not aimed his conduct at the United States, and the "sufficient nexus" test is not satisfied.

This is the lesson of the Second Circuit's decision in *Leasco*, which was discussed in detail in our opening brief and which the Government neglects to address. As this Court recently observed, *Leasco* stands for the proposition that "[s]pecific jurisdiction based on conduct that takes place overseas is *only* warranted where the domestic effects of a defendant's conduct 'occur[] as a *direct and foreseeable* result of the conduct outside the territory.'" *Wilder v. News Corp.*, No. 11-CV-4947, 2014 WL 1315960, at *6 (S.D.N.Y. Mar. 31 2014) (emphasis added) (quoting *Leasco*, 468 F.2d at 1341). While "worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process." *Leasco*, 468 F.2d at 1342; *see also J. McIntyre Mach. Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011) (emphasis added) ("The question is whether a defendant has followed a course of conduct *directed* at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct.").

Rather than confront *Leasco*, the Government argues that the doctrine of civil personal jurisdiction is completely irrelevant to the criminal "sufficient nexus" analysis. (RB at 17-18). This makes no sense. The doctrines share the same purpose—"ensur[ing] that a United States court will assert jurisdiction only over a defendant 'who should reasonably anticipate being haled into court' in this country." *United States v. Klimavicious-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Indeed, *Goldberg*—the very case the Government cites for its argument that domestic effects are relevant

to the "sufficient nexus" test—uses the civil standard to reach its holding.  690 F. Supp. 2d at 107 (internal quotation marks omitted) ("That defendant has had sufficient contact with this jurisdiction to subject it to general jurisdiction is a significant factor in the analysis of whether application of United States law would be arbitrary or fundamentally unfair.").

To the extent, moreover, that civil personal jurisdiction differs from the criminal "sufficient nexus" test, "*greater* due process protection is required in the criminal context than in the civil context." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1312 n.9 (11th Cir. 2009) (emphasis added); *see also Goldberg*, 690 F. Supp. 2d at 106 ("[T]he mere existence of personal jurisdiction will not always satisfy the nexus requirement.").  Since the Government cannot establish personal jurisdiction over Mr. Darin, *a fortiori* it cannot satisfy the "sufficient nexus" test with respect to him.

The Government's cursory treatment of international law is equally flawed.  The Government argues that "no law . . . would justify the dismissal of a criminal case on purely international law grounds."  (RB at 18).  This misses the point.  Mr. Darin is not seeking dismissal of his complaint "on purely international law grounds."  Rather, international law is relevant because some courts have used it to inform their analyses of the constitutional "sufficient nexus" standard.  (OB at 9 (citing *Hijazi*, 589 F.3d at 412; *United States v. Davis*, 905 F.2d 245, 259 n.2 (9th Cir. 1990)).  This proposition is unassailable, which is why the Government attacks a straw man instead.  *See, e.g., Goldberg*, 690 F. Supp. 2d at 109-10 (considering international law in the context of the "sufficient nexus" analysis).[8]

---

[8] The Government builds a similar straw man to dispute the relevance of international comity, arguing that "Darin cannot point to a decision by any federal court dismissing a criminal case based on international comity." (RB at 19 n.12). The Government also asserts, incorrectly and without authority, that "[c]omity is a concern typically left to those branches of government that handle international relations: the executive and legislative branches." (*Id.*). Contrary to the Government's assertion, the Supreme Court has expressly instructed the lower courts to weigh

Like civil personal jurisdiction, international law requires something more than the "worldwide reliance" theory the Government has alleged.  International law considers whether extraterritorial conduct "has substantial, direct, and foreseeable effect upon or in the territory." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 402(1)(c).  As explained in our opening brief (and not disputed by the Government), to qualify as "direct," an effect must "follow[] as an immediate consequence of a defendant's activity."  (OB at 11 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)).  When domestic effects are not substantial, direct, *and* foreseeable, a court cannot fairly infer that the defendant has "aimed" his conduct at the United States.  *See Leasco*, 468 F.2d at 1341-42.

### B.  The Government Has Not Alleged and Cannot Establish That Mr. Darin Aimed His Conduct at the United States.

Despite the Government's rhetoric, the only allegation in the Complaint that actually ties Mr. Darin to the United States is the claim that he, among others, "caused the publication of manipulated interest rate information in New York."  (Compl. ¶ 2).[9]  There is no dispute that this interest rate information—the final Yen Libor fixing—was published worldwide by Thomson

---

principles of international comity in considering the extraterritorial reach of U.S. law. *See F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (observing that courts should "construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations").  As discussed in our opening brief, considerations of international comity strongly weigh in favor of dismissing the Complaint.  (OB at 12-13).

