

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
UNITED STATES OF AMERICA,                :        12 MJ 3229
                                         :
                Plaintiff,               :        MEMORANDUM
                                         :        AND  ORDER
        - against -                      :
                                         :
TOM ALEXANDER WILLIAM HAYES and          :
ROGER DARIN,                             :
                                         :
                Defendants.              :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

        Roger Darin seeks to dismiss the criminal complaint filed

against him by the United States of America (the "Government"),

which alleges that he conspired with co-defendant Tom Alexander

William Hayes to commit wire fraud by manipulating the London

Interbank Offered Rate ("LIBOR") for Yen.  The motion is denied.

Background

        LIBOR is "the primary global benchmark for short-term interest

rates."  (Complaint, attached as Exh. A to Declaration of Bruce A.

Baird dated Oct. 2, 2014, ¶ 7).  During the relevant time period

(roughly 2006-2009), the British Bankers' Association ("BBA")

administered the LIBOR for Yen through its agent Thomson Reuters,

which solicited each day from sixteen member banks "the rate at

which members of the bank's staff primarily responsible for

management of the bank's cash perceive that the bank can borrow

unsecured funds from another bank in the designated currency over

the specified maturity."  (Complaint, ¶¶ 7-9; Memorandum of Law in

Support of Defendant Roger Darin's Motion to Dismiss the Criminal

Complaint ("Def. Memo.") at 1).  After excluding the highest and

1

lowest four rates, Thomson Reuters averaged the remaining eight to derive the Yen LIBOR figure for the day.  (Complaint, ¶ 10; Def. Memo. at 1-2).  The resulting rate was widely published, including in New York.  (Complaint, ¶ 10).

Member banks of the Yen LIBOR panel such as UBS AG ("UBS") trade Yen LIBOR-based derivative products.  (Complaint, ¶¶ 12, 17).  One such product, an "interest rate swap," is an arrangement between two parties in which

> each party agrees to pay either a fixed or floating rate
> denominated in a particular currency to the other party.
> The fixed or floating rate is multiplied by a notional
> principal amount to calculate the cash flows which must
> be exchanged at settlement.    This  notional  amount
> generally does not change hands.

(Complaint, ¶ 17).   An interest rate swap is "effectively [a] wager[] on the direction in which Yen LIBOR [will] move."  (Complaint, ¶ 18).  Traders are compensated, in part, based on the profitability of their trading positions.  (Complaint, ¶ 18).

The Complaint alleges that both Mr. Darin and Mr. Hayes worked at UBS and traded in short-term interest rates.  Mr. Hayes was a senior Yen swaps trader at UBS in Tokyo; Mr. Darin traded in short-term interest rates at UBS in Singapore, Tokyo, and Zurich, and was responsible, either as principal or as supervisor, for the bank's Yen LIBOR submissions to the BBA.   (Complaint, ¶¶ 15-16).  According to the Complaint, Mr. Hayes conspired with Mr. Darin to manipulate the Yen LIBOR by presenting false and misleading submissions to the BBA on behalf of UBS in order to increase the profitability of UBS' trading positions to the detriment of its counterparties, at least one of which was located in New York.

2

(Complaint, ¶¶ 2, 19, 22).   Mr. Hayes would ask Mr. Darin or Mr. Darin's subordinates (who had been instructed to heed the requests of Mr. Hayes and other UBS traders) that UBS' submission be raised or reduced -- depending on Mr. Hayes' trading positions -- from the rate that Mr. Darin would otherwise have submitted.   Mr. Darin complied, resulting in considerable yield to Mr. Hayes' positions. (Complaint, ¶ 21(b)-(h)).  For example, in one such communication, Mr. Hayes requested a low Yen LIBOR submission from UBS. (Complaint, ¶ 21(d)(i)).   Mr. Darin informed him that the "'unbiased' 3-month Yen LIBOR submission would be 0.69 percent and that he could not set too far away from the 'truth' or he would risk getting UBS 'banned' from the Yen LIBOR panel." (Complaint, ¶ 21(d)(ii)).  UBS' submission that day was 0.67 percent, resulting in a "3-month Yen LIBOR fix [] 1/8 of a basis point lower than it otherwise would have been."   (Complaint, ¶ 21(d)(iv)).   Such requests were made by Mr. Hayes or at his direction on approximately 335 out of 738 trading days between November 2006 and August 2009.   (Complaint, ¶ 21(h)).   The manipulated LIBOR was published to servers in New York.   (Complaint, ¶ 10).   Moreover, confirmations for certain trades with a New York counterparty affected by those manipulated rates were electronically routed from UBS' overseas offices to servers located in this district.[1]

---

[1] The Government represented in its papers and at oral argument that Mr. Darin himself also traded Yen LIBOR swaps with counterparties in the United States and that the alleged manipulation impacted these trades. (Opposition to Defendant Roger Darin's Motion to Dismiss the Criminal Complaint ("Gov't Memo.") at 6 n.4, 23 n.16; Transcript of Oral Argument dated Jan. 12, 2015 ("Tr.") at 43).  However, I am evaluating the sufficiency of the

(Complaint, ¶ 22).

The Government filed the Complaint in December 2012. It charges Mr. Darin with conspiracy to commit wire fraud, pursuant to 18 U.S.C. § 1349, by engaging in the activities outlined above. Mr. Darin, a Swiss citizen living in Switzerland, now seeks to dismiss the Complaint, arguing that it violates his Fifth Amendment right to due process. Specifically, he contends that, as "a foreign national[] [charged] with conspiring to manipulate a foreign financial benchmark, for a foreign currency, while working for a foreign bank, in a foreign country," he lacks a sufficient nexus to the United States and did not have constitutionally adequate notice that his alleged conduct was criminal. (Def. Memo. at 1-2). In addition, he argues that prosecuting him under these circumstances would violate the presumption against extraterritorial application of American law.

## Discussion

The Government opposes Mr. Darin's substantive arguments but also contends that the Fifth Amendment is inapplicable at this juncture and that the fugitive disentitlement doctrine counsels against addressing the constitutional and statutory arguments presented. I will address these two threshold questions first.

