

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                    v.

TOM ALEXANDER WILLIAM HAYES, and
ROGER DARIN,

               *Defendants.*

Case No.  12-MJ-3229

---

## DEFENDANT ROGER DARIN'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE CRIMINAL COMPLAINT

---

Bruce A. Baird
James M. Garland
Alexander A. Berengaut

**COVINGTON & BURLING LLP**

*Attorneys for Defendant Roger Darin*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

PROCEDURAL HISTORY ............................................................................................. 5

ARGUMENT .................................................................................................................... 6

I.    The Magistrate Judge Erred in Concluding That Mr. Darin's Prosecution
      Comports With the Fifth Amendment. ................................................................. 6

      A.    The Fifth Amendment Requires a Sufficient Nexus Between Foreign
            Defendants and the United States, and There Is No Such Nexus Here. ............... 6

            1.    To Allege a Sufficient Nexus, a Complaint Must Charge That a
                  Foreign Defendant's Conduct Was Aimed at the United States ................. 7

            2.    Mr. Darin's Alleged Conduct Was Not Aimed at the United States,
                  and Mr. Hayes's Conduct Is Irrelevant to Whether There Is a
                  "Sufficient Nexus" Between Mr. Darin and the United States ................. 14

      B.    The Fifth Amendment Requires That Foreign Defendants Receive Fair
            Notice, and There Was No Such Notice Here. ..................................................... 19

II.   The Magistrate Judge Erred in Concluding That This Case Involves a Domestic
      Application of the Wire Fraud Statute. .............................................................. 21

III.  As the Magistrate Judge Correctly Found, Mr. Darin Is Entitled to a Ruling on the
      Merits of His Motion. ......................................................................................... 23

      A.    The Fifth Amendment Applies Because Mr. Darin Has Been Charged in
            an Article III Court in the United States. ............................................................ 24

      B.    The Fugitive Disentitlement Doctrine Is Inapplicable ........................................ 25

            1.    Mr. Darin Is Not a Fugitive ................................................................ 25

            2.    Even if Mr. Darin Were a Fugitive, the Magistrate Judge Did Not
                  Abuse His Discretion in Declining to Apply the Disentitlement
                  Doctrine ............................................................................................. 27

CONCLUSION ............................................................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 West 57th Street Realty Co., LLC v. Citigroup, Inc.*,
  13-CV-981 (PGG), 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ......................................9, 16

*Bano v. Union Carbide Corp.*,
  273 F.3d 120 (2d Cir. 2001).............................................................................................25, 27

*Calder v. Jones*,
  465 U.S. 783 (1984)....................................................................................................7, 16, 19

*Chiarella v. United States*,
  445 U.S. 222 (1980)...............................................................................................................21

*Collazos v. United States*,
  368 F.3d 190 (2d Cir. 2004)...................................................................................................27

*Degen v. United States*,
  517 U.S. 820 (1996)...............................................................................................................27

*Empire Blue Cross & Blue Shield v. Finkelstein*,
  111 F.3d 278 (2d Cir. 1997).............................................................................................25, 27

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004)...............................................................................................................10

*Ford v. United States*,
  273 U.S. 593 (1927)...............................................................................................................18

*Goldberg v. UBS AG*,
  690 F. Supp. 2d 92 (E.D.N.Y. 2010) .............................................................................*passim*

*In re Grand Jury Subpoenas*,
  179 F. Supp. 2d 270 (S.D.N.Y. 2001)...............................................................................26, 27

*Harris v. Mexican Specialty Foods, Inc.*,
  564 F.3d 1301 (11th Cir. 2009) . Civil ...................................................................................13

*In re Hijazi*,
  589 F.3d 401 (7th Cir. 2009) .........................................................................................*passim*

*In re Hijazi*,
  No. 11-2475 (7th Cir. July 1, 2011).......................................................................................12

*J. McIntyre Machinery, Ltd. v. Nicastro,*
   131 S. Ct. 2780 (2011).............................................................................................8, 15

*Johnson v. Eisentrager,*
   339 U.S. 763 (1950).............................................................................................23, 24, 25

*Kiobel v. Royal Dutch Petroleum Co.,*
   133 S. Ct. 1659 (2013)...........................................................................................22

*Laydon v. Mizuho Bank, Ltd.,*
   12-CV-3419 (GBD), 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015)..................................9, 16

*Leasco Data Processing Equipment Corp. v. Maxwell,*
   468 F.2d 1326 (2d Cir. 1972)........................................................................... *passim*

*Lotes Co., Ltd. v. Hon Hai Precision Industry Co. Ltd.,*
   No. 12-CV-7465 (SAS), 2013 WL 2099227 (S.D.N.Y. May 14, 2013) ................................10

*Morrison v. National Australia Bank Ltd.,*
   561 U.S. 247 (2010).............................................................................................3, 8, 21, 22

*Pasquantino v. United States,*
   544 U.S. 349 (2005).............................................................................................22, 23

*Rajaratnam v. Moyer,*
   47 F.3d 922 (7th Cir. 1995) ...................................................................................5

*Republic of Argentina v. Weltover, Inc.,*
   504 U.S. 607 (1992)..............................................................................................10

*In re Terrorist Attacks,*
   538 F.3d 71 (2d Cir. 2008)......................................................................................16

*In re Terrorist Bombings,*
   552 F.3d 177 (2d Cir. 2008).....................................................................................25

*United States v. Al Kassar,*
   660 F.3d 108 (2d Cir. 2011).............................................................................. *passim*

*United States v. Ali,*
   718 F.3d 929 (D.C. Cir. 2013)................................................................................11, 12

*United States v. Buck,*
   No. 13-CR-282 (VM), 2015 WL 195872 (S.D.N.Y. Jan. 9, 2015) ........................................26

*United States v. Davis,*
   905 F.2d 245 (9th Cir. 1990) ..................................................................................13

iii

*United States v. Giffen,*
   326 F. Supp. 2d 497 (S.D.N.Y. 2004)......................................................................................20

*United States v. Hernandez,*
   No. 09-CR-625 (HB), 2010 WL 2652495 (S.D.N.Y. June 30, 2010) ....................................26

*United States v. Hijazi,*
   845 F. Supp. 2d 874 (C.D. Ill. 2011) ...............................................................................12, 18

*United States v. Hijazi,*
   No. 05-CR-40024 (C.D. Ill. Aug. 29, 2011)...........................................................................12

*United States v. Juda,*
   797 F. Supp. 774 (N.D. Cal. 1992) ........................................................................................11

*United States v. Klimavicious-Viloria,*
   144 F.3d 1249 (9th Cir. 1998) .........................................................................................11, 18

*United States v. Manuel,*
   371 F. Supp. 2d 404 (S.D.N.Y. 2005)....................................................................................18

*United States v. Mohammad-Omar,*
   323 F. App'x 259 (4th Cir. 2009)...........................................................................................11

*United States v. Morgan,*
   254 F.3d 424 (2d Cir. 2001)......................................................................................................6

*United States v. Mostafa,*
   965 F. Supp. 2d 451 (S.D.N.Y. 2013)......................................................................................8

*United States v. Noriega,*
   683 F. Supp. 1373 (S.D. Fla. 1988) .......................................................................................24

*United States v. Perlaza,*
   439 F.3d 1149 (9th Cir. 2006) .........................................................................................17, 18

*United States v. Praddy,*
   725 F.3d 147 (2d Cir. 2013)....................................................................................................23

*United States v. Saathoff,*
   708 F. Supp. 2d 1020 (S.D. Cal. 2010)..................................................................................20

*United States v. Sancho,*
   957 F. Supp. 39 (S.D.N.Y. 1997)...........................................................................................23

*United States v. Schreiber,*
   535 F. Supp. 1359 (S.D.N.Y. 1982).......................................................................................26

*United States v. Shahani-Jahromi*,
  286 F. Supp. 2d 723 (E.D. Va. 2003) ...................................................................................11

