**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.

TOM ALEXANDER WILLIAM HAYES,
and
ROGER DARIN,

*Defendants.*

Case No. 12 MJ 3229

**OPPOSITION TO DEFENDANT ROGER DARIN'S OBJECTIONS TO THE
MAGISTRATE JUDGE'S ORDER DENYING DEFENDANT'S MOTION TO DISMISS
THE CRIMINAL COMPLAINT**

# TABLE OF CONTENTS

Page

I.    **INTRODUCTION**................................................................................. 1

II.    **THE COMPLAINT AND ARREST WARRANT** ................................................ 3

III.    **LEGAL STANDARD** ......................................................................... 4

IV.    **ARGUMENT** ................................................................................. 4

    A.    The Magistrate Judge Did Not Err in Rejecting Darin's Fifth
        Amendment Arguments ............................................................. 4

        1.    There is A Sufficient Nexus Between Darin's Offense and
            the United States. ............................................................. 4

        2.    The Magistrate Judge Was Correct in Holding that Darin
            Received Ample Notice for the Purposes of the Due Process
            Clause That His Alleged Conduct Was Criminal. ........................... 19

    B.    The Magistrate Judge Correctly Ruled that The Charge Against
        Darin Represents a Domestic Application of the Wire Fraud Statute. .................... 23

    C.    The Magistrate Judge Erred in Reaching the Merits of Darin's
        Motion Under the Fugitive Disentitlement Doctrine or a More
        General Exercise of His Discretion............................................... 26

V.    **CONCLUSION** .............................................................................. 30

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Chairella v. United States*, 445 U.S. 22 (1980) ................................................................ 23

*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014) ..................................... 25, 26

*Goldberg v. UBS AG*, 690 F. Supp. 2d 92 (E.D.N.Y. 2010) .................................................. 8, 10

*Hanson v. Phillips*, 442 F.3d 789 (2d Cir. 2006) .................................................................. 28

*Laydon v. Mizuho Bank, Ltd. et al.*, Case No. 12-cv-3419 (GBD) ......................................... 16

*Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) ............... 11

*Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014) ................................................. 25

*McNally v. United States*, 483 U.S. 350 (1987) .................................................................... 20

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010) ............................................ 25

*Nen Di Wu v. Holder*, 617 F.3d 97 (2d Cir. 2010) ............................................................... 30

*Pasquantino v. United States*, 544 U.S. 349 (2005) ............................................................. 24

*Pesin v. Rodriguez*, 244 F.3d 1250 (11th Cir. 2001) ............................................................ 30

*United States v. Ahmed*, 10 CR. 131 (PKC), 2011 U.S. Dist. LEXIS 123182 (S.D.N.Y. Oct. 20, 2011) ........................................................................................................................ 8, 23

*United States v. Al Kassar*, 582 F. Supp. 2d 488 (S.D.N.Y. 2008) ......................................... 21

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ..................................... 5, 7, 9, 19, 21

*United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013) ..................................................... 6, 9, 12

*United States v. Altman*, 48 F.3d 96 (2d Cir. 1995) .............................................................. 20

*United States v. Alvarez-Machain*, 504 U.S. 655 (1992) ....................................................... 11

*United States v. Awadalla*, 357 F.3d 243 (2d Cir. 2004) ....................................................... 28

*United States v. Best*, 304 F.3d 308 (3d Cir. 2002) .............................................................. 12

*United States v. Blackmon*, 839 F.2d 900 (2d Cir. 1988) .............................................. 23

*United States v. Caicedo*, 47 F.3d 370 (9th Cir. 1995) .................................................... 5

*United States v. Cardales*, 168 F.3d 548 (1st Cir. 1999) .................................................. 5

*United States v. Davis*, 905 F.2d 245 (9th Cir. 1990) ................................................. 5, 12

*United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) ............................................... 26

*United States v. Gilboe*, 684 F.2d 235 (2d Cir. 1982) .................................................... 24

*United States v. Goldblatt*, 813 F.2d 619 (3d Cir. 1987) ............................................... 20

*United States v. Hernandez*, 09 CR 625 (HB), 2010 U.S. Dist. LEXIS 65400 (S.D.N.Y. June 30, 2010) .................................................................................................... 27

*United States v. Hill*, 279 F.3d 731 (9th Cir. 2002) ...................................................... 13

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) ..................................................... 16

*United States v. Jimenez*, 421 F. Supp. 2d 1008 (W.D. Tex. 2006) ................................. 4

*United States v. Kim*, 246 F.3d 186 (2d Cir. 2001) ................................... 15, 23, 24, 25

*United States v. Klimavicius-Viloria*, 144 F.3d 1249 (9th Cir. 1998) .......................... 11

*United States v. Levis*, 488 Fed. Appx. 481 (2d Cir. 2012) ......................................... 17

*United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014) ................................................... 26

*United States v. Manuel*, 371 F. Supp. 2d 404 (S.D.N.Y. 2005) .......................... 8, 13, 18

*United States v. Martinez-Hidalgo*, 993 F.2d 1052 (3d Cir. 1993) ................................. 5

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ........................... 10, 18

*United States v. Oliveri*, 190 F. Supp. 2d 933 (S.D. Tex. 2001) ................................... 28

*United States v. Perez-Herrera*, 610 F.2d 289 (5th Cir. 1980) ..................................... 14

*United States v. Perez-Oviedo*, 281 F.3d 400 (3d Cir. 2002) ......................................... 5

*United States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006) ..................................... 5, 6, 9, 18

*United States v. Postal*, 589 F.2d 862 (5th Cir. 1979) ................................................. 12

iii

*United States v. Ramirez-Amaya*, 812 F.2d 813 (2d Cir. 1987)................................................... 14

*United States v. Reed*, 639 F.2d 896 (2d Cir. 1981) .................................................................. 21

*United States v. Reumayr*, 530 F. Supp. 2d 1210 (D.N.M. 2008) ................................................ 6

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008)........................................................... 14, 17

*United States v. Salazar*, 485 F.2d 1272 (2d Cir. 1973)............................................................ 4

*United States v. Sidorenko*, No. 3:14-cr-00341-CRB, 2015 U.S. Dist. LEXIS 52452 (N.D. Cal.
   Apr. 15, 2015)............................................................................................................... 6, 7, 11

*United States v. Stanzione*, 391 F. Supp. 1201 (S.D.N.Y. 1975)................................................ 27

*United States v. Suerte*, 291 F.3d 366 (5th Cir. 2002) ............................................................... 5

*United States v. Tejada*, 06 Mag. 770 (GWG), 2006 U.S. Dist. LEXIS 40127 (S.D.N.Y. June 19,
   2006) .................................................................................................................................. 4

*United States v. Trapilo*, 130 F.3d 547 (2d Cir. 1997) ................................................. 14, 24, 26

*United States v. Umeh*, 527 Fed. Appx. 57 (2d Cir. 2013) ................................................... 8, 15

*United States v. Yeh*, No. CR 10-00231 WHA, 2013 U.S. Dist. LEXIS 69284 (N.D. Cal. May 15,
   2013) ................................................................................................................................ 28

*United States v. Yousef*, 327 F. 3d 56 (2d Cir. 2003)............................................................ 5, 12

*United States v. Yousef*, No. S3 08 Cr. 1213 (JFK), 2010 U.S. Dist. LEXIS 86281 (S.D.N.Y.
   Aug. 23, 2010) ............................................................................................................ 6, 8, 15

*Weiss v. United States*, 122 F.2d 675 (5th Cir. 1941)............................................................... 20

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ............................................ 11

**Statutes**

18 U.S.C. § 1343..................................................................................................................... 23

18 U.S.C. § 1349..................................................................................................................... 23

18 U.S.C. § 3237..................................................................................................................... 15

28 U.S.C. § 2466(a) ............................................................................................ 27

**Rules**

Fed R. Crim. P. 3 ................................................................................................. 4

Fed. R. Crim P. 4 ................................................................................................. 4

From his home country of Switzerland – after assuring the Government, through counsel, that he cannot be extradited and will never appear in a United States courtroom to answer the charge he faces – the defendant, Roger Darin, asks this court to dismiss a Criminal Complaint alleging that in the Southern District of New York and elsewhere, he participated in a conspiracy to manipulate benchmark interest rates that are used in financial markets and products around the world, including in transactions with various market participants based in the United States. The Magistrate Judge did not err in correctly denying Darin's motion to dismiss. Accordingly, even if this Court were to consider Darin's objections on their merits – thus enabling him and similarly situated defendants to litigate in United States courts, and to seek tactical advantages from such litigation, while simultaneously declaring that they live beyond the reach of U.S. authorities – they should be rejected.

