# ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.

TOM ALEXANDER WILLIAM HAYES, and
ROGER DARIN,

*Defendants.*

Case No.  12-MJ-3229

---

---

**REPLY BRIEF IN SUPPORT OF DEFENDANT ROGER DARIN'S OBJECTIONS
TO THE MAGISTRATE JUDGE'S ORDER DENYING DEFENDANT'S MOTION TO
DISMISS THE CRIMINAL COMPLAINT**

---

Bruce A. Baird
James M. Garland
Alexander A. Berengaut

**COVINGTON & BURLING LLP**

*Attorneys for Defendant Roger Darin*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

I.   The Government Fails to Rebut Mr. Darin's Showing That He Lacks a "Sufficient Nexus" to the United States For Purposes of the Fifth Amendment. ................................. 2

    A.   The "Sufficient Nexus" Test Requires Aiming. ...................................................... 2

    B.   The Complaint Does Not Allege a Sufficient Nexus Between Mr. Darin and the United States. ............................................................................................ 7

II.  Mr. Darin Did Not Receive Fair Notice That His Conduct Was Criminal....................... 11

III. Mr. Darin Is Not a Fugitive and the Fugitive Disentitlement Doctrine Does Not Apply to Him. ......................................................................................................... 12

CONCLUSION.................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 West 57th Street Realty Co. v. Citigroup, Inc.*,
   13-CV-981 (PGG), 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) .......................................4, 9

*Calder v. Jones*,
   465 U.S. 783 (1984).................................................................................................................9

*Collazos v. United States*,
   368 F.3d 190 (2d Cir. 2004)...................................................................................................14

*Empire Blue Cross & Blue Shield v. Finkelstein*,
   111 F.3d 278 (2d Cir. 1997)...................................................................................................12

*Goldberg v. UBS AG*,
   690 F. Supp. 2d 92 (E.D.N.Y. 2010) ..................................................................................5, 7

*In re Grand Jury Subpoenas*,
   179 F. Supp. 2d 270 (S.D.N.Y. 2001)...................................................................................13

*In re Hijazi*,
   589 F.3d 401 (7th Cir. 2009) .......................................................................................2, 3, 14

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945).................................................................................................................4

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950)...............................................................................................................12

*Laydon v. Mizuho Bank, Ltd.*,
   12-CV-3419 (GBD), 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015)................................4, 6, 9

*Leasco Data Processing Equip. Corp. v. Maxwell*,
   468 F.2d 1326 (2d Cir. 1972)........................................................................................ passim

*McIntyre Mach. Ltd. v. Nicastro*,
   131 S. Ct. 2780 (2011)........................................................................................................3, 8

*Morrison v. Nat'l Australia Bank, Ltd.*,
   561 U.S. 247 (2010)............................................................................................................3, 8

*Skilling v. United States*,
   561 U.S. 358 (2010)...............................................................................................................12

*United States v. Al Kassar,*
    660 F.3d 108 (2d Cir. 2011)................................................................2, 11

*United States v. Ali,*
    718 F.3d 929 (D.C. Cir. 2013).............................................................5, 6

*United States v. Bodmer,*
    342 F. Supp. 2d 176 (S.D.N.Y. 2004)......................................................2

*United States v. Covington,*
    395 U.S. 57 (1969)..................................................................................2

*United States v. Davis,*
    905 F.2d 245 (9th Cir. 1990) ...................................................................6

*United States v. Goldblatt,*
    813 F.2d 619 (3d Cir. 1987)...................................................................12

*United States v. Hernandez,*
    No. 09-CR-625 (HB), 2010 WL 2652495 (S.D.N.Y. June 30, 2010) ....................13

*United States v. Juda,*
    797 F. Supp. 774 (N.D. Cal. 1992) ..........................................................4

*United States v. Klimavicious-Viloria,*
    144 F.3d 1249 (9th Cir. 1998) .....................................................4, 5, 10

*United States v. Manuel,*
    371 F. Supp. 2d 404 (S.D.N.Y. 2005)......................................................10

*United States v. Mostafa,*
    965 F. Supp. 2d 451 (S.D.N.Y. 2013)......................................................11

*United States v. Perlaza,*
    439 F.3d 1149 (9th Cir. 2006) ...............................................................10

*United States v. Schreiber,*
    535 F. Supp. 1359 (S.D.N.Y. 1982).......................................................13

