ᶜ

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,

    *-against-*

TOM ALEXANDER WILLIAM HAYES *and*
ROGER DARIN,

    *Defendants.*

-------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8-3-15
```

12 mj 3229 (PAC) (JCF)

**ORDER PARTIALLY
ADOPTING MEMORANDUM
& ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendant Roger Darin, a Swiss citizen residing in Switzerland, moves to dismiss a criminal complaint which charges him with conspiracy to manipulate the LIBOR[1] for Yen in violation of 18 U.S.C. § 1343 ("Section 1343"). Darin argues that the complaint violates his Fifth Amendment right to due process because he lacked a sufficient nexus to the United States and received insufficient notice that the alleged conduct was criminal. Darin also argues that Section 1343 cannot be applied extraterritorially to cover his acts which allegedly occurred outside the United States.

The Government responds that Darin is not entitled to Fifth Amendment protection at this time and that, in any event, the Court should decline to rule on the merits of Darin's motion under the fugitive disentitlement doctrine. If the Court were to rule on the merits, the Government contends that the criminal complaint alleges a domestic application of Section 1343 and that the Fifth Amendment nexus and notice requirements are satisfied.

---

[1] The LIBOR refers to the London Interbank Offered Rate. It is the "primary global benchmark for short-term interest rates, and it is calculated by averaging the estimates from leading banks around the world of the rates they would be charged if borrowing from other banks." Compl. ¶ 7.

After extensive briefing and an oral hearing, Magistrate Judge Francis issued a Memorandum and Order ("Order") on March 20, 2015. Magistrate Judge Francis determined that Darin was entitled to Fifth Amendment protection and declined to apply the fugitive disentitlement doctrine. The Order also found that the complaint alleged a domestic application of Section 1343 and satisfied the Fifth Amendment nexus and notice requirements.

Darin objected to the Order's conclusion that Section 1343 was being applied domestically and that the nexus and notice requirements were satisfied. The Government objected to the Order's failure to apply the fugitive disentitlement doctrine. Neither party objected to the Order's conclusion that Darin was protected by the Fifth Amendment; finding no clear error, the Court, therefore, adopts that section of the Order in full. *See* Order 4–9.

On June 23, 2015, the Court heard oral arguments in the matter. After considering the arguments made in court, as well as the lengthy memorandums submitted by each party, the Court determines that the fugitive disentitlement doctrine bars Darin's motion to dismiss. But even if the motion were not barred, the complaint alleges a domestic application of Section 1343 and satisfies both the nexus and notice requirements of the Fifth Amendment. Accordingly, Darin's motion to dismiss is DENIED.

## BACKGROUND

On December 12, 2012, the Government filed a criminal complaint against Roger Darin,[2] alleging he conspired to commit wire fraud in violation of Section 1343 by manipulating the LIBOR for Yen. From 2006 to 2009, Darin allegedly conspired to falsify UBS's "daily Yen LIBOR submissions to the [British Bankers' Association] regarding the interest rates at which

---

[2] The Complaint also names Tom Hayes, alleging one count of wire fraud conspiracy, one substantive count of wire fraud, and one substantive count of antitrust violations. Hayes was tried and convicted on August 3, 2015 in London's Southwark Crown Court of eight counts of fraud for his role in manipulating the LIBOR.

UBS could borrow reasonable sums denominated in Yen from other banks." Compl. ¶ 21(a). The complaint alleges that these submissions caused "the final Yen LIBOR fixings published by Thomson Reuters to move in directions favorable to UBS trading positions in Yen LIBOR-based derivative products." *Id.* The complaint also alleges that Darin "caused the publication of manipulated interest rate information in New York, New York." *Id.* at ¶ 2.

Pursuant to the complaint, Magistrate Judge Maas issued an arrest warrant for Darin on December 12, 2012. Darin has not yet been arrested since he is a Swiss citizen, residing in Switzerland. Nor has Darin submitted to the Court's jurisdiction—he "appears" solely through his lawyers, whom he retained to dismiss the complaint.

## DISCUSSION

### I.      Legal Standard

The Court construes Magistrate Judge Francis's Order as a criminal Report and Recommendation. *See* Fed. R. Crim. P. 59. Under Rule 59(b)(3), if a party objects to a Report and Recommendation for a dispositive matter, the Court must consider the matter *de novo*. Accordingly, since Darin objects to the Order's failure to dismiss the complaint and since the Government objects to the Order's failure to apply the fugitive disentitlement doctrine, the Court considers these matters *de novo*.

