F6NPDARC

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4              v.                        12 MJ 3229 (PAC)

 5  ROGER DARIN,

 6              Defendant.

 7  ------------------------------x

 8                                  New York, N.Y.
                                    June 23, 2015
 9                                  3:26 p.m.

10
    Before:
11
                    HON. PAUL A. CROTTY,
12
                                    District Judge
13

14                       APPEARANCES

15
    PREET BHARARA,
16       United States Attorney for the
         Southern District of New York
17  BY:  DANIEL A. BRAUN
         Assistant United States Attorney
18       THOMAS B.W. HALL,
         U.S. Department of Justice,
19       Criminal Division, Fraud Section

20  COVINGTON & BURLING, LLP (DC)
         Attorneys for Defendant
21  BY:  BRUCE A. BAIRD
         ALEXANDER A. BERENGAUT
22       JAMES M. GARLAND

23

24

25

F6NPDARC

```
 1            (In open court)

 2            THE COURT:  Good afternoon.  Please be seated.

 3            (Case called).

 4            MR. HALL:  Good afternoon, your Honor.  Thomas Hall,

 5   Daniel Braun for the United States.

 6            MR. BAIRD:  Your Honor, Bruce Baird for the defendant,

 7   Roger Darin.

 8            THE COURT:  Who's with you, Mr. Baird?

 9            MR. BAIRD:  Thank you, your Honor.  Shall I begin,

10   your Honor?

11            THE COURT:  No.  Who's with you?

12            MR. BAIRD:  I'm sorry.  Alex Berengaut and Jim

13   Garland.

14            THE COURT:  All right, Mr. Baird, go ahead.

15            MR. BAIRD:  Thank you.  Your Honor, Roger Darin is a

16   Swiss citizen and is accused in the complaint filed in this

17   court of one thing, of altering his opinion about the answer to

18   hypothetical questions from the British Bankers Association

19   about yen interest rates while working at a Swiss bank in

20   Tokyo, Singapore and Zurich.

21            The only connection between Roger Darin and the United

22   States is that the British Bankers Association used Roger

23   Darin's opinions, together with many others, to calculate a

24   so-called LIBOR fixing for yen, and that that fixing was

25   published worldwide, including the United States.
```

F6NPDARC

1          On these facts, for two simple reasons, the complaint

2    against Roger Darin should be dismissed.  The first reason is

3    that on all variations of the test for when the U.S. can

4    constitutionally charge a foreigner for acts done somewhere

5    else --

6          THE COURT:  But they're alleged to have occurred here

7    in the United States, haven't they?

8          MR. BAIRD:  I'm sorry, your Honor?

9          THE COURT:  They're alleged to have occurred here in

10   the United States.  That's what the complaint charges.

11         MR. BAIRD:  There's actually no allegation in the

12   complaint, your Honor, that Roger Darin did anything in the

13   United States.  There's no connection between the United States

14   and Roger Darin alleged in the complaint, apart from the

15   publication of LIBOR.  There are allegations involving

16   Mr. Darin's co-defendant.

17         The complaint is in two parts.  There's a very narrow

18   allegation against Roger Darin, consisting only of his offering

19   an opinion to the British Bankers Association, and there's a

20   much broader set of facts alleged against his co-defendant,

21   Thomas Hayes, among which are connections to the United States

22   but those connections are not alleged to involve Roger Darin.

23         THE COURT:  Well, I'm referring to Count One, the

24   first paragraph in the complaint.  It says that Mr. Hayes and

25   Mr. Darin, the defendants, and others known and unknown,

F6NPDARC

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | conspired to defraud and to obtain money, and they did that by     |
| 2  | using the wires in the United States.  That's what the             |
| 3  | allegation is.                                                     |
| 4  | MR. BAIRD:  Your Honor, that's not a factual                       |
| 5  | allegation.  That's not the allegation that is on --               |
| 6  | THE COURT:  That's the charge on which the arrest                  |
| 7  | warrant was issued.                                                |
| 8  | MR. BAIRD:  Yes, your Honor.  It's a charge that's not             |
| 9  | supported by the facts.  In other words, your Honor, there's       |
| 10 | no -- your Honor has no obligation -- in fact, your Honor is       |
| 11 | really not allowed to accept as true mere legal allegations.       |
| 12 | They need to be factual allegations, and I can cite your Honor     |
| 13 | cases for that.  There need to be factual allegations in the       |
| 14 | complaint.  Those must be accepted as true.                        |
| 15 | The legal boilerplate at the beginning need not be             |
| 16 | accepted as true.  Those are not factual allegations, and that     |
| 17 | if your Honor reads through the rest of the remainder of the       |
| 18 | counts, there's no allegation.  In fact --                         |
| 19 | THE COURT:  I know Two and Three are silent with                  |
| 20 | regard to Mr. Darin.                                               |
| 21 | MR. BAIRD:  Well, they are, but even with respect to              |
| 22 | Count One, your Honor, the scheme as described -- and perhaps I     |
| 23 | can direct your Honor to the page.  I apologize, your Honor.       |
| 24 | I'll just take a minute.  I want to find the right page.           |
| 25 | THE COURT:  May I suggest 18 and 19 to you, Mr. Baird?            |

F6NPDARC

1        MR. BAIRD:  Those are some of the chats, your Honor.

2        On Page 7, your Honor, there is a description of the

3   fraudulent scheme as charged.  That's the charge in Count One.

4        THE COURT:  At paragraph 19?

5        MR. BAIRD:  Correct, paragraph 19, A, B and C.

6        THE COURT:  Right.

7        MR. BAIRD:  And there are three subparts.  Subpart A

8   is conspiring with Darin to cause the bank to make false or

9   misleading yen LIBOR submissions to BBA.  That's the only one

10  that relates to Darin.  That's the opinion.

11       Then it goes on, in B and C, to describe the remainder

12  of the scheme.  And those elements of the scheme, those parts

13  of the scheme are alleged only to relate to Mr. Hayes.  They're

14  not alleged to relate to Mr. Darin at all.

15       So it is only the delivery of that opinion, the

16  alteration of his opinion, at the insistence of Mr. Hayes, that

17  Darin is alleged to have done.  That's what's alleged to be his

18  key part in this scheme.

19       THE COURT:  So according to your theory, Mr. Baird,

20  the Fifth Amendment applies?

21       MR. BAIRD:  It certainly does, your Honor.

22       THE COURT:  And that requires what, that the

23  government show nexus and notice?

24       MR. BAIRD:  Yes, your Honor.  And, in particular, I'd

25  like to focus on nexus.  It needs to show --

F6NPDARC

1          THE COURT:  Before we get there, I want to talk about

2    the fugitive disentitlement, as to why Mr. Darin is not a

3    fugitive, or if he is a fugitive, whether I should exercise my

4    discretion and say that somebody who is in Switzerland, is a

5    Swiss citizen, a Swiss national, but refuses to come to the

6    United States.  Why should we be expending any time on

7    considering the argument you're raising?