[9] In passing, the Government argues that the Complaint alleges that "Defendants Hayes and Darin engag[ed] in electronic chats routed through the Southern District."  (RB at 6).  Not so. The Complaint merely alleges that "Darin engaged in electronic chats with Hayes," without alleging that those chats were routed through the U.S.  (Compl. ¶ 2).  Even if this had been alleged, however—and even if it were true—it would not establish a "sufficient nexus."  *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 (3d Cir. 2003) (email correspondence not sufficient to trigger personal jurisdiction absent purposeful availment of the forum).  The Government also asserts that it has evidence, which it is prepared to introduce, that Mr. Darin entered into LIBOR-based trades with United States counterparties with a notional value of $8.7 billion.  (RB at 23 n.16).  Setting aside the fact that the notional value of a transaction does not accurately reflect the actual transaction value (*see* Compl. ¶ 17), this assertion is irrelevant because the Government has not alleged—and presumably cannot establish—that these trades were connected to any alleged acts of manipulation.

Reuters from London, and that the United States was just one of the scores of countries where it was available.  (OB at 6; RB at 22).

In our opening brief we explained that "[g]iven the number of countries in which Yen Libor is published, the Government could not plausibly allege that Thomson Reuters 'aim[ed]' its activity at the United States, let alone that Mr. Darin did so."  (OB at 6).  The Government does not appear to disagree.  Rather, the Government contends that Mr. Darin "entered into a conspiracy with sweeping *global* aims: to manipulate a leading *global* benchmark interest rate." (RB at 22 (emphasis added)).  Accordingly, the Government reasons, it is fair to prosecute him wherever "his LIBOR manipulation efforts had effects"—including the United States.

This is precisely the "worldwide reliance" argument that Judge Friendly rejected in *Leasco*.  While "worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process."  468 F.2d at 1342; *see also Nicastro*, 131 S. Ct. at 2789.  And—it bears repeating—while *Leasco* was a civil case, the interest in fundamental fairness to a foreign defendant is no different and indeed the due process interests at stake here in the criminal context are indisputably stronger.  *See supra* Section II.A.

Lacking an answer to *Leasco* and unable to establish the requisite nexus by reference to the alleged activities of Mr. Darin himself, the Government focuses instead on the conduct of Tom Hayes, Mr. Darin's alleged co-conspirator, and in particular on the allegation that Mr. Hayes entered into trades with counterparties in New York.  (RB at 23-24).  The Government argues that "Darin is accountable for the actions of his co-conspirators, and those actions play a factually significant and legally proper role in forming part of the nexus between Darin and the United States."  (*Id.* at 23).  Similarly, the Government maintains that because Mr. Hayes made

"wire transmissions into the United States," Mr. Darin's alleged offense somehow occurred inside the United States, and thus the "sufficient nexus" test does not apply. (*Id.* at 20-21).

Both of these arguments fail for the same reason: "[t]he ability of a United States court to exercise jurisdiction over [a] particular defendant . . . is a *preliminary determination* totally distinct from the crime itself and must be considered *before* any United States court or jury may determine whether the defendant acted as a principal or an aider and abettor." *United States v. Perlaza*, 439 F.3d 1149, 1168-69 (9th Cir. 2006) (emphasis added). There is good reason for this rule. Due process rights are personal to the individual. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Each defendant's contacts with the forum State must be assessed individually."). It may be fair to exercise jurisdiction over one defendant but not another, which is why the Second Circuit has rejected a "concerted action theory of liability" as a basis for establishing personal jurisdiction over foreign defendants. *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 94-95 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

The Government strains to distinguish *Perlaza*, arguing that it stands only for the proposition that the Court must conduct a separate "sufficient nexus" analysis for each defendant; not that the alleged conduct of co-conspirators cannot be taken into account. (RB at 24-25 n.17). But this interpretation of *Perlaza* cannot be squared with the court's conclusion that the "sufficient nexus" test is both "*totally distinct from the crime itself*" and completely independent from the determination whether the "*defendant acted as a principal or an aider and abettor*." 439 F.3d at 1168-69. The Government completely ignores this language, and the two cases it cites do not address, let alone disagree with, this analysis.[10]

---

[10] The Government cites two cases for the proposition that Mr. Hayes' actions should "play a factually significant and legally proper role in forming part of the nexus between Darin and the United States." (RB at 23). The first is *Manuel*, 371 F. Supp. 2d 404, which, as discussed above, is about statutory construction and does not address the "sufficient nexus" standard at all.

In short, only Mr. Darin's conduct may be considered in determining whether there is a "sufficient nexus" between him and the United States. And because Mr. Darin's alleged conduct was not aimed at the United States, no such "sufficient nexus" exists. The Complaint accordingly violates the Fifth Amendment and must be dismissed.

## IV.   Mr. Darin Lacked Fair Notice That His Alleged Conduct Could Subject Him to Criminal Prosecution

Finally, the Government argues that Mr. Darin had fair notice that altering his opinion in response to the hypothetical Libor survey question was a crime. It does this not by citing any authority or any facts, but by simply using the labels "manipulation" and "fraud" and claiming that anyone would know such conduct was criminal. But "manipulation" and "fraud" are legal conclusions, not factual allegations, and are of no use in determining whether Mr. Darin was on notice that he could be subject to prosecution.