### A.   Applicability of the Fifth Amendment

Relying primarily on <u>Johnson v. Eisentrager</u>, 339 U.S. 763 (1950), the Government contends that Mr. Darin "<u>currently</u> cannot assert claims under the Fifth Amendment" because he is a foreign

---

Complaint, which does not include any such allegations.

4

national at liberty on foreign soil. (Gov't Memo. at 8-10). This argument is not legally sound.

Eisentrager concerned the post-World War II conviction by a United States military tribunal in China of a number of German nationals for "violating the laws of war[] by engaging in, permitting or ordering continued military activity against the United States after surrender of Germany and before surrender of Japan." 339 U.S. at 765-66. The prisoners petitioned for writs of habeas corpus, arguing that "their trial, conviction and imprisonment violate[d]" various constitutional provisions including the Fifth Amendment. Id. at 767. The Supreme Court denied the writ, holding that constitutional protections did not extend to enemy aliens, and noting that the "prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." Id. at 777-78. The Government appears to contend that Eisentrager announces a rule that Fifth Amendment protections can never apply to non-citizens who are not "presen[t] in the United States (or U.S.-controlled) territory." (Gov't Memo. at 10).

That is too facile a reading. Boumediene v. Bush warned against a "formalis[tic]" application of Eisentrager because the extraterritorial application of constitutional principles "turn[s] on objective factors and practical concerns." 553 U.S. 723, 764 (2008). And the types of objective circumstances and practical

5

considerations with which the <u>Eisentrager</u> Court was concerned - for example, the fact that affording the enemy alien petitioners the Fifth Amendment rights they sought would "put [] them in a more protected position than our own soldiers," <u>Eisentrager</u>, 339 U.S. at 784 -- are not present here.   <u>See also In re Terrorist Bombings of U.S. Embassies in East Africa</u>, 552 F.3d 177, 201 (2d Cir. 2008) ("[T]he Court's rejection of the Fifth Amendment claim in <u>Eisentrager</u> cannot be unmoored from the salient facts of the case: an overseas conviction of 'nonresident enemy aliens,' following the cessation of hostilities, by a duly-constituted military court.").

To be sure, the Court in <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 269 (1990), characterizes <u>Eisentrager</u> as "reject[ing] [] extraterritorial application of the Fifth Amendment [] emphatic[ally]," but that dictum must also be construed in context. In that case, Mexican officials apprehended Rene Martin Verdugo-Urquidez, a Mexican citizen and resident, pursuant to a United States arrest warrant and transported him to United States territory to be arrested.   <u>Id.</u> at 262.   In concert with Mexican law enforcement personnel and without a search warrant, the Drug Enforcement Agency then searched the defendant's Mexican properties and seized certain documents.   <u>Id.</u> at 262.   The Supreme Court held that the Fourth Amendment did not apply "to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country."   <u>Id.</u> at 261.   At the outset of its analysis, the Court stated that the Fourth Amendment "operates in a different manner than the Fifth Amendment," offering

6

the example that "[t]he privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants." <u>Id.</u> at 264.  Thus, the Court's later reference to <u>Eisentrager</u>'s "emphatic" holding is consistent with the proposition that the applicability of Fifth Amendment protections depends on the venue and the tribunal: while such protections apply in United States civilian courts, they may not always pertain in military proceedings. <u>See Eisentrager</u>, 339 U.S. at 785 (holding that Fifth Amendment does not confer immunity from military trial on enemy aliens "engaged in the hostile service of a government at war with the United States"); <u>In re Terrorist Bombings</u>, 552 F.3d at 198-205 (holding that Fifth Amendment and <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), apply to admission in federal court of statements made by foreign nationals in foreign custody to United States law enforcement officers).

In his concurring opinion in <u>Verdugo-Urquidez</u>, Justice Kennedy reasoned that constitutional protections must be interpreted "in light of the undoubted power of the United States to take actions to assert its legitimate power and authority abroad," and he concluded that, where "[t]he United States is prosecuting a foreign national in a court established under Article III, [] all of the trial proceedings are governed by the Constitution.  All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant." <u>Verdugo-Urquidez</u>, 494 U.S. at 277-78 (Kennedy, J. concurring).  Justice Kennedy recognized, of course, that "the Constitution does not create, nor

do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory," id. at 275 (Kennedy, J. concurring); however, a criminal complaint certainly creates a cognizable "juridical relation" between the defendant and the court in which the complaint is filed.

Other cases bear this out. For example, the defendant in In re Hijazi was a Lebanese citizen residing in Kuwait, indicted in an Illinois federal court. 589 F.3d 401, 403 (7th Cir. 2009). He sought to dismiss the indictment based, among other things, on violation of his right to due process, but "[t]he district court refuse[d] to rule on his motions . . . [unless] he appear[ed] in person and [was] arraigned." Id. The Seventh Circuit issued a writ of mandamus directing the district court to rule on the defendant's motions, suggesting that he had a sufficient relationship with the United States to trigger due process protections. Id. at 406-12; see also United States v. Noriega, 683 F. Supp. 1373, 1374-75 (S.D. Fla. 1988) (allowing indicted "de facto head of a foreign government" to file motion attacking indictment, and citing "basic notions of due process"). By contrast, the Government cites no case standing for the proposition that limits on the extraterritorial reach of the Constitution bar a court from addressing a motion to dismiss a criminal complaint or indictment on constitutional grounds on account of the defendant's status as a non-resident alien outside United States territory. I therefore reject the Government's contention that Fifth Amendment

8

protections are inapplicable to the defendant here.

B.   Fugitive Disentitlement Doctrine

The Government next argues that I should decline to address Mr. Darin's motion pursuant to the fugitive disentitlement doctrine. This discretionary doctrine allows a court to refrain from expending its resources on an application presented by a fugitive. In re Grand Jury Subpoenas dated March 9, 2001, 179 F. Supp. 2d 270, 285-86 (S.D.N.Y. 2001). The Second Circuit has

> articulated four rationales for applying the fugitive disentitlement doctrine: 1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape.

Bano v. Union Carbide Corp., 273 F.3d 120, 125 (2d Cir. 2001) (internal quotation marks omitted); accord Hanson v. Phillips, 442 F.3d 789, 795 (2d Cir. 2006). The doctrine thus presents two questions: whether the applicant is a fugitive and, if so, whether, in light of the factors underlying the doctrine, a court should abstain from addressing his application. In re Grand Jury Subpoenas, 179 F. Supp. 2d at 287.