*United States v. Sidorenko*,
  14-CR-341 (CRB), Dkt. 54 (N.D. Cal. Apr. 21, 2015).....................................................7, 11

*United States v. Technodyne LLC*,
  753 F.3d 368 (2d Cir. 2014).................................................................................................27

*United States v. Umeh*,
  527 Fed. App'x 57 (2d Cir. 2013)...........................................................................................8

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990).......................................................................................................24, 25

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013)....................................................................................................21

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003)......................................................................................................7

*United States v. Yousef*,
  No. 08-CR-1213 (JFK), 2010 WL 3377499 (S.D.N.Y. Aug. 23, 2010)................................11

*Walden v. Fiore*,
  134 S. Ct. 1115 (2014)..........................................................................................................16

*Wilder v. News Corp.*,
  No. 11-CV-4947 (PGG), 2014 WL 1315960 (S.D.N.Y. Mar. 31, 2014) ................................8

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)................................................................................................................2

**Statutes**

18 U.S.C. § 1349...............................................................................................................17, 23

28 U.S.C. § 636.........................................................................................................................5

28 U.S.C. § 2466.....................................................................................................................27

**Other Authorities**

BLACK'S LAW DICTIONARY (9th ed. 2009)...............................................................................25

*Delisting of Three-month Euroyen LIBOR Futures on the Trading Floor —*
  *Effective Sunday, August 23, 2009*, CME GROUP ...............................................................15

Press Release, European Comm'n, Libor Scandal:  Amendments to Proposed
     Market Abuse Legislation to Fight Rate-Fixing—Frequently Asked Questions
     (July 25, 2012) ..................................................................................................................20

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW ...............................................................10

## INTRODUCTION

Under long-established constitutional principles governing personal jurisdiction, plaintiffs cannot obtain specific jurisdiction over foreign defendants in civil cases merely by alleging that they participated in a fraudulent scheme with global scope. Rather, to satisfy due process, a plaintiff must allege that the foreign defendant's conduct is *aimed* at the United States. Otherwise, the defendant could not reasonably anticipate being haled into court in this country, and the resulting lawsuit would be arbitrary and fundamentally unfair.

This case presents the question whether the Fifth Amendment permits the Government to *criminally* charge a foreign defendant under circumstances that would be unconstitutional in the civil context. At issue is a criminal complaint filed against Roger Darin, a Swiss citizen who has never resided in the United States. The complaint alleges that while Mr. Darin was employed overseas by UBS, a Swiss financial services company, he conspired with a senior bank trader, Tom Hayes, to manipulate the London Interbank Offered Rate ("Libor") for Yen. Yen Libor is an interest rate benchmark created by averaging sixteen banks' opinions as to the estimated rates at which a bank could hypothetically borrow Yen in London if another bank were willing to lend to them. Mr. Darin allegedly participated in the conspiracy by agreeing to alter UBS's Yen Libor opinion at the request of Mr. Hayes, who then benefitted from those altered opinions in transactions he conducted without Mr. Darin's involvement. The *only* nexus connecting *Mr. Darin's* alleged conduct to the United States is the fact that, after it was calculated in London, Yen Libor was published worldwide, including in the United States.

In the civil context, these allegations would not be enough to satisfy due process. The Government's theory is "worldwide reliance": the notion that because Libor is relied upon everywhere, there is jurisdiction everywhere, including in the United States. But as Judge Friendly explained more than forty years ago—and as this Court has uniformly held since—

1

while "worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process." *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1342 (2d Cir. 1972) ("*Leasco*").

Due process demands at least as much in the criminal context. Just as the Constitution bars civil lawsuits against defendants who lack "minimum contacts" with the United States, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980), it also forbids the prosecution of foreign defendants who lack "a sufficient nexus" to the United States. *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011). The "sufficient nexus" test "serves the same purpose as the 'minimum contacts' test in personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 106 (E.D.N.Y. 2010) (internal quotation marks omitted). Accordingly, courts applying the criminal "sufficient nexus" test have relied on civil cases and reached conclusions that are entirely consistent with the established civil jurisprudence. The complaint here fails to plead "minimum contacts" between Mr. Darin and the United States, and thus it also fails to allege a "sufficient nexus."

This defect renders the complaint facially unconstitutional, and Mr. Darin accordingly moved to dismiss. After rejecting two threshold arguments raised by the Government in an effort to avoid the merits of Mr. Darin's motion,[1] the Magistrate Judge concluded that the "sufficient nexus" test has nothing to do with due process in civil litigation and denied the motion on that basis. The Magistrate Judge reached this conclusion even though courts—both inside and outside this Circuit—routinely rely on civil jurisprudence to apply the criminal "sufficient nexus" test and even though, as the Magistrate Judge recognized, to the extent the

---

[1] Insofar as the Government objects to these aspects of the Magistrate Judge's decision, such objections are without merit, as discussed *infra* § III.

2

standards differ, "*greater* due process protection is required in the criminal context than in the civil context." Magistrate Judge's Memorandum and Order ("Op."), Dkt. 28, at 27 n.4.

Given this well-established relationship between the criminal and civil standards, the lack of any inconsistency between them, and the plain overreach of the Government's charge under the civil standard, the Magistrate Judge's disregard of civil jurisprudence—and consequent holding that Mr. Darin should have expected to be prosecuted in the United States—is reversible error. It is not, however, the only ground upon which this Court can and should reverse. The Magistrate Judge also erred in rejecting Mr. Darin's separate due process argument based on a lack of "fair warning" that his alleged conduct—*i.e.*, altering his opinion in response to the hypothetical Libor survey question—could subject him to this unprecedented criminal prosecution. Finally, the Magistrate Judge wrongly rejected Mr. Darin's statutory argument by misapplying the presumption against extraterritoriality and neglecting to consider the "focus of congressional concern." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010) (internal quotation marks omitted). Each of these arguments provides an independent reason why the complaint against Mr. Darin must be dismissed.

## FACTUAL BACKGROUND

Libor is a benchmark interest rate that prior to 2014 was administered by the British Bankers' Association ("BBA"), a private trade association based in London. During the relevant time period, Libor was determined by the BBA based on information provided by a panel of member banks, each of which provided a daily submission to the BBA with its opinion as to the hypothetical estimated rates at which the bank could borrow funds in the inter-bank market in London. *See* Complaint ("Compl.") ¶ 9, Dkt. 1. For Yen Libor, during the relevant time period, sixteen banks submitted their opinions to the BBA and its agent, Thomson Reuters, in London. *Id.* ¶ 10. After excluding the four highest and four lowest rates, Thomson Reuters averaged the

remaining rates to derive the Yen Libor figures for that day.  *Id.*  Once the Yen Libor opinion averages (or "fixings") were calculated, they were published worldwide by Thomson Reuters, including in the United States.  *Id.*

Roger Darin is a Swiss citizen who has never resided in the United States.  The Government has alleged that during the relevant time period, Mr. Darin was employed by UBS, a Swiss financial services company, in its Singapore, Tokyo, and Zurich offices.  *Id.* ¶ 16.  His primary responsibility was trading Yen-denominated short-term interest rate products.  *Id.*  In addition, Mr. Darin was allegedly responsible for UBS's Yen Libor submissions to the BBA.  *Id.*

The Complaint alleges that Mr. Darin conspired with another UBS employee, Tom Hayes, a senior trader in Tokyo, to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349.[2] Op. at 2.  According to the Complaint, Mr. Hayes would ask Mr. Darin or Mr. Darin's subordinates (who had been allegedly instructed by Mr. Darin to heed Mr. Hayes's requests) to alter UBS's submission for Yen Libor, depending on Mr. Hayes's trading positions.  Mr. Darin or his subordinates allegedly complied, thereby increasing the profitability of Mr. Hayes's positions in transactions tied to Yen Libor.  *Id.* at 2-3.