Assuming *arguendo* that this Court were to exercise its discretion under the fugitive disentitlement doctrine to reach the merits of Darin's claims, his arguments are unavailing. Darin asserts that he cannot be prosecuted in the United States because the LIBOR manipulation scheme in which he allegedly participated lacks a sufficient "nexus" to this country. Even if such a nexus had to be alleged and supported in a criminal complaint – a proposition that Darin seems to assume but that he cannot support – the charge against Darin would not represent an arbitrary or fundamentally unfair application of United States law because that conduct has a connection or "nexus" to this country. Indeed, the opening allegations of the Complaint make clear that Darin is charged with participating in a conspiracy to commit wire fraud "in the Southern District of New York and elsewhere," rather than solely in a foreign country. More specifically, the Complaint alleges that Darin and his co-conspirators used communication facilities and wire transmissions in the United States in furtherance of a scheme to manipulate Yen LIBOR rates in

1

order to defraud counterparties based in the Southern District of New York and elsewhere. Based on all of the allegations in the Complaint, and the clear implications of those allegations, there is a sufficient nexus between Darin's alleged offense and the United States to satisfy any requirement under the Due Process Clause, and the Magistrate Judge was correct when he denied Darin's motion on this ground.

Darin further contends that his purported right to due process has been violated because he was not on notice that his conduct could be considered criminal. The Magistrate Judge rejected this argument summarily and correctly. The allegations in the complaint make clear that Darin participated in a scheme to manipulate LIBOR rates that would determine the profitability of trades, and that this scheme was devised and executed through, among other means, the transmission of false and misleading LIBOR submissions that were formulated to provide UBS with a secret pecuniary advantage over its counterparties. When individuals engage in deceptive devices of this sort as part of a scheme to cheat others out of their property, the prosecution of such conduct does not contravene, or even implicate, notions of fundamental fairness.

Third, as the Magistrate Judge properly found and contrary to Darin's assertions, application of the wire fraud statute in this case would not be extraterritorial because – as explicitly alleged in the Complaint – the conspirators, including Darin himself, used wires in the United States to execute their scheme. Moreover, in precedent that Darin has failed to cite and cannot persuasively distinguish, the Second Circuit, while acknowledging and applying the presumption that United States statutes should not be construed to apply to extraterritorial offenses, has held that so long as wire signals transmitted in furtherance of a scheme pass into or through the United States, the wire fraud statute reaches conduct that otherwise occurs outside this country. Accordingly, and contrary to Darin's apparent position, United States law does not

permit individuals who reside elsewhere to defraud victims in this country through the use of electronic communications that are transmitted to and from the United States.

Finally, in the exercise of its discretion, the Court can and should decline to consider Darin's motion under the related doctrines of fugitive disentitlement and mutuality in litigation until he submits to the jurisdiction of this Court.

Accordingly, and for the reasons set forth more fully below, Darin's motion should be denied.

## I.      THE COMPLAINT AND ARREST WARRANT

The United States incorporates by reference those facts regarding the complaint and the arrest warrant discussed in detail in the Government original opposition brief (Doc. No. 18 at 3-7) and ably summarized in the Magistrate Judge's opinion. (Op. at 1-4.) [1,2]

---

[1]     In this submission, references to "Compl." are to the Complaint (Doc. No. 1); references to "D. Mem." are to Darin's original memorandum in support of his motion to dismiss (Doc. No. 7); references to "Op." are to Magistrate Judge Francis's ruling denying Darin's motion to dismiss (Doc. No. 28); and references to "Obj." are to Darin's objections to the Magistrate Judge's Order (Doc. No. 30). For convenience, the Complaint is attached to this submission as Exhibit A.

[2]     Since the original round of briefing, there have been additional guilty pleas and corporate settlements beyond those discussed in Footnote 2 of the Government's original opposition brief. (Doc. No. 18 at 4 n.2.) A total of three individual defendants have now pled guilty in the Southern District of New York to charges related to the manipulation of Yen and U.S. Dollar LIBOR; four other defendants have been charged in the same case. *See United States v. Robson et al.*, Case No. 1:14 Cr. 00272 (JSR) (S.D.N.Y.). In addition, in April 2015 DB Group Services UK Limited pled guilty to fraud charges based on LIBOR manipulation. *See United States v. DB Group Services UK Ltd.*, Case No. 3:15-cr-00062-RNC (D. Conn.). Deutsche Bank AG, the parent company of DB Group Services UK Limited, also entered into a deferred prosecution agreement with the Government as a result of the same conduct. *See United States v. Deutsche Bank AG*, Case No. 3:15-cr-00061-RNC (D. Conn.).

## II.    LEGAL STANDARD

Fed R. Crim. P. 3 states that a criminal complaint is a "written statement of the essential facts constituting the offense charged." A criminal complaint signed by a magistrate judge allows an arrest warrant to be issued under Fed. R. Crim P. 4. A complaint merely must establish probable cause for an arrest. If a complaint fails to do so, "it would have to be dismissed." *United States v. Tejada*, 06 Mag. 770 (GWG), 2006 U.S. Dist. LEXIS 40127, *2 (S.D.N.Y. June 19, 2006); *see also United States v. Jimenez*, 421 F. Supp. 2d 1008, 1010-11 (W.D. Tex. 2006) (motion to dismiss criminal complaint decided based on whether the facts of the complaint showed probable cause).

The Government is not aware of any authority supporting the proposition that a complaint, in order to withstand scrutiny, must allege facts and describe evidence on which the Government would rely in responding to claims such as those Darin has asserted in his motion to dismiss.[3]

## III.    ARGUMENT

### A.  The Magistrate Judge Did Not Err in Rejecting Darin's Fifth Amendment Arguments.

#### 1.  There is A Sufficient Nexus Between Darin's Offense and the United States.

First, Darin advances the novel argument that he lacks a constitutionally sufficient nexus to the United States, and that accordingly, his prosecution here would be arbitrary and

---

[3]    Even if the charging document were an indictment, the United States would not need to allege explicitly a nexus to the United States or fair notice of criminality. The Second Circuit has "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973).

4

fundamentally unfair under the Due Process Clause. The Magistrate Judge rejected his argument as legally and factually without merit, and this Court should as well.

### a.   Applicable Legal Principles

It is well established that, "as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" *United States v. Yousef*, 327 F. 3d 56, 86 (2d Cir. 2003) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). *See also, e.g., United States v. Siddiqui*, 699 F.3d 690, 700 (2d Cir. 2012). The Supreme Court has never suggested that the Due Process Clause limits Congress's authority to enact criminal statutes that apply to conduct committed abroad. In *Yousef*, however, the Second Circuit agreed with the Ninth Circuit's view that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *Yousef*, 327 F.3d at 111 (quoting *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990) and rejecting the defendants' due process claim). The Second Circuit articulated and applied the same principle in *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) ("*Al Kassar II*") (holding, as in *Yousef*, that the required nexus had been demonstrated).[4]

---

[4]    This proposition is far from clear or well-established. Indeed, the First, Third, and Fifth Circuits have expressly rejected the "nexus" requirement, holding that due process is satisfied as long as application of a statute is not "arbitrary or fundamentally unfair." *See, e.g., United States v. Suerte*, 291 F.3d 366, 375-76 (5th Cir. 2002); *United States v. Perez-Oviedo*, 281 F.3d 400, 402-03 (3d Cir. 2002); *United States v. Cardales*, 168 F.3d 548, 552-53 (1st Cir. 1999); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056-57 (3d Cir. 1993). Moreover, even in the Ninth Circuit, the "nexus" requirement does not apply in all cases. *See, e.g., United States v. Caicedo*, 47 F.3d 370, 373 (9th Cir. 1995) (holding that a nexus is not required for prosecutions under the Maritime Drug Law Enforcement Act (the "MDLEA") involving "stateless vessels"); *accord United States v. Perlaza*, 439 F.3d 1149, 1167-68 (9th Cir. 2006). In *Yousef*, while summarily adopting the Ninth Circuit's view, the Second Circuit did not acknowledge this division of authority or discuss the differing views that have been articulated in the cases and