*United States v. Sidorenko,* 14-CR-341 (CRB), 2015 WL 1814356 (N.D. Cal.
    Apr. 21, 2015) .......................................................................................3

*United States v. Yousef,*
    No. 08-CR-1213 (JFK), 2010 WL 3377499 (S.D.N.Y. Aug. 23 2010)....................5

*Walden v. Fiore,*
    134 S. Ct. 1115 (2014)............................................................................9

iii

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)........................................................................................................3, 5, 9

**Statutes**

28 U.S.C. § 2466(a) ....................................................................................................................14

## INTRODUCTION

The Government has not responded to Mr. Darin's showing that the Complaint against him should be dismissed.[1]   Instead of answering Mr. Darin's contentions—which the Government appears unable to do—the Government mischaracterizes many of Mr. Darin's arguments, completely ignores others, and attacks a veritable army of straw men.

That the Government would file such a non-responsive brief is perhaps explained by its assertion, buried in a footnote, that after *29 months of inactivity*, the Government "plans to seek an indictment in this case in the near future," which the Government maintains "would necessarily moot these proceedings." RB at 29 n.22. This revelation—which is plainly animated by the Government's concern about its litigation risk on the present record—is presumably intended to encourage the Court to defer its decision on Mr. Darin's motion.

The Court should not be deterred from ruling by this tactical maneuver. Roger Darin's life has been on hold since December 2012, when the Complaint against him was filed and he was effectively confined to his home country of Switzerland. He cannot find work, travel, or afford to start a family. Dkt. 20. And now, after *nine months* of extensive briefing and an initial decision by the Magistrate Judge, Mr. Darin deserves to know whether he may be haled into court in this country for the wholly extraterritorial conduct alleged in the Complaint.

The Government may seek an indictment. Or it may ultimately pursue a different course. In the meantime, an enforceable arrest warrant has been issued against Roger Darin based on wholly foreign conduct that was not aimed at the United States and had no substantial, direct, and foreseeable effects here. The Due Process Clause of the Fifth Amendment does not permit

---

[1] Mr. Darin's Objections to the Magistrate Judge's Order (Dkt. 30) and the Government's Opposition to those Objections (Dkt. 31) are cited as "OB" and "RB," respectively.   The Magistrate Judge's Memorandum and Order (Dkt. 28) is cited as "Op." The Complaint (Dkt. 1) is cited as "Compl."

this unconstrained extraterritorial application of U.S. law.

I.    **The Government Fails to Rebut Mr. Darin's Showing That He Lacks a "Sufficient Nexus" to the United States For Purposes of the Fifth Amendment.**

    A.    **The "Sufficient Nexus" Test Requires Aiming.**

Mr. Darin's opening brief explained that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary and fundamentally unfair." OB at 6 (quoting *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011)). Such a nexus can be shown through a defendant's subjective intent. *See id.* at 7 (quoting *Al Kassar*, 660 F.3d at 118 ("[A] jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests.")). Or it can be shown through the "substantial, direct, and foreseeable" domestic effects of the defendant's foreign conduct. *Id.* (quoting *In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009)).[2]

The Government does not appear to disagree with this articulation of the "sufficient nexus" test. Instead, the Government spends four pages of its brief attacking a straw man argument that Mr. Darin did *not* make—namely, that a "subjective intent" to harm the United States is the *only* way of establishing a sufficient nexus. RB at 7-10. Contrary to the Government's mischaracterization, we *agree* that effects (and not just intent) are relevant to the "sufficient nexus" analysis. *Compare* OB at 7 *with* RB at 8. The real question is: *what kind of effects are enough?* Here the Government has nothing to say. It does not dispute that the "sufficient nexus" test requires "substantial, direct, and foreseeable" domestic effects. *See In re*

---

[2]  The Government questions its obligation to allege facts in its Complaint on which the Government would rely in responding to Mr. Darin's motion. RB at 4. But as the Magistrate Judge recognized in reaching the merits of the motion, it has been long established that, where a charge is constitutionally deficient after accepting all pertinent allegations as true, then dismissal is appropriate. *See United States v. Covington*, 395 U.S. 57, 60-61 (1969); *United States v. Bodmer*, 342 F. Supp. 2d 176, 189 (S.D.N.Y. 2004).