### II.     Analysis

#### A. The fugitive disentitlement doctrine applies

"Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996) (citing *Chambers v. NASCO,*

*Inc.*, 501 U.S. 32, 43–46 (1991)). To that end, the fugitive disentitlement doctrine is "an 'equitable doctrine' that may be applied at court discretion" barring fugitives from seeking judicial relief. *Hanson v. Phillips*, 442 F.3d 789, 795 (2d Cir. 2006) (citation omitted).[3]

While the "paradigmatic object of the doctrine is the convicted criminal who flees while his appeal is pending," *Gao v. Gonzales*, 481 F.3d 173, 175 (2d Cir. 2007) (internal quotation marks and citation omitted), it applies to defendants that evade the authority of the justice system at any stage of the criminal process. *See, e.g.*, *United States v. Buck*, No. 13 Cr. 282 (VM), 2015 WL 195872 (S.D.N.Y. Jan. 9, 2015) (denying the defendant's request for a bail hearing because he was a fugitive). When determining if the doctrine applies, the Court must consider the threshold question of whether the defendant is a "fugitive." Then, the Court must weigh the following four factors: (1) whether a decision on the merits would be enforceable; (2) whether the defendant is flouting the judicial process; (3) whether a decision on the merits would encourage similar flights from justice; and (4) whether the defendant's evasion prejudices the Government. *See Empire Blue Cross and Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2d Cir. 1997).

The Government argues that Darin is a fugitive because he failed to surrender pursuant to the Government's arrest warrant, dated December 12, 2012. The Government also argues that the doctrine's four factors require disentitlement. Darin argues that since he never fled from the United States, he is not a fugitive. And even if he were a fugitive, Darin argues that the doctrine's four factors weigh against disentitlement. Magistrate Judge Francis agreed with Darin, concluding that because the four factors weighed against disentitlement, he need not reach the

---

[3] The fugitive disentitlement doctrine does not interfere with the Court's jurisdiction since the Court has jurisdiction over all offenses against the laws of the United States. *See* 18 U.S.C. § 3231.

4

"thorny" question of whether Darin is a fugitive. Order 9–11. Considering the matter *de novo*, the Court rules that Darin is a fugitive and that, upon a full consideration of the four factors, the fugitive disentitlement doctrine applies.

### (i)   Darin is a fugitive

Under the common law, a "fugitive" was defined as one who "flees or escapes" from custody. BLACK'S LAW DICTIONARY (10th ed. 2014). Indeed, the quintessential image of a fugitive is fresh in the public mind in light of the recent prison break at the Clinton Correctional Facility in Dannemora, New York, and the subsequent 22-day manhunt for the two fugitives.

But defendants need not affirmatively flee to be labeled fugitives. *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d 270, 287 (S.D.N.Y. 2001) ("[A] person can be a fugitive even when he does not 'flee' but is simply found outside the jurisdiction" (internal quotation marks and citation omitted)). Rather, defendants "constructively flee" when they were present in the jurisdiction at the time of the alleged crime, they subsequently leave the jurisdiction, and they decide not to return upon learning they are wanted by the authorities. *See Buck*, 2015 WL 195872, at \*2 ("The concept of 'constructive flight' has been clearly adopted in the Second Circuit and applies where a defendant evades prosecution by remaining outside of the Court's jurisdiction after learning of the charges against him.").

The connection between "flight" and "fugitive status" is best understood when one considers that most federal crimes are committed by defendants who are physically located in the United States. Hence, defendants flee the jurisdiction either before, during, or after the prosecution commences, becoming fugitives. But a limited, though still significant, number of crimes can be committed by defendants who never set foot in the United States. For example, a

5

defendant can conspire to commit wire fraud—as the Government alleges Darin did here—based entirely on actions taken abroad that use United States wires. Defendants who have allegedly violated United States law from afar neither have the capacity nor incentive to flee the United States. Are such defendants not appropriately classified as fugitives, simply because they allegedly committed their crimes remotely?

Consider the following hypothetical example: A defendant works at a bank in New York and allegedly conspires to manipulate financial data using United States wires. The Government files a criminal complaint alleging a conspiracy to violate Section 1343 and obtains an arrest warrant. The Government fails to arrest the defendant because he flees the jurisdiction. Certainly, the defendant is a fugitive.