8          MR. BAIRD:  Your Honor, first of all, he's not a

9    fugitive.  There's a clear statement of the test for when

10   someone is a fugitive in Judge Chin's opinion, which we cite,

11   In re Grand Jury Subpoena.

12         THE COURT:  I don't think that Judge Chin's statement,

13   though, completely exhausts the alternatives for fugitive

14   status.  It was sufficient for the Marc Rich case, but I don't

15   think it was pretending to define what fugitive status was in

16   other matters.

17         MR. BAIRD:  Well, your Honor, I take your word for it.

18   It looks to me like a broader test, but as I understand the

19   test, and it corresponds with the reasons for the test.  The

20   reason for the fugitive disentitlement doctrine at all is

21   because you don't want to expend the resources of this court,

22   on somebody.  Indeed, you want to penalize someone who flees

23   from justice, who flouts the law.  That's not what Mr. Darin's

24   position is at all.

25         He's not someone who was here and committed a crime

F6NPDARC

and then left, or fled from justice when he learned there was a crime.  He's never fled anywhere.  He's never gone anywhere. He's living where he's always lived.  He's simply not a fugitive.  The word has no meaning when applied to him.

THE COURT:  There are cases, I think you would agree, that suggest you're a fugitive if you don't appear to respond to the charges that are made against you.

MR. BAIRD:  Actually, your Honor, I think there are no cases.  There's not a single case, that I believe I know of and there's no case that the government cites or that Magistrate Francis cites that holds that.

There are cases that use the word "return."  If he's charged and he does not return, meaning that he committed the crime here, he then left, and he did not return to face the charges.  There are cases like that on those facts, your Honor, but I believe there are not cases in which someone is overseas the whole time, who has never fled anywhere, never traveled anywhere, is not alleged to have traveled anywhere, is held to be a fugitive.  I don't think there's a case like that, your Honor.

There are cases that use that word "return," and if you read them quickly and you're not thinking about what "return" means, you can reach the conclusion, as the government does, that these cases imply that you can -- that you must come to the United States in the first instance, even if you've

F6NPDARC

never been here.  I don't think there's a case that holds that,
and there's no case that discusses that as a component of the
fugitive doctrine.

          THE COURT:  So in your view, was Magistrate Judge
Francis right?

          MR. BAIRD:  Well, your Honor, I think --

          THE COURT:  Or just partially right?

          MR. BAIRD:  He didn't decide -- actually, what he did,
as I understood his opinion, he really didn't decide whether
the fugitive disentitlement doctrine -- sorry whether Mr. Darin
was a fugitive.  He said assuming that he was.

          THE COURT:  He wouldn't apply --

          MR. BAIRD:  I, nevertheless, won't apply the doctrine.
So I believe that's where he came out, and I think he certainly
was right not to apply the doctrine, even assuming that your
Honor was of the view that it applies because, again, Mr. Darin
is going nowhere, has been nowhere.

          Judge Francis made the explicit finding that Mr. Darin
was disadvantaged by the situation he's in.  He's been
living -- he's been restricted to Switzerland for two years
without any action on this case.

          THE COURT:  Why do you say he's restricted?

          MR. BAIRD:  He's restricted, your Honor, because
there's an arrest warrant.

          THE COURT:  He can't go to Italy?

F6NPDARC

1          MR. BAIRD:  He can't go anywhere.  His fiancé is

2     Japanese, and he has relatives in Germany and has family in

3     various countries and he can't go anywhere.  That would be true

4     for the rest of his life if this motion is not ruled on.  His

5     entire existence has been affected severely by this situation.

6          It's not the sort of situation in which the fugitive

7     disentitlement doctrine was meant to embrace.  He's not

8     fleeing.  This is a classic fugitive case.  The case for which

9     the doctrine was made is the case in which someone leaves; he

10     is flouting the law.  He's not -- not only commits a crime here

11     and then flees, but he ignores the order to show up to court.

12          THE COURT:  Why would I order him to show up in court?

13     Would he show up in court?

14          MR. BAIRD:  This is a case -- no, your Honor.  This is

15     a case in which he is not -- he cannot -- he's not willing to

16     come to the United States because --

17          THE COURT:  He wants to make all these arguments long

18     distance, correct?

19          MR. BAIRD:  He does, your Honor.  Well, your Honor, I

20     think he's entitled to do that.

21          THE COURT:  That may be, but he's not submitting

22     himself to the Court's jurisdiction, and I don't have control

23     over the defendant.  He's making these arguments from

24     Switzerland.

25          MR. BAIRD:  In a very real sense, your Honor does have

F6NPDARC

1    control.  You have control over the rest of his life.  If these

2    charges are well-founded, we don't believe they are, then your

3    Honor has disadvantaged him for the rest of his life.  I would

4    say your Honor has great control.  It's an extremely serious

5    matter to him.

6           THE COURT:  One thing that's, that was clear to me, at

7    least from reading Magistrate Judge Francis' opinion, was his

8    conclusion I think he reached in that Mr. Darin, under no

9    circumstances, can come to the United States.  Is that an

10   accurate --

11          MR. BAIRD:  Your Honor, I hesitate to predict the

12   future, but --

13          THE COURT:  In the present state, that's the present

14   situation?

15          MR. BAIRD:  That's the situation we're in right now.

16   Yes, sir, your Honor.

17          THE COURT:  I've been interrupting you.  Now,

18   Mr. Baird, why don't you go ahead.

19          MR. BAIRD:  Your Honor, my most important function

20   here is to answer your Honor's questions; so I want to make

21   sure I do.  This fugitive disentitlement doctrine is

22   extremely -- we thought Judge Francis dealt with it well.  So I

23   did not mean to argue it, but if your Honor is pausing on that

24   question, I want to really focus on it for a moment.  I really

25   think that it's --

F6NPDARC

1          THE COURT:  Well, maybe Magistrate Judge Francis is

2     right.  He said that he was not going to apply it because he

3     thought that the other arguments about nexus and notice could

4     not be maintained because of the allegations in the complaint.

5     He thought that all of the requirements of the Fifth Amendment

6     had been satisfied.

7          MR. BAIRD:  Yes, your Honor.

8          THE COURT:  Why was he wrong on that?

9          MR. BAIRD:  Okay.  Well, then let me go on to that.

10    For two reasons.  So the first reason is that on all variations

11    of the test, and the test it is stated in various ways, for

12    when the U.S. can constitutionally charge a foreigner for acts

13    done somewhere else, that test is not met here based on the

14    allegations against -- just against Roger Darin.  I'll get into

15    that test.  I just want to tell your Honor the two points.

16    That's the first point.

17          The second point is it's only the allegations against

18    Roger Darin, not allegations against someone else -- in this

19    case, the broader allegations against Thomas Hayes -- that can

20    be used in determining jurisdiction over Roger Darin.  Those

21    are the two points.