The actual scheme alleged against Mr. Darin is contained in paragraph 19(a) of the Complaint and states only that he conspired with Mr. Hayes "to cause the bank to make false and misleading Yen LIBOR submissions to the BBA." In our original brief we explained that this charge is premised on an unprecedented theory of liability—the notion that one can commit fraud by providing an opinion in response to a hypothetical question. The Government does not contest that no one has ever been prosecuted before on this theory. It does not contest that the European Commission has acted to bar Libor manipulation after the fact. And among the many

---

See supra at n.7. The second is *Mostafa*, 965 F. Supp. 2d 451. In that case, the court rejected the defendant's "sufficient nexus" argument because the allegations all "concern[ed] or relat[ed] to terrorists (members of al Qaeda) or the al Qaeda organization." *Id.* at 459. The court noted that "there was no doubt that the United States considered al Qaeda a security threat, and that al Qaeda had made public its desire to bring harm to U.S. interests and people." *Id.* In other words, the defendant's affiliation with al Qaeda supported the inference that *he* aimed his conduct at the United States. *Mostafa* is perfectly consistent with the holding in *Perlaza* that the "sufficient nexus" test must be satisfied for each defendant as a threshold matter without regard to principles of secondary liability.

16

chats attached to the Complaint, it cannot identify *any* suggesting that Mr. Darin was aware of the criminal nature of his acts.

Nor does the Government find support from the hoary axiom that fraud is an old and broad concept. (*See* RB at 26 (quoting *United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) ("[T]he law does not define fraud; it needs no definition, it is as old as falsehood and as versable as human ingenuity."))). The Government is correct that fraud is an amorphous concept, but that just underscores the importance of vigorously policing its boundaries to ensure that defendants receive fair notice. The notion that anything the Government does not like is within the scope of the mail and wire fraud statutes was most recently rebutted by the Supreme Court in *United States v. Skilling*, 561 U.S. 358 (2010). Courts have also repeatedly rejected novel theories of fraud on due process grounds. *See United States v. Giffen*, 326 F. Supp. 2d 497, 507 (S.D.N.Y. 2004) (dismissing portion of indictment because the application of the mail fraud statute to the defendant was based on a novel theory of honest services fraud and accordingly deprived the defendant of fair notice); *United States v. Saathoff*, 708 F. Supp. 2d 1020, 1041 (S.D. Cal. 2010) ("That which the indictment alleges to be a failure to deliver honest services, has not heretofore been prosecuted as such. The indictment reflects a reach to the outer limits of federal criminal authority. Because it requires exploration of the outer limits of the honest services statute, the defendants have not received fair notice of the potential criminality of their alleged actions. In 2002, the time of the events, the defendants may very well have believed their actions perfectly legal."). Just as in *Giffen* and *Saathoff*, the charge here is both unprecedented and at "the outer limits" of the relevant criminal statute. It should meet the same fate.

## V.   Conclusion

For the reasons set forth above and in our opening memorandum, the Complaint against Mr. Darin should be dismissed.

17

Dated:    December 3, 2014                    Respectfully submitted,

                                             COVINGTON & BURLING LLP

                                             By: _____
                                             Bruce A. Baird
                                             James M. Garland*
                                             Alexander A. Berengaut*
                                             1201 Pennsylvania Avenue NW
                                             Washington, DC 20004
                                             Tel:  (202) 662-6000
                                             Fax:  (202) 662-6291
                                             bbaird@cov.com
                                             jgarland@cov.com
                                             aberengaut@cov.com
                                             *Admitted *pro hac vice*

                                             *Attorneys for Defendant Roger Darin*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

               *Plaintiff,*

      v.

TOM ALEXANDER WILLIAM HAYES, and
ROGER DARIN,

              *Defendants.*

Case No.  12 MJ 3229

ORIGINAL

## CERTIFICATE OF SERVICE

        I, Claire Catalano Dean, hereby certify that on the 3rd Day of December, 2014, I caused true and correct copies of the REPLY MEMORANDUM IN SUPPORT OF DEFENDANT ROGER DARIN'S MOTION TO DISMISS THE CRIMINAL COMPLAINT and DECLARATION OF BRUCE A. BAIRD to be served via overnight Federal Express delivery upon the attorneys of record at the following addresses:

Thomas B.W. Hall
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, D.C. 20530
(202) 616-1682

Daniel Adam Braun
U.S. Attorney's Office, SDNY
86 Chambers Street
New York, NY 10007
(212) 637-2215

Elizabeth B. Prewitt
United States Department of Justice
26 Federal Plaza, Room 3630
New York, NY 10038
(212) 264-9319

William John Stellmach
United States Attorney Office, SDNY
One Saint Andrew Plaza

New York, NY 10007
(212) 637-2527

_____
Claire Catalano Dean SDNY Bar # CC7432
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: 212-841-1000
Fax: 212-841-1010
ccatalano@cov.com