1.   Fugitive Status

The first question is a thorny one. See, e.g., United States v. Bokhari, 757 F.3d 664, 672 (7th Cir. 2014) ("Identifying fugitives for purposes of the disentitlement doctrine can present complicated legal and factual questions . . . . [T]he term 'fugitive' may take on subtly different meanings as it is used in a variety of legal contexts."); United States v. Baccollo, 725 F.2d

170, 172 (2d Cir. 1983) (noting difficulty of determining fugitive status of defendant who both absconded and was returned before district court entered judgment).   Although the word "fugitive" conventionally indicates flight, see Black's Law Dictionary 786 (10th ed. 2014), "[i]t is unnecessary for a court to find that a defendant physically fled to decide he is a fugitive.   Rather, . . . 'the intent to flee' can be inferred when a person 'fail[s] to surrender to authorities once he learns that charges against him are pending.'"   United States v. Buck, No. 13 Cr. 282, 2015 WL 195872, at *1 (S.D.N.Y. Jan. 9, 2015) (third alteration in original) (quoting United States v. Catino, 735 F.2d 718, 722 (2d Cir. 1984)).   It is unclear, however, whether a "fail[ure] to surrender" imposes fugitive status on a defendant who was not present in the United States during the alleged crime, at the time of charging, or at any time since he became aware of the charges. Compare In re Hijazi, 589 F.3d at 412-13 (non-resident alien not fugitive where only presence in United States was unrelated to case), and In re Grand Jury Subpeonas, 179 F. Supp. 2d at 287 ("One [who has 'constructively fled'] cannot be a fugitive . . . unless (i) he was present in the jurisdiction at the time of the alleged crime, (ii) he learns, while he is outside the jurisdiction, that he is wanted by the authorities, and (iii) he then fails to return to the jurisdiction to face the charges."), with 28 U.S.C. § 2466(a) (allowing application of disentitlement doctrine in civil forfeiture actions to persons who, after notice that process has been issued for apprehension, "decline[] to enter or reenter the

10

United States to submit to its jurisdiction" in order to avoid criminal prosecution), and United States v. Hernandez, No. 09 CR 625, 2010 WL 2652495, at *5 (S.D.N.Y. June 30, 2010) ("[H]ow the person became a 'fugitive' is not necessarily relevant because the focus is on the intent to return and appear before the court.").

Here, Mr. Darin's intent to avoid prosecution is clear. His counsel asserts that the Complaint "has effectively confined Mr. Darin to Switzerland" and that "if the court upholds the Government's [C]omplaint, the restrictions under which he has been living will become permanent." (Declaration of Bruce A. Baird dated Dec. 3, 2014 ("Baird 12/3/14 Decl."), ¶¶ 5,7). On the other hand, the record before me does not indicate that Mr. Darin has ever even entered the United States. Nor has he hidden his whereabouts from United States authorities. He has merely remained in his home country. In any case, I need not decide the question of his status because, even assuming Mr. Darin is a fugitive, I would not apply the disentitlement doctrine in this case.

  2.   Rationales for Doctrine

    a.   Mututality

A primary ground for applying the fugitive disentitlement doctrine is the absence of "mutuality," which occurs when a decision in favor of an applicant would benefit him, but a decision against him would not be enforceable or would not operate to his disadvantage. See, e.g., In re Hijazi, 589 F.3d at 412-13 ("[I]f [a defendant] wants the United States to be bound by a decision dismissing the indictment, he should be similarly willing to bear

11

the consequences of a decision upholding it."); United States v. Eng, 951 F.2d 461, 465 (2d Cir. 1991) (noting "the impropriety of permitting a fugitive to pursue a claim in federal court where he might accrue a benefit, while at the same time avoiding an action of the same court that might sanction him"), abrogated on other grounds by Degen v. United States, 517 U.S. 820 (1996).  The textbook example of this occurs where a person who has appealed his conviction absconds.  See, e.g., Molinaro v. New Jersey, 396 U.S. 365, 366 (1970) (per curiam) ("No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction."); United States v. Awadalla, 357 F.3d 243, 246 (2d Cir. 2004) ("Because Awadalla absconded after challenging his judgment of conviction in this Court, there is no doubt that we have the authority to dismiss his appeal.").

The Government contends that "if the Court decides against [Mr.] Darin, the decision will not be enforceable: [Mr.] Darin will not submit to the Court's jurisdiction if the Court denies his motion on the merits."  (Gov't Memo. at 36).  I assume that the factual statement is correct; Mr. Darin seems to ratify it.  (Baird 12/3/14 Decl., ¶ 7).  I disagree, however, with the legal premise. The effect of a decision upholding the validity of the complaint will be to allow the charges, and the arrest warrant issued pursuant to those charges, to stand.  That decision, like the

12

arrest warrant, is enforceable even in Mr. Darin's absence.[2] Likewise, the arrest warrant will still be enforceable. That is precisely the point made in <u>United States v. Finkielstain</u>, No. 99 Cr. 0009, 1999 WL 1267467 (S.D.N.Y. Dec. 29, 1999). In that case, the defendant, who resided in "his native Argentina" after he was voluntarily deported, sought a declaration that a warrant issued for his arrest was "a nullity." <u>Id.</u> at *1. Rejecting the argument that mutuality was lacking, the court noted that the defendant would "be bound by any decision denying relief just as much as he would be bound by one granting it. A decision denying relief would simply leave matters where they were before, with an outstanding warrant in place." <u>Id.</u> at *2. There is no merit to the argument that a decision denying Mr. Darin's motion is not binding upon him.

Moreover, affirming the validity of the complaint will entail significant burdens for Mr. Darin. In <u>In re Hijazi</u>, a case with remarkably similar relevant facts, the court found "adverse consequences" sufficient to establish mutuality. These consequences included restrictions on travel imposed by the indictment -- the petitioner was effectively forced to stay in Kuwait or hazard apprehension and extradition -- and the risk that, if a federal court upheld the indictment, Kuwait might exercise its discretion to cooperate with the United States and extradite him. 589 F.3d at 413. Here, similar consequences attach to Mr. Darin.