The Complaint alleges that, for several of these trades, Mr. Hayes's counterparty was located in the United States, and that the electronic confirmations for these trades were electronically routed from UBS's offices overseas to the counterparty's servers in Rye Brook, New York.  Compl. ¶ 22.  The Complaint does *not* allege, however, that Mr. Darin was aware of the nationality of this counterparty or had any involvement in these particular transactions whatsoever.  The *only* threads connecting Mr. Darin to these transactions are the allegations that: (i) Mr. Darin's subordinate altered UBS's submission to the BBA in response to Mr. Hayes's

---

[2] The only aspect of the Complaint that is relevant to Mr. Darin is Count One.  Counts Two and Three— alleging wire fraud and antitrust violations, respectively—do not pertain to Mr. Darin.

request; and (ii) Yen Libor was ultimately published by Thomson Reuters worldwide, including the United States, where it affected the terms of financial transactions, including the transactions between Mr. Hayes and his counterparty. *Id.*

## PROCEDURAL HISTORY

On December 12, 2012, the Government filed a criminal complaint (the "Complaint") seeking an arrest warrant for Mr. Darin. Dkt. 1. On October 2, 2014, after more than 18 months passed without further filings by the Government, Mr. Darin moved to dismiss the Complaint. Dkt. 6. Mr. Darin contended that the Complaint violated the Due Process Clause of the Fifth Amendment and involved an impermissible extraterritorial application of the conspiracy and wire fraud statutes. The Government opposed the motion, disputing Mr. Darin's arguments on the merits and arguing, moreover, that Mr. Darin could not challenge the Complaint while he remained in Switzerland. Dkt. 18.

On March 20, 2015, Magistrate Judge Francis denied Mr. Darin's motion. Dkt. 28. Magistrate Judge Francis rejected the Government's threshold arguments and concluded that Mr. Darin was entitled to a ruling on the merits of his motion. Judge Francis decided, however, that the Government had alleged sufficient facts in the Complaint to survive the motion to dismiss. On March 24, 2015, Mr. Darin filed notice of his objections to the Magistrate Judge's order, and the Part I term of this Court entered a briefing schedule for those objections. Dkt. 29.

## STANDARD OF REVIEW

The Magistrate Judge's jurisdiction arose under the general grant of magistrate authority in 28 U.S.C. § 636(b)(3). Accordingly, this Court reviews *de novo* the Magistrate Judge's dispositive ruling. *See Rajaratnam v. Moyer*, 47 F.3d 922, 924 n.8 (7th Cir. 1995).[3]

---

[3] To the extent that this Court reaches the question whether the fugitive disentitlement doctrine should be applied to Mr. Darin, as discussed *infra* § III.B, the Court should review the Magistrate

## ARGUMENT

### I.   The Magistrate Judge Erred in Concluding That Mr. Darin's Prosecution Comports With the Fifth Amendment.

There are two independent Fifth Amendment defects in the Complaint that require its dismissal. First, the Government has failed to allege a sufficient nexus between Mr. Darin and the United States for purposes of due process. Second, the Government has failed to allege facts establishing that Mr. Darin received fair notice that his conduct was criminal. The Magistrate Judge erroneously rejected both of these arguments.

#### A.   The Fifth Amendment Requires a Sufficient Nexus Between Foreign Defendants and the United States, and There Is No Such Nexus Here.

"In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary and fundamentally unfair." *Al Kassar*, 660 F.3d at 118 (internal quotation marks omitted). "The nexus requirement serves the same purpose as the 'minimum contacts' test in personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country." *Goldberg*, 690 F. Supp. 2d at 106 (quoting *United States v. Klimavicious-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998)). Because the tests share the "same purpose," courts applying the criminal "sufficient nexus" test look to the law of personal jurisdiction in civil cases (and related norms of international law) for guidance. *See id.* These principles require—at a minimum—that jurisdiction be founded on foreign conduct with *direct* and *foreseeable* domestic effects, which means that such conduct must be *aimed* at the United States, as opposed to another country or the world as a whole. *See infra* § I.A.1.

Judge's discretionary decision not to apply the doctrine for an abuse of that discretion. *Cf. United States v. Morgan*, 254 F.3d 424, 426 (2d Cir. 2001) ("We review a district court's application of the fugitive disentitlement doctrine for abuse of discretion.").

The Complaint against Mr. Darin fails this test. *See infra* § I.A.2. At most, Mr. Darin's alleged conduct was directed generally at world financial markets—*i.e., not* at the United States. And while the Government claims that Mr. Darin's alleged co-conspirator, Tom Hayes, engaged in transactions with a U.S. counterparty, Mr. Darin had nothing to do with those trades, and his "contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984).

1.      **To Allege a Sufficient Nexus, a Complaint Must Charge That a Foreign Defendant's Conduct Was Aimed at the United States.**

"For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Al Kassar*, 660 F.3d at 118. Courts also consider "the defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States." *Goldberg*, 690 F. Supp. 2d at 106. Not every domestic effect will be enough to establish a "sufficient nexus"; courts must evaluate whether the effect is "substantial, direct, and foreseeable." *In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009) (internal quotation marks omitted), and determine ultimately whether applying U.S. law would be "arbitrary or fundamentally unfair." *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) (internal quotation marks omitted).

Where courts have concluded that an indictment fails to allege a "sufficient nexus," they have not hesitated to dismiss the charge. *See United States v. Sidorenko*, 14-CR-341 (CRB), Dkt. 54, at 1 (N.D. Cal. Apr. 21, 2015) (dismissing an indictment on "sufficient nexus" grounds that sought to apply the conspiracy and wire fraud statutes to "foreign defendants for foreign acts involving a foreign governmental entity"). But most of the relatively few "sufficient nexus" cases tend to involve international terrorism and drug trafficking—situations where the nexus to

the United States is readily apparent. Thus, for example, in *Al Kassar*, the Second Circuit found a sufficient nexus where the defendant sold arms with the understanding they would be used to kill Americans. 660 F.3d at 118. In *United States v. Umeh*, the Second Circuit found a sufficient nexus where the defendant joined a conspiracy "with knowledge that [illegal drugs] would be exported to the United States." 527 Fed. App'x 57, 63 (2d Cir. 2013). And in *United States v. Mostafa*, this Court found a sufficient nexus where the defendant helped take U.S. citizens hostage. 965 F. Supp. 2d 451, 459 (S.D.N.Y. 2013). In all of these cases, the defendant's conduct had "substantial, direct, and foreseeable" effects on the United States. Indeed, so clear was the connection between the respective defendants and the United States that in none of these decisions was it necessary for the court to parse exactly what constitutes a "substantial, direct, and foreseeable" effect.

In the civil context, by contrast, courts routinely address this question. It is black letter law that "[s]pecific jurisdiction based on conduct that takes place overseas is only warranted where the domestic effects of a defendant's conduct 'occur[] as a direct and foreseeable result of the conduct outside the territory.'" *Wilder v. News Corp.*, No. 11-CV-4947 (PGG), 2014 WL 1315960, at *6 (S.D.N.Y. Mar. 31, 2014) (quoting *Leasco*, 468 F.2d at 1341);[4] *see also J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011) ("The question is whether a defendant has followed a course of conduct *directed* at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct.") (emphasis added).

---

[4] As noted in *Wilder*, *Leasco*'s separate discussion of "subject matter jurisdiction"—*i.e.*, "the applicability of the Securities Exchange Act" to the defendants' alleged extraterritorial conduct—was abrogated by *Morrison*, 561 U.S. 247. *Morrison* did not affect *Leasco*'s personal jurisdiction analysis, which continues to be relied upon by this Court. *See Wilder*, 2014 WL 1315960, at *6.