As this Court has observed, dismissals under the "sufficient nexus" requirement are exceedingly rare. *United States v. Yousef*, No. S3 08 Cr. 1213 (JFK), 2010 U.S. Dist. LEXIS 86281, at *8 n.2 (S.D.N.Y. Aug. 23, 2010)) (noting that the Court is "not aware of any case in which a federal court has dismissed an action on the ground that the extraterritorial application of a federal statue violates the Due Process Clause") (citing *United States v. Reumayr*, 530 F. Supp. 2d 1210, 1223 (D.N.M. 2008) (same)). Indeed, the Government is only aware of two decisions doing so, one of which was issued after the Magistrate Judge's opinion. *See United States v. Perlaza*, 439 F.3d at 1169 (overturning convictions under the MDLEA after trial, and dismissing charges on the alternative basis of a failure to prove the required nexus, because the district court did not find, and the Government conceded it had not proven, that drugs dumped from a stateless speedboat off the coast of South America had any nexus to the United States);[5] *United States v. Sidorenko*, No. 3:14-cr-00341-CRB, 2015 U.S. Dist. LEXIS 52452 (N.D. Cal. Apr. 15, 2015) (dismissing indictment on due process nexus grounds where, among other characteristics

_____

commentary addressing this issue. Needless to say, the Government does not question the force of Second Circuit authority in this Court. Purely for purposes of preserving the position, however, the United States reserves the right to argue at a later time that the nexus requirement is not a necessary component of due process. Moreover, there is no need to reexamine this question in considering Darin's motion, because even under the standard adopted in *Yousef*, the requisite "nexus" can readily be established in this case.

[5]    In *Perlaza*, the Ninth Circuit did not review a finding regarding this issue. Rather, it held that: (1) the district court erred by concluding that such a finding was unnecessary; and (2) the error was not harmless, based on the Government's concession that it had not proven a nexus to the United States. *Perlaza*, 439 F.3d at 1168-69. Thus, in cases where this issue has been raised and decided, on the merits no court has found a deprivation of due process. *See also United States v. Ali*, 718 F.3d 929, 943 (D.C. Cir. 2013) ("[The defendant] has not cited – and we have not found – any case in which extraterritorial application of a federal criminal statute was actually deemed a due process violation. Although that does not mean such a result is beyond the realm of possibility, it does suggest [the defendant's] burden is a heavy one, for he traverses uncharted territory.").

distinguishing it from the case at hand, the indictment alleged no wires into the United States).[6] Based on the circumstances presented here, and the allegations in the Complaint, the Court should adopt the Magistrate Judge's decision denying the motion to dismiss on this ground.

In support of his objections, Darin asserts – and relies heavily upon the theory – that in order to establish a sufficient nexus to the United States under the Due Process Clause, the Government must allege and prove that his action "was aimed at the United States." (Obj. at 7.)[7] Because the Complaint does not explicitly allege that he possessed such subjective intent, Darin claims, it must be dismissed. The Magistrate Judge properly recognized that under governing law, "that is not the proper standard." (Op. at 26.) Indeed, putting aside Darin's unsupported position that this is a pleading requirement, no court – in the Second Circuit or elsewhere – has ever adopted the legal standard on which he bases his claim.

While an intent to harm the United States plainly suffices to establish a "sufficient nexus" for due process purposes, *Al Kassar II*, 660 F.3d at 119, "a 'substantial intended effect' in or on the United States *is sufficient but not necessary* to justify the extraterritorial application of

---

[6]   Darin gives short shrift in his objections to the *Sidorenko* decision, where Judge Breyer of the Northern District of California dismissed an indictment pre-trial on lack of nexus grounds – apparently the first-ever District Judge to do so. *Sidorenko*, 2015 U.S. Dist. LEXIS 52452 at *22-*24. But Darin's lack of focus on *Sidorenko* is not a surprise, considering the indictment in that case did not allege wires in or through the United States. *See id.* at *5 (discussing how the indictment alleged conduct between defendants "whose use of wires did not reach or pass through the United States"). Moreover, the indictment in that case did not allege direct United States-based victims or the publication of fraudulent information in the United States. *Sidorenko* in fact demonstrates how significant a nexus to the United States the Complaint in this case alleges.

[7]   The "aim" that must be alleged, according to Darin, must specifically target the United States among other nations. Accordingly, Darin asserts that even if a defendant directs his conduct at individuals and entities in the world's leading financial markets – including, necessarily, in the United States – he cannot be prosecuted in this country, consistent with principles of due process, unless the contemplated harm to or in the United States stands out, distinctly, in the defendant's thinking. (Obj. at 7.)

federal criminal law." *Yousef*, 2010 U.S. Dist. LEXIS 8628, at *9 (emphasis added); *id.* at *4 (acknowledging that the defendant may not have acted with "the specific purpose of harming interests of or related to the United States," but finding nonetheless that the defendant "was aware that the charged conduct would have such an effect"). To determine whether a "sufficient nexus" exists, "courts also have considered factors such as the 'defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and *whether those acts could be expected to or did produce an effect in the United States.*'" *Id.* at *9 (quoting *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 106 (E.D.N.Y. 2010)) (emphasis added). Indeed, the Second Circuit and this Court have found a "sufficient nexus" for Due Process Clause purposes in circumstances where no "substantial intended effect" was alleged or proven.

   For instance, in *United States v. Umeh*, the Second Circuit, applying *Al Kassar II*, found that the "nexus" requirement was satisfied where the jury found that "each defendant joined a conspiracy *knowing* that the cocaine to be trafficked would reach the United States." 527 Fed. Appx. 57, 63 (2d Cir. 2013) (emphasis added). *See also United States v. Ahmed*, 10 CR. 131 (PKC), 2011 U.S. Dist. LEXIS 123182, at *1 (S.D.N.Y. Oct. 20, 2011) (denying defendant's motion to dismiss on jurisdictional grounds despite no allegation in the indictment that "the defendant engaged or intended to engage in specific acts either within the United States or directed at its citizens or property here or in other countries"); *United States v. Manuel*, 371 F. Supp. 2d 404, 408-09 (S.D.N.Y. 2005) (finding sufficient nexus where the leaders of the conspiracy knew illegal drugs transported within Europe were intended for shipment to the United States, even though defendant drug courier did not know of or intend a United States destination for the drugs). Even in *Perlaza*, on which Darin relies, the Ninth Circuit stated clearly that in order to satisfy due process, the Government "needs to establish *some detrimental effect*

8

within, or nexus to, the United States." *Perlaza*, 439 F.3d at 1169 (emphasis added) (citing Ninth Circuit precedent holding that "jurisdiction is appropriate if the acts performed outside the United States produce *detrimental effects* within the United States" (emphasis added)). Neither the Ninth Circuit, nor any other court, has intimated that such a nexus can *only* be established if the defendant subjectively intends or "aims" to harm United States interests; nor does it comport with law or logic to suggest that absent such a showing, it would be arbitrary or fundamentally unfair to prosecute a defendant in the United States for conduct occurring abroad.

 To be sure, in *Al Kassar II,* 660 F.3d at 118-19, the Court found a sufficient nexus based on evidence that the defendants in that case intended to harm United States interests. Nowhere in that decision, however, did the Second Circuit suggest that absent proof of such intent, it would offend due process to prosecute a defendant in the United States if his conduct occurred elsewhere. Indeed, if the Court intended to adopt such a novel standard – contrary to clear precedent both in the Ninth Circuit, which the Second Circuit cited in *Yousef* and *Al Kassar*, and elsewhere – it presumably would have acknowledged, and even explained, its diversion from all prior authority. Darin nonetheless attempts to manufacture support for his desired standard by quoting isolated statements in *Al Kassar* out of the context in which they appear. His argument, however, is not faithful to the Court's holding or reasoning. Thus, as the D.C. Circuit recently pointed out, in rejecting the very argument that Darin has advanced here: "[E]ven assuming [that *Al Kassar II*'s] characterization [of the nexus requirement] is right, the decision only tells us when such a nexus *exists, not when it is absent* . . . ." *United States v. Ali*, 718 F.3d at 944 (emphasis added). The Circuit therefore rejected the defendant's overly "expansive" reading of *Al Kassar II*. For the same reasons, the Magistrate Judge rejected Darin's similarly overly expansive reading of *Al Kassar II*, and this Court should do the same.