*Hijazi*, 589 F.3d at 412. Nor does the Government deny that the terrorism and drug trafficking cases on which it relies offer no guidance on what constitutes a "substantial, direct, and foreseeable" effect. *Compare* OB at 7-8 with RB at 8-10. Nor does the Government offer any other authorities for what constitutes such an effect.

As we have previously shown (OB at 8-10), what *does* shed light on this question is the analogous due process standard in the civil context. Under this established standard, a foreign defendant's conduct must be aimed at the United States to support specific jurisdiction. *See McIntyre Mach. Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011) ("The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."). Contrary to the Government's repeated mischaracterizations, aiming is *not* a subjective standard. "The person sought to be charged must know, *or have good reason to know*, that his conduct will have effects in the state seeking to assert jurisdiction over him." *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1342 (2d Cir. 1972) ("*Leasco*") (emphasis added), *abrogated on other grounds by Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 256-57 (2010). What matters, in other words, is that the domestic effects of the foreign conduct are sufficiently direct and foreseeable that the defendant "should reasonably anticipate being haled into court" in the United States. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

As Judge Friendly explained in *Leasco*, this aiming requirement is not satisfied by an allegation that a defendant made misrepresentations directed at world financial markets as a whole. "Although such worldwide reliance may be, in a sense, foreseeable, it is not sufficiently so to constitute a basis of personal jurisdiction consonant with due process." 468 F.2d at 1342.

3

Consistent with *Leasco*, this Court has as recently as this year decided that it lacked jurisdiction over foreign financial institutions accused of Libor manipulation because they did not aim their alleged conduct at the United States. *See 7 West 57th Street Realty Co. v. Citigroup, Inc.*, 13-CV-981 (PGG), 2015 WL 1514539, at \*8-11 (S.D.N.Y. Mar. 31, 2015); *Laydon v. Mizuho Bank, Ltd.*, 12-CV-3419 (GBD), 2015 WL 1515358, at \*2-6 (S.D.N.Y. Mar. 31, 2015).

The Government does not dispute this straight-forward analysis of the civil caselaw or propose any competing interpretation. Instead, the Government tries to brush aside the relevance of civil due process with the demonstrably false assertion that "there is no case that applies a minimum-contacts analysis in determining whether a criminal prosecution is arbitrary and fundamentally unfair under the Due Process Clause." RB at 10. It is unclear how the Government can make this representation, given that our opening brief cited *multiple* criminal cases that have relied upon civil minimum-contacts principles. *See* OB at 11. In *United States v. Juda*, 797 F. Supp. 774, 779 (N.D. Cal. 1992), for example—a criminal drug case—the court cited *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) and explained that "the basic requirements for a constitutional exercise of jurisdiction are minimal contacts meeting a basic test of fairness." The Government ignores *Juda* and several other similar cases.

The few cases the Government does address serve only to underscore the disingenuousness of its attempt to distinguish the civil standard. The Government asserts that "Darin's only source of support [for the relevance of the civil standard] is a single passing and general observation in a 1998 Ninth Circuit opinion." RB at 10. In that case, *United States v. Klimavicious-Viloria*, the court held that the "*[t]he nexus requirement serves the same purpose as the 'minimum contacts' test in personal jurisdiction.* It ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into

4

court' in this country." 144 F.3d 1249, 1257 (9th Cir. 1998) (quoting *Woodson*, 444 U.S. at 297) (emphasis added).  The Government would have this Court believe that *Klimavicious-Viloria* is an outlier that should not be taken at face value.  But the Government neglects to acknowledge that *Klimavicious-Viloria* has been repeatedly cited by this Court in criminal cases, *see, e.g., United States v. Yousef*, No. 08-CR-1213 (JFK), 2010 WL 3377499, at *3 (S.D.N.Y. Aug. 23 2010), and that its holding on the relevance of the civil standard was central to the analysis of the criminal "sufficient nexus" test in *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 106-107 (E.D.N.Y. 2010), a detailed decision by Judge Trager on which both parties rely.  OB at 2, 7; RB at 8.