Now consider the Government's allegations against Darin: Darin worked at a bank in Switzerland and allegedly conspired to manipulate the LIBOR using United States wires. The Government filed a criminal complaint alleging a conspiracy to violate Section 1343 and obtained an arrest warrant. The Government failed to arrest Darin because he remains in Switzerland, a nation which does not extradite its citizens for financial crimes. Is Darin not also a fugitive?

Both the hypothetical defendant and Darin are charged with the same criminal conduct. Both have valid arrest warrants. And both have avoided arrest. The sole difference is that the hypothetical defendant allegedly committed the crime while physically located in the United States; therefore, he had to fee the jurisdiction to avoid prosecution. But Darin allegedly committed the crime while physically located outside the United States and asserts that he can avoid prosecution by simply remaining outside the jurisdiction.

6

In the civil forfeiture context, Congress avoids this anomaly by explicitly extending the

fugitive disentitlement doctrine beyond common-law fugitives:

> A judicial officer may disallow a person from using the resources
> of the courts of the United States in furtherance of a claim in any
> related civil forfeiture action or a claim in third party proceedings
> in any related criminal forfeiture action upon a finding that such
> person—
>
> (1) after notice or knowledge of the fact that a warrant or
> process has been issued for his apprehension, in order to avoid
> criminal prosecution—
>
> (A) purposely leaves the jurisdiction of the United States;
> (B) declines to *enter or reenter* the United States to submit
> to its jurisdiction; or
> (C) otherwise evades the jurisdiction of the court in which a
> criminal case is pending against the person.

28 U.S.C. § 2466(a) (emphasis added); *see also Collazos v. United States*, 368 F.3d 190, 199–

200 (2d Cir. 2004) ("Congress's use of 'enter' as well as 'reenter' in subpart B extends

disentitlement authority beyond common-law fugitives, who may have been in the United States

at the time they committed the charged crimes and who refuse to return, to persons who,

although they may have never set foot within the territorial jurisdiction of the United States,

know that warrants are outstanding for them and, as a result, refuse to enter the country").

Courts, too, have expanded the definition of "fugitive" outside of the civil forfeiture setting. *See*

*United States v. Chung Cheng Yeh*, No. CR 10-00231 (WHA), 2013 WL 2146572 (N.D. Cal.

May 15, 2013) (applying the fugitive disentitlement doctrine to a defendant who was never

physically present in the United States); *see also Buck*, 2015 WL 195872 (applying the fugitive

disentitlement doctrine to a Swiss defendant who was only briefly in the United States and

allegedly committed most of acts while living in Switzerland).

In line with these developments, the definition of a "fugitive" should take account of the

realities of modern criminal prosecutions, coping with the strains of globalization. The Court

7

cannot be bound by the semantics that limit fugitive status to fleeing or failing to return when dealing with an international criminal defendant who allegedly violated United States law from abroad. Instead, the Court considers the real-world implication of the Government's allegations: Darin allegedly violated United States law; a warrant for Darin's arrest was issued by Magistrate Judge Maas; Darin would be arrested if he entered the United States (or if he left Switzerland); and Darin has avoided arrest by remaining in Switzerland. That Darin did not flee the United States should not preclude him from being labeled a fugitive as a matter of law.

### *(ii)* *The fugitive disentitlement doctrine applies*

The Court has no hesitation in applying the fugitive disentitlement doctrine. Indeed, the doctrine exists precisely to guard against defendants, like Darin, that "attempt[] to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him [a dismissal] while carefully shielding himself from the possibility of a penal sanction." *Collazos*, 368 F.3d at 200. Each of the following factors weighs in favor of disentitlement.