22          So let me start with the first point, where the line

23    is, what the test is to decide when it's fundamentally fair to

24    charge someone, a foreigner, in this country for acts done

25    somewhere else.  There's no dispute that this is a

F6NPDARC

1     constitutional due process issue.  The Second Circuit believes

2     you can't just charge someone overseas for acts done overseas.

3     You have to find the minimum level of contact, the nexus

4     between that person and the United States.  That's true in a

5     civil case.  It's true in a criminal case.

6          Al Kassar is a main Second Circuit case on this point.

7     It articulates the test.  There must be a sufficient nexus, the

8     court said there, between the defendant and the U.S. so that

9     prosecuting him here would not be arbitrary or fundamentally

10    unfair.  And they go on to talk about what nexus is required.

11    They say for a non-citizen -- this is the Second Circuit -- for

12    a non-citizen acting entirely abroad, a jurisdictional nexus

13    exists when the aim of an activity is to cause harm inside the

14    U.S. as to U.S. citizens and interests.

15          Judge Francis said in his opinion that he didn't think

16    this was the proper standard, and I believe he meant there that

17    there are various ways to show aiming.  Effects is another way,

18    for substantial direct effects so that there's specific intent

19    to one side.  A reasonable person could expect to be haled into

20    court in the U.S.  In other words, the test is objective, not

21    subjective.  It depends on the surrounding facts and

22    circumstances, and we agree with that.  We don't dispute that.

23    There are other cases for that proposition, and we cite some in

24    our brief.  Goldberg against UBS.

25          The key question in this case is what kind of intent

F6NPDARC

1    or effects add up to a focus on the U.S.  The facts and

2    circumstances have to add up in some way to a focus on the U.S.

3    as opposed to the world as a whole.  So in the two cases cited

4    by Judge Francis on effects, one of them is Yousef, an opinion

5    by Judge Keenan, explicitly found that the defendant was aware

6    that the conduct he was charged with would have an effect in

7    the U.S.

8            And in Mostafa, another case they cite, the court

9    explicitly found that the defendants targeted American

10   interests; so again, a focus on the U.S.  There are numerous

11   civil cases in this circuit and elsewhere adopting that same

12   aiming analysis.  Leasco, for example, is a Second Circuit

13   case, Judge Friendly, it's on all fours.  The quote is:  While

14   worldwide reliance may, in some sense, be foreseeable, it is

15   not sufficiently so to constitute a basis for personal

16   jurisdiction consonant with due process.

17           And there are cases much closer than that In Re:

18   Terrorist Attacks is another Second Circuit case, more recent,

19   and there are two District Court cases this year, one from

20   Judge Gardephe, one from Judge Daniels, both involving this

21   exact situation.  Financially, in a civil case, but financial

22   institutions -- overseas financial institutions charged with

23   manipulating LIBOR.  And these cases both -- in both cases the

24   complaints were dismissed.  There was not sufficient nexus --

25           THE COURT:  That's the long-arm statute, right?

F6NPDARC

1          MR. BAIRD:  Well, your Honor, it's the civil

2     jurisdiction versus criminal, but the test is the same.

3     Goldberg, for example, I commend to your Honor Judge Trager's

4     opinion in Goldberg, which discusses that in a civil case, the

5     way in which the tests for the civil and criminal due process

6     are the same with one distinction, that in the criminal

7     context, more due process is required.  That is, the civil test

8     is easier to satisfy.  If you can't satisfy the civil test,

9     there's no way you can satisfy criminal due process.

10         THE COURT:  Well, Judge Francis disagrees with you.

11    He said the complaint here alleges use of interstate wires in

12    furtherance of a fraudulent scheme that underlies the charge of

13    conspiracy against Mr. Darin.  The co-conspirators purportedly

14    caused the manipulated LIBOR he published to servers in the

15    United States and used the United States wires to memorialize.

16    So the culpable conduct underlying the substantive account,

17    therefore, occurred in the United States.

18         You keep on talking about what Mr. Darin says.  I

19    think the standard is, the test is really what does the

20    complaint allege.

21         MR. BAIRD:  Well, no, your Honor.  It has to be

22    regarding this defendant.  I think Judge Francis was mixing up

23    two doctrines in cases that he cited in that too.  There is a

24    doctrine involving the extraterritorial application of the

25    statute, and with respect to that doctrine, it's a statutory

F6NPDARC

1   doctrine --

2          THE COURT:  Doctrine of statute interpretation?

3          MR. BAIRD:  Yes, your Honor.  Whether the statute will

4   be applied extraterritorially or not.  For that purpose, you

5   can look at the actions of all co-conspirators and other

6   individuals, but that's not what we're talking about here.

7   We're talking about personal jurisdiction over a particular

8   person, and for those purposes, it is only the allegations with

9   respect to that person that are relevant.  That's the

10  difference.

11         Those are two separate doctrines, and what I'm

12  addressing here is the doctrine of personal jurisdiction.  And

13  the cases, there are criminal cases that say the civil test and

14  the criminal test are the same test.  Those are -- that's the

15  same question that's being addressed.  They're getting the same

16  answer.  The question is, is it fair to hale this person into

17  court in the United States, this foreign person, who did things

18  only overseas, is it fair to bring them here?  And in judging

19  whether it's fair to bring him here, the question is:  What did

20  he do?  What are his connections?  There's a Supreme Court

21  case, last year --

22         THE COURT:  Don't you think we ought to consider what

23  he's charged with here?

24         MR. BAIRD:  Your Honor, I think what he's --

25         THE COURT:  Because whether it's fair or unfair

F6NPDARC

1    depends upon what he did here.

2              MR. BAIRD:  I agree.

3              THE COURT:  What he's alleged to have done here.

4              MR. BAIRD:  I agree with that completely, your Honor.

5              THE COURT:  Well, why are the allegations insufficient

6    here?

7              MR. BAIRD:  Your Honor, there's the only allegation

8    tying Mr. Darin to the United States is the publication of

9    LIBOR all over the world, including here.  There's no factual

10   allegation in the complaint that relates to Mr. Darin and the

11   United States.  If you start talking about Mr. Hayes, then

12   there are connections to the United States, and I'm going to

13   get to that.

14             There's a test.  That's my second point, that you

15   can't use Mr. Hayes.  What you have on Mr. Hayes, you can use

16   that to get jurisdiction over Mr. Hayes, but if Mr. Darin is

17   somebody overseas who has nothing to do with this country and

18   he does something over there, you can't just grab him because

19   you have something on other people.

20             THE COURT:  We're more familiar with drug cases here.

21   If somebody is dealing drugs in Colombia and stays in Colombia

22   but the drugs end up here in the United States and there's a

23   conspiracy charge, the person in Colombia doesn't have to be

24   here.

25             MR. BAIRD:  What happens in those cases, your Honor,

F6NPDARC

1    is that there's a judgment made, opinions considered and

2    discussed whether the people in Colombia, for example, know

3    where the drugs are headed.  They know that the United States

4    is the place that's targeted.  Those decisions actually

5    explicitly talk about that subject, and that's part of -- those

6    drug cases are some of the cases that are relevant here.