_____

[2] It is worth noting that an arrest warrant -- unlike a judgment of conviction, for example -- imposes no duty on a defendant; it creates a duty in an "authorized officer" to arrest the accused. (Warrant for Arrest of Roger Darin dated Dec. 12, 2012).

He is "effectively confined . . . to Switzerland," unable to visit
family even in neighboring Austria.   (Baird 12/3/14 Decl., ¶ 5).
Because of the substance of the complaint, he is "unable to find
any job in the Swiss financial sector -- the line of work for which
he is professionally qualified."  (Baird Decl., ¶ 3).  And, indeed,
a decision denying Mr. Darin's motion will exacerbate the situation
somewhat by imposing on him a choice either to live under these
disabilities for an indeterminate length of time or submit to
apprehension and extradition.   See In re Hijazi, 589 F.3d at 413
("[A] decision [denying the motion to dismiss] would . . . make it
very risky for [the defendant] to ever leave Kuwait.").

### b.   Flouting the Judicial Process

According to the Government, Mr. Darin "is 'flouting the
judicial process' by refusing to appear in this Court."  (Gov't
Memo. at 36).  That argument is unpersuasive in part because every
fugitive has refused to appear in court -- it is the sine qua non
of fugitive status.    If mere absence from court constituted
"flouting the judicial process," this factor would always favor the
prosecution, and no further analysis would be necessary.    The
Government has not explained what constitutes "flouting" in Mr.
Darin's circumstances in particular. The record does not show, for
example, that Mr. Darin fled from the United States after learning
he had been or was to be charged; as far as I can tell, there is no
indication here that he ever set foot in this jurisdiction.  He is
avoiding the arrest warrant -- a document that does not compel his
voluntary surrender -- merely by remaining in his home country

14

c.   Discouraging Flights from Justice

The Government worries that "ruling on [this] motion would encourage others in [Mr.] Darin's position -- including potentially other defendants in LIBOR-related cases residing abroad -- to take flight from justice."   (Gov't Memo. at 36).   This contention suffers from a similar flaw as the previous one in that it would apply to every case in which the fugitive disentitlement doctrine might apply.  I cannot see how addressing Mr. Darin's application, in particular, would make other defendants more likely to engage in conduct similar to his.  There is no indication in the papers that other defendants or potential defendants in LIBOR-related cases are similarly situated to Mr. Darin -- that is, able to avoid prosecution by residing in home countries that have extradition arrangements with the United States similar to Switzerland's -- so that they might be inspired by his example.

d.   Prejudice

The final purpose of the fugitive disentitlement doctrine is "avoiding prejudice to the other side caused by the defendant's escape."   Bano, 273 F.3d at 125.  As articulated, this factor seems to assume that the applicant was once in custody and has absconded.   That is not the case here.   The Government notes, however, that "witnesses' memories fade and the criminal events become more remote in time," (Gov't Memo. at 36-37), and that, of course, is true whether the defendant has escaped or is merely avoiding prosecution.

The fading of witnesses' memories is a cognizable prejudice to

the Government.    But the Government itself does not seem

particularly keen to move this action forward.    Despite its

attestations that it "has an interest in prosecuting this case in

a timely manner," the Government has not yet indicted Mr. Darin,

which is a precondition to prosecuting a felony.  Fed. R. Crim. P.

7(a)(1)(B); (Tr. at 53).    In light of the circumstances here,

including the other findings discussed above, I will not exercise

my discretion to apply the fugitive disentitlement doctrine.

    C.    <u>Presumption Against Extraterritoriality</u>

Mr. Darin argues that the Complaint against him "should be

dismissed because it involves an unauthorized extraterritorial

application of the conspiracy and wire fraud statutes."    (Def.

Memo. at 17).

        1.    <u>Legal Standard</u>

The "presumption against extraterritoriality" is a canon of

statutory construction that assumes that Congress intends its

enactments, whether civil or criminal, to apply only domestically

unless it clearly expresses a contrary intention.    <u>Morrison v.</u>

<u>National Australia Bank Ltd.</u>, 561 U.S. 247, 255 (2010); <u>United</u>

<u>States v. Vilar</u>, 729 F.3d 62, 72 (2d Cir. 2013).    Because the

presumption "is a method of interpreting a statute," it "is not a

rule to be applied to the specific facts of each case"; rather "[a]

statute either applies extraterritorially or it does not, and once

it is determined that a statute does not apply extraterritorially,

the only question [to be] answer[ed] in the individual case is

whether the relevant conduct occurred in the territory of a foreign

sovereign." <u>Vilar</u>, 729 F.3d at 74.

<u>Morrison</u> provides the Supreme Court's most recent guidance on the presumption. In that case, the Court addressed whether Section 10(b) of the Securities Exchange Act of 1934 "provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges." <u>Morrison</u>, 561 U.S. at 250-51. The complaint alleged that an Australian bank had purchased a United States company, manipulated that company's financial data, and published some of that manipulated data in the Australian bank's financial statements, annual reports, and other documents. <u>Id.</u> at 251-52. Ultimately, the value of the United States company's assets had to be written down, prompting certain Australian shareholders to sue for violations of Section 10(b) and Securities and Exchange Commission Rule 10(b)(5). <u>Id.</u> at 252-53. Examining the statute, the Supreme Court first held that a "general reference to foreign commerce" in a statute "does not defeat the presumption against extraterritoriality." <u>Id.</u> at 263. Rather, to determine whether a statute is intended to apply extraterritorially (absent a clear indication in the text), a court must look at the "'focus' of congressional concern." <u>Id.</u> at 266 (quoting <u>EEOC v. Arabian American Oil Co.</u>, 499 U.S. 244, 255 (1991) (hereinafter "<u>Aramco</u>"), <u>superseded by statute as recognized in</u> <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 508, 512 n.8 (2006)). The focus of Section 10(b), the Court held, "is not upon the place where the deception originated, but upon purchases and sales of securities in the United States," which

17

are "the objects of the statute's solicitude" and the "transactions that the statute seeks to regulate." Id. at 266-67 (internal quotation marks omitted); see also Aramco, 499 U.S. at 255 (finding that elements of Title VII of Civil Rights Act of 1964 "suggest ] a purely domestic focus").

### 2.   Application to Wire Fraud Statute

The wire fraud statute punishes anyone who,

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . .

18 U.S.C. § 1343.  Mr. Darin has been charged with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  That section does not set out separate elements of conspiracy (and, indeed, has been held not to contain an "overt act" requirement, see, e.g., United States v. Huff, No. 12 Cr. 750, 2015 WL 463770, at *2 (S.D.N.Y. Feb. 4, 2015) (collecting cases)), but subjects those conspiring or attempting to commit wire fraud to "the same penalties as those prescribed for the offense." 18 U.S.C. § 1349.

Prior to 1956, the wire fraud statute referred only to interstate communications, punishing those who executed a fraudulent scheme "'by means of interstate wire, radio, or television communications.'" Wentz v. United States, 244 F.2d 172, 174 (9th Cir. 1957) (quoting pre-1956 version of 18 U.S.C. § 1343). The 1956 amendment added the reference to "foreign commerce." United States v. Kim describes the legislative history of the

18

amendment:

> The amendment was prompted by the failed prosecution of
> an individual who made a fraudulent telephone call from
> Mexico to the United States and successfully argued that
> § 1343 did not cover such a foreign communication. <u>See</u>
> S. Rep. No. 1873, 84th Cong., 2d Sess. 2 (1956). With
> this case in mind, Congress acted to "close [the]
> loophole" that limited prosecution to cases in which the
> fraudulent transmission occurred between two states, and
> explicitly extended the coverage of § 1343 to foreign
> communications. <u>See</u> H.R. Rep. No. 2385, 84th Cong., 2d
> Sess. 1 (1956), <u>reprinted in</u> 1956 U.S.C.C.A.N. 3091,
> 3092.

<u>United States v. Kim</u>, 246 F.3d 186, 189 (2d Cir. 2001) (alteration

in original). According to <u>Kim</u>, this reference to foreign commerce

established that Congress intended "to reach fraud schemes

furthered by foreign wires." <u>Id.</u> However, as <u>Kim</u> was decided

before <u>Morrison</u> ruled that such a reference does not indicate

congressional focus on extraterritorial application, the

legislative history is ripe for reinterpretation. In the case

inspiring the amendment, the wire transmission entered the United

States; that is, it used domestic wires. Congress thus seemed to

be clarifying that frauds originating in foreign territory that use

wires touching the United States can be prosecuted under the

statute. Recognizing this, <u>In re Hijazi</u> held that the statute did

not apply extraterritorially, but was focused on the use of

domestic wires. 845 F. Supp. 2d 874, 906 (C.D. Ill. 2011).

A number of courts, in applying the wire fraud statue to

frauds in which some of the alleged conduct occurred on foreign

soil, have likewise indicated that the statute targets the use of

domestic wires. <u>See, e.g.</u>, <u>United States v. Trapilo</u>, 130 F.3d 547,

552 (2d Cir. 1997) ("[W]hat is proscribed [by the wire fraud

19

statute] is the use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property." (emphasis omitted) (footnote omitted) ; United States v. Approximately $25,829,681.80 in Funds (Plus Interest) in the Court Registry Investment System, No. 98 Civ. 2682, 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999) ("[T]he use of wires in the United States to transfer the funds would clearly allow this Court to exercise jurisdiction over the underlying wire fraud claim."); United States v. Golitschek (Heinz), No. CR-85-131, 1986 WL 2603, at *2 (W.D.N.Y. Feb. 25, 1986) ("[T]he law in this circuit   premises jurisdiction under 18 U.S.C. § 1343 on a defendant's use of the wires to accomplish his fraudulent scheme.").

     Most convincingly, the Second Circuit has recently stated categorically that the wire fraud statute "doe[s] not overcome Morrison's presumption against extraterritoriality."   European Community v. RJR Nabisco, 764 F.3d 129, 139 (2d Cir. 2014); but see United States v. Georgiou, 777 F. 3d 125, 137-38 (3d Cir. 2015) (holding that wire fraud statute "applies extraterritorially'); United States v. Lyons, 740 F.3d 702, 718 (1st Cir. 2014) (holding that Wire Act, which prohibits using "wire communication facility" to transmit bets or wagers "in interstate or foreign commerce" applies extraterritorially because it "explicitly applies to transmissions between the United States and a foreign country"). Although the Court of Appeals did not explicitly discuss the "focus of congressional concern" and may have dealt with the

extraterritoriality question in a "cursory" manner (Gov't Memo. at 31), there is, as discussed above, significant support for this conclusion.

### 3.   Application to the Facts

The conclusion that the wire fraud statute has only domestic application is not fatal to the Government's case against Mr. Darin, however, because the statute is not being applied extraterritorially here.  See Vilar, 729 F.3d at 74 ("[O]nce it is determined that a statute does not apply extraterritorially, the only question [to be] answer[ed] in the individual case is whether the relevant conduct occurred in the territory of a foreign sovereign.").

The allegation that a defendant who is charged with violation of the fraud statute used domestic wires to carry out the fraudulent scheme is "clearly sufficient to sustain jurisdiction." United States v. Gilboe, 684 F.2d 235, 237 (2d Cir. 1982); see also Trapilo, 130 F.3d at 552 ("[W]hat is proscribed is the use of the telecommunications systems of the United States in furtherance of a scheme whereby one intends to defraud another of property. Nothing more is required.  The identity and location of the victim, and the success of the scheme, are irrelevant." (emphasis omitted) (footnote omitted)); cf. United States v. Hoskins, __ F.3d __, __, 2014 WL 7385131, at *9 (D. Conn. 2014) (under Foreign Corrupt Practices Act ("FCPA"), indictment charged domestic conduct where it alleged use of mails and means of interstate commerce in furtherance of payment to foreign official notwithstanding fact

21

that accused alien never entered United States in connection with corrupt scheme).  In <u>Gilboe</u>, a non-resident alien was accused of arranging for grain to be shipped to a corporation in China, obtaining the ships through "telex and telephone communication channels" in and out of the United States, and then pocketing proceeds received from the Chinese company without paying the shipowner.  <u>Id.</u>  The defendant appealed his conviction, arguing "that the district court did not have jurisdiction over the offenses charged because he was a nonresident alien whose acts occurred outside the United States and had no detrimental effect within the United States."  <u>Id.</u>  The Second Circuit affirmed, holding that the use of telephone and telex communications systems in negotiating for the ships conferred jurisdiction under the wire fraud statute.[3]  <u>Id.</u> at 237-38.