Under this established due process standard, it is not enough for a plaintiff to allege that a foreign defendant directed his conduct at global financial markets as a whole. In *Leasco*, for example, the plaintiffs alleged that the defendants conspired to cause them to purchase stock in a British publisher at inflated prices. 468 F.2d at 1330. Among the defendants was a British accounting firm, which allegedly certified the false financial statements upon which the plaintiffs relied. *Id.* at 1331-32. The plaintiffs argued that jurisdiction was proper because the accounting firm "must have known that its reports on [the publisher] would be relied upon by anyone interested in buying [its] shares." *Id.* at 1342. Writing for the Court of Appeals, Judge Friendly disagreed, concluding that "[o]n that basis accountants operating solely in London could be subjected to personal jurisdiction in any country whose citizen had purchased stock of a company they had audited." *Id.* While "such worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process." *Id.*

In the 42 years since *Leasco* was decided, this Court has repeatedly dismissed complaints premised on "worldwide reliance." And just last month, in two separate cases, this Court concluded that it lacked personal jurisdiction over foreign financial institutions accused of conspiring to manipulate Libor. *See 7 West 57th Street Realty Co., LLC v. Citigroup, Inc.*, 13-CV-981 (PGG), 2015 WL 1514539, at *8 (S.D.N.Y. Mar. 31, 2015) (even though "the negative effect on Solow's portfolio was a foreseeable result of the Foreign Banks' alleged LIBOR manipulation, the fact that harm in the forum is foreseeable … is insufficient for the purpose of establishing specific personal jurisdiction over a defendant") (internal quotation marks omitted); *Laydon v. Mizuho Bank, Ltd.*, 12-CV-3419 (GBD), 2015 WL 1515358, at *2-3 (S.D.N.Y. Mar. 31, 2015) (fact that defendants "planned and carried out [Libor] manipulation using electronic

9

means that entered the United States through the Bloomberg network" and that such manipulation allegedly caused domestic effects was insufficient to establish personal jurisdiction) (internal quotation marks omitted).

In applying this longstanding due process limitation on the extraterritorial reach of U.S. jurisdiction, courts have drawn on principles of international law, which restrict states from "unreasonable" exercises of extraterritorial jurisdiction—an analysis that turns, in part, on whether the foreign activity has a "substantial, direct, and foreseeable effect upon or in the territory." *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW ("RESTATEMENT") §§ 402, 403(2)(a); *see also Leasco*, 468 F.2d at 1341 (quoting analogous provision of Second Restatement); *In re Hijazi*, 589 F.3d at 412. "Worldwide reliance" fails under this standard not just (as Judge Friendly noted) because the effects upon the United States are not sufficiently "foreseeable," but also because such effects are not "direct." *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (to qualify as "direct," an effect must "follow[] as an immediate consequence of the defendant's activity") (internal quotation marks omitted); *see also Lotes Co., Ltd. v. Hon Hai Precision Indus. Co. Ltd.*, No. 12-CV-7465 (SAS), 2013 WL 2099227, at * 7 (S.D.N.Y. May 14, 2013) ("[B]ut for" causation is insufficient, as are "secondary and indirect effects" that occur as "the by-product of numerous factors.") (internal quotation marks omitted). Respect for these requirements of foreseeability and directness is necessary to ensure international comity and to "avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (citing RESTATEMENT § 403).

The Magistrate Judge brushed aside in a footnote the relevance of due process cases from the civil context. Reasoning that "criminal law and civil law serve different purposes and have

different sources and constraints," the Magistrate Judge concluded that "[p]ositing that doctrines of personal jurisdiction in civil cases should serve as a foundation for the question presented here is attractive, but ultimately inappropriate." Op. at 27 n.4. But in the context of this case, the Magistrate Judge's premise is wrong. "The nexus requirement serves the *same purpose* as the 'minimum contacts' test in personal jurisdiction. It ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country." *Goldberg*, 690 F. Supp. 2d at 106-07 (quoting *Klimavicious-Viloria*, 144 F.3d at 1257) (emphasis added). In disregarding the relevance of personal jurisdiction, the Magistrate Judge completely ignored the cases—including *Goldberg* and *Klimavicious-Viloria*—that have relied on civil minimum-contacts principles to frame the criminal sufficient nexus test. *See id.*; *see also United States v. Yousef*, No. 08-CR-1213 (JFK), 2010 WL 3377499, at *3 (S.D.N.Y. Aug. 23, 2010) ("The nexus test ensures that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country.") (internal quotation marks omitted); *United States v. Mohammad-Omar*, 323 F. App'x 259, 262 (4th Cir. 2009) (relying on the civil standard); *United States v. Juda*, 797 F. Supp. 774, 779 (N.D. Cal. 1992) (same); *United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 727 (E.D. Va. 2003) (same). Indeed, just this week, the U.S. District Court for the Northern District of California relied on civil minimum contacts principles to *dismiss* criminal conspiracy and wire fraud charges under the "sufficient nexus" test. *See Sidorenko*, 14-CR-341 (CRB), Dkt. 54, at 13 (N.D. Cal. Apr. 21, 2015).

The two cases cited by the Magistrate Judge, meanwhile, are not to the contrary. First, the Magistrate Judge quoted *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013) for the proposition that "the law of personal jurisdiction is inapposite" to the sufficient nexus analysis.

*Ali* was a piracy case, however, and "[p]iracy ... is no ordinary offense." *Id.* at 935. Since pirates commit "hostilities upon the subjects and properties of any or all nations," they are considered "*hostis humani generis*"—"an enemy of the human race." *Id.* (internal quotation marks omitted). Accordingly, piracy is one of very few "universal jurisdiction offenses" under international law, which by definition are punishable by *all* civilized nations and do not therefore require any showing of a nexus of the offense with a particular state. *Id.* Thus, while it is true that principles of personal jurisdiction were inapposite in *that* case, *Ali* says nothing about their relevance here.[5]

The Magistrate Judge also cited one of the district court decisions in *United States v. Hijazi*, 845 F. Supp. 2d 874 (C.D. Ill. 2011). The court in that case dismissed the relevance of civil jurisdiction in a conclusory, two-sentence footnote. *Id.* at 882 n.8. Setting aside its lack of reasoning, the procedural posture of the district court's decision undercuts its persuasiveness.[6] More importantly, the district court—following the Seventh Circuit's express instruction—found "that the appropriate due process analysis in this case [was] to be performed under the rubric of international law." *Id.* at 883; *see also In re Hijazi*, 589 F.3d at 412 (quoting RESTATEMENT

---

[5] *Ali* also conflates the "sufficient nexus" test with the related but distinct Fifth Amendment requirement of fair notice. *See* 718 F.3d at 944 (noting, in the course of distinguishing civil personal jurisdiction, that "[w]hat appears to be the animating principle governing the due process limits of extraterritorial jurisdiction is the idea that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed") (internal quotation marks omitted).

[6] By the time the district court issued the July 2011 ruling cited by the Magistrate Judge, the Seventh Circuit had twice granted Hijazi mandamus relief, ordering the district court to address the merits of Hijazi's claims (which had been pending for several years). *In re Hijazi*, 589 F.3d 401 (declining to apply fugitive disentitlement doctrine and directing district court to rule on Hijazi's motions); *In re Hijazi*, No. 11-2475 (7th Cir. July 1, 2011) (unreported) (reiterating directive). Hijazi immediately appealed the district court's July 2011 ruling, and the Seventh Circuit ordered expedited briefing immediately thereafter. In August 2011, barely one month after denying Hijazi's motion and while Hijazi's appeal was still pending, the district court dismissed the indictment against Hijazi with prejudice, on motion of the Government. *United States v. Hijazi*, No. 05-CR-40024 (C.D. Ill. Aug. 29, 2011).

§§ 402, 403).  As explained above, international law addresses the same basic question as civil jurisdiction and the criminal "sufficient nexus" test—when a person in one country can be haled into court in another—and arrives at the same answer:  the requirement of aiming.