In his original brief supporting his motion to dismiss, Darin also relied on *United States v. Mostafa*, 965 F. Supp. 2d 451, 459-60 (S.D.N.Y. 2013). The Magistrate Judge properly recognized, however, that *Mostafa* supports the Government's position here – and not Darin's. In *Mostafa*, the defendant was accused of conspiring to take hostages, including United States nationals, along with other offenses. *Id.* at 455-58. The court in *Mostafa* held:

> Defendant argues that [while two of the hostages taken in Yemen may have been American citizens], there is no allegation [in the indictment] that he intended to harm the United States or its citizens. *However, Defendant's specific intent to harm Americans is not what the law requires. Rather, courts have found sufficient nexus to exist based upon factors such as the "defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States."* It is also unnecessary that the defendant had any expectation that he would be prosecuted in the United States. The facts alleged in the indictment are therefore plainly sufficient.

*Mostafa*, 965 F. Supp. 2d at 459 (emphasis added) (citations omitted) (quoting *Goldberg v. UBS AG,* 690 F. Supp. 2d at 106). Thus, while *Al Kassar* provides no support for the legal standard on which Darin bases his nexus claim, *Mostafa* explicitly rejects that standard.

In a creative effort to invent legal standards that are more to his liking, Darin turns his attention away from authoritative or even analogous precedent and looks to other sources. Specifically, he relies upon (1) standards that have been developed in civil cases addressing whether a party's "minimum contacts" with a forum provide a basis for personal jurisdiction and (2) principles of customary international law and "comity." These arguments are plainly untenable, and the Magistrate Judge properly rejected them.

First, there is no case that applies a minimum-contacts analysis in determining whether a criminal prosecution is arbitrary and fundamentally unfair under the Due Process Clause, and the Magistrate Judge properly recognized that such law is "not relevant" to this analysis. (Op. at 27 n.4.) Darin's only source of support for this notion is a single passing and general observation in a 1998 Ninth Circuit opinion. *See United States v. Klimavidius-Viloria*, 144 F.3d 1249, 1257 (9th

Cir. 1998) (stating that "[t]he nexus requirement serves the same purpose as the 'minimum contacts' test in personal jurisdiction" and going on to discuss the requirements for establishing general personal jurisdiction in the civil context). While, in a broad sense, the nexus requirement may serve the same purpose as the civil minimum contacts test, it is not the same test, and there is no support for a wholesale importation of minimum-contacts jurisprudence into the criminal realm.[8] The United States is aware of no court that has done so, and for good reason, as there are important differences between the two contexts.[9] For example, one of the principal purposes of the "minimum contacts" requirement – "to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) – has no application in the context of a federal criminal case. Indeed, the United States has a strong interest in punishing those who seek to do it harm through conduct committed abroad – and it has the prerogative to pursue that objective even where, unlike here, doing so meets with objections from the country in which the criminal conduct took place. *See, e.g.*, *United States v. Alvarez-Machain*, 504 U.S. 655 (1992). Thus, in definitively rejecting the sort of argument that Darin has advanced here, the D.C. Circuit recently stated: "In support of his due process argument, [the defendant] cites a panoply of cases concerning personal jurisdiction in the context

---

[8]   Darin spends considerable time discussing *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) and its theory of "worldwide reliance." Reliance is, of course, a civil law concept – yet another way in which Darin attempts to conflate the civil and criminal spheres. The United States has alleged in this Complaint a wide-ranging scheme, targeting UBS counterparties in many locations – including the U.S.

[9]   Darin claims that the Court in the *Sidorenko* case "relied on civil minimum contacts principles" in dismissing the indictment in that case. (Obj. at 11.) While it is true that the Court made a passing reference to the "minimum contacts requirement," the Court nowhere adopted whole cloth the minimum contacts analysis from civil jurisprudence. *See Sidorenko*, 2015 U.S. Dist. LEXIS 52452 at *24.

of civil suits. It is true courts have periodically borrowed the language of personal jurisdiction in discussing the due process constraints on extraterritoriality. But [the defendant's] flawed analogies do not establish actual standards for judicial inquiry; the law of personal jurisdiction is simply inapposite." *Ali*, 718 F.3d at 943.[10] Indeed, the considerations are quite different when the Executive Branch is prosecuting a crime pursuant to Congressional authority, as compared to when a private plaintiff is entering the United States courts and haling a foreign defendant into court.

Second, Darin's effort to rely on principles of customary international law is similarly misplaced. As a threshold matter, Darin points to no law – in the Second Circuit or elsewhere – that would justify the dismissal of a criminal case on purely international law grounds. Courts have in fact recognized the opposite proposition: that international law creates no rights for criminal defendants. *See Davis*, 905 F.2d at 248 ("International law principles, standing on their own, do not create substantive rights or affirmative defenses for litigants in United States courts."); *see also United States v. Yousef*, 327 F.3d 56, 91 [2d Cir. 2003) ("United States law is not subordinate to customary international law or necessarily subordinate to treaty-based international law and, in fact, may conflict with both."); *United States v. Best*, 304 F.3d 308, 314 (3d Cir. 2002) (a defendant "cannot rely upon a mere violation of international law as a defense to the court's jurisdiction.") (quoting *United States v. Postal*, 589 F.2d 862, 884 (5th Cir. 1979)).

As Darin concedes, the Second Circuit has not considered international law in analyzing purportedly extraterritorial prosecutions under the Fifth Amendment. But even assuming Darin could make a colorable claim to dismiss the Complaint solely under international law, that claim

---

[10]     Contrary to Darin's assertions (Obj. at 11-12), the fact that *Ali* was a piracy case does not change whether or not civil personal jurisdiction standards apply to criminal cases.

would fail based on the provisions of the Restatement (Third) of Foreign Relations Law ("Restatement"). First, the Complaint plainly alleges that conduct took place within the territory of the United States. *Compare* Restatement § 403(2)(a) *with* Compl. ¶ 2. Second, the Complaint plainly alleges a direct effect in the United States: United States counterparties losing money in transactions with UBS. *Compare* Restatement § 403(2)(a) with Compl. ¶ 3. And even the Ninth Circuit, the court that has looked to principles of customary international law in assessing the adequacy of a nexus to the United States, has recognized that "[u]nder the territorial jurisdiction theory, jurisdiction is appropriate if the acts performed outside the United States produce detrimental effects within the United States." *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002). To whatever extent international law is relevant to this analysis, it supports the Government's position – not Darin's. Judge Lynch of this Court adopted the same approach in *Manuel. See* 371 F. Supp. 2d at 409 n.4. ("While international law standards of national jurisdiction are not binding on the Congress, it should be noted that extraterritorial application of United States law to Manuel is entirely in keeping with international law, since international law permits a country to exercise jurisdiction over acts committed outside it that have harmful effects within it.").[11]

---

[11]     Similarly, Darin derives no support from his effort to promote the cause of comity between nations, an argument to which he gives short shrift in his objections. (Obj. at 13.) Darin cannot point to a decision by any federal court dismissing a criminal case based on international comity. Moreover, his passing misplaced reliance on that concept only serves to demonstrate Darin's failure to appreciate fundamental distinctions between civil and criminal process. The United States Department of Justice and United States regulators have worked closely with foreign regulators and law enforcement in the LIBOR investigation in an exercise of international comity, not in contravention of international comity. International comity will not be disrupted by Darin's prosecution here.

### b. Discussion

At the outset, it bears repeating that in this case, Darin is charged with committing a territorial offense: a conspiracy to commit wire fraud in this District and elsewhere, where wire transmissions into the United States were used in furtherance of the scheme to defraud. Although Darin was located abroad during the scheme, it is well-established that the geographic location of a wire fraud is determined, at least in part, by the path of wire signals transmitted in furtherance of the scheme. *See, e.g., United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997). Moreover, a conspiracy to commit wire fraud occurs in any location in which "an overt act in furtherance of the conspiracy was committed by any of the coconspirators." *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987). "This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (applying these principles in affirming a conviction for wire fraud and securities fraud). *See also United States v. Perez-Herrera*, 610 F.2d 289, 291 (5th Cir. 1980) ("We have repeatedly held it is not a defense to a conspiracy charge that the defendant never entered the country, at least so long as an overt act in furtherance of the conspiracy occurred within the United States.").