The Government is equally dismissive of *United States v. Sidorenko*, yet another criminal case that relies on civil minimum contacts principles.  14-CR-341 (CRB), 2015 WL 1814356 (N.D. Cal. Apr. 21, 2015).  Buried in a footnote, the Government concedes that *Sidorenko* "made a passing reference to the 'minimum contacts principles' in dismissing the indictment in that case."  RB at 11 n.9.  Yet, the Government claims, the "Court nowhere adopted whole cloth the minimum contacts analysis from civil jurisprudence."  *Id.*  This is empty rhetoric.  *Sidorenko* cites *Klimavicious-Viloria* and *Woodson* and discusses in detail why the Government's allegations fail to comport with the "minimum contacts requirement."  *See* 2015 WL 1814356, at *8 ("If everything that had an impact on national security gave the United States the right to drag foreign individuals into court in this country, the minimum contacts requirement would be meaningless.").  Minimum contacts were undeniably central to the court's decision.

Just as the Government has no answer to the criminal cases that rely on civil minimum-contacts principles, it has no explanation for *why* those principles should not be relevant here.  All the Government can muster is a conclusory statement in *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013), that "the law of personal jurisdiction is simply inapposite" to the sufficient

nexus analysis. RB at 12. As already explained (OB 11-12), however, this statement must be read in light of the fact that *Ali* involved piracy—one of very few "universal jurisdiction offenses" that by definition do not require a showing of nexus with a particular state. It was accordingly unnecessary for the court in *Ali* to weigh what constituted a "substantial, direct, and foreseeable" effect on the United States—the key question for which the civil standard is relevant here.[3]

The Government next mischaracterizes Mr. Darin's point about the relevance of international law. The Government claims that "Darin points to no law—in the Second Circuit or elsewhere—that would justify the dismissal of a criminal case on purely international law grounds." RB at 12. But Mr. Darin is not seeking dismissal of the Complaint "on purely international law grounds." As already explained, "international law and comity are not separate arguments for dismissing the Complaint; they are *part of* the Fifth Amendment 'sufficient nexus' analysis." OB at 13. Courts regularly consider international law in applying the "sufficient nexus" test,[4] and international law incorporates the same requirement of aiming—*i.e.,* "substantial, direct, and foreseeable effects"—as the civil caselaw. *See* OB at 10, 13. The

---

[3] In passing, the Government also asserts that federalism considerations (*i.e.*, the allocation of power between States) underlie the minimum contacts test and that these considerations are inapplicable here. RB at 11. But the doctrine of minimum contacts also applies with equal force in federal cases where, as here, the relevant contacts are those between the foreign defendant and the United States as a whole (and not any particular State), and courts cite minimum-contacts precedents from the two contexts interchangeably. *See Laydon*, 2015 WL 1515358, at *3-6 (concluding there is "no basis to conclude that any of the [defendant banks], took actions 'expressly aimed' at the United States" and that none of the defendants "have the requisite minimum contacts with the United States").

[4] The Government quotes *United States v. Davis*, 905 F.2d 245 (9th Cir. 1990), for the proposition that "[i]nternational law principles, standing on their own, do not create substantive rights or affirmative defenses in United States courts." RB at 12 (quoting *Davis*, 905 F.2d at 248). But the court in *Davis* went on to explain that "[i]nternational law principles may be useful as a rough guide of whether a sufficient nexus exists between the defendant and the United States so that application of the statute in question would not violate due process." *Id.* at 249 n.2.

Government has no response to any of this.[5]

Most tellingly, the Government offers no response to the Magistrate Judge's recognition that, to the extent the civil and criminal standards differ, "*greater* due process protection is required in the criminal context than in the civil context." Op. at 27 n.4 (emphasis in original); *see also* OB at 13. Thus, even if the Government were correct—and the conduct for which "a defendant could reasonably expect to be subject to the United States law," *Goldberg*, 690 F. Supp. 2d at 109, were different in the civil and criminal contexts—*then the Government would still need to show that its Complaint comports with civil due process principles. See id.* at 106 ("[T]he mere existence of personal jurisdiction will not always satisfy the nexus requirement."). The Government's failure to address this issue reflects its inability to do so.

In short, civil personal jurisdiction and international law address the same basic question as the criminal "sufficient nexus" test and they arrive at the same answer: the requirement of aiming embodied in *Leasco*. The Government does not like this answer, so it tries repeatedly to change the subject. Yet short of the line set in *Leasco*, there is no limit on the ability of one country to hale into its courts the citizens of another country. "Worldwide reliance" fails under the Fifth Amendment because the alternative is that such conduct could be prosecuted everywhere, a result that foreign defendants could not anticipate and that we would not accept were it proposed by any other country.