First, the Court's decision will not be enforceable in Darin's absence. *See Smith v. United States*, 94 U.S. 97, 97 (1876) ("It is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party . . . is where he can be made to respond to any judgment we may render"). Often termed "mutuality," this factor weighs in favor of disentitlement when a favorable decision benefits a defendant but an adverse decision has no effect. Here, mutuality is clearly lacking. If the Court dismisses the complaint, Darin benefits. But if the Court affirms the complaint, Darin will continue to ignore the complaint and arrest warrant. *See* Tr. 10:6–16 (counsel for Darin acknowledging that "under no circumstances" will Darin come to the United States). The Magistrate Judge reaches a different result, concluding that the Court's order and

arrest warrant remain enforceable in Darin's absence. Order 12–13. This begs the question of how the Court can enforce an order against a defendant who has not submitted to the Court's jurisdiction. Darin will continue to ignore any order made by this court by simply remaining in Switzerland, his home country. The Order also concludes that Darin would be bound by an adverse result since it would impose "significant burdens," forcing him to remain in Switzerland and hampering his ability to find a job. *Id.* at 13–14. But such "burdens" are typical for fugitives and cannot outweigh the competing benefit of being able to live freely in Switzerland. The Order concludes by noting that "a decision denying Mr. Darin's motion will exacerbate the situation somewhat by imposing on him a choice either to live under these disabilities for an indeterminate length of time or submit to apprehension and extradition." *Id.* at 14. Said differently, Darin's "choice" is: compliance with a valid arrest warrant or continued evasion of United States authorities. Equitable doctrines cannot assist such decision-makers. Accordingly, since Darin will ignore any unfavorable order, mutuality is lacking.

Second, Darin is flouting the judicial process. He does so not merely by being absent, as the Order suggests, but rather by being absent, appearing through his lawyers, and openly stating that he will not comply with any unfavorable result—while at the same time asking the Court to rule in his favor. This is the very essence of flouting the judicial process. *See Buck*, 2015 WL 195872, at \*3 ("Buck is not entitled to receive any potentially favorable rulings from this Court if he is unwilling to stand for and face the consequences of any potentially unfavorable rulings.").

Third, ruling on the merits of Darin's motion would encourage similarly situated defendants to remain outside the United States. If the Court were to permit Darin to move to dismiss the complaint without submitting to the Court's jurisdiction, it would enable any

9

defendant located outside the United States to do likewise. This would eradicate any incentive for a foreign defendant to comply with an arrest warrant, submit to a court's jurisdiction, and respond to the Government's allegations while enjoying the constitutional protections afforded to criminal defendants. Moreover, the Government points to specific examples of criminal defendants, similarly situated to Darin, who would likely engage in similar conduct if the Court entertained Darin's motion on the merits. *See* Mem. in Opp. 28.

Fourth, Darin's evasion prejudices the Government. If Darin continues to evade the Court's jurisdiction, the Government cannot prosecute what is already a very complex case, likely involving documents and witnesses located worldwide.

Accordingly, because Darin is a fugitive and because each factor favors disentitlement, the Court exercises its discretion under the fugitive disentitlement doctrine and declines to consider the merits of Darin's motion.

## B. Even if the fugitive disentitlement doctrine did not apply, Darin's motion would be denied on the merits[4]

If the Court were to consider the merits of Darin's motion, the Court, reviewing the contested issues *de novo*, would fully adopt the Order's conclusions and deny the motion.

### (i)    *Section 1343 is not being applied extraterritorially*

The complaint alleges that Darin conspired to manipulate the LIBOR for Yen using United States wires. Compl. ¶ 1. Accordingly, there is no extraterritoriality here; the complaint

---

[4] Though the Court declines to consider the merits of Darin's motion since he is a fugitive, in light of Magistrate Judge Francis's thorough and comprehensive Order, the Court includes its alternative holding. This will give any reviewing court a complete judicial record of the proceeding.

alleges a domestic application because Congress's legislative concern was "to prevent the use of [United States wires] in furtherance of fraudulent enterprises." *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001) (citation omitted); *see also United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982) ("[J]urisdiction under § 1343 is satisfied by defendant's use of the wires to obtain the proceeds of his fraudulent scheme"); *see also United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997) ("[W]hat is proscribed is use of the telecommunication systems of the United States in furtherance of a scheme"). Neither *Morrison v. Nat. Australia Bank Ltd.*, 561 U.S. 247 (2010), nor *European Community v. RJR Nabisco, Inc.*, 783 F.3d 123 (2d Cir. 2015) (en banc), alter this conclusion. Darin's argument that the location of the wires is "ancillary" to the location of the scheme to defraud must, therefore, be rejected because the location of the wires is the Court's primary concern.[5]

### *(ii)    A sufficient nexus exists*

Darin argues that his alleged actions lack a sufficient nexus to the United States based on the standards imposed by specific jurisdiction in the civil context, whereby courts only have jurisdiction over foreign defendants that engage in conduct with a direct and foreseeable effect in the United States. *See Goldberg v. UBS AG*, 690 F. Supp. 2d 92 (E.D.N.Y. 2010). Darin contends that while his alleged conduct may have had a foreseeable effect in the United States, the conduct was never directed at the United States. *See Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015) (dismissing a civil LIBOR claim for lack of personal jurisdiction); *see also 7 West 57th Street Realty Co., LLC v. Citigroup, Inc.*,

---

[5] Since the Court determines that this is a domestic application of the wire fraud statute, the Court need not adopt the Order's conclusion that Section 1343 cannot be applied extraterritorially.