7              Klimavicius-Viloria, for example, in the Ninth Circuit

8    is one of those.  It involved ships and whether you can take

9    jurisdiction over the --

10             THE COURT:  Ships on the high sea.

11             MR. BAIRD:  Yes.

12             THE COURT:  The fast boats.

13             MR. BAIRD:  And the consideration that was given was

14   whether you could tell from the position of the ship and the

15   amount of the drugs and various other criteria that their goal,

16   their aim was the United States, and the court decided that,

17   yes, you could.  Those are all cases involving an aiming at the

18   United States.

19             That's what we don't have here.  We don't have

20   anything like that with respect to Mr. Darin that suggest

21   aiming at the United States.  It's the reverse.  There's not a

22   shred of aiming at the United States.  It's only worldwide for

23   Mr. Darin.

24             He's not alleged to have traded at all.  He's not

25   alleged to have done anything except offer an opinion to the

F6NPDARC

1   British Bankers Association from Tokyo or Singapore or Zurich,

2   working for a Swiss bank.  That's all he's alleged to have done

3   factually in this complaint.

4           His co-conspirator is the guy who did everything.

5   He's the one who traded.  He's the one who is alleged to have

6   sent wires, dealt with people in the United States, as well as

7   otherwise, talked to other bankers.  There's all kinds of stuff

8   against him.  He's on trial in the UK right now, this other

9   individual, but Roger Darin is not part of that.  And there are

10   no allegations like that against him.

11           THE COURT:  All right, Mr. Baird.  If you don't mind,

12   I'd like to hear from the government, and you can get a

13   rebuttal of ten minutes.  Okay.

14           MR. HALL:  Thank you, your Honor.  Your Honor, I think

15   the Court has correctly identified what some of the factual

16   allegations in this case are, but I think because this case

17   only recently came to this Court, it is important to emphasize

18   what's alleged in the complaint.  And what's alleged in the

19   complaint is Mr. Darin's participation in a worldwide scheme to

20   defraud UBS counterparties across the globe in

21   yen-LIBOR-related trades.

22           That's what's alleged.  It's not just this narrow

23   thing that Mr. Baird is talking about, the publication of the

24   rate.  He was alleged to participate in a conspiracy to

25   manipulate yen LIBOR, to steal money from UBS counterparties

F6NPDARC

1    across the world.

2              I was planning to address the issues of nexus, fair

3    notice, extraterritoriality and fugitive disentitlement in that

4    order, but I'm, of course, pleased to go wherever the Court

5    would like.

6              THE COURT:  Well, start with fugitive disentitlement,

7    please.

8              MR. HALL:  Of course, your Honor.  I think an opinion

9    that should be relevant to the Court's determination here is

10   Judge Marrero's opinion in January 2015 in United States v.

11   Buck.  That was a very similar case to the one at bar today.

12   It was a Swiss defendant charged with tax evasion, conspiracy.

13   He perhaps set foot in the United States once during the course

14   of the conspiracy, and he was abroad when he was charged.

15             He didn't come here, and Judge Marrero, just five

16   months ago, said:  I'm not going to hear your motion to set new

17   bail conditions under the fugitive disentitlement doctrine.  So

18   to the extent that Mr. Darin is arguing there's no case where a

19   judge has done it, there's a case from this courthouse in this

20   year, and that's United States v. Buck.

21             I think the Court is correct too in identifying that

22   what a fugitive is is not just defined by Judge Chin's opinion

23   in the Marc Rich case.  If you look, for instance, as the

24   Second Circuit has, in Empire Blue Cross and Blue Shield, the

25   Second Circuit looks at the definition of fugitive from Black's

F6NPDARC

Law Dictionary.  And one of the definitions of that, a fugitive

there is a criminal suspect who evades prosecution.

That's what Mr. Darin is.  No game of semantics is

going to avoid what he is, and that is a person who is refusing

to submit to the jurisdiction of this court.  He's no different

than Mr. Buck, and as Judge Marrero properly found, the Court

shouldn't be hearing his arguments.

And beyond the Buck case, there are, in fact, cases

where District Court judges across the country have said, I am

not going to hear your argument on a motion to dismiss under

exactly the same circumstances.  These are cited in our brief,

United States v. Yeh, a 2013 decision from the Northern

District of California.  The defendant there was in Taiwan.

Wasn't going to show up in the United States.  Fugitive

disentitlement doctrine applied.  In re: Han Yong Kim, that was

a Ninth Circuit case.  Ninth Circuit refused to issue a writ of

mandamus.  Similar circumstances, defendant in Taiwan.

There's no law that the United States is aware of that

would prevent the Court from exercising its discretion more

generally, not just under the fugitive disentitlement doctrine

specifically, but more generally exercising its discretion in

refusing to hear the motion of someone like Mr. Darin, who is

refusing to appear here in court but, instead, is sending his

lawyers in an attempt to get the charges against him dismissed.

I think Judge Francis went through the public policy

F6NPDARC

1    factors underlying the fugitive disentitlement doctrine in his

2    opinion, and I just want to touch on two of them here that the

3    United States particularly disagreed with Judge Francis'

4    analysis.  One, is his, Judge Francis', finding that reaching

5    the merits on Mr. Darin's motion would not encourage others in

6    similar situations to flee from justice.

7            In fact, the Department of Justice has charged several

8    defendants with extraordinarily similar conduct, LIBOR

9    manipulation, who are in the same circumstance as Mr. Darin.

10   They're in countries that have, to date, not extradited them,

11   and you can be sure that they are watching these proceedings

12   with great interest.  And if the Court is willing to entertain

13   motions from defendants abroad, those defendants will also come

14   knocking on the Court's door, through their lawyers, to fill up

15   the Court's docket with litigation that is not a useful use of

16   the Court's time.

17           Second is the point about prejudice to the United

18   States because of pretrial delay.  This case was indicted or

19   charged by complaint in December of 2012.

20           THE COURT:  Why hasn't there been an indictment?

21           MR. HALL:  Several reasons, your Honor.  Well, one, as

22   you've seen in our motion papers, we plan to ask a grand jury

23   for an indictment in the near future.  Two, we have not

24   proceeded with an indictment in this case --

25           THE COURT:  That doesn't explain what happened between

F6NPDARC

1    2012 and 2015.

2              MR. HALL:  Absolutely, your Honor.  We were in

3    communication with Mr. Darin's counsel prior to the charges,

4    you know, during the pendency of the complaint, as well.  And

5    Mr. Hayes, as the Court knows, is being charged in the United

6    Kingdom and so the United Kingdom authorities, not particularly

7    excited about extraditing him back to the United States to face

8    charges when he's facing charges there.  In fact, as I

9    understand their legal system, while he is charged there, he

10   cannot be extradited here.