In <u>Pasquantino v. United States</u>, 544 U.S. 349 (2005), the Supreme Court confirmed that prosecuting frauds that allege use of domestic wires does not constitute extraterritorial application of the wire fraud statute.  In that case, two of the defendants, "while in New York, ordered liquor over the telephone from discount package stores in Maryland.  They employed [the third defendant] to drive the liquor over the Canadian border, without paying the required excise taxes."  544 U.S. at 353 (internal citation

---

[3] <u>Gilboe</u>, as well as other cited cases, discusses the question of whether a statute is applied extraterritorially in terms of the court's jurisdiction.  <u>Morrison</u> held that the issue of extraterritoriality was not one of jurisdiction, but of statutory interpretation.  561 U.S. at 253-54.  This nuance does not alter the analysis here.

omitted).  The majority reasoned that applying the wire fraud
statute in such a situation did not give it extraterritorial effect
merely because

> [the defendants] used U.S. interstate wires to execute a
> scheme to defraud a foreign sovereign of tax revenue.
> Their offense was complete the moment they executed the
> scheme inside the United States . . . .  This domestic
> element of [the defendants'] conduct is what the
> Government is punishing in this prosecution.

Id. at 371 (internal citation omitted); accord Morrison, 561 U.S.
at 271-72.  That is, the Court found that by using United States
interstate wires, the defendants executed their scheme inside the
United States.  See United States v. Coffman, 771 F. Supp. 2d 735,
738 (E.D. Ky. 2011) (denying motion to dismiss indictment charging
scheme to defraud which occurred in Canada between Canadian sales
office and Canadian investors but used interstate wires), aff'd,
574 F. App'x 541, 557-58 (6th Cir. 2014) ("[W]ire fraud occurs in
the United States when defendants use interstate wires as part of
their scheme."); see also United States v. Ayesh, 762 F. Supp. 2d
832, 837 (E.D. Va. 2011) (noting that territorial jurisdiction is
appropriate over wire fraud cases involving "the misuse of domestic
wires").

The complaint here alleges use of interstate wires in
furtherance of the fraudulent scheme that underlies the charge of
conspiracy against Mr. Darin: the co-conspirators purportedly
caused the manipulated LIBOR to be published to servers in the
United States and used United States wires to memorialize trades
affected by that rate.  The culpable conduct underlying the
substantive count therefore occurred in the United States.  The

presumption against extraterritoriality is thus irrelevant to both
the wire fraud and the conspiracy.   See Kim, 246 F.3d at 189-91 &
n.2 (where statute covers conduct alleged in substantive count,
conspiracy count also covered); United States v. Ivanov, 175 F.
Supp. 2d 367, 372 (D. Conn. 2001) (same).

     D.   <u>Nexus</u>

     Courts, including the Second Circuit, have held that a court
may apply a statute extraterritorially provided that (a) Congress
intended its reach to extend beyond the territorial boundaries of
the United States and (b) there is a "'sufficient nexus between the
defendant and the United States, so that such application would not
be arbitrary or fundamentally unfair.'"   United States v. Al-
Kassar, 660 F.3d 108, 118 (2d Cir. 2011) (quoting United States v.
Yousef, 327 F.3d 56, 111 (2d Cir. 2003)); see also United States v.
Davis, 905 F.2d 245, 248-49 (9th Cir. 1990) ("In order to apply
extraterritorially a federal criminal statute to a defendant
consistently with due process, there must be a sufficient nexus
between the defendant and the United States so that such
application would not be arbitrary or fundamentally unfair."
(internal citation omitted)); United States v. Mohammad-Omar, 323
F. App'x 259, 261 (4th Cir. 2009) (same); United States v. Mostafa,
965 F. Supp. 2d 451, 458 (S.D.N.Y. 2013) (same).   The Government
asserts that, because this is a territorial application of the
statute, no nexus inquiry is necessary.   (Gov't Memo. at 20-21).

     While it may be correct that courts typically do not engage in
an analysis of a defendant's nexus with the United States where the

crime charged is not extraterritorial, this may simply be a
function of the nexus being obvious. While the extraterritoriality
inquiry addresses the reach of a statute, the nexus analysis
considers the validity of the court's exercise of jurisdiction over
the particular defendant. The Fifth Amendment requires all
prosecutions to be reasonable and fundamentally fair.  See Al-
Kassar, 660 F.3d at 118. The statutory interpretation involved in
determining if a statute is or is not extraterritorial reveals
nothing (or, at best, very little) about whether a particular
prosecution comports with the Fifth Amendment.  Thus, in a
situation like this, where a criminal statute is applied
domestically but the defendant claims insufficient connections with
the United States, a court should evaluate whether the prosecution
is fundamentally fair.

The nexus analysis does not get Mr. Darin very far, however,
because the Complaint alleges a nexus between him and the United
States sufficient to satisfy due process concerns. As the District
of Columbia Circuit notes, cases in which even the extraterritorial
application of a federal criminal statute has been "actually deemed
a due process violation" are exceedingly rare, and a defendant's
burden "is a heavy one."  United States v. Ali, 718 F.3d 929, 944
n.7 (D.C. Cir. 2013).  This is particularly true where the
prosecution is challenged at the pleading stage. Cf. United States
v. Ahmed, No. 10 Cr. 131, 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 11,
2011) ("[W]hether the government can adequately prove an effect of
interstate and foreign commerce should not be resolved prior to

trial as long as the indictment itself is sufficient on its face."); <u>United States v. Remire</u>, 400 F. Supp. 2d 627, 630-31 (S.D.N.Y. 2005) ("Given the limited information that is before the Court, it is not possible to undertake the detailed factual analysis required to assess whether the government will be able to meet its jurisdictional burden."). Here, Mr. Hayes and Mr. Darin allegedly conspired to manipulate the LIBOR for Yen to benefit Mr. Hayes at the expense of his counterparties, at least one of whom was in the United States. Mr. Darin was aware that the Yen LIBOR was published in the United States, and it is a reasonable inference from the Complaint that, as a trader in short-term interest rates (like the Yen LIBOR), he was aware that such trades would likely have counterparties in the United States and particularly in a center of international finance like New York. In these circumstances, and at this point in the case, Mr. Darin has not shown that it is arbitrary or fundamentally unfair to subject him to prosecution under United States criminal law.