Yet the Magistrate Judge also gave short shrift to these international law principles.  Op. at 31 n.5 ("Because I have found that the Due Process Clause of the Fifth Amendment is satisfied by this nexus I need not address the defendant's arguments about international law or comity.").  This omission matters because international law and comity are not separate arguments for dismissing the Complaint; they are *part of* the Fifth Amendment "sufficient nexus" analysis.  *See In re Hijazi*, 589 F.3d at 412; *accord United States v. Davis*, 905 F.2d 245, 249 n.2 (9th Cir. 1990); *Goldberg*, 690 F. Supp. 2d at 108-09 ("Although compliance with international law alone will not render the extraterritorial application of federal law constitutional, it remains relevant to the analysis of whether a defendant could reasonably expect to be subject to the United States law, and, in turn, whether the application of that law can be considered arbitrary or fundamentally unfair.").

The Magistrate Judge's unwillingness to consider civil due process is particularly unjustified because—as the Magistrate Judge himself recognized—to the extent the civil and criminal standards differ, "*greater* due process protection is required in the criminal context than in the civil context."  Op. at 27 n.4 (emphasis in original); *see also Harris v. Mex. Specialty Foods, Inc.*, 564 F.3d 1301, 1312 n.9 (11th Cir. 2009) (same).  Civil personal jurisdiction constitutes the constitutional *floor*, in other words, "and the mere existence of personal jurisdiction will not always satisfy the nexus requirement."  *Goldberg*, 690 F. Supp. 2d at 106.  The Magistrate Judge's rejection of civil due process standards is flatly incompatible with this principle.

Ultimately, the Magistrate Judge based his refusal to consider civil jurisprudence on a policy concern—namely, that applying *Leasco* in criminal cases "would work to insulate from prosecution those accused of wide-ranging frauds merely because of their expansive scope." Op. at 27 n.4. This concern is misplaced. Under *Leasco*, the Government could still prosecute foreign defendants involved in "expansive" international frauds, so long as it alleges facts demonstrating that the defendants "should reasonably anticipate being haled into court in this country." *Goldberg*, 690 F. Supp. 2d at 106 (internal quotation marks omitted). In the typical international fraud, this will not be difficult, because most federal prosecutions target foreign conduct that causes a "direct, substantial, and foreseeable" effect upon the United States. All *Leasco* prevents is the U.S. prosecution of a foreign defendant based on nothing more than a claim that the defendant's alleged conduct affects the whole world. And this modest limitation on the reach of U.S. jurisdiction is the minimum that due process requires, whether the case is civil or criminal.

> **2. Mr. Darin's Alleged Conduct Was Not Aimed at the United States, and Mr. Hayes's Conduct Is Irrelevant to Whether There Is a "Sufficient Nexus" Between Mr. Darin and the United States.**

Two allegations in the Complaint appear directed at establishing a "sufficient nexus" between Mr. Darin and the United States. First, the Complaint alleges that Mr. Darin and others "caused the publication of manipulated interest rate information in New York, New York." Compl. ¶ 2. Second, the Complaint alleges that Mr. Hayes—but *not* Mr. Darin—"entered into trades with a counterparty based in Purchase, New York" that were affected by UBS's allegedly manipulated Yen Libor submissions. *Id.* Neither of these allegations states a sufficient nexus between Mr. Darin and the United States for purposes of the Fifth Amendment, and the Magistrate Judge erred in concluding that they did.

14

*Mr. Darin's alleged role in the Libor submission process.* According to the Complaint, Mr. Darin participated in the alleged conspiracy by altering (or directing his subordinates to alter) UBS's Yen Libor submissions in response to Mr. Hayes's requests. Compl. ¶ 21. These submissions were transmitted to Thomson Reuters, the BBA's agent, in London. *Id.* ¶¶ 10, 16. Thomson Reuters then calculated the daily Yen Libor fixings by taking the data from UBS and the fifteen other panel banks, eliminating the four highest and four lowest submissions, and averaging the remaining opinions. *Id.* ¶ 10. Once Thomson Reuters calculated the daily Yen Libor numbers, they were published worldwide, including in the United States, and used by parties to transactions in many countries. *Id.*

This is *exactly* the "worldwide reliance" theory that Judge Friendly rejected in *Leasco.* 468 F.2d at 1342. Consequently, this allegation does not provide a sufficient basis to conclude that Mr. Darin's "course of conduct" was "directed at" the United States, as opposed to any of the other jurisdictions where Yen Libor was published. *Nicastro,* 131 S. Ct. at 2789. It is no answer to say, as the Magistrate Judge did, that Mr. Darin knew that Yen Libor was published in the United States and that Mr. Darin must have known that Mr. Hayes had counterparties in the United States. Op. at 26.[7] The same could be said—and has been said—in any "worldwide reliance" case; it is not enough to make prosecution in the United States fundamentally fair. *See*

---

[7] According to the Magistrate Judge, Mr. Darin should have been aware that Mr. Hayes had counterparties in the United States, "particularly in a center of international finance like New York." Op. at 26. Yet there is no support in the Complaint for the Magistrate Judge's assumption that Yen Libor-related instruments are traded with particular frequency in the United States, and, in any event, the assumption is incorrect. Yen Libor-related instruments are *not* traded with particular frequency in the United States. In 2009 the Chicago Mercantile Exchange delisted certain Yen Libor futures because "their open interest ha[d] been and remain[ed] at zero" since September 2004. *See Delisting of Three-month Euroyen LIBOR Futures on the Trading Floor – Effective Sunday, August 23, 2009,* CME GROUP, http://www.cmegroup.com/tools-information/lookups/advisories/market-data/Q2009-182.html#pageNumber=1 (last visited April 22, 2015). The Magistrate Judge's unsupported assumptions about the prevalence of New York-based trading in Yen Libor-related instruments cannot justify his finding of a sufficient nexus here.

*Leasco*, 468 F.2d at 1342 (rejecting the argument that "Chalmers must have known that its reports on Pergamon would be relied upon by anyone interested in buying Pergamon shares," including in the United States); *see also Citigroup, Inc.*, 2015 WL 1514539, at *11; *Laydon*, 2015 WL 1515358, at *2.

> ***Mr. Hayes's alleged transaction with a U.S. counterparty***. The Complaint also alleges that Mr. Hayes—with no involvement by Mr. Darin—entered into a transaction with a New York-based counterparty, the profitability of which was tied to Yen Libor. Compl. ¶ 22. Even though the Complaint fails to allege that Mr. Darin had any knowledge of this transaction, the Magistrate Judge concluded that it helped establish a "sufficient nexus" because, in the Magistrate Judge's view, "allegations as to Mr. Hayes's conduct in the charged conspiracy may be evaluated in determining whether there is a 'sufficient nexus' between Mr. Darin and the United States." Op. at 31.