Based on these well-established principles, Darin's alleged offense occurred, among other locations, here in the United States. The requirement of establishing a sufficient nexus for purposes of due process has never been recognized or applied in such circumstances; rather, in the jurisdictions that have adopted such a requirement, it has only been applied to offenses that are purely extraterritorial, such as those charged in *Yousef* and *Al Kassar*. To the Government's knowledge, no court has ever suggested that such a finding would have to be made in a case where a defendant engaged in conspiracy to defraud victims in the United States and elsewhere

14

and where that scheme was foreseeably furthered by wire transmissions into this country. The alleged commission of such a territorial offense either makes the nexus requirement entirely inapplicable or, in itself, satisfies that requirement – at least for purposes of determining the adequacy of a criminal complaint.[12]

Even assuming *arguendo* that Darin's alleged offense were extraterritorial, it would not be arbitrary or fundamentally unfair to prosecute him in the United States because "the allegations in the complaint are more than sufficient to support findings that: (1) Darin's conduct "could be expected to or did produce an effect in the United States," *Yousef*, 2010 U.S. Dist. LEXIS 86281 at *9; and (2) Darin was aware that his conduct would have such an effect. *Umeh*, 527 Fed. Appx. 57 at 63. Indeed, even if the Court's inquiry were to focus entirely, and incorrectly, on Darin's intent, the allegations in the Complaint would meet the requirement of due process, because the scheme in which he participated was aimed at promoting the financial interests of the conspirators, and of UBS, at the expense of UBS's trading partners in the international market for interest-rate derivatives tied to Yen LIBOR. Some of those parties – as the Complaint makes clear, and as Darin necessarily understood – were based in the United States and, specifically, in the Southern District of New York.

The Complaint alleges that "[m]any financial institutions, mortgage lenders, and credit card agencies set their own rates relative to LIBOR and that "[m]ortgages, credit cards, student loans, and other consumer lending products often use LIBOR as a reference rate." (Compl. ¶7). As a sophisticated player in the financial markets who traded in Yen LIBOR products, Darin was

---

[12]     In effect, Darin is arguing that it is a violation of due process to prosecute him in a district where this case is properly venued under 18 U.S.C. § 3237. That is an untenable claim. *See United States v. Kim*, 246 F.3d 186, 191-92 (2d Cir. 2001) (holding that wire fraud is a continuing offense under 18 U.S.C. § 3237 and that venue for such an offense is "proper in any district in which the offense began, continued, or concluded.").

aware of the significant role of Yen LIBOR in global financial transactions, including in the
United States, and could reasonably expect that its manipulation would have direct and
significant effects in the United States extending well beyond any losses to UBS's trading
partners.[13] A jury, moreover, could permissibly and readily conclude that Darin fully intended to
bring about the natural and probable consequences of his efforts to manipulate Yen LIBOR in
order to favor UBS's trading positions over those of its counterparties, including market
participants in the United States. *See, e.g., United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir.
1997) (recognizing that "one is presumed to intend the natural and 'probable' consequences of
one's acts").

    The Complaint also alleges that Defendants Darin and Hayes caused the publication of
manipulated information (i.e., LIBOR rates) in New York, New York. (*Id.* ¶2(c)). Darin argues
that this conduct was not "aimed" at the United States. (Obj. at 6.) But the reality is that Darin
entered into a conspiracy with sweeping geographic aims: to manipulate a leading global
benchmark interest rate to make money for UBS and for the conspirators personally, at the

---

[13]    A civil suit alleging precisely such consequences is currently pending in this District. *See Laydon v. Mizuho Bank, Ltd. et al.*, Case No. 12-cv-3419 (GBD). Darin argues that the delisting of "certain Yen LIBOR futures" at the Chicago Mercantile Exchange ("CME") is evidence that Yen LIBOR products were not traded with particular frequency in the United States (Obj. at 15 n.7) and that the Magistrate Judge was wrong in finding that "[a]s a trader in short-term interest rates (like the Yen LIBOR), [Darin] was aware that such trades would likely have counterparties in the United States and particularly in a center of international finance like New York." (Op. at 26.) This is a red herring: futures are not the only products tied to the 3-month Yen LIBOR rate, as the Complaint makes clear. (*See* Compl. ¶¶ 17-18, discussing Yen LIBOR's use in forward rate agreements and interest rate swaps.) And most of the trading done by UBS was done "over-the-counter" – that is, bilaterally between two parties without the supervision of an exchange like the CME. Yen LIBOR is the second most-used reference rate in the world for interest rate swaps and floating rate notes (a form of debt instrument). *See* The Wheatley Review of LIBOR, https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/191763/condoc_wheatley_review.pdf, at 79.

expense of counterparties based in the United States and elsewhere. Darin is correct that LIBOR rate information is published in "scores … of countries" (*id.*), but that is the risk Darin took by entering into a conspiracy with global scale: the risk of being held to account for his illegal actions where his LIBOR manipulation efforts had effects, and particularly in an international financial center like New York.[14]

The Complaint further alleges that Defendant Hayes entered into trades with counterparties in New York, and that electronic communications with such counterparties – transmitted into the United States – furthered the scheme in which Hayes and Darin participated. (*Id.* ¶¶ 2(a), 3, 22). This conduct was entirely foreseeable to Darin, especially in light of his regular interactions with Hayes, the prominent place that Hayes occupied among Yen-derivatives traders both within UBS and globally, and Darin's own direct experience as such a trader.[15] (*Id.* ¶¶ 2, 19-33). As the Complaint makes clear, Hayes and Darin, along with others, participated in a conspiracy directed against market participants in the United States and elsewhere, and their scheme had a global impact. (*Id.* ¶¶ 19-21). As a participant in that conspiracy, Darin is

---

[14]   *Cf. Royer*, 549 F.3d at 895 (holding in the context of a venue challenge that "the defendants, having concocted a scheme that relied so heavily on the actions of the [web] site subscribers for its success and that defrauded investors throughout the country, can hardly complain that their very *modus operandi* subjected them to prosecution in numerous districts, including the Eastern District of New York."); *United States v. Levis*, 488 Fed. Appx. 481, 485 (2d Cir. 2012) (citing *Royer*, 549 F.3d at 895) ("When the case involves publication on the internet, venue is proper in any district where it is reasonably foreseeable that the material will be accessed.").

[15]   The Complaint does not, and need not, contain specific allegations regarding Darin's trading activity. The available evidence, however, indicates that during the time of the conspiracy, Darin entered into LIBOR-based trades with United States counterparties with a notional value of some ¥967 trillion ($8.7 billion). This evidence, which the Government can provide to the Court and is prepared to introduce, is consistent with the allegation in the Complaint stating that, overall, the fraudulent scheme in which Hayes and Darin participated was intended to defraud UBS's counterparties "and also globally impacted transactions and financial products tied to Yen LIBOR." (Compl. ¶ 20).

accountable for the actions of his co-conspirators, and those actions play a factually significant and legally proper role in forming part of the nexus between Darin and the United States. The Magistrate Judge properly found that the "allegations as to Hayes' conduct in the charged conspiracy may be evaluated in determining whether there is a 'sufficient nexus' between Mr. Darin and the United States," (Op. at 31), and governing law supports this position. *See, e.g., Manuel*, 371 F. Supp. 2d at 409-10 (Lynch, J.) (concluding that in keeping with basic principles of conspiracy law, the defendant was guilty of joining the conspiracy and was "brought under American jurisdiction" by the acts of his conspirators, regardless of whether the defendant was aware of the facts that established such jurisdiction); *Mostafa*, 965 F. Supp. 2d at 459 (finding sufficient nexus where counts in an indictment alleged that defendant's co-conspirators engaged in conduct that occurred in the United States). This principle sensibly and necessarily follows from the overall purpose of the nexus requirement. If an individual participates in collective venture in which co-conspirators take actions that occur, or have an impact, within the United States, that conduct links the individual to this country and defeats any claim that his prosecution here is arbitrary or fundamentally unfair.[16]

---

[16]    Relying on a statement from *Perlaza*, Darin contends that the Court should not take Hayes's conduct into account in assessing Darin's nexus to the United States. (Obj. at 16-19.) *Perlaza*, however, provides no support for that position and is not contrary to the controlling precedent from this jurisdiction cited above.