### B. The Complaint Does Not Allege a Sufficient Nexus Between Mr. Darin and the United States.

The Government makes two main arguments for why the Complaint alleges a "sufficient

---

[5] To the extent the Government discusses international law, it appears to concede that international law requires that domestic effects be "direct" to support jurisdiction. *See* RB at 13 ("[T]he Complaint plainly alleges a direct effect in the United States: United States counterparties losing money in transactions with UBS."). As discussed *infra* (§ I.B), what matters is not whether the Complaint, as a whole, "alleges a direct effect" in the United States, but rather whether *Mr. Darin's conduct* caused such an effect here.

nexus": (i) that by changing his opinion regarding UBS's Yen Libor submissions to the British Bankers' Association ("BBA"), Mr. Darin participated in "a conspiracy with global scale," and thus should have known that his conduct would affect the United States; and (ii) that Mr. Darin's alleged co-conspirator, Tom Hayes, "entered into trades with counter-parties in New York." RB at 17.[6]

With respect to the first argument, the Government does not dispute that the only allegation in the Complaint that actually pertains to Mr. Darin is the claim that, in response to Mr. Hayes's request, Mr. Darin or his subordinates altered their opinions as to the correct Yen Libor fixing. Compl. ¶ 21. Those opinions were transmitted to Thomson Reuters, the BBA's agent in London, where they were used by Thomson Reuters to calculate the daily Yen Libor fixings. *Id.* ¶¶ 10, 16. The Yen Libor fixings were then published worldwide, including in the United States, where they were used by transaction parties in many countries. *Id.* ¶ 10.

The Government characterizes these allegations as constituting "a conspiracy with global scale" and argues that "Darin was aware of the significant role of Yen LIBOR in global financial transactions, including in the United States." RB at 16-17. But this is *exactly* the "worldwide reliance" theory that Judge Friendly rejected in *Leasco*. 468 F.2d at 1342. In arguing that Mr. Darin was aware that Yen Libor affected the United States, among many other countries, the Government is implicitly conceding that Mr. Darin's "course of conduct" was not "directed at" the United States. *Nicastro*, 131 S. Ct. at 2789. And this, in turn, means that Mr. Darin could

---

[6] The Government also argues that the "sufficient nexus" test is inapposite because the Complaint alleges a "territorial offense"—"a conspiracy to commit wire fraud in this District and elsewhere." RB at 14-15. This argument was properly rejected by the Magistrate Judge, who recognized that it confuses two separate analyses: (i) the Court's jurisdiction over the alleged offense *as a whole* (which Mr. Darin is also contesting under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), *see* OB § II); and (ii) the Court's jurisdiction over the particular defendant. Op. at 24-25.

not "reasonably anticipate being haled into court" in this country. *Woodson*, 444 U.S. at 297.

The Government does not discuss the relationship between its theory and *Leasco*, or, for that matter, the similarities between its allegations and those of the plaintiffs whose claims against foreign defendants for Libor manipulation were recently dismissed for want of personal jurisdiction. *See Citigroup, Inc.*, 2015 WL 1514539, at *11; *Laydon*, 2015 WL 1515358, at *2. The Government's position thus rises or falls based on its attempt (discussed *supra* § I.A) to dismiss entirely the relevance of the civil caselaw. If this Court concludes that civil cases can help inform the "sufficient nexus" test (as it should), then there is no denying that the allegations against Mr. Darin fail under *Leasco* and the logic of the Due Process Clause.

That leaves the Government's allegations against Tom Hayes, Mr. Darin's alleged co-conspirator. The Complaint alleges that Mr. Hayes entered into a transaction with a New York-based counterparty, the profitability of which was tied to Yen Libor. Compl. ¶ 22. The Complaint does *not* allege that Mr. Darin had any knowledge of, or involvement in, this transaction. Yet, the Government argues, "Darin is accountable for the actions of his co-conspirators, and those actions play a factually significant and legally proper role in forming part of the nexus between Darin and the United States." RB at 17-18.

The Government's attempt to impute Mr. Hayes's contacts to Mr. Darin runs afoul of a fundamental principle of due process: when considering whether it is fundamentally fair to hale a foreign defendant into court in the United States, what matters are the "contacts the defendant *himself* creates with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (internal quotation marks omitted) (emphasis in original); *see also Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Each defendant's contacts with the forum state must be assessed individually.").