No. 13 Civ. 981 (PGG), 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) (dismissing a civil LIBOR claim against foreign banks for lack of personal jurisdiction). Moreover, Darin argues that conduct directed at global banking as a whole is insufficient to establish a nexus with the United States. *See Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) (dismissing worldwide reliance as a basis for personal jurisdiction), *abrogated on other grounds by Morrison*, 561 U.S. 247.

But courts faced with a territorial offense—*i.e.*, a domestic application of Section 1343—do not need to conduct a "nexus" inquiry. *See United States v. Remire*, 400 F. Supp. 2d 627, 630–31 (S.D.N.Y. 2005) ("Given the limited information that is before the Court, it is not possible to undertake the detailed factual analysis required to assess whether the government will be able to meet its jurisdictional burden."). Instead, at this stage the Fifth Amendment merely requires an inquiry into the "fundamental fairness" of the criminal complaint. *See United States v. Al-Kassar*, 660 F.3d 108, 118 (2d Cir. 2011). Since Darin allegedly conspired to manipulate the LIBOR using United States wires, and since Darin was likely aware that this conduct would affect financial markets in the United States, his prosecution by United States authorities is not fundamentally unfair.

Even if the Court were to conduct a "nexus" inquiry, the complaint alleges a sufficient connection to the United States. The complaint alleges that Darin, using United States wires, "caused the publication of the manipulated interest rate information in New York, New York." Compl. ¶ 2(c). And the complaint alleges that Darin's co-conspirator, Tom Hayes, had ample connections to the United States. *See, e.g., id.* at ¶ 22 (alleging that Hayes traded with a counter party based in Purchase, New York). While Darin argues that his connections to the United States must be assessed independently from Hayes's, *see United States v. Perlaza*, 439 F.3d 1149

12

(9th Cir. 2006), under general conspiracy principles actions taken by co-conspirators can be imputed to other co-conspirators. *See United States v. Manuel*, 371 F. Supp. 2d 404, 410 (S.D.N.Y. 2005) (actions taken by a co-conspirator in the United States brought the entire conspiracy "under American jurisdiction"); *see also Ford v. United States*, 273 U.S. 593, 622 (1927) ("[J]urisdiction exists to try one who is a conspirator[] whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against"). Accordingly, based on Darin's own connection to the United States, and based on his alleged co-conspirator's connection to the United States, the Fifth Amendment nexus requirement is satisfied.

### *(iii) Sufficient notice exists*

Darin argues that since he allegedly manipulated the LIBOR—which is based on providing hypothetical opinions to the British Bankers' Association—he had no notice that his conduct was criminal. Instead, he argues that he understood his conduct may have led to professional sanctions, such as the British Bankers' Association banning UBS from the LIBOR panel. But this concession, coupled with his alleged warnings to Hayes not to stray "too far from the 'truth,'" Compl. ¶ 21(d)(ii), demonstrates that he knew his opinions were false. Moreover, Darin would have known that these hypothetical opinions would benefit UBS at the financial expense of other banks. Based on these allegations, the Court is satisfied that Darin had sufficient notice under the Fifth Amendment that the alleged conduct was criminal. *See Al-Kassar*, 660 F.3d at 119 ("Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere.").

13

## **CONCLUSION**

For the reasons stated above, Darin is a fugitive and cannot challenge the complaint until he submits to the Court's jurisdiction. And even if Darin could challenge the complaint, the Court concludes that the complaint alleges a domestic application of Section 1343 and satisfies the Fifth Amendment nexus and notice requirements. Accordingly, Darin's motion to dismiss is DENIED.

Dated: New York, New York
       August 3, 2015

SO ORDERED

Paul A. Crotty

PAUL A. CROTTY
United States District Judge

14