11             So, therefore, the United States didn't believe it was

12   a good use of the grand jury's time to return an indictment

13   against two defendants who were not going to present themselves

14   in court.  We understood from Mr. Darin's counsel, as he's

15   represented today, that he will never show up in the United

16   States.  And so, therefore, we didn't think it was necessary.

17             However, we were surprised by Judge Francis'

18   suggestion in his opinion that the United States was not

19   interested in prosecuting this case and in moving it forward.

20   Nothing could be further from the truth, and that's why we are

21   going to go to the grand jury and ask for an indictment in the

22   near future because we didn't expect the Court to misapprehend

23   our intentions in that regard.

24             As to the prejudice to the United States, the United

25   States is suffering prejudice by Mr. Darin's continued absence

F6NPDARC

1   from the jurisdiction.  Witnesses' memories fade as time goes

2   on.  These events were remote, are remote now and will only

3   grow more remote with time, and so the United States is

4   sustaining prejudice.  So I think those two equitable factors

5   weigh in favor of the Court declining to hear Mr. Darin's

6   motion under the fugitive disentitlement doctrine.

7           Unless the Court has any more questions --

8           THE COURT:  Go ahead.  No.  I think what Magistrate

9   Judge Francis was thinking of, you know, why should he bother

10  getting into the fugitive disentitlement doctrine because you

11  intend to uphold the validity of the complaint and to allow the

12  charges in the arrest warrant issued to remain standing; so why

13  should he bother.  So I think that's the next big thing.  Is

14  the complaint valid under the Fifth Amendment, and is the

15  arrest warrant issued pursuant to these charges; is that valid

16  as well?

17          MR. HALL:  Absolutely, your Honor.

18          THE COURT:  So as Mr. Baird points out, the

19  allegations with regard to Mr. Darin seem thin.

20          MR. HALL:  We would disagree with that

21  characterization, of course, your Honor.  We think that the

22  complaint is absolutely valid under both the presumption

23  against extraterritoriality, that's more of a statutory

24  argument, but more significantly, I think --

25          THE COURT:  Do we have to even worry about

F6NPDARC

1   extraterritoriality in light of the allegations that the fraud

2   was committed using the wires in the United States?

3          MR. HALL:  No, and I notice the defense didn't even

4   address that in their reply brief.

5          THE COURT:  Well, maybe Mr. Baird didn't have enough

6   time.

7          MR. HALL:  Well, that's possible, or enough pages.

8   But I think the Court is absolutely correct as to

9   extraterritoriality.  This case, as alleged, is a domestic

10  application of the wire fraud statute, and under firm Second

11  Circuit precedent in Kim, Trapilo, Gilboe, this is a domestic

12  application of the wire fraud statute.

13          We don't even have to discuss extraterritoriality.  We

14  don't have to discuss Morrison, we don't have to discuss RJR

15  Nabisco because, as alleged, it's a domestic application of

16  that statute.  Full stop.  End of story.

17          But Mr. Baird spent more time on the nexus issue, and

18  then the corresponding Fifth Amendment issue of notice.  And on

19  the nexus point, I think it's important to recognize from the

20  outset that this is an extraordinarily high burden for a

21  defendant.

22          In fact, there are only two cases, of which the United

23  States is aware, where a court has found that the United States

24  failed to demonstrate nexus.  One of those was United States v.

25  Perlaza in the Ninth Circuit.  That was on appeal, and that was

F6NPDARC

1    a strange procedural posture because the United States, at the

2    trial court, was not even allowed to present evidence of nexus

3    as the one subset of defendants.

4           And so when the Ninth Circuit said you need to present

5    some evidence of nexus here, it wasn't because of some sort of

6    failure below, it was because the United States had not even

7    been allowed to present that evidence.

8           The other case on this, where a court has found a lack

9    of demonstrated nexus, is the United States v. Sidorenko case,

10   the very recent case by Judge Breyer in the Northern District

11   of California.  As far as the United States is aware, that's

12   the only case where a judge has granted a motion to dismiss on

13   nexus grounds pretrial.

14          And the Sidorenko case is easily distinguishable from

15   the case at bar here.  No interest rates published in the

16   United States in Sidorenko.  No wires into the United States in

17   Sidorenko.  No victims in the United States in Sidorenko.  It's

18   an entirely different case.  It's not a domestic application of

19   a wire fraud statute, for one thing, and it just does not have

20   nearly the same facts that we're looking at here.

21          Two kind of other initial matters as to the nexus

22   requirement.  Nexus is not a pleading requirement.  There's no

23   case that says that.  There's no case cited by the defense that

24   supports that, and Judge Breyer in Sidorenko seems to assume

25   it, but does not explain where that law comes from, whether

F6NPDARC

1    it's a pleading requirement or not.  Sidorenko is only an

2    outlier in that regard.

3           There are no other cases that even suggest that nexus

4    is a pleading requirement.  And the touchstone of nexus is, is

5    the prosecution here arbitrary or fundamentally unfair?  I

6    think the Court is right on when analogizing this case to a

7    Colombian drug distribution conspiracy.  If someone is in

8    Colombia and doesn't, himself -- his actions don't touch the

9    United States directly, but he is aware that his

10   co-conspirators will be importing cocaine into the United

11   States, it is not arbitrary or fundamentally unfair for that

12   person to be prosecuted.

13           THE COURT:  Are you suggesting that nexus is an

14   adequate requirement?

15           MR. HALL:  No.  Oh, absolutely not, your Honor.  Nexus

16   is a requirement.  I will point out, however, that it is highly

17   unusual and, in fact, I'm aware of no reported case, where a

18   domestic application of a statute, like the wire fraud statute

19   here, in a case like that where a court has done this nexus

20   importing.  That's why most of the nexus cases have to do with

21   stateless vessels in the high seas or terrorism cases, for

22   instance, where the conduct is all abroad.

23           There is, I think, an open question of whether you

24   even need to do the nexus analysis here because of the domestic

25   nature of the crimes alleged.  However --

F6NPDARC

1          THE COURT:  If I were to insist, though, on finding a

2     nexus requirement, where would it be satisfied within the

3     complaint as it exists now?

4          MR. HALL:  I think in a variety of ways.  I think the

5     touchstone of this analysis is Al Kassar, which I think is

6     properly identified by both parties, where it says that an

7     aimed harmed U.S. interest was sufficient for this nexus.  Then

8     there are other case that suggest -- for instance, Judge

9     Forrest recently in the Mostafa case said that whether those

10    acts could be expected to or did produce an effect.  Judge

11    Keenan made a similar observation in the 2010 Yousef case, did

12    they produce an effect in the United States.

13          There's no question, based on the allegations in the

14    complaint, that Mr. Darin's conduct, along with the conduct of

15    his co-conspirators, produced effects in the United States.

16    The publication of the manipulated interest rate data, that

17    affected the millions of transactions here in the United States

18    that are tied to these benchmark interest rates.