Mr. Darin contends that the Fifth Amendment's guarantee of due process is not satisfied because the "aim of [his] activity [was not] to cause harm inside the United States or to U.S. citizens or interests." (Def. Memo. at 4 (quoting <u>Al-Kassar</u>, 660 F.3d at 118)). There are a number of problems with this argument. First, that is not the proper standard. As the Government argues, "a substantial intended effect in or on the United States is sufficient but not necessary" to satisfy the Fifth Amendment. <u>United States v. Yousef</u>, No. 08 Cr. 1213, 2010 WL 3377499, at *4

(S.D.N.Y. Aug. 23, 2010) (internal quotation marks omitted)); see also Ali, 718 F.3d at 945-46 ("[A]ssuming Al Kassar's characterization is right, the decision only tells us when such a nexus exists, not when it is absent."); Mostafa, 965 F. Supp. 2d at 459 ("[S]pecific intent to harm Americans is not what the law requires.").

Second, Mr. Darin contends that the Court must evaluate the Complaint's allegations regarding his connections to the United States isolated from the allegations regarding Mr. Hayes or the conspiracy as a whole. (Def. Memo. at 5). I disagree.[4] The defendant relies on the Ninth Circuit's decision in United States

---

[4] Mr. Darin analogizes to the law of personal jurisdiction developed in civil cases, but it is not relevant. To be sure, "greater due process protection is required in the criminal context than in the civil context" (Reply at 12 (internal quotation marks omitted)), but criminal law and civil law serve different purposes and have different sources and constraints. Positing that doctrines of personal jurisdiction in civil cases should serve as a foundation for the question presented here is attractive, but ultimately inappropriate. See Ali, 718 F.3d at 944 ("It is true courts have periodically borrowed the language of personal jurisdiction in discussing the due process constraints on extraterritoriality. But Ali's flawed analogies do not establish actual standards for judicial inquiry; the law of personal jurisdiction is simply inapposite."); Hijazi, 845 F. Supp. 2d at 882 n.8 (rejecting reliance on civil cases regarding minimum contacts, finding them "inapposite"). One of the casualties of this observation is Mr. Darin's argument, derived from Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972), that his knowledge that the LIBOR figures were published globally is an insufficient connection to the United States because "worldwide reliance" cannot provide a sufficiently targeted basis for personal jurisdiction. (Def. Memo. at 7-8). But if I were to address this contention, I would reject it in part because if it were true, it would work to insulate from prosecution those accused of wide-ranging frauds merely because of their expansive scope. As the Government notes, one who enters in a conspiracy with a global scale "risk[s] being held to account for his illegal actions where[ever] his [] manipulation efforts had effects." (Gov't Memo. at 22-23).

v. Perlaza, 439 F.3d 1149 (9th Cir. 2006). The defendants in that
case had been apprehended in the Eastern Pacific Ocean off the
coasts of Colombia, Ecuador, and Peru after throwing a number of
bales of cocaine overboard as their small speedboat sank, and they
were prosecuted under the Maritime Drug Law Enforcement Act
("MDLEA"). Id. at 1154-56. The district court found that the
craft was stateless, and therefore exercised jurisdiction over
those defendants without engaging in a nexus inquiry. Id. at 1160-
61. It also found that the crew of another, larger ship flying the
Colombian flag, which was allegedly used for refueling the smaller
craft, had aided and abetted the crew of the small craft, and found
a sufficient nexus on that basis alone to exercise jurisdiction
over that crew. Id. at 1161. That is, the district court, finding
that it had jurisdiction over the crew members of the smaller craft
without addressing their connection to the United States, imputed
that jurisdiction to the crew of the Colombian vessel under the
theory that aider and abetters "stand in the shoes of the
principals . . . for jurisdictional purposes." Id. (internal
quotation marks omitted). The Ninth Circuit reversed the
convictions, first holding that the question of the smaller craft's
statelessness was a "disputed factual question" to be decided by
the jury, not the court. Id. at 1165. Turning to the convictions
of the crew of the larger vessel, the court reasoned as follows:

> Relying on the theory of aiding and abetting does not
> vitiate the need to consider the underlying bases for
> jurisdiction. In [United States v. ]Klimavicius-Violoria,
> [144 F.3d 1249 (9th Cir. 1998),] we noted that criminal
> liability under the MDLEA could be predicated on an
> aider-and-abettor theory, but we conducted a nexus

> analysis nevertheless.  See Klimavicius-Viloria, 144 F.3d
> at 1257.   Aiding and abetting is a substantive area of
> criminal law that allows courts to punish vicariously a
> defendant who, in some way, associates himself with an
> illegal venture, participates in it as in something he
> wishes to bring about, and seeks by his actions to make
> it succeed.   Id. at 1263 (citing Nye & Nissen v. United
> States, 336 U.S. 613, 619 (1949)).  The ability of a
> United States court to exercise jurisdiction over that
> particular  defendant,  however,  is  a  preliminary
> determination totally distinct from the crime itself and
> must be considered before any United States court or jury
> may determine whether the defendant acted as a principal
> or an aider and abettor.  See id. at 1257.

Perlaza, 439 F.3d at 1168-69 (parallel citation omitted).

The defendant overreads this passage as stating a rule that,
when analyzing whether the exercise of jurisdiction over a criminal
defendant charged with conspiracy comports with due process, only
facts alleged as to the specific defendant at issue (but not as to
the conspiracy as a whole) can be taken into account. However, in
the context of the case, the Ninth Circuit merely required a nexus
analysis for each defendant.     Imputing jurisdiction for an
aider-and-abetter or co-conspirator based only on a jurisdictional
decision made for a principal -- particularly one made without an
evaluation of whether those facts were adequate to confer
jurisdiction over the principals -- is insufficient.   Mr. Damin
points to the (rather gnomic) last sentence in the citation above,
which states that the question of jurisdiction over a criminal
defendant is "preliminary" to and "totally distinct from" the crime
itself.   But the court cannot have meant that the facts of the
charged  crime  are  not  to  be  considered  in  deciding  the
jurisdictional question: the facts of the crime, as set out in the
statute and as alleged, guide the nexus analysis (especially at

29

this early stage, where the only facts to be evaluated are those in the Complaint). Perhaps most damaging to the defendant's theory is that fact that in <u>Klimavicius-Viloria</u>, the case <u>Perlaza</u> cites as support for this proposition, there is no indication that each conspirator's conduct was evaluated in isolation from the actions of others. Indeed, it appears to analyze the alleged conspirators' contacts as a group. <u>See</u> <u>Klimavicius-Viloria</u>, 144 F.3d at 1257-59.