> This conclusion was error. Due process is a threshold standard that demands fairness to the individual defendant. *See Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (personal jurisdiction must be based upon "contacts the defendant *himself* creates with the forum State") (internal quotation marks omitted) (emphasis in original); *Calder*, 465 U.S. at 790 ("Each defendant's contacts with the forum State must be assessed individually."). It may be fair to exercise jurisdiction over one defendant in an alleged conspiracy but not another, which is why the Second Circuit has rejected a "concerted action theory of liability" as a basis for establishing personal jurisdiction over foreign defendants. *See In re Terrorist Attacks*, 538 F.3d 71, 94-95 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

> The Magistrate Judge erroneously dismissed these principles because they were articulated in civil cases. But even without regard to the civil case law, the Magistrate Judge's

decision to consider Mr. Hayes's conduct would *still* be wrong. That is because even in the criminal context, courts have held a finding of "sufficient nexus" is "a preliminary determination totally distinct from the crime itself" that "must be considered before" any principles of secondary liability, such as "whether the defendant acted as a principal or an aider and abettor." *United States v. Perlaza*, 439 F.3d 1149, 1168-69 (9th Cir. 2006). In *Perlaza*, the Government sought to prosecute the crew members of two vessels that were involved in drug smuggling: the fishing vessel *Gran Tauro* and a "Go-Fast" speedboat. *Id.* at 1154-55. The "district court concluded that the Government need not show nexus as to the *Gran Tauro* because the *Gran Tauro* aided and abetted the Go-Fast, over which the district court already concluded that it had jurisdiction." *Id.* at 1168. The Ninth Circuit reversed, holding that "[t]he district court's conclusion that the Government need not show nexus as to the *Gran Tauro* was erroneous." *Id.*

While *Perlaza* involved aiding and abetting, its rationale applies equally to a conspiracy charge under 18 U.S.C. § 1349. Just as the Government could not impute the conduct of a principal to an aider-and-abettor for purposes of nexus, it cannot impute the conduct of Mr. Hayes to Mr. Darin. Yet the Magistrate Judge held that *Perlaza* cannot be read for the proposition that "when analyzing whether the exercise of jurisdiction over a criminal defendant charged with conspiracy comports with due process, only facts alleged to the specific defendant at issue (but not as to the conspiracy as a whole) can be taken into account." Op. at 29. Rather, the Magistrate Judge concluded, *Perlaza* "merely required a nexus analysis for each defendant." *Id.* But if the Magistrate Judge were right, and allegations concerning the conspiracy as a whole could be considered for each defendant, then what would be the point of separate nexus analyses for each defendant? If a nexus existed for any one alleged co-conspirator, it would necessarily exist for all co-conspirators, and there would be no need for individual analyses. This

17

interpretation would render *Perlaza* nonsensical and—perversely—would afford criminal defendants less due process than civil defendants. *Contra* Op. at 27 n.4 ("To be sure, *greater* due process protection is required in the criminal context than in the civil context.").

The cases cited by the Magistrate Judge (at 30-31) lend no support to this implausible interpretation of *Perlaza*. It is true that in *Klimavicious-Viloria*, the court conducted a single nexus analysis for all co-conspirators. 144 F.3d at 1257-59. But that was because all the defendants in that case were—literally—in the same boat: a vessel loaded with cocaine that was destined for the United States. *Id.* Individual nexus analyses were not needed because each defendant "knowingly participated in the smuggling operation." *Id.* at 1265.

The Magistrate Judge's other cited cases are all distinguishable because they address the *statutory* question whether extraterritorial conduct falls within the scope of a criminal law, *not* the *constitutional* question whether a "sufficient nexus" connects the defendant to the United States. Thus, when the district court in *Hijazi* cited *Ford v. United States*, 273 U.S. 593 (1927), for the proposition that one co-conspirator's actions can be attributed to another, it did so to address Hijazi's *statutory* argument that his extraterritorial conduct was not covered by the Major Fraud Act and wire fraud statute. 845 F. Supp. 2d at 897-98. The same is true of the court's discussion in *United States v. Manuel*. *See* 371 F. Supp. 2d 404, 409 (S.D.N.Y. 2005) (observing that "whether [the relevant criminal statute] has such extraterritorial application is solely a question of legislative intent"). This approach makes sense in the statutory context because a single criminal statute can criminalize the conduct of multiple individuals. We do not dispute that for purposes of Mr. Darin's statutory argument, *see infra* § II, it is appropriate for this Court to examine the Complaint's allegations as to the conspiracy as a whole. But for purposes of examining whether, consistent with the Constitution, Mr. Darin can be haled into

court in the United States for any statutory violation, Mr. Darin's contacts with the United States "must be assessed individually." *Calder*, 465 U.S. at 790.

In short, only Mr. Darin's alleged conduct may be considered in determining whether there is a "sufficient nexus" between him and the United States.  And because Mr. Darin's alleged conduct was not aimed at the United States, no such nexus exists.  The Complaint accordingly violates the Fifth Amendment and must be dismissed.

**B.      The Fifth Amendment Requires That Foreign Defendants Receive Fair Notice, and There Was No Such Notice Here.**

The Complaint has a second fatal constitutional defect:  it fails to allege that Mr. Darin received fair warning that his conduct could expose him to criminal liability.  "The idea of fair warning is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  *Al Kassar*, 660 F.3d at 119 (internal quotations omitted).  To satisfy this requirement, the Government must allege that foreign defendants "would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere," if not necessarily in the United States. *Id.*

Even drawing all inferences favorable to the Government, there is no basis in the Complaint to conclude that Mr. Darin would "reasonably understand that [his] conduct was criminal."  To the contrary, the Government's theory of liability in this case is indisputably novel.  To determine Yen Libor during the relevant time period, the BBA asked panel banks to submit their opinion regarding the hypothetical estimated rate at which they might be able to borrow funds, if any bank were willing to lend to them.  Compl. ¶ 7.  In other words, Mr. Darin's allegedly "manipulated" submissions were opinions in response to a hypothetical question, not representations of fact or even statements of opinion *about* a concrete fact.

Throughout this litigation, the Government has been unable to point to any precedents for this novel theory of fraud, and we are aware of none. Indeed, when foreign governments have moved to prohibit Libor manipulation, they have done so after the fact. *See* Press Release, European Comm'n, Libor Scandal: Amendments to Proposed Market Abuse Legislation to Fight Rate-Fixing—Frequently Asked Questions (July 25, 2012) ("Given that benchmarks are not currently explicitly covered by these proposals, the Commission has concluded that direct manipulation of benchmarks does not fall within the scope of either proposal.").[8] The novelty of Mr. Darin's prosecution—and the fact that foreign governments have recognized that existing law did not criminalize Libor manipulation—undercuts any inference that Mr. Darin had "fair warning."

Nor can such fair warning be assumed simply because the Government has labeled Mr. Darin's conduct as "fraud." Fraud is an amorphous concept, and it is accordingly a tempting vehicle for the prosecution of any financial conduct that the Government later finds inappropriate. It is for precisely this reason, however, that courts must carefully scrutinize novel theories of fraud for fair notice, and it is why such theories have been rejected on due process grounds. *See, e.g., United States v. Giffen*, 326 F. Supp. 2d 497, 507 (S.D.N.Y. 2004) (concluding novel theory of honest services fraud deprived defendant of fair notice); *United States v. Saathoff*, 708 F. Supp. 2d 1020, 1041 (S.D. Cal. 2010) (same).

Absent any examples of *anyone* being prosecuted for changing their opinion in response to a hypothetical question, Mr. Darin could not reasonably have anticipated that doing so was

---

[8] *Available at*: http://europa.eu/rapid/press-release_MEMO-12-595_en.htm (last visited April 22, 2015). The mere fact that the United Kingdom, like the United States, has attempted to prosecute Libor manipulation through the unprecedented interpretation of existing authorities does not mean that Mr. Darin received fair warning. More telling is the fact that the countries closest to Mr. Darin's alleged conduct, Switzerland, Japan, and Singapore, have taken no action.

criminal.  The allegations in the Complaint bear this out.  The Government attached to the
Complaint numerous electronic chats allegedly between Mr. Darin and others at UBS, including
Mr. Hayes.  In none of these chats, however, is there *any* suggestion that Mr. Darin was—or
should have been—aware of the criminal nature of his acts.

What is contained in the chats, as the Magistrate Judge pointed out, is a statement
suggesting concern that submitting too "far from the truth" could have caused the BBA to ban
UBS from the Yen Libor panel.  *See* Compl. ¶ 21(d)(ii).  For the Magistrate Judge, these
allegations showed that "Mr. Darin submitted opinions that were not *bona fide*," which
"benefitted Mr. Hayes at the expense of his counterparties."  Op. at 32.  But even if this were
true, it does not show that Mr. Darin received "fair warning" that his conduct was *criminal*.  At
most, Mr. Darin's concern that the BBA might ban UBS supports the inference that there was
something unfair or unethical about agreeing to Mr. Hayes's requests.  As the Supreme Court has
made clear, however, "not every instance of financial unfairness constitutes fraudulent activity."
*Chiarella v. United States*, 445 U.S. 222, 232 (1980).