   *Perlaza* involved two groups of defendants who were traveling on boats off the coast of South America. One group was aboard a stateless speedboat referred to in the opinion as the "Go-Fast"; the other was aboard a Colombian-flagged fishing boat named the Gran Tauro. *Perlaza*, 439 F.3d at 1153-57. Consistent with Ninth Circuit precedent, the district court concluded that for the Go-Fast defendants, because their boat was stateless, no nexus finding was required in order to assert jurisdiction. 439 F.3d at 1161. It then determined that because the Gran Tauro defendants had aided and abetted the Go-Fast defendants, there was no need for the Government to demonstrate any nexus between the Gran Tauro and the United States. *Id.* at 1168. As the first basis for overturning the defendants' conviction, the Ninth Circuit held that the district court committed reversible

2.   **The Magistrate Judge Was Correct in Holding that Darin Received Ample Notice for the Purposes of the Due Process Clause That His Alleged Conduct Was Criminal.**

Darin next contends that he did not receive sufficient notice that his conduct was criminal for purposes of the Due Process Clause. (Obj. at 19-21.) Under the Due Process Clause, "[f]air warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Al Kassar II*, 660 F.3d at 119. The Magistrate Judge correctly concluded that this "standard is easily met here." (Op. at 31.)

Darin's argument that Yen LIBOR submissions were "opinions in response to a hypothetical fact" (Obj. at 19) ignores the most basic facts of the fraud alleged in the Complaint: Defendants Darin and Hayes were secretly manipulating – to UBS's advantage and to its counterparties' detriment – an integral component of the trades UBS was entering into with those counterparties. Thus Darin is arguing that he was deprived of fair notice that he could be prosecuted for participating in a scheme to manipulate LIBOR, by making false and misleading

---

error by making the finding that the Go-Fast was a stateless vessel; that question, the Circuit held, should have been submitted to the jury. *Id.* On that basis alone, the district court's conclusion that no nexus had to be demonstrated with respect to the Gran Tauro defendants could not survive review. *Id.* Continuing, however, and setting forth an alternative basis for its ruling, the Circuit explained: "Relying on the theory of aiding and abetting does not vitiate the need to consider the underlying bases for jurisdiction." *Id.* Thus, in the Ninth Circuit's view – absent an exception making the nexus requirement inapplicable – that requirement would have to be met for each individual defendant, and the inquiry could not be obviated based on an aiding-and-abetting theory. *Id.* at 1168-69. That rationale, however, does not suggest in any way that in determining whether the requisite nexus exists – rather than dispensing with the inquiry entirely, as the district court did in *Perlaza* – the actions of a defendant's co-conspirators (or aiders and abettors) should not be taken into account or properly attributed to the defendant. *Perlaza* simply does not address that question. For that reason, even if the decision were authoritative here (and it is not), *Perlaza* does not contradict decisions from this jurisdiction finding that a sufficient nexus has been established based on the conduct of a defendant's co-conspirators.

19

LIBOR submissions, in order to gain a secret advantage over UBS's trading partners. This argument is contrary to the allegations in the Complaint, which demonstrate that Darin understood the implications of his actions.

The crime of fraud is neither new nor complicated. As courts have observed, fraud can be difficult to define with precision, and in abstract terms, because the offense has been committed in so many different ways; nonetheless, the essential nature of a fraudulent scheme is not difficult to identify. Fraud is "measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987). *See also McNally v. United States*, 483 U.S. 350, 358 (1987) ("the words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.") (internal citations omitted). Indeed, as courts have observed for many years: "[T]he law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." *United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) (quoting *Weiss v. United States*, 122 F.2d 675, 681 (5th Cir. 1941)). *Cf. United States v. Martin*, 411 F. Supp. 2d 370, 372-73 ("[T]he meaning of scheme to defraud is measured by a nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life of members of society … [B]reaking the rules of the horserace by doping a horse, like smuggling, violates fundamental notions of honesty, fair play and right dealing and is therefore an act within the meaning of a 'scheme to defraud.'" (internal quotations and citations omitted)).

Understandably, Darin does not seem to suggest that it would violate due process, based on a lack of fair notice, to prosecute an individual for committing fraud. He instead argues that

20

he would not have known that one could be prosecuted for fraud by secretly manipulating a benchmark rate to gain an advantage over parties to transactions in which that rate determines profit and loss. In support of that view, Darin contends that (1) LIBOR manipulation had not specifically been criminalized at the time of this conduct; and (2) because a LIBOR submission is subjective, it cannot be false. These arguments are without merit.

Whether UBS's Yen LIBOR submissions were "opinions" as Darin argues or facts, Darin – as a sophisticated employee of one of the world's largest banks – had ample notice that intentionally attempting to manipulate a global benchmark interest rate like LIBOR – with an "opinion" or with a simple lie – was the type of crime that would "subject [him] to prosecution somewhere." *Al Kassar II*, 660 F.3d at 119. Financial fraud in a global market is plainly criminal conduct, as this Court has recognized by accepting the guilty pleas of Paul Robson, Takayuki Yagami, and Lee Stewart for manipulating Yen LIBOR. *See United States v. Robson et al.*, Case No. 1:14-cr-00272-JSR (S.D.N.Y.) (Doc. Nos. 16, 21, 43). Darin surely cannot suggest that he had "suddenly learned" that financial fraud "was illegal in the United States or anywhere else." *United States v. Al Kassar*, 582 F. Supp. 2d 488, 495 (S.D.N.Y. 2008) ("*Al Kassar I*") (internal quotation and citation omitted). Notably, the cases cited by Darin in his "notice" argument involve charges involving honest services fraud – not traditional financial fraud.

Darin further argues that the European Commission implicitly recognized that LIBOR manipulation was not criminalized during the relevant time period, because it had subsequently proposed a measure specifically barring this practice. (Obj. at 20.) However, simply because a specific statute has been passed to proscribe a distinct form of fraudulent conduct does not mean that an original, broader statute did not apply to the proscribed conduct. *See, e.g., United States v. Reed*, 639 F.2d 896, 905 (2d Cir. 1981) ("[T]he mail fraud statute remains an important tool

21

for prosecuting frauds even in those areas where legislation has been passed more directly addressing specific fraudulent conduct."). [17]

And while Darin argues that LIBOR submissions are "statements of opinion" and therefore such submissions cannot be false (Obj. at 15), Darin's own statements as reflected in the Complaint reflect otherwise – and the Magistrate Judge recognized this fact. The Complaint alleges that Darin cautioned Hayes that he could not make a LIBOR submission too far from the "truth" without suffering negative consequences. (Compl. ¶ 21(d)(ii)). The Complaint also alleges Darin was able to identify LIBOR submissions that were "unbiased" and "correct." (*Id.* ¶¶ 21(d)(ii), 21(f)). The Complaint alleges Darin knew what LIBOR submission would be "correct" and "unbiased" – but submitted something different than the truth, to the advantage of UBS's trading positions. In order to advance this fair notice claim, Darin is therefore left to argue that although he knowingly and intentionally participated in a scheme to manipulate LIBOR for financial gain – through submissions that, by Darin's own account were false and biased – he could not have reasonable understood that he would be prosecuted for that conduct. The Magistrate Judge correctly rejected that contention. (Op. at 32-33.)

---

[17]     Notably, Defendant Hayes has been charged by the United Kingdom's Serious Fraud Office ("SFO") with LIBOR manipulation-related crimes, and his trial commenced this month. On October 7, 2014, a former senior banker at a British bank pled guilty to LIBOR manipulation in a British court. *See* http://dealbook.nytimes.com/ 2014/10/07/a-former-banker-pleads-guilty-in-british-libor-case/. And on October 28, 2014, the SFO charged a former broker with LIBOR manipulation. *See* http://www.reuters.com /article/2014/ 10/28/libor-tullett-prebon-cryanidUSL5N0SN4V520141028. Regardless of what the European Commission thought of LIBOR manipulation, the U.K. criminal authorities recognize it as a crime. And while Darin argues that it is "telling" that Switzerland and Japan have declined to prosecute Darin (Obj. at 20 n.8), this Court is only assessing the charges against Darin in the United States – not the decisions of foreign prosecutors whether or not to charge Darin.