The Government does not deny (or even address) this basic principle, as it has been

consistently articulated and applied in the civil due process context. *See* OB at 10. If these principles are applied here, in other words, then the Government loses—yet another respect in which the Government's entire case hinges on its flawed effort to banish civil due process principles from the criminal context. Even if civil cases were *not* considered, however, the Government's efforts to impute Mr. Hayes's contacts to Mr. Darin *still* fails under a straightforward application of the one criminal case that analyzes this question in the "sufficient nexus" context: *United States v. Perlaza*, 439 F.3d 1149, 1168 (9th Cir. 2006).

Like the other criminal cases discussed above, *Perlaza* recognized the link between the civil and criminal due process standards. *Id.* (quoting *Klimavicious-Viloria*, 144 F.3d at 1257). It accordingly held that a finding of "sufficient nexus" is a "preliminary determination totally distinct from the crime itself" that "must be considered before" any principles of secondary liability, such as "whether the defendant acted as a principal or an aider and abettor." *Id.* at 1168-69. The Government strains to distinguish *Perlaza* by arguing that it held only that the "sufficient nexus" requirement "would have to be met for each individual defendant," and *not* that "a defendant's co-conspirators (or aiders and abettors) should not be taken into account or properly attributed to the defendant." RB at 18-19 n.16. As explained in our opening brief (OB at 17-18), however, this interpretation of *Perlaza* makes no sense. If allegations against one co-conspirator can be imputed to another co-conspirator for purposes of the "sufficient nexus" test, then what would be the point of the conducting separate nexus analyses for each defendant? The result for each co-defendant would always be the same. The Government says nothing about this problem with its interpretation, and the few cases it cites lend no support to its position.[7]

---

[7] The Government cites two cases in support of its efforts to impute Mr. Hayes's conduct to Mr. Darin. RB at 18. The first is *United States v. Manuel*, 371 F. Supp. 2d 404, 409 (S.D.N.Y. 2005), which, as explained in our opening brief (OB at 18), is about statutory construction (*i.e.,* what Congress intended about the extraterritorial reach of the statute) and does not address the

## II.   Mr. Darin Did Not Receive Fair Notice That His Conduct Was Criminal.

Apart from the "sufficient nexus" requirement, the Fifth Amendment also requires that foreign defendants receive "fair notice" that their conduct could subject them to criminal liability. *See Al Kassar*, 660 F.3d at 119 (fair notice requires that the defendant "reasonably understand that their conduct was criminal and would subject them to prosecution somewhere").

How was Mr. Darin to know that his alleged conduct—altering his opinion in response to the hypothetical Libor survey question—was criminal?  No prior prosecutions could have served to put him on notice.  (Indeed, the Government does not dispute that its theory of liability is unprecedented.)  Nor is it alleged that any laws, regulations, BBA guidance, or UBS trainings should have provided such notice.  (To the contrary, those jurisdictions that have sought to criminalize Yen Libor manipulation have done so after the fact. *See* OB at 20.)  Nor is it alleged that Mr. Darin ever possessed actual knowledge that his conduct could subject him to *criminal* liability—as opposed to a concern about the BBA, a trade group with no law enforcement authority, banning UBS from the Yen Libor panel. *See* OB at 21.

What the Government's argument boils down to is the claim that Mr. Darin should have known his conduct was criminal because he was engaged in "fraud"—an amorphous concept that, in the Government's view, encompasses Mr. Darin's conduct. *See* RB at 20 ("Fraud is 'measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life

---

constitutional "sufficient nexus" standard at all.  The second case is *United States v. Mostafa*, 965 F. Supp. 2d 451, 459 (S.D.N.Y. 2013), in which the court rejected the defendant's "sufficient nexus" argument because the allegations all "concern[ed] or relat[ed] to terrorists (members of al Qaeda) or the al Qaeda organization."  The court recognized that "there was no doubt that the United States considered al Qaeda a security threat, and that al Qaeda had made public its desire to bring harm to U.S. interests and people." *Id.*  In other words, the defendant's affiliation with al Qaeda supported the inference that he aimed his conduct at the United States, irrespective of the conduct of his alleged co-conspirators.

of the community.'" (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987))).

Yet the self-evident fact that not *all* "departure[s] from … moral uprightness" constitute criminal

fraud means that something *more* is required to establish that Mr. Darin received "fair notice."