19          The manipulation of that interest rate data affected

20    counterparties, UBS's counterparties here in the United States

21    as alleged in the complaint.  These are U.S. companies doing

22    business, doing trades with UBS, who are being cheated out of

23    their trades, out of money on their trades because UBS and

24    Mr. Hayes and Mr. Darin are manipulating interest rates to

25    which those trades are tied.

F6NPDARC

1          His conduct absolutely could be expected to and did

2     produce an effect in the United States.  He was aware that his

3     conduct would have such an effect as an experienced UBS trader,

4     working hand in hand with Mr. Hayes, who was a global trader.

5     Certainly no question in his mind that manipulating this

6     interest rate would have effect on counterparties around the

7     world, including in the United States, and most especially in

8     New York City, the financial capital of the globe.  It couldn't

9     have been a surprise to him.

10          THE COURT:  Does the complaint allege that?

11          MR. HALL:  The complaint alleges that he was an

12     experienced yen LIBOR trader.  He was a yen LIBOR trader.  It

13     alleges that he, himself, was trading.  It alleges that he was

14     helping Mr. Hayes in a conspiracy.  If you look at paragraph

15     19, it alleges that he was participating in a conspiracy to

16     manipulate yen LIBOR in a direction favorable to Hayes'

17     positions, that Mr. Hayes was aiming to defraud UBS's

18     counterparties and globally impact transactions in financial

19     products tied to yen LIBOR.  I'm looking at paragraph 20 now,

20     your Honor, on Page 7.  The counterparties entering into these

21     derivative trades with Hayes did not know about the

22     manipulation, were deceived.

23          THE COURT:  What about the argument that Hayes doesn't

24     count here, you have to look at the allegations with regard to

25     Mr. Darin?  Hayes may very well be a wrongdoer and may be

F6NPDARC

1    subject to jurisdiction, but that doesn't have anything to do

2    with Mr. Darin, according to the argument.

3             MR. HALL:  I understand, your Honor.  I think

4    Magistrate Judge Francis hit the nail on the head here because

5    the case on which Mr. Darin is most closely, most heavily

6    relying on is the United States v. Perlaza case.  And

7    Magistrate Judge Francis devotes a lot of time to this in his

8    opinion, pages 27 through 29 in his opinion, and I think very

9    carefully parses the facts and the ruling there.

10            And where the Ninth Circuit did say that nexus

11   determinations need to be made for each defendant, in the

12   context of that opinion, that is not a huge surprise because,

13   as I explained earlier, what would happen at the District Court

14   level is the court had said -- again, there are two sets of

15   defendants in Perlaza, the fast-boat defendants and the

16   defendants on a boat called the Gran Tauro.

17            THE COURT:  It's the mother ship.

18            MR. HALL:  Exactly, your Honor.  And what the court

19   had said, the District Court had said, is that it's the

20   fast-boat defendants were on a stateless vessel, no nexus

21   requirement exists.  And he then imputed that to the Gran Tauro

22   defendants and said the United States did not need to prove

23   nexus as to those defendants.

24            On appeal, the Ninth Circuit found two problems with

25   that.  It said, as to the fast-boat defendant, the court needed

F6NPDARC

1    to let the jury answer that question, and as to the Gran Tauro

2    defendants, because the jury needed to make the decision on the

3    stateless vessel, over here, the United States had failed to

4    prove nexus as to the Gran Tauro defendants.  And so it

5    reversed and remanded and said this needs to be proven down

6    below.

7            Now, what that opinion didn't say, it does not say, is

8    that in considering the nexus analysis, the court can't look to

9    the scope and aims of the conspiracy.  And as the Court well

10   knows, a position like that, in the Ninth Circuit or elsewhere,

11   would be at odds with decades of established conspiracy law

12   that the actions of one co-conspirator can generally be imputed

13   to others.

14           There's so many stages of the criminal process,

15   ranging from the very beginning of the case, all the way

16   through sentencing, where co-conspirators are on the hook for

17   their co-conspirator's actions.  It would make no sense that,

18   in considering nexus, the court could not consider the aims,

19   the scopes, the plan, the actions of the conspiracy as a whole.

20   That's not what Perlaza stands for.

21           And Mr. Darin is attempting to twist, I think, the

22   court's words in Perlaza to his own end, and Magistrate Judge

23   Francis I think properly recognized that in finding that he

24   could consider the co-conspirator's actions, Mr. Hayes'

25   actions, in considering whether Mr. Darin's conduct as part of

F6NPDARC

1    a conspiracy had a nexus to the United States.

2              THE COURT:  Take three or four minutes and sum up the

3    other areas.

4              MR. HALL:  Sure, your Honor.  One point that I did

5    want to hit before I sat down today was the point of minimum

6    contacts, and Mr. Baird mentioned that briefly about civil

7    cases and --

8              THE COURT:  Your point is simply that's not the

9    standard?

10             MR. HALL:  That's correct, your Honor.  That's what

11   Magistrate Judge Francis found.  You know, in the reply brief

12   the defense accuses the United States of being disingenuous on

13   this point.  If we are being disingenuous, Magistrate Judge

14   Francis may be being disingenuous as well because what he had

15   to say was --

16             THE COURT:  You better not say that.

17             MR. HALL:  Yes, I would not say that either.  The law

18   of personal jurisdiction is not relevant.  He said that the use

19   here would be inappropriate, and that's the United States'

20   position too.  As the Court well knows, with a full criminal

21   and civil law docket, criminal law is not the same as civil

22   law.

23             Civil personal jurisdiction law is not some sort of

24   lower bar that is then raised and ratcheted up when a criminal

25   defendant enters the courtroom.  They are different standards.

F6NPDARC

1    It's not the higher standard using the same scale.  There are

2    different plaintiffs, there are different processes, different

3    purposes, different procedures.

4         It's just different when a sovereign is protecting its

5    citizens from fraud, as opposed to when a court is trying to

6    decide whether one plaintiff can hale a foreign defendant into

7    that particular court.

8         Indeed, I think it's safe to say that adopting Judge

9    Friendly's formulation in Leasco, this worldwide reliance

10   formulation, would result in the perverse outcome that

11   Magistrate Judge Francis identified, which is the broader a

12   criminal scheme, the more global a criminal scheme, the less

13   the United States could do to prosecute it.  That's not good

14   law and that's not good policy, and that shouldn't be the

15   result here.

16        Very briefly on nexus -- I'm sorry, on notice, the

17   standard is easily met here.  That's what Judge Francis said.

18   I don't think with need to spend a lot of time discussing

19   notice because I think it's a fairly clear issue.

20        This was a creative way to steal money from victims.

21   Manipulating LIBOR, yen LIBOR in this way was a clever way to

22   steal money from these counter-party victims, but it wasn't one

23   that implicates  Fifth Amendment notice principles because

24   Mr. Darin was on notice that this conduct could be considered

25   criminal somewhere, and that's all the Fifth Amendment requires

F6NPDARC

1   in the notice context.