Other cases confirm this point. In <u>Ford v. United States</u>, the defendants were charged with conspiracy to violate federal law "by introducing into and transporting in the United States intoxicating liquor," but they argued that "they were corporeally at all times during the alleged conspiracy out of the jurisdiction of the United States, and so could commit no offense against it." 273 U.S. 593, 601, 619-20 (1927). The Supreme Court recognized that "jurisdiction exists to try one who is a conspirator, whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against." <u>Id.</u> at 621-22. Further, it held that, because the indictment charged acts within the jurisdiction of the United States, the United States had jurisdiction over those conspirators who were not within its territory. <u>Id.</u> at 624. The obvious implication is that the acts of co-conspirators may be taken into account in deciding whether United States courts may prosecute an alleged conspirator. <u>See</u> <u>United States v. Manuel</u>, 371 F. Supp. 2d 404, 409 (S.D.N.Y. 2005) ("The Supreme Court has specifically upheld the exercise of jurisdiction over conspirators who have never entered the United States, where the conspiracy was

'directed to violation of the United States law within the United States.'" (quoting Ford, 273 U.S. at 620)).  Relying on Ford, the district court in Hijazi held that a co-conspirator's "actions in furtherance of the scheme to defraud can [] be attributed" to another conspirator, "even [one who] is a foreign national." Hijazi, 845 F. Supp. 2d at 886.  Therefore, allegations as to Mr. Hayes' conduct in the charged conspiracy may be evaluated in determining whether there is a "sufficient nexus" between Mr. Darin and the United States.  At this stage of the litigation, the allegations of the Complaint satisfy the nexus requirements of the Fifth Amendment.[5]

    E.   Notice

    Finally, Mr. Darin contends that he did not have fair notice that his conduct could subject him to criminal liability.  Holding an accused criminally responsible for conduct he could not reasonably know was illegal violates the Fifth Amendment.  Al-Kassar, 660 F.3d at 119.  "Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they could reasonably understand that their conduct was criminal and would subject them to prosecution somewhere."  Id. (emphasis omitted).  That standard is easily met here.

_____

    [5] Because I have found that the Due Process Clause of the Fifth Amendment is satisfied by this nexus I need not address the defendant's arguments about international law or comity.  Ali, 518 F.3d at 945 ("Our duty is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law." (internal quotation marks omitted)); Yousef, 327 F.3d at 91.

Mr. Darin argues that his Yen LIBOR submissions were "opinions in response to a hypothetical question, not representations of fact or even statements of opinion _about_ a concrete fact." (Def. Memo. at 15). But the Complaint alleges that Mr. Darin submitted opinions that were not _bona fide_: he worried to Mr. Hayes, for example, that his submission could not stray too far from the "truth" -- that is, an "unbiased" and legitimate opinion of the appropriate interest rate.[6] (Complaint, ¶ 21(d)(ii)). Mr. Darin knew that submission of a biased opinion would likely have real-world consequences: he himself traded short-term interest rate swaps; Mr. Hayes instructed him regarding how the submissions should differ from the unbiased rate; and Mr. Hayes repeatedly made such requests. (Complaint, ¶ 21). The obvious inference is that Mr. Darin's false submissions benefitted Mr. Hayes at the expense of his counterparties.[7] As the Government argues, Mr. Darin "had ample notice that intentionally attempting to manipulate a global benchmark interest rate like LIBOR . . . was the type of crime that

---

[6] Indeed, Mr. Darin knew that such manipulation was improper, as he fretted that being found out might get UBS banned from the Yen LIBOR panel. (Complaint, ¶ 21(d)(ii)). Mr. Darin suggests that this statement supports his position that he had no idea that such manipulation was illegal, because if he had, he would have been more concerned about possible prosecution than about UBS' position on the Yen LIBOR panel (Def. Memo. at 16; Tr. at 27). This argument is unconvincing. There are any number of reasons why Mr. Darin would refrain from calling attention to possible criminal liability in a conversation with his alleged co-conspirator.

[7] Mr. Hayes is also being prosecuted in the United Kingdom for his role in this scheme. The Government notes that the court in that proceeding has found that the LIBOR can be the subject of fraudulent misrepresentation. (Transcript of Proceedings in _Regina v. Hayes_ dated Dec. 5, 2014, attached as Exhibit to Letter of Thomas B.W. Hall dated Jan. 2, 2015).

would 'subject [him] to prosecution somewhere.'"[8] (Gov't Memo. at 26 (quoting Al Kassar, 660 F.3d at 119)).

Conclusion

For these reasons, defendant Roger Darin's motion to dismiss the Complaint (Docket no. 6) is denied.[9]

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       March 20, 2015

Copies transmitted this date to:

William J. Stellmach, Esq.
Thomas B.W. Hall. Esq.
Assistant U.S. Attorneys
United States Department of Justice
1400 New York Ave. NW
Washington, D.C. 20530

Bruce A. Baird, Esq.
James M. Garland, Esq.
Alexander A. Berengaut, Esq.
Covington & Burling LLP
One CityCenter
850 Tenth St., NW
Washington, D.C. 20001-4956

---

[8] The fact that the European Commission moved to "clearly prohibit" benchmark manipulation in 2012, see European Commission Press Release, "Libor scandal: Commission proposes EU-wide action to fight rate-fixing," available at http://europa.eu/rapid/press-release_IP-12-846_en.htm (last visited March 2, 2015), does not indicate, as the defendant would have it, that LIBOR manipulation did not constitute fraud under previously-enacted laws in the the United States, United Kingdom, or elsewhere.

[9] The Clerk of Court is respectfully directed to close as moot the Government's motion for leave to file excess pages (Docket no. 22).

33