## II.     The Magistrate Judge Erred in Concluding That This Case Involves a Domestic Application of the Wire Fraud Statute.

Since *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), courts have
applied a two-step inquiry in assessing whether a statute can be applied extraterritorially.  The
first question is whether Congress clearly intended for the statute to apply abroad.  *Id.* at 255-65.
If the statute "does not apply extraterritorially," the next question "is whether the relevant
conduct occurred in the territory of a foreign sovereign."  *United States v. Vilar*, 729 F.3d 62, 74
(2d Cir. 2013).    Here, the Magistrate Judge correctly answered the first question and
concluded—following recent Second Circuit precedent—that the wire fraud statute "does not

overcome *Morrison*'s presumption against extraterritoriality." Op. at 20 (quoting *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 139 (2d Cir. 2014)) (alteration omitted).

The Magistrate Judge then determined that because "the co-conspirators purportedly caused the manipulated LIBOR to be published to servers in the United States and used United States wires to memorialize trades affected by that rate," the "culpable conduct underlying the substantive count therefore occurred in the United States." Op. at 23. In other words, because the alleged conspiracy involved wires into the United States, it did not constitute an extraterritorial application of the wire fraud statute.

Yet it is the "rare case of prohibited extraterritorial conduct that lacks *all* contact with the territory of the United States." *Morrison*, 561 U.S. at 266. Where, as here, a statute is applied to conduct that is both domestic and extraterritorial, courts must assess the "the focus of congressional concern" and determine the "object[] of the statute's solicitude." *Id.* at 266-67. If a statute is "focused" on conduct that takes place outside the United States, then the application of the statute is extraterritorial, notwithstanding the fact that some ancillary conduct takes place in the United States. *See id.*; *see also Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013) ("[E]ven where ... claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application.").

The Magistrate Judge neglected to apply this second *Morrison* step, and the cases the Magistrate Judge cited (at 21-23) were either pre-*Morrison* or failed to consider the "focus" of the relevant statute (or both). It is true that the use of the wires is an *element* of the wire fraud statute, but the scheme to defraud is the *focus* of the statute. *See Pasquantino v. United States*, 544 U.S. 349, 371 (2005) ("[T]he wire fraud statute punishes the scheme....") (internal quotation

marks omitted); *see also United States v. Sancho*, 957 F. Supp. 39, 43 (S.D.N.Y. 1997), *aff'd*, 157 F.3d 918 (2d Cir. 1998) ("The essence of the wire fraud act is the defendant's *intent to defraud*, and the scheme he perpetrates in furtherance of that intent…."). Where the use of the wires and the scheme to defraud occur in different countries, it is the location of the *scheme* that controls whether the application of the statute is extraterritorial. Here, the Complaint alleges that Mr. Hayes and Mr. Darin "executed the scheme," *Pasquantino*, 544 U.S. at 371, while they were outside the United States, working at UBS's offices in Japan, Singapore, and Zurich. Compl. ¶ 15. The Complaint accordingly constitutes an impermissible extraterritorial exercise of the wire fraud statute.[9]

**III.    As the Magistrate Judge Correctly Found, Mr. Darin Is Entitled to a Ruling on the Merits of His Motion.**

In addition to disputing the merits of Mr. Darin's motion, the Government also raised two threshold objections to its consideration. First, based on *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Government contended that Mr. Darin, as a non-citizen residing outside the United States, was not entitled to assert his Fifth Amendment due process rights. Second, the Government urged the Magistrate Judge to decline to consider Mr. Darin's motion under the discretionary fugitive disentitlement doctrine. As the Magistrate Judge properly concluded, both of these attempts to deny Mr. Darin a forum in which to challenge his unconstitutional prosecution are without merit.

---

[9] Analyzing the conspiracy statute under which Mr. Darin was charged, 18 U.S.C. § 1349, leads to the same result. "The essence of the crime of conspiracy, of course, is the *agreement* to commit one or more unlawful acts." *United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013) (internal quotation marks and alteration omitted). Here, the alleged conspiratorial agreement was entered into and carried out outside the United States. The Complaint accordingly involves an extraterritorial application of § 1349, notwithstanding that certain overt acts not involving Mr. Darin—*i.e.*, the wires confirming Mr. Hayes's trades—allegedly occurred inside the United States.

### A.     The Fifth Amendment Applies Because Mr. Darin Has Been Charged in an Article III Court in the United States.

The Government argued below that the Fifth Amendment does not apply to Mr. Darin because he is not physically in the United States. The Government based this argument principally on *Eisentrager*, a 1950 Supreme Court decision that denied Fifth Amendment protections to "an alien enemy engaged in hostile service of a government at war with the United States," who had been convicted by a U.S. military commission in China. 339 U.S. at 785.

As the Magistrate Judge correctly found, however, this argument ignores a key difference between Mr. Darin and the petitioners in *Eisentrager*: the fact that Mr. Darin is being prosecuted in an Article III court in the United States. Op. at 5-8. When the Government files a complaint in federal court, it "creates a cognizable 'juridical relation' between the defendant and the court in which the complaint is filed." Op. at 8; *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (Kennedy, J., concurring) ("The United States is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution. All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant."). This "cognizable juridical relation" entitles Mr. Darin to appear through counsel and assert his Fifth Amendment rights.

In rejecting the Government's attempt to graft *Eisentrager* onto domestic criminal proceedings, the Magistrate Judge joined several other courts that have permitted foreign defendants residing abroad to assert the constitutional rights at issue here. *See In re Hijazi*, 589 F.3d at 412 (concluding that, even though the defendant had not appeared in the United States, he was entitled to a ruling on his Fifth Amendment claim); *United States v. Noriega*, 683 F. Supp. 1373, 1375 (S.D. Fla. 1988) (allowing indicted foreign defendant to file any motion attacking indictment and citing "basic notions of due process"). As the Magistrate Judge noted,

24

meanwhile, the Government failed to cite any cases in which its version of the *Eisentrager* rule was applied to bar a foreign defendant, charged in federal court, from moving to dismiss a complaint or indictment on Fifth Amendment grounds. Op. at 8.[10]   *Eisentrager* accordingly poses no bar to this Court's consideration of Mr. Darin's motion.

### B.   The Fugitive Disentitlement Doctrine Is Inapplicable.

The fugitive disentitlement doctrine allows "courts to refuse to hear assertions made on behalf of fugitives from justice because of their fugitive status." *Bano v. Union Carbide Corp.*, 273 F.3d 120, 125 (2d Cir. 2001). It involves two questions: "whether the applicant is a fugitive and, if so, whether, in light of the factors underlying the doctrine, a court should abstain from addressing his application." Op. at 9 (citing *In re Grand Jury Subpoenas*, 179 F. Supp. 2d 270, 286 (S.D.N.Y. 2001)). Because Mr. Darin is not a fugitive, the doctrine does not apply. But even if the Court were to consider the factors underlying the disentitlement doctrine, it should decline—as the Magistrate Judge did—to apply the doctrine in this case.

### 1.   Mr. Darin Is Not a Fugitive.

Traditionally, to qualify as a fugitive, a defendant must "flee." BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "fugitive" as a "person who flees or escapes"); *accord Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997). It is undisputed that Mr. Darin is not a fugitive in this traditional sense. He has lived openly in Switzerland—his home country—since before he was charged.

---

[10] The Government cited *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990), but as the Magistrate Judge pointed out, that was a Fourth Amendment case that discussed the Fifth Amendment (and *Eisentrager*) only in dicta. Op. at 6-7. When the Court in *Verdugo-Urquidez* referenced *Eisentrager*, moreover, its discussion was "consistent with the proposition that the applicability of Fifth Amendment protections depends on the venue and the tribunal: while such protections apply in United States civilian courts, they not always pertain in military proceedings." Op. at 7; *see also In re Terrorist Bombings*, 552 F.3d 177, 199 (2d Cir. 2008) (observing that Fifth Amendment rights attach to the criminal proceeding, whereas the Fourth Amendment applies at the time of the search and seizure).