Moreover, while the Complaint alleges that Darin was aware he could expose UBS to potential regulatory penalties for making manipulative LIBOR submissions (Comp. at ¶ 21(d)(ii)), that allegation certainly does not foreclose the possibility that Darin was aware of potential criminal penalties. The Magistrate Judge correctly recognized that "[t]here are any number of reasons why Mr. Darin would refrain from calling attention to possible criminal liability in a conversation with his alleged co-conspirator." (Op. at 32 n.6.) Darin concedes as proper the inference "that there was something unfair or unethical about agreeing to Mr. Hayes's requests," but argues that "not every instance of financial unfairness constitutes fraudulent activity." (Obj at 21, quoting *Chairella v. United States*, 445 U.S. 22, 232 (1980).) But what is clearly fraudulent activity is *lying to make money* – and that is what the Complaint plainly alleges. The Court should affirm the Magistrate Judge's ruling regarding notice.

**B.  The Magistrate Judge Correctly Ruled that The Charge Against Darin Represents a Domestic Application of the Wire Fraud Statute.**

Darin next argues that the charged conspiracy statute (18 U.S.C. § 1349) and wire fraud statute (18 U.S.C. § 1343) lack extraterritorial application, and that the Complaint "constitutes an impermissible extraterritorial exercise" of these statutes. (Obj. at 23.)[18] The Magistrate Judge erred in finding that the wire fraud statute does not apply extraterritorially, but reached the proper ultimate result in finding that the wire fraud statute "is not being applied extraterritorially here." (Op. at 21.).

---

[18]    In considering the extraterritorial application of the conspiracy statute, the Court should look to the underlying substantive offense: wire fraud. *See Kim*, 246 F.3d at 191 n.2 ("Because there was jurisdiction over the wire fraud counts against [defendant], there was also jurisdiction over the conspiracy counts.") (quoting *United States v. Blackmon*, 839 F.2d 900, 910-11 (2d Cir. 1988)); *United States v. Ahmed*, 10 Cr. 131 (PKC), 2012 U.S. Dist. LEXIS 39451, *4-5 (S.D.N.Y. Mar. 21, 2012).

23

Because the United States has alleged as part of the conspiracy wires into the Southern District, this case represents a *domestic* application of the wire fraud statute. *See Kim*, 246 F.3d at 190-91 (application of wire fraud statute to scheme that was perpetrated from abroad was appropriate because "our goal is simply to vindicate the intended purpose of the statute, that is, to prevent the use of [our telecommunication systems] in furtherance of fraudulent enterprises"); *see also Trapilo*, 130 F.3d at 552 (2d Cir. 1997) ("what is proscribed [under the wire fraud statute] is use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property. Nothing more is required. The identity and location of the victim, and the success of the scheme, are irrelevant"); *United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982) (holding district court had jurisdiction over wire fraud charges related to international shipping scam against non-resident alien).

While Darin is correct that there is a presumption against extraterritoriality, the Second Circuit has already examined the wire fraud statute under similar factual circumstances and concluded that the prosecution was proper. *See Kim*, 246 F.3d 186. In *Kim*, the defendant claimed on appeal that the district court lacked jurisdiction over his fraudulent conduct because "none of his conduct, or that of his co-conspirators, occurred in the United States." *Id.* at 188. The Second Circuit acknowledged the general presumption against extraterritoriality but then looked carefully at Congressional intent in enacting the statute. *Id.* at 189. The Second Circuit found that the wire fraud statute applied to Kim's conduct, holding that "our goal is simply to vindicate the intended purpose of the statute, that is, to prevent the use of [our telecommunication systems] in furtherance of fraudulent enterprises. Such a goal is best met by the conclusion that the district court had jurisdiction over this case." *Id.* at 190-91. *See also Pasquantino v. United States,* 544 U.S. 349, 371-72 (2005) (observing in dicta that even if

24

defendants' conduct in violation of the wire fraud statute could be deemed to have occurred outside the United States, the statute's prohibition of frauds executed "in interstate or foreign commerce" indicates that "this is surely not a statute in which Congress had only domestic concerns in mind") (internal quotation marks omitted)).

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), and *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014) do not change the analysis. *Morrison* cautions that "[t]he general reference to foreign commerce in the definition of 'interstate commerce' does not defeat the presumption against extraterritoriality." 561 U.S. at 263. But as the Second Circuit has recognized, if Congress does not provide a "clear statement" on extraterritoriality, the Court must then proceed to analyze the "focus of Congressional concern." *Loginovskaya v. Batratchenko*, 764 F.3d 266, *10 (2d Cir. 2014). Although the *Kim* decision preceded *Morrison*, that is exactly what the Second Circuit did in *Kim* by looking at the Congressional concern with closing the loophole that had previously existed in the wire fraud statute. *Kim*, 246 F.3d at 189.

As for the *RJR Nabisco* case, the Magistrate Judge recognized that the Second Circuit there made only a cursory review of the wire fraud statute's extraterritorial application and did not consider the Second Circuit's opinion in *Kim*. *RJR Nabisco*, 764 F.3d at 141. But this cursory review is not surprising considering the Second Circuit's ultimate conclusion in *RJR Nabisco*:

> We need not now decide precisely how to draw the line between domestic and extraterritorial applications of the wire fraud statute, mail fraud statute, and Travel Act, because wherever that line should be drawn, the conduct alleged here clearly states a domestic cause of action. The complaint alleges that defendants hatched schemes to defraud in the United States, and *that they used the U.S. mails and wires in furtherance of those schemes* and with the intent to do so. … In other words, plaintiffs have alleged conduct in the United States that satisfies every essential element of the mail fraud, wire fraud, and Travel Act claims.

*Id.* at 32 (emphasis added).[19]

Here, the Complaint similarly alleges conduct in the United States that satisfies every essential element of the wire fraud statute: all that is required within the United States is "use of the telecommunication systems of the United States" to facilitate a scheme to defraud. *Trapilo*, 130 F.3d at 552. While the Magistrate Judge erred in finding the wire fraud statute does not have extraterritorial application, that ruling does not affect the final outcome: denial of Darin's motion to dismiss on this ground. And while Darin makes the tortured argument that the Complaint's allegations of a scheme executed abroad and wires touching the United States represent an extraterritorial application of the wire fraud statute (Obj. at 22-23), *Morrison*'s ruling does not disturb firm Second Circuit precedent in *Trapilo*, *Gilboe*, and *Kim*. Moreover, while the *planning* of Hayes and Darin's scheme may have taken place in Japan, Singapore, and Zurich, the Complaint alleges a scheme the *execution* of which involved the publication of false LIBOR rates in the United States and the victimization of trading partners in the United States. Darin attempts to slice his fraudulent scheme far too thinly in his attempt to avoid criminal liability in the United States for his criminal actions.

### C. The Magistrate Judge Erred in Reaching the Merits of Darin's Motion Under the Fugitive Disentitlement Doctrine or a More General Exercise of His Discretion

The Magistrate Judge declined to rule whether Darin was a fugitive for the purposes of the fugitive disentitlement doctrine (Op. at 9-11), but ruled that even if Darin were, the Magistrate Judge "would not apply the disentitlement doctrine in this case." (*Id.* at 11.) Both rulings were error.

---

[19]     As the Magistrate Judge noted (Op. at 20), other circuits that have examined this issue in greater detail have reached the contrary conclusion. *See, e.g.*, *United States v. Georgiou*, 777 F.3d 125, 137-38 (3d Cir. 2015); *United States v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014).