Otherwise "fraud" would be whatever the Government chooses to charge.[8]  Here there is nothing

beyond the Government's claim that Mr. Darin's conduct was dishonest and thus "plainly

criminal."  RB at 21.  That is not enough under the Fifth Amendment.

## III.    Mr. Darin Is Not a Fugitive and the Fugitive Disentitlement Doctrine Does Not Apply to Him.

Lastly, the Government argues that the Court should decline to hear Mr. Darin's motion

under the "fugitive disentitlement doctrine."[9]  That argument fails because (i) because Mr. Darin

does not qualify as a "fugitive" for purposes of the doctrine; and (ii) even if he were a fugitive,

the Magistrate Judge rightly concluded that it would be inappropriate to apply the doctrine here.

*Mr. Darin is not a fugitive.*  There are two ways in which a person can be a "fugitive" for

purposes of the fugitive disentitlement doctrine.  First, the person can learn of charges against

them and then flee the jurisdiction.  *See Empire Blue Cross & Blue Shield v. Finkelstein*, 111

F.3d 278, 281 (2d Cir. 1997).  Second, a person can qualify as a fugitive by "constructively

fleeing"—*i.e.,* by committing a crime in the country, learning of the charges while they are

---

[8] This is precisely why the example of honest services fraud is so relevant.  *See* OB at 20.  There, as here, the Government invented a creative theory to prosecute as fraud conduct that it considered to be inappropriate.  In *Skilling v. United States*, for example, the Government argued that the defendant "placed his interests in conflict with that of the shareholders, when, for his own financial benefit, he engaged in an undisclosed scheme to artificially inflate the stock's price by deceiving the shareholders and others about the company's true financial condition. That conduct constituted fraud."  Brief of Respondent at 50, *Skilling v. United States*, 561 U.S. 358 (2010) (No. 08-1394).  The Supreme Court disagreed.  *See Skilling v. United States*, 561 U.S. 358, 409-10 (2010) (rejecting the Government's attempt to extend honest-services fraud to Skilling's circumstances).

[9] The Government previously argued that this Court also lacked the power to consider Mr. Darin's motion under *Johnson v. Eisentrager*, 339 U.S. 763 (1950).  *See* OB § III.A.  The Government is no longer pursuing that argument.  *See* RB at 30 n.23.

outside of the country and then failing to return. *See In re Grand Jury Subpoenas*, 179 F. Supp. 2d 270, 286-87 (S.D.N.Y. 2001).

It is undisputed that Mr. Darin is not a fugitive under the first definition. He has been living openly in Switzerland since before he was charged. It is equally clear, moreover, that Mr. Darin does not qualify as a fugitive under the second, "constructive flight," definition because that doctrine only applies to those defendants who were in the jurisdiction at the time of the alleged offense. *See In re Grand Jury Subpoenas*, 179 F. Supp. 2d at 287 (one cannot be a fugitive under the constructive flight doctrine unless "(i) *he was present in the jurisdiction at the time of the alleged crime*, (ii) he learns, while he is outside the jurisdiction, that is he is wanted by the authorities, *and* (iii) he then fails to *return* to the jurisdiction to face the charges." (emphasis added)); *see also United States v. Schreiber*, 535 F. Supp. 1359, 1363 (S.D.N.Y. 1982) ("One, of course, cannot be a fugitive unless he was present in the demanding state at the time the crime was committed."). Mr. Darin was not in the United States at the time of the alleged offense, and he is therefore not a fugitive. *See* Compl. ¶ 16; OB at 4.

The Government completely ignores *In re Grand Jury Subpoenas* and *Schreiber*—both of which were discussed in our opening brief. *See* OB at 26. The authorities the Government does cite, meanwhile, lend no support to its effort to label Mr. Darin a fugitive. The Government quotes *United States v. Hernandez*, No. 09-CR-625 (HB), 2010 WL 2652495, at *5 (S.D.N.Y. June 30, 2010) for the proposition that "how a person became a 'fugitive' is not necessarily relevant because the focus is on the intent to return and appear before the court." RB at 27. But this statement is perfectly consistent with the rule articulated in *In re Grand Jury Subpoenas*. If anything, *Hernandez* cuts against the Government by focusing on the defendant's "intent to

*return*." Mr. Darin cannot "return" to the United States; he was not here to begin with.[10]

***The Magistrate Judge did not abuse his discretion in declining to apply the doctrine.***
The bulk of the Government's discussion of fugitive disentitlement is devoted to the argument that the Magistrate Judge misapplied the discretionary factors that underlie the doctrine. This analysis is relevant *only* if the Court first concludes that Mr. Darin is a fugitive. Since Mr. Darin is *not* a fugitive for the reasons already discussed, the Court need not address this issue.