2            THE COURT:  Thank you very much.

3            MR. HALL:  Thank you, your Honor.

4            THE COURT:  Mr. Baird?

5            MR. BAIRD:  Your Honor, let me try to do several

6   things very quickly.  I know your Honor's time is short.  On

7   fugitive disentitlement, I would say two things.  The

8   government identified a case that they did not cite in their

9   brief called Buck, and if your Honor is interested in that --

10           THE COURT:  Buck is cited.

11           MR. BAIRD:  That's what -- yes, that's the name that

12   they used.  If your Honor would like something additional on

13   that, we'd be glad to provide --

14           THE COURT:  No, I think that, if I can find the cite,

15   it is cited in the brief.

16           MR. HALL:  Your Honor, if I may, I believe it's cited

17   in Judge Francis' opinion, but I don't believe it's cited in

18   the United States' brief.

19           THE COURT:  That's right.

20           MR. BAIRD:  In Buck, I believe the facts were and the

21   government I think just identified --

22           THE COURT:  Excuse me, Mr. Baird.  Buck is cited in

23   Magistrate Judge Francis' opinion at Page 10, where he says:

24   Failure to surrender to authorities, once he learns that

25   charges against him are pending.  At least that's his approved

F6NPDARC

1    definition of a fugitive.

2           MR. BAIRD:  Thank you, your Honor.  In any event, the

3    government stated when they were up here that, in that case,

4    the defendant had been in the United States during the

5    conspiracy.

6           THE COURT:  Yes, they did.

7           MR. BAIRD:  That's the point, and that's the same fact

8    pattern in every other case that they cited to.  If your Honor

9    looks at those cases, you will find that to be the fact

10   pattern.  What Judge Chin said the rule was -- I don't take

11   these words to be just in this case -- he says, one cannot be a

12   fugitive in these circumstances unless, one, he was present in

13   the jurisdiction at the time of the crime; two, he learns,

14   while he was outside, that he was wanted; and three, he then

15   fails to return.

16          THE COURT:  That's certainly Marc Rich.

17          MR. BAIRD:  That seems like a category, yes.

18          THE COURT:  He didn't have to define anybody else

19   other than Marc Rich, who was the party before him.

20          MR. BAIRD:  I understand, your Honor.  And, of course,

21   the judges are not required to say anything broader than the

22   case before them, but Judge Chin, here, does say something that

23   appears to be broader than the case before him, and it's

24   something that is consistent with all other cases that we're

25   aware of.  So let me just make that one point about the test.

F6NPDARC

1          THE COURT:  Yes, sir.

2          MR. BAIRD:  Then on discretionary choice that the

3    judge made, I'd say this, in addition.  There are discretionary

4    factors to show how deserving Roger Darin is of the decision.

5    One discretionary factor is the doctrine is penalty for

6    flouting judicial process.  I submit that Mr. Darin has not

7    flouted anything.  He stayed where he lived.  He's not done

8    anything.

9          It's to discourage flights from justice.  Mr. Darin

10   has not fled anywhere.  It's to avoid prejudice caused by

11   defendants' escape.  He's not escaped from anywhere.  Those are

12   the reasons for the doctrine, and I submit, Your Honor, that

13   Roger Darin is deserving on the merits of a decision here and

14   not of being left without a decision.

15         Let me talk briefly --

16         THE COURT:  What do you mean left without a decision?

17   He's going to get a decision one way or the other.  Magistrate

18   Judge Francis did decide.  He decided against him.

19         MR. BAIRD:  Yes, your Honor.

20         THE COURT:  And you're objecting to that, and I'm

21   considering those objections.

22         MR. BAIRD:  Yes, sir.

23         THE COURT:  But there will be a decision on this

24   matter, one way or the other.

25         MR. BAIRD:  What I mean is, your Honor, if your Honor

F6NPDARC

1    decides that, at the end of the day, Mr. Darin is not entitled

2    to have his case decided because of the fugitive disentitlement

3    doctrine, that would be a decision not to rule on the merits,

4    but let me put that to one side.

5         I have two points on this, your Honor.  First is this

6    worldwide reliance.  The government has no cases, there are no

7    cases saying that if someone does not aim at the United States,

8    but only at the world, that that's good enough for the nexus.

9    There's no case like that.  There's no case that says that.

10        There are cases, mostly civil cases, but they're cases

11   that say it's not good enough.  There are no criminal cases

12   that say it is good enough.  There are lots of civil cases that

13   say it's not good enough, and there's at least one criminal

14   case, Perlaza, with the big boat and the small boat, as your

15   Honor pointed out.  And the small boat -- the big boat was said

16   to be an aider and abettor of the small boat, and the judge

17   decided, no, you had to look at independently the nexus of the

18   big boat.  You can't just take the fact that they were aiding

19   and abetting the smaller boat and that would be good enough.

20        There's a particularity to the inquiry.  There needs

21   to be an examination of this defendant, what's been alleged

22   against him, and there needs to be an aim at the United States.

23   Those are the two points.  And there's no case, the government

24   has no case to say that worldwide reliance is enough, that you

25   don't have to aim at the United States.  Instead, all of the

F6NPDARC

1    cases talk about aiming at the United States, civil and

2    criminal cases, including civil cases that are directly on

3    point.

4              There's no good reason not to use those civil cases

5    because they're answering the same question.  They're using the

6    same analysis.  There are criminal cases that talk about the

7    analysis of these civil cases and talk about how it's relevant,

8    how they are answering the same questions.  It's not different.

9              The government starts to talk about protecting its

10   citizens from fraud.  I submit, your Honor, that's avoiding the

11   issue.  This is a person, this is an individual who's overseas,

12   who's done nothing here, who's alleged to have done very little

13   and nothing in the United States.  The government is here

14   saying to your Honor, well, worldwide is enough.  We admit

15   there's a nexus that's required because they can't deny that,

16   but somehow, anything will satisfy it, the world.

17             He can be overseas and have had nothing to do with the

18   United States and have activities that affect the whole world

19   similarly.  That's a recipe for prosecuting everybody

20   everywhere in the world if they're involved in something on the

21   Internet, for example, that affects the United States, as well

22   as other countries.  There's no limit to that, and the United

23   States suggests no limit.

24             I submit, your Honor, that a nexus is required, and

25   with all the cases, no matter what differences they may have,

F6NPDARC

```
 1    what all the cases end up saying is that an aim at the United
 2    States, as opposed to somewhere else or the whole world, is
 3    what's required.  And to decide that, this is my point too, it
 4    needs to be the facts relating to this defendant.
 5              THE COURT:  But there's a worldwide market for yen,
 6    isn't there?
 7              MR. BAIRD:  Well, your Honor, I think there is --
 8              THE COURT:  Then if it's a worldwide market, why,
 9    because the government doesn't say it had a particular impact
10    in the United States, is there a failure of jurisdiction?
11              These fellows are trading round the clock in a
12    currency that goes around the world and, you know, so surely
13    some of it must stop off here in the United States.
14              MR. BAIRD:  Your Honor, first of all --
15              THE COURT:  And it fails because they didn't say it
16    stopped off in the United States?
17              MR. BAIRD:  No, your Honor.  Mr. Darin is not alleged
18    to have traded anything.  He's alleged to have given an
19    opinion.  His part in this crime is giving an opinion, is
20    altering an opinion that he gives to the British Bankers
21    Association.  His trading -- he is a trader, but his trading
22    has nothing to do with the charges.  This is about Thomas
23    Hayes' trading.
24              Roger Darin's trading doesn't have anything to do with
25    it.  Judge Friendly, in the Leasco case, and the government
```

F6NPDARC

1     said and Judge Francis said these cases are irrelevant.  I

2     submit, your Honor, they're anything but irrelevant.  This is

3     the same analysis, whether it's a criminal case or a civil

4     case.  You sit down and think to yourself, when is it fair to

5     hale someone from overseas into a court in the United States,

6     you're answering the same question.