The question, then, is whether Mr. Darin can be deemed to have "constructively fled" since he learned of the charges pending against him and has remained outside the United States. This concept, too, is inapposite. A person cannot be a fugitive under the constructive flight doctrine unless "(i) *he was present in the jurisdiction at the time of the alleged crime*, (ii) he learns, while he is outside the jurisdiction, that he is wanted by the authorities, *and* (iii) he then fails to return to the jurisdiction to face the charges." *In re Grand Jury Subpoenas*, 179 F. Supp. 2d at 287 (emphasis added); *see also United States v. Schreiber*, 535 F. Supp. 1359, 1363 (S.D.N.Y. 1982) ("One, of course, cannot be a fugitive unless he was present in the demanding state at the time the crime was committed."). Mr. Darin was not in the United States at the time of the alleged offense, and he is accordingly not a fugitive under this standard.

The Magistrate Judge cited *In re Grand Jury Subpoenas* but ultimately concluded that authorities were divided and that it was "unclear" whether "a fail[ure] to surrender imposes fugitive status on a defendant who was not present in the United States during the alleged crime, at the time of charging, or at any time since he became aware of the charges." Op. at 10 (alteration in original) (internal quotation marks omitted). All the cases cited by the Magistrate Judge, however, are perfectly consistent. While some decisions note that "the 'intent to flee' can be inferred when a person 'fail[s] to surrender.'" *United States v. Buck*, No. 13-CR-282 (VM), 2015 WL 195872, at *1 (S.D.N.Y. Jan. 9, 2015) (quoting *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984)), and another observes that the focus of the doctrine "is on the intent to return and appear before the court." *United States v. Hernandez*, No. 09-CR-625 (HB), 2010 WL 2652495, at *5 (S.D.N.Y. June 30, 2010), these cases involved defendants who were present in the United States at the time of the alleged offense. None, accordingly, can be read to disagree with the rule that "constructive flight" applies *only* when a defendant "was present in the

jurisdiction at the time of the alleged crime." *In re Grand Jury Subpoenas*, 179 F. Supp. 2d at 287.[11]

**2.    Even if Mr. Darin Were a Fugitive, the Magistrate Judge Did Not Abuse His Discretion in Declining to Apply the Disentitlement Doctrine.**

Having concluded that it was uncertain whether Mr. Darin was a fugitive, the Magistrate Judge proceeded to the second step of the analysis:  a discretionary weighing of the factors underlying the disentitlement doctrine. *See Degen v. United States*, 517 U.S. 820, 824 (1996) (application of disentitlement doctrine is within the court's sound discretion).  There are four such factors:  1) mutuality—*i.e.*, "assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." *Bano v. Union Carbide Corp.*, 273 F.3d 120, 125 (2d Cir. 2011) (internal quotation marks omitted).  The Magistrate Judge weighed these considerations and concluded that the application of the doctrine was inappropriate in this case.  There was no abuse of discretion in this determination.

First, as to mutuality, the Magistrate Judge rightly observed that this is not a situation "when a decision in favor of an applicant would benefit him, but a decision against him would not be enforceable or would not operate to his advantage." Op. at 11.  As the Magistrate Judge

---

[11]  The Magistrate Judge also cited 28 U.S.C. § 2466(a), a civil forfeiture statute, but it is inapposite.  Section 2466 sets out a number of specific statutory requirements that must be met before a court can disentitle a claimant. *See United States v. Technodyne LLC*, 753 F.3d 368, 381 (2d Cir. 2014).  Given the unique rules governing civil forfeiture and the fact that the word fugitive "is not employed in the text of the provision," the Second Circuit has explicitly declined to apply common-law fugitive disentitlement precedent in interpreting the statute. *See Collazos v. United States*, 368 F.3d 190, 196-97 (2d Cir. 2004) (declining to apply *Empire Blue Cross*, 111 F.3d 278, and concluding that "the text of § 2466 makes plain that statutory disentitlement extends beyond common-law fugitives to encompass persons who may never previously have been in the United States").

pointed out, "[t]he effect of a decision upholding the validity of the complaint will be to allow the charges, and the arrest warrant issued pursuant to those charges, to stand." *Id.* at 12. This would "entail significant burdens for Mr. Darin," including restrictions on his travel and employment. *Id.* at 13-14. These adverse consequences are sufficient to establish mutuality. *See In re Hijazi*, 589 F.3d at 413 (finding mutuality where petitioner was effectively forced to stay in Kuwait or hazard apprehension and extradition).

As to the second and third factors, the Magistrate Judge rejected the Government's argument that Mr. Darin had "flouted the judicial process" and engaged in a "flight from justice" by not appearing in court. Op. at 14-15. As the Magistrate Judge rightly observed, Mr. Darin is simply "remaining in his home country," and "if mere absence from court" were enough to implicate these factors, then they "would *always* favor the prosecution, and no further analysis would be necessary." *Id.* at 14 (emphasis added). There is nothing specific to *Mr. Darin's* situation that suggests that these factors are implicated here.

Finally, with regard to prejudice to the Government "caused by the defendant's escape," the Magistrate Judge correctly noted that while "this factor seems to assume that the applicant was once in custody and has absconded ... [t]hat is not the case here." Op. at 15. Even if prejudice were to be weighed, the Government's only theory of prejudice is the general assertion that witnesses' memories fade as criminal events become more remote in time. But this too would be true of any criminal case—and it is especially unpersuasive here, since as the Magistrate Judge observed, "the Government itself does not seem particularly keen to move this action forward." *Id.* at 16. Accordingly, even if these equitable considerations were relevant (they are not, because Mr. Darin is not a fugitive), they all weigh in favor of ruling on Mr. Darin's motion.

## CONCLUSION

For the reasons set forth above, the Court should reverse the decision of the Magistrate

Judge and dismiss the Complaint against Mr. Darin.

Dated:    April 24, 2015                         Respectfully submitted,

                                                 COVINGTON & BURLING LLP

                                                 By: _____

                                                 Bruce A. Baird
                                                 James M. Garland*
                                                 Alexander A. Berengaut*
                                                 One CityCenter
                                                 850 Tenth Street, NW
                                                 Washington, DC 20001
                                                 Tel:  (202) 662-6000
                                                 Fax:  (202) 662-6291
                                                 bbaird@cov.com
                                                 jgarland@cov.com
                                                 aberengaut@cov.com
                                                 *Admitted *pro hac vice*

                                                 *Attorneys for Defendant Roger Darin*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  12 MJ 3229 |
| *Plaintiff,* | |
| v. | |
| TOM ALEXANDER WILLIAM HAYES, and ROGER DARIN, | |
| *Defendants.* | |

### CERTIFICATE OF SERVICE

I, Claire Catalano Dean, hereby certify that on the 24th Day of April, 2015, I caused a true and correct copy of the DEFENDANT ROGER DARIN'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE CRIMINAL COMPLAINT to be served via overnight Federal Express delivery upon the attorneys of record at the following addresses:

Thomas B.W. Hall
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, D.C. 20530
(202) 616-1682

Daniel Adam Braun
U.S. Attorney's Office, SDNY
86 Chambers Street
New York, NY 10007
(212) 637-2215

Elizabeth B. Prewitt
United States Department of Justice
26 Federal Plaza, Room 3630
New York, NY 10038
(212) 264-9319

William John Stellmach
United States Attorney Office, SDNY
One Saint Andrew Plaza
New York, NY 10007
(212) 637-2527

Claire Catalano Dean SDNY Bar # CC7432
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: 212-841-1000
Fax: 212-841-1010
ccatalano@cov.com