26

The Magistrate Judge correctly recognized that the first step in the analysis in determining whether Darin is in fact a fugitive. Darin again cites to Black's Law Dictionary for the definition of "fugitive" (Obj. at 25) but ignores altogether the second, more applicable definition from that source: "A criminal suspect or a witness in a criminal case who flees, *evades*, or escapes *arrest, prosecution*, imprisonment, service of process, or the giving of testimony ..." Black's Law Dictionary (9th Ed. 2009) (emphasis added). But this Court has recognized that "how the person became a 'fugitive' is not necessarily relevant because the focus is on the *intent to return and appear before the court*." *United States v. Hernandez*, 09 CR 625 (HB), 2010 U.S. Dist. LEXIS 65400, *13-14 (S.D.N.Y. June 30, 2010) (emphasis added). And although the fugitive disentitlement doctrine is based in common law, the Court should take note of Congress's interpretation of this doctrine in the asset forfeiture context.[20] The Court should decline to engage in a game of semantics and instead recognize Darin's motion for what it is: a litigant who presents himself to this Court "willing to enjoy the benefits of a legal victory, but ... not at all prepared to accept the consequences of an adverse holding." *United States v. Stanzione*, 391 F. Supp. 1201, 1202 (S.D.N.Y. 1975).

Second, the Magistrate Judge misapplied at least two of the factors the Second Circuit has instructed district courts to consider in their analysis under the doctrine. The Second Circuit has identified at least four relevant policy considerations undergirding the fugitive disentitlement doctrine: "(1) assuring the enforceability of a decision against a fugitive; (2) imposing a penalty

---

[20]   *See* 28 U.S.C. § 2466(a) (defining fugitive for the purposes of the fugitive disentitlement doctrine in civil forfeiture actions to include a person who "*declines to enter* or reenter the United States to submit to [the court's] jurisdiction" or "otherwise evades the jurisdiction of the court in which a criminal case is pending against the person" and "is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction") (emphasis added).

27

for flouting the judicial process; (3) discouraging flights from justice to promote efficient operation of the courts; and (4) avoiding prejudice to the other side engendered by a defendant's flight." *Hanson v. Phillips*, 442 F.3d 789, 795 (2d Cir. 2006). The Second Circuit has instructed district courts to consider all four grounds in deciding whether to exercise discretion in hearing a fugitive's claims. *United States v. Awadalla*, 357 F.3d 243, 245 (2d Cir. 2004).

Although the United States disagrees with the Magistrate Judge's analysis on all four factors, the latter two merit specific attention.[21] As to discouraging flights from justice, the Magistrate Judge found that there was "no indication in the papers that other defendants or potential defendants in LIBOR-related cases are similarly situated to Mr. Darin … so that they might be inspired by his example." (Op. at 15.) But five defendants in two different LIBOR-related case in this Court are similarly situated to Darin. *See United States v. Read et al.*, Case No. 1:13 Mag. 02224 (UA) (S.D.N.Y.); *United States v. Robson et al.*, Case No. 1:14 Cr. 00272 (JSR) (S.D.N.Y.). All five reside abroad and to date have not made an appearance in United States courts. The Court can be sure that these defendants are watching Darin's case with great interest: if the Court continues to entertain Darin's motion to dismiss on the merits, these defendants will doubtless file similar motions, wasting more of this Court's time – and avoiding drains on the Court's resources is one of the fundamental tenets of the fugitive disentitlement doctrine. *See United States v. Yeh*, No. CR 10-00231 WHA, 2013 U.S. Dist. LEXIS 69284, *8 (N.D. Cal. May 15, 2013) (declining to consider defendant's motion to dismiss the indictment and holding that it "would be a waste of resources to adjudicate advisory opinions at [defendant's] behest"); *United States v. Oliveri*, 190 F. Supp. 2d 933, 935 (S.D. Tex. 2001)

---

[21]     The Government incorporates by reference its arguments related to the other two factors in its original opposition brief. (*See* Doc. No. 18 at 36-38.)

("[T]he fugitive disentitlement doctrine has come to signify the unwillingness of courts to waste time and resources exercising jurisdiction over litigants who will only comply with favorable rulings of the court.").

As to the fourth factor – prejudice – the Magistrate Judge correctly recognized that the fading of witnesses' memories is a "cognizable prejudice to the Government." (Op. at 15-16.) But the Magistrate Judge was wrong when he stated that "the Government itself does not seem particularly keen to move this action forward." (*Id.* at 16.) On the contrary, the Government is eager to prosecute this case in a timely manner. Up to this time, the United States has not sought an indictment because (1) given Darin's assurances that he would continue to evade the reach of U.S. authorities, the Government did not see how an indictment would serve to advance this case; and (2) the Government simply did not anticipate by not seeking an indictment, it would be so misunderstood in the manner reflected in the Magistrate Judge's opinion.[22]

And there is another sense in which the Government has been prejudiced by Darin's motion. Defendants like Darin attempt to use their absence from the courtroom, and their unwillingness to abide by adverse rulings of this Court, for tactical advantage. They take the position that they cannot be prosecuted – regardless of the outcome of pretrial litigation – but that by litigating from the safety of their home countries, they can consume the Government's resources and subject the Government to the risk of negative outcomes. In other words, Defendants like Darin tell the Government that it has nothing to gain and much to lose by going forward with a criminal case; and from their perspective, this absence of mutuality amounts to negotiating leverage that can be used to extract protection from prosecution or an outcome that is

---

[22]   The United States plans to seek an indictment in this case in the near future. The United States suggested to defense counsel a joint motion to stay these proceedings, because an indictment would necessarily moot these proceedings. Defense counsel declined.

to their liking. But the Court should not allow itself to be misused for this purpose, and the

Government should not be required to litigate against parties who have made perfectly clear that

if the Court rules against them, they do not intend to ever appear to face a criminal charge. The

fugitive disentitlement doctrine is based in equity. *See Nen Di Wu v. Holder*, 617 F.3d 97, 101

(2d Cir. 2010); *Pesin v. Rodriguez*, 244 F.3d 1250, 1252 (11th Cir. 2001) ("the doctrine is an

equitable one and rests upon the power of the courts to administer the federal courts system").

The equities in this case dictate in favor of the Court declining to be used by an overseas

defendant in such a manner.

## IV.   CONCLUSION

In support of his motion, Darin describes the Complaint in this case as "facially

unconstitutional" and a case of the Government engaging in "plain overreach." (Obj. at 2-3.)

Darin apparently believes that these dire warnings will serve his tactical interests. That effort

should not succeed, however, because the exaggerated threat that Darin describes is a fiction that

bears no resemblance to the case that has been brought – as the Magistrate Judge properly

recognized in denying his motion to dismiss on all three of the grounds he has advanced.[23]

The Complaint alleges that Roger Darin participated in conspiracy to commit wire fraud,

in the Southern District of New York and elsewhere, by manipulating a benchmark rate used in a

global financial market. That scheme victimized parties in the United States, and it was furthered

by the transmissions of electronic communications into this country. The Complaint further

alleges that Darin was an experienced derivatives trader who made and oversaw UBS's Yen

---

[23]   The United States preserves its argument that as a foreign citizen residing abroad who is
not in custody and has not appeared in this Court, Darin currently cannot assert claims
under the Fifth Amendment. (Doc. No. 18 at 8-10.) But the Court need not reach this
issue because his Fifth Amendment claims are without merit.

LIBOR submissions, and who did so in order to promote the unlawful and sweeping objectives of the fraudulent scheme in which he participated. Thus, this case does not present, and says nothing about, a circumstance in which someone has merely affected some piece of financial information that is available on the Internet. If the Government ever brings such a case, the Court may be called upon to address the concerns that Darin has invented. It has no cause to do so here.

For all the reasons discussed above, the Court should reject Darin's claims under the Due Process Clause and adopt the Magistrate Judge's ruling and reasoning. Moreover, the wire fraud statute applies to Darin's conduct, which is alleged as a territorial offense. Finally, the Court should not devote its resources to resolving claims asserted by a defendant who will not submit to its authority. If it does so, however, the Government respectfully submits that Darin's motion should be denied.

DATED:     May 29, 2015         ANDREW WEISSMANN
Chief, Fraud Section


THOMAS B.W. HALL
Trial Attorney


31

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        v.

TOM ALEXANDER WILLIAM HAYES,
and
ROGER DARIN,

      *Defendants.*

Case No. 12 MJ 3229

## CERTIFICATE OF SERVICE

    I certify that on this 29th day of May, 2015, I caused to be sent, via First Class U.S. Mail, a copy of the foregoing **OPPOSITION TO DEFENDANT ROGER DARIN'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE CRIMINAL COMPLAINT** to the following:

Bruce A. Baird
James M. Garland
Alexander A. Berengaut
Covington & Burling, L.L.P.
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956

THOMAS B.W. HALL
Trial Attorney