Yet even if the Court were to reach this question, it can readily dismiss the Government's objections. To begin, the Government does not object to the Magistrate's Judge's analysis of two of the four relevant factors, including the Magistrate Judge's finding that Mr. Darin will suffer in concrete ways if his motion is denied. RB at 27; Op. at 11-14. This finding correctly demonstrates the "mutuality" of Mr. Darin's motion—*i.e.,* that he will benefit from a favorable ruling but also will suffer from an adverse one. *Id.* On this basis alone, courts have reached the merits of the defendant's motion. *See In re Hijazi*, 589 F.3d at 413.

The Government has two basic complaints with the Magistrate Judge's analysis. First, with respect to the second factor ("discouraging flights from justice"), the Government argues that there are several other similarly situated foreign defendants in Libor-related proceeding who have not yet made an appearance in the United States and thus could be inspired by Mr. Darin's example. RB at 28. Yet the Government makes no showing that *any* of these defendants are similarly situated to Darin in the relevant respect identified by the Magistrate Judge: "that is, able

---

[10] The Government also half-heartedly cites the fugitive disentitlement standard in the civil forfeiture statute, 28 U.S.C. § 2466(a). RB at 27 ("And although the fugitive disentitlement doctrine is based in common law, the Court should take note of Congress's interpretation of this doctrine in the asset forfeiture context."). The reason for the Government's hedging is that, as explained in our opening brief (at 27 n.11), "the text of § 2466 makes plain that statutory disentitlement extends beyond common-law fugitives to encompass persons who may never previously have been in the United States." *Collazos v. United States*, 368 F.3d 190, 196-97 (2d Cir. 2004). The Government's brief does not address *Collazos*.

14

to avoid prosecution by residing in home countries that have extradition arrangements with the United States similar to Switzerland." Op. at 15. The Government simply ignores this aspect of the Magistrate Judge's ruling.[11]

Second, the Government argues that contrary to the Magistrate Judge's analysis, it has been prejudiced by Mr. Darin's motion. RB at 29-30. As the Magistrate Judge recognized, however, the relevant factor considers "prejudice to the other side *caused by the defendant's escape.*" Op. at 15 (emphasis added). "[T]his factor seems to assume that the applicant was once in custody and has absconded. That is not the case here." *Id.* Even setting this aside, the Government's only theory of prejudice—the generalized claim that witnesses' memories fade— is belied by its decision to delay its indictment of Mr. Darin. *See* Op. at 16.[12] That litigation risk has now apparently prompted the Government to consider an indictment does not rescue the Government from the consequences of its tactical decisions thus far.

### CONCLUSION

For the reasons set forth above and in our opening brief, the Court should reverse the decision of the Magistrate Judge and dismiss the Complaint against Mr. Darin.

---

[11] The Government selectively quotes the Magistrate Judge's opinion to elide this language. *See* RB at 28 ("As to discouraging flights from justice, the Magistrate Judge found that there was 'no indication in the papers that other defendants or potential defendants in LIBOR-related cases are similarly situated to Mr. Darin … so that they might be inspired by his example.'").

[12] The Government also argues that it is prejudiced when "[d]efendants like Darin attempt to use their absence from the courtroom, and their unwillingness to abide by adverse rulings of this Court, for tactical advantage." RB at 29. This is the same argument about mutuality that the Magistrate Judge properly rejected. Op. at 11-2. As discussed above, despite its rhetoric, the Government does not contest the Magistrate Judge's finding that Mr. Darin *would* suffer from an adverse ruling.

Dated:   June 12, 2015

Respectfully submitted,

**COVINGTON & BURLING LLP**

By: _____

Bruce A. Baird
James M. Garland*
Alexander A. Berengaut*
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel:  (202) 662-6000
Fax:  (202) 662-6291
bbaird@cov.com
jgarland@cov.com
aberengaut@cov.com
*Admitted *pro hac vice*

*Attorneys for Defendant Roger Darin*