7           The government doesn't get a lower bar because it's a

8     criminal case.  I think that's outrageous.  If anything, it's a

9     higher bar, but it's certainly not anything like the reverse.

10    Indeed, if the civil case -- if the civil standard can't be

11    met, what does that say about what the government is proving?

12    And there are lots of civil cases.  There are not just a

13    couple, there are lots of them, and Judge Friendly's opinion

14    in --

15          THE COURT:  Usually in these cases, Mr. Baird, there's

16    a hearing of some kind where the parties come in and submit --

17          MR. BAIRD:  Some there are and some there aren't, your

18    Honor.  In 7 West 57th, and Laydon v. Mizuho, very recent

19    cases, involving LIBOR, involving this exact situation, one

20    involving yen, the other involving dollar LIBOR, Judge Gardephe

21    and Judge Daniels dismissed complaints on this very ground

22    because, No. 1, there was no effect on the United States other

23    than this worldwide financial market, and No. 2, the facts

24    alleged as to co-conspirators could not be used against the

25    foreign bank who was making the argument.

F6NPDARC

1           In other words, you couldn't say because there were 16

2    banks involved in LIBOR, some of them did have effects in the

3    United States.  You could use that to charge those banks, to

4    get jurisdiction over those banks but you couldn't use it

5    against banks who had no contacts with the United States.

6    Those two opinions are on all fours.

7           The only way to avoid this -- This is what the

8    government is trying desperately to do here, your Honor.

9    They're trying to -- the combination is, this is a big fraud;

10   so, my gosh, you can't worry too much about jurisdiction.  So

11   let's not worry about the civil cases, which are dispositive,

12   if your Honor considers them.  And your Honor must consider

13   them or should consider them because they are using the same

14   analysis.  And, again, I point -- actually, Judge Trager, I

15   don't know if you knew Judge Trager.

16           THE COURT:  I did.

17           MR. BAIRD:  He was a careful --

18           THE COURT:  Careful and thorough scholar.

19           MR. BAIRD:  Yes, your Honor.

20           THE COURT:  First-rate lawyer.

21           MR. BAIRD:  I agree, your Honor.  I served with him on

22   the State Bar Ethics Committee years and years ago, and I found

23   that to be the case myself.

24           THE COURT:  He's responsible for many well-qualified

25   judges.  He was the chairman of Ed Koch's independent screening

F6NPDARC

1    committee for the judiciary; so I know him well.

2            MR. BAIRD:  I commend to you his decision in Goldberg

3    against UBS.  He considers some of these questions.  He

4    considers, in particular, the degree in which the civil

5    standard and the criminal standard are really the same

6    standard.  They're talking -- they're asking the same question,

7    and they're answering in the same way, and talks about the need

8    for aiming at the United States.

9            These are really not separate streams of authority.

10   It's not a situation in which you can toss the civil cases, and

11   it's not as if the criminal cases are diametrically opposed

12   either.  What the government does is first it gets rid of the

13   civil cases.  It doesn't consider them.  And as to the criminal

14   cases, it analogizes from some cases that really aren't talking

15   about this issue.

16           They talk, and I think the government here today

17   talked about this today again, of domestic versus

18   international.  The cases they cite in their brief and the

19   cases Judge Francis cited in his opinion, are not nexus cases.

20   He cited for the proposition that you can look at the actions

21   of a co-conspirator, he cited a case like Manuel.  It's a case

22   of Judge Lynch, a fine judge, but Judge Lynch was not talking

23   about personal jurisdiction or nexus.  His opinion had nothing

24   to do with that.  He was talking about the statutory, the

25   extraterritorial application of the statute.  So it was a

F6NPDARC

1   different question.  And for that purpose, as we concede and

2   agree, you can look at the actions of co-conspirators.

3           And the other case he cites is Mostafa, which is a

4   case, like Klimavicius, in which there's no separate

5   consideration of the different co-conspirators, but that's

6   because they're all on the same boat.  In Klimavicius, for

7   example, they're all literally on the same boat.  They're on

8   the same ship, and so the factors that are relevant to

9   jurisdiction are the same for everybody on that ship.

10          There aren't -- so short way of saying that, there

11  aren't cases that say you can use the facts that are alleged

12  against others to find jurisdiction against the person in front

13  of you.  And the Supreme Court spoke on this in a civil case

14  last year, Walden against Fiore.  They italicized the

15  "himself."  You must use the acts relating to this individual

16  himself.

17          THE COURT:  What's the name of the case?

18          MR. BAIRD:  Walden against Fiore.

19          THE COURT:  Okay, yes.

20          MR. BAIRD:  So, your Honor, I submit, if you look at

21  these and get past the government's broad brush, look at the

22  safety of the United States, worldwide fraud and you focus on

23  an individual, there's an individual out there who doesn't have

24  anything to do with the United States, and I'm not asking your

25  Honor here to consider the notice requirement that's on our

F6NPDARC

1    briefs, the extraterritorial application of the statute that's

2    in our briefs, but there's only one point that I'm making here

3    today and that is this nexus requirement.

4           There is no nexus here.  There's nothing but

5    worldwide, an effort to say it's the whole world, there's no

6    difference.  It can be Africa, it can be Siberia, it can be

7    United States.  They all have LIBOR.  They can all trade LIBOR,

8    and so you can prosecute them in the United States.  That's

9    just -- that's not right, and as soon as China starts doing it,

10   maybe we'll change our mind about how broad these efforts

11   should be.  I submit the government is overreaching to try to

12   even bring this case against Roger Darin.

13          THE COURT:  Okay.

14          MR. BAIRD:  If they've got something more, they can

15   put it in the indictment.  I'd love to see it, your Honor.  I

16   don't think they can, but in the meantime, I'd request your

17   Honor prayerfully to consider this on the cases that exist on

18   this.

19          THE COURT:  I'll do that.  I'll read all your briefs

20   very carefully.  I'll have a decision for you shortly.  Thank

21   you very much.

22          (Adjourned)

23

24

25